EXHIBIT 2

1  Joel W. Baruch SBN 85903
   Corey A. Hall SBN 295470
2  LAW OFFICES OF JOEL W. BARUCH, PC
   2601 Main Street, Suite 980
3  Irvine, California 92614
   Telephone: (949) 864-9662
4  Facsimile: (949) 851-3185

5  Attorneys for Plaintiff CARL BARNEY,
   as Trustee of the CARL BARNEY LIVING TRUST
6

7

8

9            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10       **FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER**

11

12

13  CARL BARNEY, as Trustee of the          CASE NO.:
    CARL BARNEY LIVING TRUST,
14                                          *Assigned for all purposes to:*
              Plaintiff,
15
16  v.                                      Action Filed:
                                            Trial Date:
17  LUKAS PIETER and DOES 1 through
18  20, inclusive,                          **COMPLAINT FOR DAMAGES AND**
                                            **RESTITUTION AND DEMAND FOR**
19            Defendants.                   **JURY TRIAL**

20                                          1)  **Fraud- Intentional Misrepresentation**
21                                          2)  **Fraud- Concealment**
                                            3)  **Fraud- Failure to Disclose Known**
22                                              **Facts**
                                            4)  **Unfair Business Practices- Business**
23                                              **and Professions Code §§17200, et.**
                                                **seq.**
24
                                            5)  **Negligent Misrepresentation**
25                                          6)  **Breach of Fiduciary Duty**
26                                          7)  **Innocent Misrepresentation**

27

28
   _____

   **COMPLAINT FOR DAMAGES AND RESTITUTION AND DEMAND FOR JURY TRIAL**
   1

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
07/18/2018 at 04:53:33 PM
Clerk of the Superior Court
By Angelina Nguyen-Do, Deputy Clerk

30-2018-01006531-CU-FR-CJC

Judge David Chaffee

COMES NOW, Plaintiff CARL BARNEY, as Trustee of the CARL BARNEY LIVING TRUST, who makes this Complaint for Damages and Restitution and Demand for Jury Trial against Defendant LUKAS PIETER and DOES 1 through 20 as follows:

### **GENERAL ALLEGATIONS**

1.    Plaintiff CARL BARNEY, as Trustee of the CARL BARNEY LIVING TRUST is, and at all times herein mentioned was, a living trust vehicle for Carl Barney.

2.    Defendant LUKAS PIETER ("PIETER") is, and at all times herein mentioned was, a resident of the State of California in the County of Orange.

3.    Plaintiff is not aware of the true names and/or capacities and/or liability of those parties named herein as DOES 1-20, and therefore sues these potential defendants or by their fictitious names.  Plaintiff will seek leave of Court to amend this Complaint when the same is ascertained.

4.    Unless otherwise specified herein, those fictitious potential defendants or defendants named herein as DOES 1 through 50 were in some manner controlled, or in association with, by Defendant PIETER and, together, conspired and planned to defraud Plaintiff.

5.    Although not a party to this Complaint, LePort Educational Institute, Inc. ("LEI") is an owner and operator of 22 private Montesssori schools located in San Francisco, Los Angeles, Orange County, San Diego, Brooklyn, and Northern Virginia.  These schools provide an excellent private school education for day care, preschool, elementary, and middle school students.   LEI was founded on or about February 9, 2000 as a California corporation with its headquarters in Irvine, California. LEI is the defendant and cross-complainant in the related case of *Lukas Pieter v. LEI, et al.,* Orange County Superior Court Case Number 30-2017-00915762, in which LEI alleges against Defendant PIETER herein related claims which involve similar and, in some cases, identical facts but with different but related measures nd items of harm to Plaintiff herein versus LEI in the related case.

---

**COMPLAINT FOR DAMAGES AND RESTITUTION AND DEMAND FOR JURY TRIAL**
2

6.      In or about April, 2014, Plaintiff, who had been affiliated with private school education for many years, invested in LEI through the purchase of 1,838,980 common stock for $3.5 million, or $1.90 per share.  The share price was represented as $1.90 per share was represented as the current fair market value of LEI common stock by DOES 1 through 20. Plaintiff was told that his buyout of LEI shares was necessary so that LEI could hand out staff bonuses.  By 2016, the LEI share price dropped from $1.90 per share to $0.10 per share.

7.      In 2016, LEI was financially distressed and was considering bankruptcy as an option.  The company was in financial turmoil and was being mismanaged.  LEI's then CEO had been terminated in or about February, 2016, and took with him numerous key company executives and management personnel, and other employees, which caused serious financial harm to LEI.   This former CEO was temporarily replaced by Jim Treleaven.

8.      On April 17, 2015, LEI filed a Certificate of Dissolution with the California Secretary of State.  It was not until September 29, 2016 that LEI was reinstated as an active California corporation.

9.      During the aforesaid corporate dissolution period, or on or about August 19, 2015, LEI consummated a financing transaction with Leeds Equity Partners V, LP ("Leeds").  Leeds loaned $5 million into a struggling LEI.  Leeds' loan was due to mature on August 19, 2016.  This Leeds loan documentation contained several provisions that could trigger a default, The Leeds loan documents provided for interest at the rate of 13% per annum, but following the occurrence of a default, the interest rate would increase to 20% per annum.

10.      Within one to two months of the closing of the LEI and Leeds financing transaction, Defendant PIETER was offered and then agreed to accept employment as LEI's Chief Financial Officer ("CFO").  On or about October 5, 2015, PIETER signed an "at will" employent contract with LEI in which he agreed to accept the CFO position at a $200,000 annual salary, a grant of shares of LEI common stock with a value of $250,000, and the added benefit that he could receive a tuition discount at the Irvine schools for his two children.  There were no bonus or severance package provisions in the employment contract.

---

**COMPLAINT FOR DAMAGES AND RESTITUTION AND DEMAND FOR JURY TRIAL**

11.     Defendant PIETER was fully aware of LEI's precarious financial position and its dissolved status when he accepted employment as LEI's CFO on the above terms and conditions.  He also knew that LEI owed substantial monies to Leeds for its $5 million loan at a very high interest rate.  As CFO, he was seeking additional investment/ loans to provide funds to LEI so that it could continue its operations. Together with DOES 1 through 20, PIETER, by making intentionally false representations, and/or by concealing known facts, and/or by failing to disclose all known essential facts, persuaded Plaintiff to loan LEI $500,000 at a very favorable annual interest rate of 6.5% in 2015 at the very favorable interest rate of 6.5%, one-half of the interest rate of the Leeds loan. An important consideration for this $500,000 loan to LEI by Plaintiff was that LEI could not increase the compensation of any new senior executives, including, but not limited to Defendant PIETER, without the prior approval of Plaintiff pursuant to the loan terms.

12.     Even with the Leeds August 15, 2015 loan of $5 million, and Plaintiff's 2015 loan of $500,000, LEI continued to experience financial distress.  In fact, on or about April 25, 2016, LEI retained outside counsel to discuss bankruptcy options.

13.     On or about June 2, 2016, Jim Treleaven, who had been retained as LEI's interim CEO in, 2015, was terminated from this position. During Mr. Treleaven's short stint as CEO, Defendant PIETER had been performing CEO duties on a de facto basis. PIETER continued to perform de facto the CEO duties as well as his CFO responsibilities after Mr. Treleaven was terminated.

14.     On or about June 2, 2016, PIETER approached the LEI founder and Board Chairman regarding a "new" employment agreement and bonus compensation.   This overture was at a time when PIETER knew that LEI was insolvent and not able to fulfill its obligations to employees and creditors, and any new compensation for senior executives would violate the terms of both the Leeds' and Plaintiff's loans.  In making this demand for a new employment agreement, PIETER misrepresented that he had earned over $500,000 in his prior employment and, further, that he had foregone a $200,000 bonus when he came to

work as an "at will" CFO employee for LEI. In fact, PIETER had only earned an annual salary of $185,000 and a much lesser bonus of $37,000 at his prior employment.

15.    On or about June 6, 2016, PIETER's demand for a new employment agreement with the $200,000 bonus demanded by PIETER was "approved". Based on that so-called "approval," PIETER retained outside counsel for LEI at LEI's expense without LEI's approval and against its interests. PIETER then instructed an attorney from that firm to prepare the paperwork for his new employment and retention agreement and LEI paid for that work to be done unbeknownst to LEI.

16.    On or about June 23, 2016, PEITER submitted the employment/retention agreement for approval to the LEI Board. This "new" employment/ retention agreement, among other things, provided that upon completions of a "qualified financing" or the sale of LEI, PIETER's salary would be increased to $250,000 per annum, he would be paid a $200,000 bonus, and he would receive tuition benefits for any of his children at any one of the LEI schools. This agreement also changed his "at will" employment status to one of "termination for cause" only, and it further provided for severance pay and benefits if the employment agreement was breached by LEI. A condition of LEI entering into the agreement was that another employee's compensation package was also increased by 100% as a means of securing approval by related family members and interested Board members in or about the Spring of 2016.

17.    Defendant PIETER knew that his "new" employment/retention agreement breached LEI's loan agreements with both Leeds and Plaintiff, and PIETER intentionally concealed this agreement and its terms from each of Leeds and Plaintiff. He also concealed the increase in the other employee's compensation package from both. In fact, PIETER instructed Mr. Treleaven to sign the agreement on behalf of LEI even though Treleaven's employment as CEO had been terminated.

\ \ \

\ \ \

\ \ \

**COMPLAINT FOR DAMAGES AND RESTITUTION AND DEMAND FOR JURY TRIAL**
5

18.    On or about July 16, 2016, Plaintiff first learned about PIETER's "new" employment/ retention agreement and the manner in which it was approved by interested LEI directors.  Plaintiff was shocked and appalled, not only because the new agreement breached its loan with LEI, but also because PIETER had breached his fiduciary duty to LEI by his self-dealing at a time when LEI was essentially insolvent and unable to satisfy its obligations to employees and creditors.  Plaintiff immediately asked that PIETER voluntarily void the "new" agreement.  PIETER refused, claiming he needed the money because he had just bought a new home in March, 2016.

19.    On or about July 22, 2016, Defendant PIETER then orchestrated another loan transaction with Leeds for LEI for $2.2 million at the high 13% interest rate and a 20% default interest rate.  When he negotiated that second loan with Leeds, Defendant PIETER was aware that Plaintiff would have extended a loan to LEI on much better and more favorable terms.  Yet, PIETER was acting in a self-dealing manner, and on behalf of LEI, entered into that second loan with Leeds because he also knew that he would be entitled to receive a higher salary and bonus under the terms of his "new" employment/retention agreement as a consequence of the completion of this second loan.

20.    On or about July 29, 2016, Defendant PIETER, purportedly acting on behalf of LEI/ LD negotiated another $500,000 loan from Leeds with a 13% annual interest rate and a 20% default interest rate. Once again, PIETER, acting on behalf of LEI in a self-dealing manner, pursued and negotiated that Leeds loan transaction even though he was well aware that Plaintiff had offered to loan LEI the same amount at a much lower interest rate.

21.    On or about August 8, 2016, PIETER, purportedly acting on behalf of LEI, negotiated another $500,000 loan from Leeds with a 13% annual interest rate and a 20% default interest rate. Once again, PIETER, acting on behalf of LEI in a self-dealing manner, pursued and negotiated that Leeds loan transaction even though he was well aware that Plaintiff had offered to provide that same loan amount at a much lower interest rate.

22.     Defendant PIETER's self-dealing transactions with Leeds directly damaged the value of Plaintiff's investment in LEI, and further breached the terms of Plaintiff's prior loan and placed Plaintiff in a very difficult position.  Plaintiff valued the LEI mission to provide quality education and facilities for students of LEI's Montessori schools.  Plaintiff also knew that if he did not step in and provide additional loan relief to LEI, the organization would not survive.  Additionally, Plaintiff also wanted to protect his prior equity investment and loans to LEI which exceeded $6 million in total.  Therefore, Plaintiff diligently sought information from PIETER and DOES 1 through 20 as to LEI's ability to continue operations as well as both repay both existing indebtedness and incremental indebtedness that Defendant PIETER advised was necessary.

23.     In or about the months of June, July, and through August, 2016, on repeated occasions, the exact dates of which are presently unknown to Plaintiff, Defendant PIETER withheld critical information, and with knowledge that his statements were not true, made a series of false statements of fact to Plaintiff as to LEI's then-insolvent status, including its expected EBITDA (earnings before interest, taxes, depreciation and amortization) in the current fiscal year of more than $5 million— PIETER's intent was to induce Plaintiff to make a huge loan for which he intended to claim a right to a $200,000 bonus under his newly-orchestrated employment/retention agreement to benefit himself personally at the great expense of LEI and Plaintiff. These materially false and fraudulent statements included, but were not limited to:

A)     PIETER falsely represented to Plaintiff that the EBITDA for LEI for the current fiscal year was in the amount of $5 million, and that the organization in the future would have sufficient cash flow from operations to meet its obligations to Plaintiff and its other creditors.  The false statement of LEI's EBITDA was relied upon by Plaintiff and its counsel in ascertaining the enterprise value of LEI and in determining to make a significant additional loan to LEI, which figure was used by Plaintiff and his counsel to determine the value of LEI's assets.

**COMPLAINT FOR DAMAGES AND RESTITUTION AND DEMAND FOR JURY TRIAL**

7

B)    PIETER knowingly provided Plaintiff with false and fraudulent LEI financial statements which grossly inflated LEI's financial position, despite having been represented by PIETER, as CFO, that they were materially accurate, and which Plaintiff and his counsel used to determine the value of LEI and its assets. These false and fraudulent financial statements were relied upon by Plaintiff and its counsel in ascertaining the enterprise value of LEI and in determining to make a significant additional loan to LEI.

C)    PIETER initially made false and fraudulent statements to Plaintiff that the sum of $10 million was necessary to pay off all of the loans from the Leeds notes in full and for LEI to meet its future obligations.  PIETER knew that significantly more than $10 million would be necessary to pay off the Leeds loans in full and satisfy obligations to other creditors in the immediately following months. These false statements were relied upon by Plaintiff and its counsel in ascertaining the enterprise value of LEI and determining to make a significant additional loan to LEI.

D)    PIETER falsely represented that LEI, under his leadership, was currently "strong and successful" when he knew that he had been leading LEI further into insolvency through, among other things, his self-dealing and poor business decisions.

24.    In the months of June, July, and through August, 2016 on numerous occasions, Defendant PIETER also concealed from Plaintiff material matters and facts which include, but are not limited to, the following:

A)    Failures to comply with applicable laws and regulations with the result of material liabilities that were not disclosed to Plaintiff or its counsel;

B)    Misconduct which could result in material liabilities that were not disclosed to Plaintiff or its counsel, affiliates, and related entities that have caused ongoing liabilities to this day, and

C)      Conflicts of interest and diversion of funds intended for use by LEI to entities that were partially owned by LEI that were not disclosed to Plaintiff or its counsel.

25.     Plaintiff also asked Defendant PIETER to meet with persons who had information about the financial situation at LEI before making loans to the corporation. Defendant PIETER falsely represented to Plaintiff that he could not do that because, to do so, would breach the provisions of an exclusivity agreement with Leeds that in fact had expired on the date that Plaintiff made this initial request of PIETER. Defendant PIETER also took steps to prevent Plaintiff from paying off the Leeds loan(s) because PIETER believed that Leeds would pay him a $200,000 bonus and that Plaintiff would not.

26.     Plaintiff relied to his detriment on these false and fraudulent misrepresentations of material fact made by Defendant PIETER as to LEI's then-financial position and ability to be profitable in the future. Plaintiff informed PIETER that he would loan $10 million to LEI so that LEI could pay off its loans to Leeds on August 19, 2016 and avoid having to pay Leeds those loans plus the default interest at the rate of 20% per annum. Upon hearing that Plaintiff would loan $10 million, PIETER then told Plaintiff that $10 million would not be sufficient but that a total of $15 million was necessary to pay Leeds in full and satisfy LEI's obligations to creditors in the coming fiscal year.

27.     At the same time as PIETER was evaluating bankruptcy options for LEI, PIETER, unbeknownst to Plaintiff, solicited a promise from LEI founder and Chairman to have LEI pay his $200,000 "bonus" under the "new" employment/retention agreement and that if LEI would not or could not pay it, he further promised he would personally pay PIETER the bonus.

28.     On or about August 25, 2016, Plaintiff, relying to his detriment on the misrepresentations of Defendant PIETER and DOES 1 through 20, loaned LEI an additional $15 million on top of the $2 million previously at an 8% interest rate, part of which was to be used to pay off in full the Leeds loans with a 13% interest rate that were about to be in default and bear interest at the rate of 20% per annum that had been previously negotiated by

PIETER for his own self-interests.  PIETER, at that point, strong-armed Plaintiff by insisting on the 8% interest rate and, also, by fraudulently representing the value of shares of LEI preferred stock at $.086 per share when in fact these shares were worth much less than this amount.  These false and fraudulent misrepresentations were made in or about mid-August 2016.

29.    Pursuant to his total $17 million loan to LEI, Plaintiff entered into a voting agreement with LEI and its shareholders that entitled him to four of six members of the LEI board of directors.  In early September, 2016, the trustee of Plaintiff assumed on a temporary basis the duties and responsibilities of the CEO of LEI.

30.    When Leeds discovered that Defendant PIETER had obtained a $17 million loan from Plaintiff in breach of its loan documents, Leeds immediately filed two lawsuits against LEI and attempted to foreclose on the collateral for these loans.  PIETER's self-dealing ultimately cost LEI to pay a settlement of $450,000 to Leeds in addition to about $500,000 in attorney fees and costs for defending the lawsuits.

31.    On or about October 5, 2016, Mr. Barney individually, who had been acting as LEI's CEO for about six weeks, took four positions on the LEI's Board of Directors pursuant to the terms of the note on his secured $17 million loan  on or about August 25, 2016.

32.    On or about December 2, 2016, Mr. Barney, as CEO, engaged LEI corporate counsel to draft a termination notice for Defendant PIETER due to his illegal, immoral, unethical and fraudulent conduct.. On or about December 9, 2016, LEI's Board of Directors approved PIETER's termination which became effective on or about December 12, 2016. PIETER was terminated not only because of his self-dealing fraud and breach of fiduciary duties to LEI in relation to his own employment/retention agreement, but also because of other business matters demonstrating his mismanagement in which he was involved.  These other business matters included, but were not limited to, each of the following:

A)   His mismanagement of the Leeds notes which resulted in the two Leeds lawsuits.

B)   His mismanagement of the sale of the Solano Beach school and a subsequent lease at a significantly higher rent.

C)   His mismanagement by failing to obtain consent before making loans to a company known as Cobble Hill, LLC and, further, the absence of any documentation pertaining to these loans.

D)   His mismanagement in the handling of the removal of former LEI CEO Ray Girn and two other executives, leaving LEI without a leader except for himself.

E)   His mismanagement in failing to obtain lien releases from contractors.

F)   His breaches of fiduciary duties and mismanagement as CFO regarding the increase in Monica LePort's compensation as a predicate of his June, 2016 "new" employment/ retention agreement, which agreement violated the Leeds notes and Plaintiff's's notes as well as creating further financial distress for an already floundering organization.

G)   His breaches of fiduciary duties in obtaining the 2016 Leeds loans when these loans were available at a much lower interest rate from Plaintiff .

H)   His breaches of fiduciary duties by fraudulently reporting his time off that was neither approved nor reported in the LEI company records.

I)   His mismanagement with respect to payments of the contractor(s) for LEI's Brooklyn, New York school, which resulted in an overpayment of $400,000 to $800,000.

J)   His mismanagement with respect to ensuring that tax withholding for some immigrant personnel working for LEI was correctly processed.

\ \ \

\ \ \

\ \ \

\ \ \

**COMPLAINT FOR DAMAGES AND RESTITUTION AND DEMAND FOR JURY TRIAL**

**FIRST CAUSE OF ACTION**

**(Fraud—Intentional Misrepresentation of Material Facts Brought By Plaintiff Against Defendant PIETER and DOES 1 Through 20)**

33.    Plaintiff specifically alleges and incorporates herein those matters contained in paragraphs 1 through 32 as though fully set forth in this cause of action.

34.    Defendant PIETER, by intentionally false representations of material  facts persuaded Plaintiff to make significant loans to LEI at a time when the company was financially distressed and essentially bankrupt.  Defendant PIETER's acted intentionally in doing so because he was self-dealing in his own interests as alleged herein.

35.    At all times herein mentioned, Defendant PIETER and DOES 1 through 20, with full intention and knowledge, falsely and fraudulently made the foregoing specific misrepresentations to Plaintiff for the purpose of securing his investment and loan monies for their own personal use and benefit, and to Plaintiff's and LEI's detriment.

36.    Plaintiff reasonably and justifiably relied to his detriment on the false and fraudulent misrepresentations of PIETER and DOES 1 through 20 by providing loans to LEI at a favorable interest rate in the in the principal amount of over $17 million to LEI.  Had Plaintiff known the true facts, which were misrepresented by Defendants PIETER and DOES 1 through 50, he would not have made the loans in the principal amount of over $20 million to LEI, none of which has been repaid to date, and which went into default shortly after they were made when the Compnay failed to have the funds to make the loan payments to Plaintiff causing it damage.

37.    As of the present date, Plaintiff has sustained significant financial losses as a result of his loans; and, further, has no discernible way to achieve the interest rate return on his investment/ loans to LEI.  Plaintiff, therefore, has lost the benefit of the bargain and/or lost profits as a result of the false and fraudulent misrepresentations of Defendants PIETER and DOES 1 through 20 .

38.    Plaintiff is entitled to his reasonable attorney's fees which are authorized by statute or by contract in an amount according to proof at the trial of this action.

39.    The conduct of Defendant PIETER and DOES 1 through 20, in defrauding Plaintiff as aforesaid, was intentional, malicious, oppressive, fraudulent and despicable, and was designed to, and did, cause injury to Plaintiff.  Plaintiff is therefore entitled to an award of punitive damages from said Defendants in an amount according to proof at the trial of this action.

## SECOND CAUSE OF ACTION

### (Fraud—Concealment of Material Facts Brought By Plaintiff Against Defendant LUKAS PIETER and DOES 1 Through 20)

40.    Plaintiff realleges and incorporates herein those matters contained in paragraphs 1 through 32 as though fully set forth herein.

41.    Defendant PIETER, by concealment of known facts, persuaded Plaintiff to make significant and substantial loans to LEI at a time when the company was financially distressed and essentially bankrupt.  Defendant PIETER's acted intentionally in doing so because he was self-dealing in his own interests as alleged hereinabove.

42.    At all times herein mentioned, Defendant PIETER and DOES 1 through 20, with full intention and knowledge, intentionally concealed from Plaintiff BARNEY material matters for the purpose of securing his investment and loan monies for their own personal use and benefit, and to Plaintiff's and LEI's detriment.

43.    Plaintiff reasonably and justifiably relied to his detriment on the concealment by PIETER and DOES 1 through 20 by providing loans to LEI at a favorable interest rate in the in the principal amount of over $20 million to LEI.  Had Plaintiff known the true facts, which were concealed by Defendants PIETER and DOES 1 through 20, he would not have made loans in the principal amount of over $17 million to LEI.

44.     As of the present date, Plaintiff has sustained significant financial losses as a result of his extension of loans; and, further, has no discernible way to achieve the interest rate return on his investment/ loans to LEI.  Plaintiff , therefore, has lost the benefit of the bargain and/or lost profits as a result of the concealment of material facts by Defendants PIETER and DOES 1 through 20.

45.     Plaintiff is entitled to his reasonable attorney's fees which are authorized by statute or by contract in an amount according to proof at the trial of this action.

46.     The conduct of Defendant PIETER and DOES 1 through 20, in defrauding Plaintiff as aforesaid, was intentional, malicious, oppressive, fraudulent and despicable, and was designed to, and did, cause injury to Plaintiff.  Plaintiff  is therefore entitled to an award of punitive damages from said defendants in an amount according to proof at the trial of this action.

## THIRD CAUSE OF ACTION

### (Fraud—Failure to Disclose All Known Material Facts Brought By Plaintiff Against Defendant LUKAS PIETER and DOES 1 Through 20)

47.     Plaintiff realleges and incorporates herein those matters contained in paragraphs 1 through 32 as though fully set forth herein.

48.     Defendant PIETER, by failing to disclose all known essential facts persuaded Plaintiff to make significant and substantial loans to LEI at a time when the company was financially distressed and essentially bankrupt.  Defendant PIETER's acted intentionally in doing so because he was self-dealing in his own interests as alleged hereinabove.

49.     At all times herein mentioned, Defendant PIETER and DOES 1 through 20, with full intention and knowledge, failed to disclose all known material facts as set forth in this Complaint to Plaintiff for the purpose of securing his investment and loan monies for their own personal use and benefit, and to Plaintiff's and LEI's detriment.

50.     Plaintiff reasonably and justifiably relied to his detriment on the failure to disclose all known material facts by PIETER and DOES 1 through 20 providing loans to LEI at a favorable interest rate in the in the principal amount of over $20 million to LEI.  Had Plaintiff known the true facts, he would he have made loans in the principal amount of over $20 million to LEI.

51.     As of the present date, Plaintiff has sustained significant financial losses as a result of his extension of loans; and, further, has no discernible way to achieve the interest rate return on his investment/ loans to LEI.  Plaintiff, therefore, has lost the benefit of the bargain and/or lost profits as a result of the false and fraudulent failure to disclose all known facts of Defendants PIETER and DOES 1 through 20.

52.     Plaintiff is entitled to his reasonable attorney's fees which are authorized by statute or by contract in an amount according to proof at the trial of this action.

53. The conduct of Defendant PIETER and DOES 1 through 20, in defrauding Plaintiff as aforesaid, was intentional, malicious, fraudulent and despicable, and was designed to, and did, cause injury to Plaintiff.  Plaintiff BARNEY is therefore entitled to an award of punitive damages from said defendants in an amount according to proof at the trial of this action.

## FOURTH CAUSE OF ACTION

### (Violations of Business and Professions Code §§17200, Et Seq.---Brought By Plaintiff Against Defendant LUKAS PIETER And DOES 1 Through 20)

54.     Plaintiff realleges and incorporates herein those matters contained in paragraphs 1 through 53 as though fully set forth.

55.     At all times herein mentioned, Business and Professions Code §§17200, et seq. were in full force and effect.  This statutory scheme provides for relief in damages to an aggrieved person who is the victim of unfair competition.  Unfair competition, under this statutory scheme, is defined as including "any unlawful, unfair or fraudulent business act or practice and unfair, untrue or misleading advertising, and any act prohibited by Business and Professions Code §§17500, et seq."

56. By engaging in the aforesaid unlawful, unfair, and/or fraudulent business acts or practices, Defendant PIETER violated the provisions of Business and Professions Code §§17200, et seq. as to his solicitations of investment and/or loan funds from Plaintiff , and, accordingly, Plaintiff is entitled to restitution for all illicit profits and amounts received by PIETER in a sum according to proof at the trial of this action.

57. Plaintiff is entitled to his reasonable attorney's fees and costs in prosecuting this action pursuant to the statutory scheme.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation— Brought By Plaintiff Defendant PIETER And DOES 1 Through 20)

58. Plaintiff realleges and incorporates herein those matters contained in paragraphs 1 through 32 as though fully set forth.

59. This cause of action is pled in the alternative to the fraud counts in this Complaint.

60. At all times herein mentioned, Defendant PIETER and DOES 1 through 20 owed a duty of due care in making material representations to Plaintiff that were true, factual, and accurate in soliciting investment and loans for LEI.

61. At all times herein mentioned, Defendant PIETER and DOES 1 through 20 negligently made representations of past and/or existing material facts, as set forth previously in the allegations of this Complaint, to Plaintiff, without reasonable grounds for believing these to be true and accurate and/or in ignorance of the truth of the same, with the intent to induce Plaintiff's reliance on the same.  The purpose of Defendants PIETER and DOES 1 through 20 in making these representations of material fact was to induce reliance on the part of Plaintiff to make investments in, or to make loans to, LEI in which Defendants PIETER and DOES 1 through 20 would personally benefit.

62. As a direct result of these negligent misrepresentations of material fact, as aforesaid, Defendants PIETER and DOES 1 through 20, Plaintiff reasonably and justifiably

relied to his detriment in making investments in, and making loans to, LEI, all to his compensatory damage in an amount according to proof at the trial of this action.

63.     Plaintiff is entitled to his attorney's fees and costs in an amount according to proof if allowed by contract or law.

**SIXTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty— Brought By Plaintiff Against Defendant  PIETER And DOES 1 Through 20)**

64.     Plaintiff realleges and incorporates herein those matters contained in paragraphs 1 through 32 as tough fully set forth.

65.     At all times herein mentioned, Defendant PIETER as an officer of LEI, owed a fiduciary duty to Plaintiff, a substantial minority shareholder in LEI.  This duty, among other things, required Defendant PIETER to put Plaintiff's interests above his own self-dealing interests when securing loans to aid a financially distressed LEI.

66.     Defendant PIETER breached his fiduciary duty to Plaintiff by, among other things, falsely representing and/or concealing material facts about his own employment contract with LEI, about the financially distressed state of LEI, and about his self-dealing relationship with the Leeds equity partner.

67.     As a direct result of Defendant PIETER's breach of fiduciary duty as alleged hereinabove, Plaintiff has been damaged in a sum according to proof.

68.     In the event that Defendant PIETER's conduct in breaching his fiduciary duty, as aforesaid, to Plaintiff is found to be intentional as opposed to negligent and/or innocent, that intentional conduct was malicious, fraudulent, oppressive, and despicable, and therefore Plaintiff is  ientitled to an award of punitive damages against Defendant PIETER in an amount according to proof.

\ \ \

\ \ \

\ \ \

**SEVENTH CAUSE OF ACTION**

**(Innocent Misrepresentations— Brought By Plaintiff Against Defendant**
**PIETER And DOES 1 Through 20)**

69.      Plaintiff realleges and incorporates herein those matters contained in
paragraphs 1 through 32 as though fully set forth.

70.      This cause of action is pled in the alternative to the fraud and negligent
misrepresentation counts in this Complaint.

71.      In 2016, Defendant PIETER, as the CFO of LEI, was seeking loans to bail out
a financially distressed LEI and/or to improve the company's cash flow so that LEI could
continue to provide quality educational opportunities for its students.   Defendant PIETER
knew that Plaintiff was a minority shareholder who had already made a relatively small loan
under a contract with LEI and, further, that Plaintiff  was a promoter of the quality education
that LEI offered to its students.

72.      Defendant PIETER innocently made representations of material fact to
Plaintiff, as alleged above, for the purpose of obtaining his funds to aid the financially-
distressed LEI which would be memorialized in a loan contract between Plaintiff and LEI.

73.      The aforesaid representations of material fact made by Plaintiff were actually
false when made and were made by Defendnat Pieter in his fiduciary duty capacity and with
a fiduciary duty to speak with the utmost loyalty, honesty, integrity, fidelity and candor that
the law can impose upon any person.

74.      Had Defendant PIETER disclosed the true facts, Plaintiff would not have
entered into the contract calling for Plaintiff to loan LEI substantial sums of money.

75.      Plaintiff reasonably and justifiably relied to his detriment on Defendant
PIETER's representations of material fact in entering into the loan contract with LEI, and
has thereby sustained measurable damages in an amount according to proof.  Rescission of
the loan agreement is not an adequate remedy in this instance.

76.      Plaintiff's losses actually benefitted Defendant PIETER personally, since his
undisclosed employment contract allowed for bonuses and a severance package in the event

he was terminated other than for reasons related to cause as set forth in the employment contract.

WHEREFORE, Plaintiff prays for the following relief:

1.  For his compensatory damages in an amount according to proof at the trial of this action in excess of the minimum jurisdiction of this Court.

2.  For restitution in an amount according to proof at the trial of this action inexcess of the minimum jurisdiction of this Court.

3.  For attorney's fees and costs as allowed by law or by contract.

4.  For punitive damages in an amount according to proof at the trial of this action in excess of the minimum jurisdiction of this Court.

5.  For costs of the suit herein incurred.

6.  For such other and further relief as this court may deem just and proper.

Dated:    July 18, 2018              LAW OFFICES OF JOEL W. BARUCH, PC

                                     By _____
                                          Joel W. Baruch, Counsel for Plaintiff


## DEMAND FOR JURY TRIAL

1.  Plaintiff demands a trial by jury.


Dated:    July 18, 2018              LAW OFFICES OF JOEL W. BARUCH, PC

                                     By _____
                                          Joel W. Baruch, Counsel for Plaintiff

**COMPLAINT FOR DAMAGES AND RESTITUTION AND DEMAND FOR JURY TRIAL**
19

EXHIBIT 3

**CM-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>JOEL W. BARUCH (SBN85903) / COREY A. HALL (SBN295470)<br>LAW OFFICES OF JOEL W. BARUCH, PC<br>2601 Main Street, Suite 980<br>Irvine, CA 92614<br>TELEPHONE NO.: (949) 864-9662   FAX NO. *(Optional)*: (949) 851-3185<br>E-MAIL ADDRESS *(Optional)*: joel@joelwbaruch.com<br>ATTORNEY FOR *(Name)*: CARL BARNEY, etc., et al. | FOR COURT USE ONLY<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br>**07/18/2018** at 04:53:33 PM<br>Clerk of the Superior Court<br>By Angelina Nguyen-Do, Deputy Clerk<br><br>30-2018-01006531-CU-FR-CJC |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana 92701
BRANCH NAME: Central Justice Center

| | |
|---|---|
| PLAINTIFF/PETITIONER: CARL BARNEY, etc., et al.<br><br>DEFENDANT/RESPONDENT: LUKAS PIETER, et al. | CASE NUMBER:<br><br>JUDICIAL OFFICER:<br>Judge David Chaffee |
| **NOTICE OF RELATED CASE** | DEPT.: |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Lukas Pieter v. LePort Educational Institute, Inc., et al.

   b. Case number: 30-2017-00915762-CU-OE-CJC

   c. Court: [✓] same as above

      [ ] other state or federal court *(name and address)*:

   d. Department: CX103

   e. Case type: [ ] limited civil [✓] unlimited civil [ ] probate [ ] family law [ ] other *(specify)*:

   f. Filing date: 04/20/2017

   g. Has this case been designated or determined as "complex?" [ ] Yes [✓] No

   h. Relationship of this case to the case referenced above *(check all that apply)*:

      [ ] involves the same parties and is based on the same or similar claims.

      [ ] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      [ ] involves claims against, title to, possession of, or damages to the same property.

      [✓] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         [ ] Additional explanation is attached in attachment 1h

   i. Status of case:

      [✓] pending

      [ ] dismissed [ ] with [ ] without prejudice

      [ ] disposed of by judgment

2. a. Title:

   b. Case number:

   c. Court: [ ] same as above

      [ ] other state or federal court *(name and address)*:

   d. Department:

---

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>*www.courtinfo.ca.gov* |

CM-015

| | |
|---|---|
| PLAINTIFF/PETITIONER: CARL BARNEY, etc., et al. | CASE NUMBER: |
| DEFENDANT/RESPONDENT: LUKAS PIETER, et al. | |

2.  *(continued)*

   e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes  ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 2h

   i. Status of case:

      ☐ pending

      ☐ dismissed  ☐ with  ☐ without prejudice

      ☐ disposed of by judgment

3.  a. Title:

   b. Case number:

   c. Court: ☐ same as above

      ☐ other state or federal court *(name and address):*

   d. Department:

   e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes  ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         ☐ Additional explanation is attached in attachment 3h

   i. Status of case:

      ☐ pending

      ☐ dismissed  ☐ with  ☐ without prejudice

      ☐ disposed of by judgment

4.  ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: July 18, 2018

JOEL W. BARUCH
_____
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

CM-015

| PLAINTIFF/PETITIONER: CARL BARNEY, etc., et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: LUKAS PIETER, et al. | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*
   a. ☐ deposited the sealed envelope with the United States Postal Service.
   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:
   a. on *(date):*
   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:
   a. Name of person served:

      Street address:
      City:
      State and zip code:

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶

_____
(TYPE OR PRINT NAME OF DECLARANT)

_____
(SIGNATURE OF DECLARANT)

# EXHIBIT 4

**BARRITT SMITH MINER LLP**
Douglas A. Barritt, Bar No. 150955
2601 Main Street, Suite 530
Irvine, California 92614
Phone: 949-553-0700
Fax:    949-553-0715
email:  dbarritt@barrittsmith.com

Attorneys for Defendant and Cross-Complainant
LUKAS PIETER

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**08/07/2018** at 08:00:00 AM
Clerk of the Superior Court
By Dollie Campos, Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF ORANGE**

**UNLIMITED JURISDICTION**

| | |
|---|---|
| CARL BARNEY, as Trustee of the CARL BARNEY LIVING TRUST,<br><br>                Barney,<br><br>        v.<br><br>LUKAS PIETER and DOES 1 through 20, inclusive,<br><br>                Defendants. | CASE NO.: 30-2018-01006531<br><br>Assigned for All Purposes to:<br>    Hon. David Chaffee<br>    Dept. C20<br><br>**DEFENDANT AND CROSS-COMPLAINANT LUKAS PIETER'S CROSS-COMPLAINT FOR:** |
| LUKAS PIETER, an individual,<br><br>                Cross-Complainant,<br><br>        v.<br><br>LEPORT EDUCATIONAL INSTITUTE, INC., a California corporation; and ROES 1 to 20, inclusive,<br><br>                Defendants. | **(1)    EXPRESS INDEMNITY;**<br><br>**(2)    IMPLIED/EQUITABLE INDEMNITY;**<br><br>**(3)    CONTRIBUTION AND APPORTIONMENT;**<br><br>**(4)    BREACH OF AGREEMENT;**<br><br>**(5)    FAILURE TO ADVANCE FEES AND COSTS; AND**<br><br>**(6)    DECLARATORY RELIEF** |

**CROSS-COMPLAINT**

Defendant and Cross-Complainant Lukas Pieter hereby alleges as follow:

**PARTIES, JURISDICTION AND VENUE**

1.      Pieter is, and at all times relevant to this action was, an individual residing in Orange County, California.

2.      Pieter is informed and believes and thereon alleges that cross-defendant LePort Educational Institute, Inc. ("LEI") is a corporation incorporated in California with its principal place of business located in Irvine, California.

3.      Pieter is unaware of the true names and capacities of cross-defendants Roes 1 through 20, inclusive, and therefore he sues these defendants by fictitious names. Pieter is informed and believes and on that basis alleges that each of the fictitiously named cross-defendants is in some manner responsible for the damage to him as alleged in this Cross-Complaint. Pieter will amend this Cross-Complaint to show the true names and capacities of these fictitiously named cross-defendants after their true names and capacities have been ascertained.

4.      Pieter is informed and believes that at all times herein mentioned, each of the cross-defendants, including the fictitious Roe defendants, was the agent and/or employee of each of the remaining defendants and in doing the things mentioned herein was acting within the scope of such agency and/or employment.

**FACTUAL ALLEGATIONS**

5.      Pieter is a highly educated financial professional. He received his undergraduate degree in finance from the University of Economics in Prague, Czech Republic in 2000. He went on to participate in a business exchange program at the University of St. Thomas in Minnesota and obtained a Masters in Business Administration from the prestigious Columbia Business School.

**CROSS-COMPLAINT**

6.    Pieter has put his financial education to work in a variety of industries. Prior to becoming employed with LEI, Pieter worked as a financial analyst for McKesson Corporation, a banking analyst for Lazard Middle Market, a Chief Financial Officer for Fairbault Mills, an engagement manager for McKinsey & Company, and a Director for Genmark Diagnostics.

7.    LEI is a private educational company that provides a variety of educational programs for infants, toddlers, preschoolers, kindergartners, and elementary school students. It operates campuses in Fountain Valley, Huntington Harbor, Irvine (five separate locations), Los Angeles, Carlsbad, Encinitas, Solana Beach, San Francisco, Emeryville, Brooklyn, and Northern Virginia (six separate locations).

8.    LEI recruited Pieter away from GenMark Diagnostics, a company specializing in molecular diagnostics, in October of 2015. It hired Pieter as its Chief Financial Officer working out of its headquarters in Irvine and reporting directly to its Chief Executive Officer.

9.    The terms and conditions of Pieter's employment with LEI were initially documented in an offer letter. The terms consisted of a base salary of $200,000 per year, medical benefits, restricted stock, and a 100% tuition discount for up to two children and other benefits.

10.    Based on his excellent performance, LEI rewarded Pieter with an Executive Employment Agreement in June of 2016. The Executive Employment Agreement was negotiated at arms-length and documented by LEI's chosen counsel (Stradling, Yocca, Carlson & Rauth, P.C., a sophisticated firm with 100+ attorneys). A true and accurate copy of the Executive Employment Agreement is attached hereto as Exhibit A.

11.    LEI's Board of Directors reviewed the Executive Employment Agreement thoroughly and unanimously approved it on June 23, 2016, and authorized the Chief Executive Officer (Jim Treleaven) to sign it that same day.

12.    The Executive Employment Agreement, drafted by LEI's outside counsel, contains the following provision:

"**11. Insurance and Indemnity.** The Company shall purchase a liability insurance policy for its directors and officers, and, to the extent permitted by law, include the Executive during the Executive's employment under the policy, with coverage at least as favorable to the Executive in amount and each other material respect as the coverage of other directors and officers covered thereby. Subject only to the exclusions set forth below, the Company hereby agrees to defend, hold harmless, and indemnify the Executive against any and all judgments, fines, penalties and amounts paid in settlement and reasonable expenses (including, without limitation, attorneys' fees and disbursements, court costs, and expert witness fees), incurred by the Executive in connection with any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company), to which the Executive is, was, or at any time becomes a party, or is threatened to be made a party, by reason of the fact that the Executive is, was, or at any time becomes a director, officer, employee or agent of the Company, or is or was serving or at any time serves at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise. The Company's obligation to provide insurance and indemnify the Executive shall survive expiration or termination of this Agreement with respect to proceedings or threatened proceedings based on acts or omissions of the Executive occurring during the Executive's employment with the Company or with any affiliated company. Such obligations shall be binding upon the Company's successors and assigns and shall inure to the benefit of the Executive's heirs and personal representatives.

13.    On information and belief, LEI amended and restated its bylaws on or around August 26, 2016. The amended and restated bylaws include the following provision:

"**ARTICLE VI-INDEMNIFICATION**

**Section 1**. Right to Indemnification. Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation or of a partnership, joint venture, trust or other enterprise (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director or officer or in any other capacity while serving as a director or officer, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the California General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred by such indemnitee in connection therewith; provided, however, that, except as provided in Section 2 of this Article VI with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. The right to indemnification conferred in this Section 1 shall be a contract right and shall

4
**CROSS-COMPLAINT**

include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the California General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee) shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Article VI or otherwise (hereinafter an "undertaking"). Section 2. Right of Indemnitee to Bring Suit. If a claim under Section 1 of this Article VI is not paid in full by the Corporation within forty-five (45) days after a written claim has been received by the Corporation, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or part in any such suit or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) any suit by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met the applicable standard of conduct set forth in the California General Corporation Law. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the California General Corporation Law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by indemnitee, be a defense to such suit. In any suit brought by the indemnitee to enforce a right hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified or to such advancement of expenses under this Article VI or otherwise shall be on the Corporation."

Attached hereto as Exhibit B is what Pieter believes to be a true and accurate copy of LEI's amended and restated bylaws.

14.    Article VI of LEI's amended and restated bylaws also contains the following provision:

"**Section 2.** Right of Indemnitee to Bring Suit. If a claim under Section 1 of this Article VI is not paid in full by the Corporation within forty-five (45) days after a written claim has been received by the Corporation, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or part in any such suit or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) any suit by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met the applicable standard of conduct set forth in the California General Corporation Law. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the

California General Corporation Law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by indemnitee, be a defense to such suit. In any suit brought by the indemnitee to enforce a right hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified or to such advancement of expenses under this Article VI or otherwise shall be on the Corporation."

15.     Pieter has been named as a defendant in the Complaint filed Carl Barney, as Trustee of the Carl Barney Living Trust ("Barney") in the Superior Court, County of Orange, Case No. 30-2018-01006531, which alleges claims against Pieter for (1) fraud-intentional misrepresentation, (2) fraud-concealment, (3) fraud-failure to disclose known facts, (4) unfair business practices, (5) negligent misrepresentation, (6) breach of fiduciary duty, and (7) innocent misrepresentation. On information and belief, Barney has not named LEI and LEI's other officers as defendants out of spite toward Pieter and retaliation for Pieter seeking to enforce the terms and conditions of his Executive Employment Agreement in a separate action.

16.     Pieter denies all of the material allegations made by Barney, and Pieter denies further that he is in any way responsible for Barney's alleged damages. Pieter alleges that every representation he made to Barney or Barney's agents was made in good faith and specifically authorized, or ratified, by LEI's Board, LEI's officers, LEI's outside counsel, or other authorized individuals.

17.     LEI's bylaws and the provisions of the Executive Employment Agreement obligate cross-defendants to defend, indemnify and hold Pieter harmless from the claims asserted by Barney in this action. By separate demand, Pieter demanded that the cross-defendants and each of them defend and indemnify him in this action for the claims asserted by Barney. Cross-defendants, their insurers, and each of them, have failed and refuse to defend and indemnify Pieter in this action.

18.     All of the conditions and obligations to be performed by Pieter under his Executive Employment Agreement or LEI's amended and restated bylaws have been performed. If Pieter has failed to perform any condition, covenant or promise, the failure is discharged and excused by the

1   cross-defendants' failure to meet conditions precedent and necessary for Pieter's performance.

2

3        19.    Pieter, has incurred, and continues to incur, necessary and reasonable attorney fees and

4   other legal costs in defending against Barney's action and prosecuting its Cross-Complaint against the

5   cross-defendants. Cross-defendants have failed to provide Pieter with a defense and indemnity to the

6   claims brought by Barney. By the terms of the Executive Employment Agreement and amended and

7   restated bylaws, Pieter is entitled to recover such fees and costs from the cross-defendants.

8

9        20.    As a result of cross-defendants' breaches of their duties to defend and indemnify, Pieter

10  has been damaged in an amount in excess of the jurisdictional minimum of this court, the full amount

11  thereof which is not yet been determined. Pieter will amend this Cross-Complaint, if and when

12  necessary, to state such amount when the same becomes known to it.

13

14                              **FIRST CAUSE OF ACTION**

15                              **(For Express Indemnity**

16                         **Against LEI and ROES 1 through 20)**

17        21.    Pieter realleges and incorporates by reference paragraphs 1 through 20 as though fully

18  set forth in this cause of action.

19

20        22.    LEI's bylaws and the provisions of the Executive Employment Agreement obligate

21  cross-defendants to defend, indemnify and hold Pieter harmless from the claims asserted by Barney in

22  this action. By separate demand, Pieter demanded that the cross-defendants and each of them defend

23  and indemnify him in this action for the claims asserted by Barney. Cross-defendants, their insurers,

24  and each of them, have failed and refuse to defend and indemnify Pieter in this action.

25

26        23.    All of the conditions and obligations to be performed by Pieter under his Executive

27  Employment Agreement or LEI's amended and restated bylaws have been performed. If Pieter has

28  failed to perform any condition, covenant or promise, the failure is discharged and excused by the

cross-defendants' failure to meet conditions precedent and necessary for Pieter's performance.

24.     Pieter, has incurred, and continues to incur, necessary and reasonable attorney fees and other legal costs in defending against Barney's action and prosecuting its Cross-Complaint against the cross-defendants. Cross-defendants have failed to provide Pieter with a defense and indemnity to the claims brought by Barney. By the terms of the Executive Employment Agreement and amended and restated bylaws, Pieter is entitled to recover such fees and costs from the cross-defendants.

25.     As a result of cross-defendants' breaches of their duties to defend and indemnify, Pieter has been damaged in an amount in excess of the jurisdictional minimum of this court, the full amount thereof which is not yet been determined. Pieter will amend this Cross-Complaint, if and when necessary, to state such amount when the same becomes known to it.

### SECOND CAUSE OF ACTION

**(For Implied/Equitable Indemnity**

**Against LEI and ROES 1 through 20)**

26.     Pieter realleges and incorporates by reference paragraphs 1 through 25 as though fully set forth in this cause of action.

27.     Pieter denies all of the material allegations made by Barney, and Pieter further denies that he is in any way responsible for Barney's alleged damages. However, if it is found that Pieter is liable as alleged by Barney, then that liability is passive and vicarious in nature.

28.     By reason of the foregoing, Pieter has an implied right of indemnity over and against cross-defendants' conduct. Cross-defendants, and each of them, owe Pieter the duty to hold him harmless from any and all claims of liabilities that Pieter may become obligated to pay Barney by judgment or settlement. Further, cross-defendants, and each of them, owe Pieter a duty of reimbursing Pieter for his costs and expenses incurred in investigating and defending the claims of Barney herein

**CROSS-COMPLAINT**

including attorney's fees.

## THIRD CAUSE OF ACTION

### (For Contribution and Apportionment

### Against LEI and ROES 1 through 20)

29.    Pieter realleges and incorporates by reference paragraphs 1 through 28 as though fully set forth in this cause of action.

30.    Pieter denies Barney's allegations as they apply to Pieter and denies he is liable to Barney; however, if Barney sustained injuries and damages by reason of the conduct alleged in the Complaint, then those injuries and damages were caused in whole or in part by the negligence, fault, or other tortious and/or wrongful conduct of cross-defendants, their officers, directors, employees or agents, and each of them.  By reason of the foregoing, Pieter is entitled to partial indemnification from cross-defendants, and each of them, on a comparative fault basis, based on an amount equal to the percentage which the contributing conduct of each cross-defendant bears to the total award, verdict or judgment.

## FOURTH CAUSE OF ACTION

### (For Breach of Executive Employment Agreement

### Against LEI and ROES 1 through 20)

31.    Pieter realleges and incorporates by reference paragraphs 1 through 30 as though fully set forth in this cause of action.

32.    Section 11 of the Executive Employment Agreement, quoted above, obligated LEI to purchase a liability insurance policy for its directors and officers to cover the claims asserted in Barney's Complaint. Section 11 states further that LEI's "obligation to provide insurance and indemnify [Barney] shall survive expiration or termination of" the Executive Employment Agreement.

33.    LEI's counsel (who is also Barney's counsel) has informed Peiter that LEI no longer has Directors & Officers insurance for its directors or officers and that it did not take steps to secure tail coverage for the time Pieter was employed with LEI. LEI's counsel (who is also Barney's counsel) has also informed Pieter that LEI's Employment Practices Liability Insurance policy is no longer in existence, and will not voluntarily inform Pieter whether LEI maintains (or maintained) any other insurance policies that could potentially provide coverage for Barney's claims.

34.    Based on the information received from LEI's counsel, Pieter is informed and believes that LEI has breached Section 11 of the Executive Employment Agreement.

35.    As a result of LEI's breach of Section 11, Pieter has been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (For Failure to Advance Fees
### Against LEI and ROES 1 through 20)

36.    Pieter realleges and incorporates by reference paragraphs 1 through 35 as though fully set forth in this cause of action.

37.    Pieter has demanded that LEI advance his fees and costs pursuant to Article VI of its amended and restated bylaws.

38.    LEI has refused Pieter's demand and has not provided a reason for its refusal.

39.    As a result of LEI's failure to comply with its amended and restated bylaws advance Pieter's fees and expenses, Pieter has been damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

### (For Declaratory Relief

### Against LEI and ROES 1 through 20)

40.     Pieter realleges and incorporates by reference paragraphs 1 through 39 as though fully set forth in this cause of action.

41.     An actual, present and justiciable controversy has arisen between Pieter and cross-defendants, as Pieter contends: if Barney sustained injuries and damages as alleged in his Complaint, and becomes entitled to recover against Pieter, then Pieter is entitled to indemnification by cross-defendants for any and all amounts Pieter is obligated to pay to Barney or, is entitled to a declaration of comparative fault of Pieter and cross-defendants, and each of them. cross-defendants, and each of them, dispute and deny the contentions of Pieter and assert they have no obligation to Pieter in this circumstance.

42.     As a result of the foregoing, a declaration of this Court is necessary to determine the rights and obligations existing between Pieter and cross-defendants, and each of them. Such a declaration will avoid the necessity of a subsequent action and permit all disputes between the parties to be resolved in a single action.

**WHEREFORE**, Pieter prays for judgment as follows:

AS TO THE FIRST CAUSE OF ACTION FOR EXPRESS INDEMNITY:

1.     For a judgment of indemnity whereby the cross-defendants, and each of them are required to indemnify and pay to Pieter the total amount of any judgment or settlement paid to Barney, together with Pieter's attorney fees, expenses and costs of suit incurred in defending against the Barney's Complaint;

AS TO THE SECOND CAUSE OF ACTION IMPLIED/EQUITY INDEMNITY:

2.     For a judgment of indemnity whereby the cross-defendants, and each of them are required to indemnify and pay to Pieter all sums proportionate to the fault attributable to the cross-defendants, and each of them, up to the full amount of the settlement with Barney, together with Pieter's attorney fees, expenses and costs of suit incurred in defending against the Defendants' Cross-Complaint;

AS TO THE THIRD CAUSE OF ACTION FOR CONTRIBUTION AND APPORTIONMENT

3.     For a judgment of indemnity whereby the cross-defendants, and each of them are required to indemnify and pay to Pieter all sums proportionate to the fault attributable to the cross-defendants, and each of them, up to the full amount of the settlement with Barney, together with Pieter's attorney fees, expenses and costs of suit incurred in defending against the Defendants' Cross-Complaint;

AS TO THE FOURTH CAUSE OF ACTION FOR BREACH OF EXECUTIVE EMPLOYMENT AGREEMENT

4.     For the damages caused by LEI's failure to purchase, maintain, and continue the insurance products required by the Executive Employment Agreement;

AS TO THE FIFTH CAUSE OF ACTION FOR FAILURE TO ADVANCE FEES

5.     For a declaration that LEI is required to advance Pieter's fees and expenses related to this action;

AS TO THE SIXTH CAUSE OF ACTION FOR DECLARATORY RELIEF:

6.     That Cross-Complainants are entitled to a judicial determination of the respective rights of Cross-Complainants and the duties of cross-defendants, and each of them, relating to Pieter's claims of Express Indemnity, Implied Indemnity, Equitable Indemnity, Apportionment and Contribution, breach of contract, and failure to advance fees;

**CROSS-COMPLAINT**

AS TO ALL CAUSES OF ACTION:

      7.    For general and special damages according to proof;

      8.    For any and all attorney fees, experts' fees, costs and discovery expenses incurred in this action, according to proof; and

      9.    For such other and further relief as the Court may deem just and proper.


DATED: August 7, 2018

**BARRITT SMITH MINER LLP**

By: _____
Douglas A. Barritt

Attorney for Defendant and Cross-Complainant
LUKAS PIETER

---

13

**CROSS-COMPLAINT**

# EXHIBIT A

**Barney v. Pieter**
**Case No. 30-2018-01006531**
**Exhibit A**

## EXECUTIVE EMPLOYMENT AGREEMENT

**THIS EXECUTIVE EMPLOYMENT AGREEMENT** (this "**Agreement**") is made effective as of this 23rd day of June, 2016 by and between LePort Educational Institute, Inc., a California corporation (the "**Company**" or "**LePort**"), and Lukas Pieter ("**Executive**") (collectively referred to as the "**Parties**").

## RECITALS

A.    The Company wishes to employ the Executive, and the Executive wishes to accept such employment, as Chief Financial Officer.

B.    It is now the mutual desire of the Company and the Executive to enter into a written employment agreement to govern the terms of the Executive's employment by the Company on the terms and conditions set forth below.

## TERMS AND CONDITIONS

In consideration for the promises of the parties set forth below, the Company and the Executive hereby agree as follows:

**1.    Term**.  The Executive's employment with the Company shall continue until written notice is given by either Party in accordance with the terms of this Agreement pertaining to the termination of the Executive's employment (see Section 7).  The Executive's Termination Date shall mean the Executive's last day on the payroll of the Company.

**2.    Position**.  During the term the Executive's employment under this Agreement, the Executive shall serve as the Chief Financial Officer of the Company.  The Executive shall report directly to the Chief Executive Officer.

**3.    Outside Activities**.  During the term of the Executive's employment, the Executive may engage in outside activities, provided those activities (including, but not limited to, membership on boards of directors of not-for-profit and for-profit organizations) do not conflict with the Executive's duties and responsibilities hereunder, according to the sole discretion of the Board of Directors (the "**Board**"), and provided further that the Executive gives written notice to the Chief Executive Officer of any significant outside business activity in which Executive plans to become involved, whether or not such activity is pursued for profit.

**4.    Compensation and Related Matters.**

**(a)    Salary**. The Company shall pay the Executive a salary of Two Hundred Thousand Dollars ($200,000) per annum. Upon the Company's consummation of a Qualified Financing or a Sale of the Company (each as defined below), the Company shall at such time increase the Executive's salary to Two Hundred Fifty Thousand Dollars ($250,000) per annum.  The Executive's salary shall be payable in equal installments in accordance with the Company's normal payroll practices applicable to senior officers. "Qualified Financing" means the private placement of debt or equity securities of the Company after the date hereof. A "Change of Control" means (i) any consolidation or merger of the Company with or into any other entity or person, or any other Company reorganization, in which the equity holders of the Company immediately prior to such consolidation, merger or reorganization, own less than 50% of the voting power of the surviving

A-1

Doc ID: f73550fbd9254ff3c9f6a5dfef738f186e2eca45

entity (or its parent) immediately after such consolidation, merger or reorganization; (ii) any sale, lease or other disposition of all or substantially all of the assets of the Company; or (iii) any transaction (or series of related transactions involving a person or entity, or a group of affiliated persons or entities) in which more than 50% of the Company's outstanding voting power is transferred.

**(b)  Retention Agreement**. The Company shall execute and deliver the Retention Agreement by and among the Company and the Executive in substantially the form attached hereto as **Exhibit A** (the "**Retention Agreement**").

**(c)  Equity Grant**. The equity grant set forth in that certain Offer Letter by and between the Executive and the Company dated September 17, 2015 (the "**Offer Letter**" and together with this Agreement and the Retention Agreement, the "**Employment Agreements**") shall remain in full force and effect and shall be deemed to be incorporated herein by this reference.

**(d)  Expenses**.  The Executive shall be entitled to receive prompt reimbursement, within the time period provided by Company policy, for all reasonable expenses incurred during the term of the Executive's employment by the Executive in performing services hereunder, including all reasonable expenses of travel and living while away from home, provided that such expenses are incurred and accounted for in accordance with the policies and procedures established by the Company.

**(e)  Time Off**.  The Executive shall be entitled to Paid Time Off (PTO) accrual at the rate of 25 days per calendar year, which carry forward from year to year, but which are subject to an accrual cap of 40 days.  PTO may be used for any purpose (such as vacation, sick days, personal days, etc.).

**(f)  Benefits**.  The Executive shall be entitled to participate in all of the Company's employee benefit plans and arrangements in which Executives of the Company are eligible to participate.

**(g)  Performance Reviews**.  The Executive shall receive a performance review once per year.

**5.  Confidential Information.**

**(a)**  The Executive agrees not to disclose, either while in the Company's employ or at any time thereafter, to any person not employed by the Company, or not engaged to render services to the Company, any confidential information obtained while in the employ of the Company, including, without limitation, any of the Company's inventions, processes, methods, curriculum, training programs, student, family or customer lists, or trade secrets; provided, however, that the provisions of this Section shall not preclude the Executive:  (1) from disclosing such information to the Executive's professional tax advisor or legal counsel solely to the extent necessary to the rendering of their professional services to the Executive if such individuals agree to keep such information confidential; and (2) from use or disclosure of information known generally to the public or from disclosure required by law or court order.

**(b)**  The Executive agrees that, upon leaving the Company's employ, the Executive will make herself reasonably available to answer questions from Company officers

Doc ID: f73550fbd9254ff3c9f6a5dfef738f186e2eca45

regarding the Executive's former duties and responsibilities and the knowledge Executive obtained in connection therewith. In addition, the Executive will not take with the Executive, without the prior written consent of any officer authorized to act in the matter by the Board, any study, memoranda, drawing, blueprint, specification or other document of the Company, its subsidiaries, affiliates and divisions, which is of a confidential nature relating to the Company, its subsidiaries, affiliates and divisions.

6.      **Intellectual Property.**

(a)      **Work for Hire.** Executive understands and agrees that, to the extent permitted by law, all work, curriculum, textbooks, educational or pedagogical materials, manipulatives, written work product, handouts, assessments, lesson plans or notes, audio-visual materials, marketing materials or strategic documents, materials defining or relating to educational philosophy, documents of educational methods, papers, reports, documentation, drawings, images, product ideas, service ideas, photographs, negatives, tapes and masters therefor, computer programs including their source code and object code, prototypes and other materials (collectively, "**Work Product**"), including, without limitation, any and all such Work Product generated and maintained on any form of electronic media, that Executive generates, either alone or jointly with others, during employment with Company will be considered a "work made for hire," and ownership of any and all copyrights in any and all such Work Product will belong to Company. In the event that any portion of the Work Product should be deemed not to be a "work made for hire" for any reason, Executive hereby assigns, conveys, transfers and grants, and agrees to assign, convey, transfer and grant to Company all of Executive's right, title, and interest in and to the Work Product and any copyright therein, and agrees to cooperate with Company in the execution of appropriate instruments assigning and evidencing such ownership rights. Executive hereby waive any claim or right under "droit moral" or moral rights to object to Company's copyright in or use of the Work Product. Any Work Product not generally known to the public shall be deemed Confidential Information and shall be subject to the use and disclosure restrictions herein.

(b)      **Inventions.** Executive hereby assigns and agrees to assign to Company all of Executive's right, title, and interest in and to any discoveries, inventions and improvements (each, an "**Invention**," and collectively, "**Inventions**"), whether patentable or not, that Executive makes, conceives or suggests, either alone or jointly with others, in the course of the Executive's employment with the Company. Any Invention that was made, conceived or suggested by Executive, either solely or jointly with others, within four (4) months following the Executive's Termination Date and that pertains to any Confidential Information or business activity of Company will be irrebuttably presumed to have been made, conceived or suggested in the course of Executive's employment and with the use of the time, materials or facilities of Company. Any Invention not generally known to the public shall be deemed Confidential Information and shall be subject to the use and disclosure restrictions herein.

(c)      **Prior Inventions.** To preclude any possible uncertainty with respect to Inventions, Executive has attached hereto a complete list of all prior inventions, discoveries, improvements, or works of authorship that Executive has, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of Executive's employment with the Company, that Executive considers to be Executive's property or the property of third parties and that Executive wishes to have excluded from the scope of this Agreement (collectively referred to as "**Prior Inventions**"). If disclosure of any such Prior Invention would cause Executive to violate any prior confidentiality agreement, Executive

Doc ID: f73550fbd9254ff3c9f6a5dfef738f186e2eca45

understands that Executive is not to list such Prior Inventions in such attachment but is only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. IF NO SUCH DISCLOSURE IS ATTACHED, EXECUTIVE REPRESENTS AND WARRANTS THAT THERE ARE NO PRIOR INVENTIONS. If, in the course of Executive's employment with the Company, Executive incorporates a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention. Notwithstanding the foregoing, Executive agrees that Executive will not incorporate, or permit to be incorporated, Prior Inventions in any Company inventions without the Company's prior written consent.

(d) **Disclosure of Inventions**. Executive hereby agrees promptly to disclose all Inventions to Company and to perform, during and after his or her employment, all acts deemed necessary or desirable by Company to permit and assist it, at its expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Inventions. Such acts may include, without limitation, the execution and delivery of documents and the provision of assistance or cooperation in legal proceedings. In addition, Executive hereby irrevocably designates and appoints Company and its duly authorized officers and agents as his or her agent and attorney in fact, to act for and in his or her behalf and stead to execute and file any such applications and to perform all other lawfully permitted acts to further the securing of Company's rights in and to the Inventions.

(e) **Prohibition on Assignment of Inventions Meeting the Requirements of Labor Code Section 2870**. This Section of this Agreement, regarding Intellectual Property, does not apply to any Invention that qualifies fully under Section 2870 of the California Labor Code.

This Section 6 of this Agreement (a) will survive the termination or expiration of Executive's employment with Company, (b) is personal to Executive and may not be assigned; (c) may be assigned by Company in its sole discretion and will inure to the benefit of the successors and assigns of Company, and (d) is binding upon Executive's heirs and legal representatives.

7.    **Termination**. The Executive's employment may be terminated during the term of this Agreement only as follows:

(a)    **Death**. The Executive's employment shall terminate immediately upon the Executive's death.

(b)    **Disability**. If, as a result of the Executive's Disability (as defined below), the Executive shall have been absent from the Executive's duties hereunder on a full-time basis for the entire period of three consecutive months, and within thirty days after written notice of termination is given by the Company or the Executive (which may occur before or after the end of such three-month period), the Executive shall not have returned to the performance of the Executive's duties hereunder on full-time basis, the Executive's employment shall terminate. A termination of employment pursuant to this Section shall be deemed an involuntary termination for purposes of this Agreement or any plan or practice of the Company. The Company has no obligation to pay the Executive during any time that the Executive is absent from the Executive's job duties, except as otherwise provided by this Agreement. For purposes of this Agreement, the term "Disability" shall mean a physical or mental illness, impairment or condition reasonably determined by the Board that prevents the Executive from performing the duties of the Executive's position under this Agreement.

Doc ID: f73550fbd9254ff3c9f6a5dfef738f186e2eca45

**(c)** **Cause**. The Company may terminate the Executive's employment for Cause. The Company shall have "**Cause**" to terminate the Executive's employment if the Executive either: (i) continuously fails to substantially perform the Executive's duties hereunder (unless such failure is a result of a Disability, as defined in Section 7(b); (ii) breaches any term of this Agreement; or (iii) engages in intentional misconduct or illegal or grossly negligent conduct which is materially injurious to the Company monetarily or otherwise. A termination for Cause shall not take effect unless: (1) the Executive is given written notice by the Company of its intention to terminate Executive for Cause; (2) the notice specifically identifies the particular act or acts or failure or failures to act which are the basis for such termination; (3) the notice is given within 90 days of the Company's learning of such act or acts or failure or failures to act; and (4) the Executive fails to substantially cure such conduct, to the extent such cure is possible, within 30 days after the date that such written notice is given to Executive.

**(d)** **Without Cause**. The Company may terminate the Executive's employment at any time Without Cause, subject to 30 days written notice to the Executive informing the Executive that the employment will be terminated effective 30 days from the date of the notice. A termination "Without Cause" is a termination of the Executive's employment by the Company for any reasons other than the death or disability of the Executive or the involuntary termination of Executive for Cause as described above in Section 7(c).

**(e)** **Voluntary Termination**. The Executive may voluntarily terminate the Executive's employment with the Company at any time by providing written notice to the Company, via its Chief Executive Officer.

8. **Notice and Effective Date of Termination.**

**(a)** **Notice**. Any termination of the Executive's employment by the Company or by the Executive during the term of this Agreement (other than as a result of death) shall be communicated by written notice of termination to the other party hereto. Such notice shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under that provision.

9. **Compensation and Benefits Upon Termination.**

**(a)** **Termination Due To Disability**. If the Executive's employment is terminated due to Disability (as defined in Section 7(b)), the Executive shall be paid the Executive's salary through the Executive's Termination Date and not thereafter, except that the Company has no obligation to pay the Executive during any time that the Executive is absent from the Executive's job duties, except as otherwise provided by this Agreement. The Company shall have no further obligations to the Executive as a result of the termination of the Executive's employment pursuant to Section 7(b) beyond the reimbursement of eligible expenses or other amounts already fully earned and owed by the Company. Any stock options granted to the Executive by the Company shall continue to vest only through the date on which the Executive's employment terminates. The Company shall not be obligated to pay any bonus amounts except for those that have already been fully earned and awarded by the Company.

(i) <u>Disability Insurance</u>. Executive is solely responsible for purchasing and maintaining Executive's own disability insurance.

Doc ID: f73550fbd9254ff3c9f6a5dfef738f186e2eca45

**(b)      Termination Without Cause**.  If the Company chooses to terminate the Executive's employment without Cause, and provided that the Executive works until the end of the 30-day notice period provided in Section 7(d), then the Company shall continue to pay to the Executive the Executive's regular base salary in effect on the Executive's Termination Date (exclusive of bonus or any other compensation), for four (4) months following the Executive's Termination Date ("**Severance Pay**").  Unless the parties agree otherwise, the Severance Pay shall be paid in installments, in accordance with the Company's regular payroll practices.  As a condition precedent to receiving Severance Pay, the Executive agrees to work for the full 30-day notice period and further agrees to execute a release, based on the Company's standard form severance agreement, of any and all claims the Executive may have against the Company and its officers, employees, directors, parents and affiliates.  Executive understands and agrees that the payment of the Severance Pay is contingent on the Executive's execution of the previously described release of claims.  Any stock options granted to the Executive by the Company shall continue to vest only through the Executive's Termination Date.  The Company shall not be obligated to pay any bonus amounts except for those that have already been fully earned and awarded by the Company.  The Company shall have no further obligations to the Executive as a result of the termination of the Executive's employment pursuant to Section 7(d) beyond the reimbursement of eligible expenses or other amounts already fully earned and owed by the Company. In addition to the Severance Pay, and under the same conditions stipulated in this section for receiving the Severance Pay, the Executive shall be eligible to continue to receive a 100% tuition discount for each of his existing or future children, at a LePort School of his choice. To the extent this tuition discount is subject to taxes during or after her employment is terminated, the Executive will be responsible for paying such taxes.

(i)      Sole Remedy.  The Severance Pay referenced above shall constitute the sole remedy of the Executive in the event of a termination of the Executive's employment by either the Company or the Executive.

**(c)      For Cause**.  If the Executive's employment is terminated for Cause (as defined in Section 7(c)), the Executive shall receive only the post-termination compensation and benefits described in Section 9(d) [Death].

**(d)      Death**.  If the Executive's employment terminates pursuant to Section 7(a) [Death], the Executive (or the Executive's designee or the Executive's estate) shall be paid the Executive's salary through the Executive's Termination Date and not thereafter.  The Company shall have no further obligations to the Executive as a result of the termination of the Executive's employment pursuant to Section 7(a) or 7(e).

**(e)      Voluntary Termination**.  If the Executive's employment terminates pursuant to Section 7(e) [Voluntary Termination], the Executive (or the Executive's designee or the Executive's estate) shall be paid the Executive's salary through the Executive's Termination Date and not thereafter.  The Company shall have no further obligations to the Executive as a result of the termination of the Executive's employment pursuant to Section 7(e).  Notwithstanding the foregoing, if the Executive does all of the following:

(i)      Provides 120 days notice to the Company of the Executive's voluntary termination;

(ii)      Continues to fully devote his or her reasonable best efforts to performing his or her job duties on behalf of the Company for the entire 120-day notice period;

Doc ID: f73550fbd9254ff3c9f6a5dfef738f186e2eca45

(iii)    Actively participates in searching for and training a replacement for the Executive's job position; and

(iv)    Does not otherwise breach any terms of this Agreement, including Section 12 regarding non-solicitation of Company employees;

then the Company shall continue to pay the Severance Pay. Unless the parties agree otherwise, the Severance Pay shall be paid in installments, in accordance with the Company's regular payroll practices. As a condition precedent to receiving Severance Pay, the Executive agrees to execute a release, based on the Company's standard form severance agreement, of any and all claims the Executive may have against the Company and its officers, employees, directors, parents and affiliates. Executive understands and agrees that the payment of the Severance Pay is contingent on the Executive's execution of the previously described release of claims. Any stock options granted to the Executive by the Company shall continue to vest only through the Executive's Termination Date. The Company shall not be obligated to pay any bonus amounts except for those that have already been fully earned and awarded by the Company. The Company shall have no further obligations to the Executive as a result of the termination of the Executive's employment pursuant to Section 7(d) beyond the reimbursement of eligible expenses or other amounts already fully earned and owed by the Company. The Severance Pay referenced above shall constitute the sole remedy of the Executive in the event of a termination of the Executive's employment by either the Company or the Executive. In addition to the Severance Pay, and under the same conditions stipulated in this section for receiving the Severance Pay, the Executive shall be eligible to continue to receive a 100% tuition discount for each of his children through the end of the school term (August – June) during which the Executive Termination Date occurs, but for no more than 4 months. To the extent this tuition discount is subject to taxes during or after her employment is terminated, the Executive will be responsible for paying such taxes.

10.    **Notice**.    For the purposes of this Agreement, notices, demands and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered or (unless otherwise specified) mailed by United States registered mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive:

Lukas Pieter
4 Hillsborough
Newport Beach, CA 92660

If to the Company:

Jim Treleaven
Chief Executive Officer
LePort Schools Head Office
1 Technology Dr., Building H, Suite 200
Irvine, CA 92618

or to such other address as any party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

Doc ID: f73550fbd9254ff3c9f6a5dfef738f186e2eca45

**11.    Insurance and Indemnity**.  The Company shall purchase a liability insurance policy for its directors and officers, and, to the extent permitted by law, include the Executive during the Executive's employment under the policy, with coverage at least as favorable to the Executive in amount and each other material respect as the coverage of other directors and officers covered thereby.  Subject only to the exclusions set forth below, the Company hereby agrees to defend, hold harmless, and indemnify the Executive against any and all judgments, fines, penalties and amounts paid in settlement and reasonable expenses (including, without limitation, attorneys' fees and disbursements, court costs, and expert witness fees), incurred by the Executive in connection with any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including an action by or in the right of the Company), to which the Executive is, was, or at any time becomes a party, or is threatened to be made a party, by reason of the fact that the Executive is, was, or at any time becomes a director, officer, employee or agent of the Company, or is or was serving or at any time serves at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise.  The Company's obligation to provide insurance and indemnify the Executive shall survive expiration or termination of this Agreement with respect to proceedings or threatened proceedings based on acts or omissions of the Executive occurring during the Executive's employment with the Company or with any affiliated company.  Such obligations shall be binding upon the Company's successors and assigns and shall inure to the benefit of the Executive's heirs and personal representatives.

**12.    Non-Solicitation of Employees**.  During the term of the Executive's employment with the Company and for a period of 24 months following the Executive's Termination Date, the Executive shall not directly or indirectly solicit any other employee of the Company to terminate his or her employment with the Company.

**13.    Successors; Binding Agreement**.  This Agreement and all rights of the Executive hereunder shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive should die while any amounts would still be payable to Executive hereunder, all such amounts shall be paid in accordance with the terms of this Agreement to the Executive's written designee or, if there be no such designee, to the Executive's estate.  No right or interest to, or in, any payments shall be assignable by the Executive; provided, however, that the Executive's provision shall not preclude the Executive from designating in writing one or more beneficiaries to receive any amount that may be payable after the Executive's death and shall not preclude the legal representative of Executive's estate from assigning any right hereunder to the person or persons entitled thereto.  This Agreement shall be binding upon and shall inure to the benefit of the Executive, the Executive's heirs and legal representatives, and the Company and its successors.

**14.    Complete Agreement; Modification or Waiver; Entire Agreement**.  The Employment Agreements represent the complete agreement of the parties with respect to the subject matter hereof and supersede all prior and contemporaneous agreements, promises or representations of the parties.  No provision of this Agreement may be modified or waived except in a document signed by the Executive and such person as may be designated by the Board.  The Employment Agreements constitute the entire agreement between the parties regarding their employment relationship.  To the extent that this Agreement is in any way inconsistent with any prior or contemporaneous agreements between the parties, this Agreement shall control.  No agreements or representations, oral or otherwise, with respect to the subject matter hereof have been made by either party which are not set forth expressly in this Agreement or the Retention Agreement.

Doc ID: f73550fbd9254ff3c9f6a5dfef738f186e2eca45

**15.    Governing Law—Severability**.    The validity, interpretation, construction, performance, and enforcement of this Agreement shall be governed by the laws of the state of California.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

**16.    Withholding**.  All payments required to be made by the Company hereunder to the Executive or the Executive's estate or beneficiaries shall be subject to the payroll and withholding deductions required by applicable law.

**17.    Arbitration**.  In the event of any dispute or claim relating to or arising out of the Parties' employment relationship or this Agreement (including, but not limited to, any claims of breach of contract, wrongful termination, or age, race, sex, disability or other discrimination), all such disputes shall be fully, finally and exclusively resolved by binding arbitration conducted by the American Arbitration Association by an arbitrator mutually agreed upon by the parties hereto or, in the absence of such agreement, by an arbitrator selected in accordance with the Commercial Arbitration Rules of the American Arbitration Association; provided, however, that the Executive's arbitration provision shall not apply to any disputes or claims relating to or arising out of the misuse or misappropriation of the Company's trade secrets or proprietary information.  Notwithstanding the foregoing, if either the Company or the Executive shall request, such arbitration shall be conducted by a panel of three arbitrators, one selected by the Company, one selected by the Executive, and the third selected by agreement of the first two, or, in the absence of such agreement, in accordance with such Rules.

**18.    Attorney's Fees**.  Each party shall bear its own attorney's fees and costs incurred in any action or dispute arising out of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Employment Agreement effective as of the date and year first above written.

**EXECUTIVE**:

Lukas Pieter

**COMPANY**:
LEPORT EDUCATIONAL INSTITUTE, INC.

Jim Treleaven
Chief Executive Officer

**EXHIBIT A**

**RETENTION AGREEMENT**

Doc ID: f73550fbd9254ff3c9f6a5dfef738f186e2eca45

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Lukas Pieter Employment Contract |
| **FILE NAME** | DOCSOC-#1765010-v...Agreement_(L.DOCX |
| **DOCUMENT ID** | f73550fbd9254ff3c9f6a5dfef738f186e2eca45 |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| SIGNED | **06/23/2016**<br>13:39:15 UTC-8 | Signed by Lukas Pieter (lpieter@leportschools.com)<br>IP: 72.211.224.214 |
| SENT | **06/23/2016**<br>13:39:17 UTC-8 | Sent for signature to Jim Treleaven<br>(jtreleaven@viastrategygroup.com)<br>IP: 72.211.224.214 |
| VIEWED | **06/23/2016**<br>14:56:35 UTC-8 | Viewed by Jim Treleaven (jtreleaven@viastrategygroup.com)<br>IP: 24.14.185.222 |
| SIGNED | **06/23/2016**<br>14:57:34 UTC-8 | Signed by Jim Treleaven (jtreleaven@viastrategygroup.com)<br>IP: 24.14.185.222 |
| COMPLETED | **06/23/2016**<br>14:57:34 UTC-8 | The document has been completed. |

LP0013



June 23, 2016

*Via email to lpieter@leportschools.com*

Re: Retention Bonus

Dear Lukas:

We consider your continued service and dedication to LePort Educational Institute, Inc., a California corporation (the "Company") essential to our business plan. To induce you to remain employed with the Company, we are pleased to offer you a retention bonus, as described in this letter agreement.

In recognition of your continued service with the Company, we are offering you a retention bonus in the amount of $200,000, less all applicable withholdings and deductions required by law (the "**Retention Bonus**"), which shall be payable to you upon the first to occur of a Qualified Financing or a Change of Control (as defined in that certain Executive Employment Agreement by and among you and the Company dated June 23, 2016 (the "**Employment Agreement**")).

You will be eligible to receive this Retention Bonus if all of the following eligibility criteria are satisfied:

1.      Your continuing status with the Company has not been terminated pursuant to Employment Agreement.

2.      If you are eligible to receive the Retention Bonus, it will be paid to you in one lump sum cash payment on the first regularly scheduled pay date after the applicable Qualified Financing or immediately prior to a Change of Control.

**<u>Your employment remains at-will, meaning that you and the Company may terminate the employment relationship pursuant to the terms and conditions of the Employment Agreement.</u>**

This letter agreement is intended to comply with, or be exempt from, Section 409A of the Internal Revenue Code of 1986, as amended ("**Section 409A**") and shall be construed and administered in accordance with Section 409A.

This letter agreement contains all of the understandings and representations between the Company and you relating to the retention bonus and supersedes all prior and contemporaneous understandings, discussions, agreements, representations and warranties, both written and oral, with respect to any retention bonus; provided, however, that this letter agreement shall not

LP0014

Doc ID: 346e978807462fd428ef3e4b2a998004e8d1fa71

supersede any other agreements between the Company and you, and specifically the Employment Agreement and the Offer Letter by and between you and the Company dated September 17, 2015, which shall remain in full force and effect. This letter agreement may not be amended or modified unless in writing signed by both the Chief Executive Officer of the Company and you. This letter agreement, for all purposes, shall be construed in accordance with the laws of California without regard to conflicts-of-law principles.

We look forward to your continued employment with us.

Very truly yours,

LEPORT EDUCATIONAL INSTITUTE, INC.

Jim Treleaven
Chief Executive Officer

Agreed to and accepted:

Lukas Pieter

Date: June 23, 2016

2

Doc ID: 346e978807462fd428ef3e4b2a998004e8d1fa71

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Lukas Pieter Retention Agreement |
| **FILE NAME** | DOCSOC-#1765141-v..._Agreement_(L.DOC |
| **DOCUMENT ID** | 346e978807462fd428ef3e4b2a998004e8d1fa71 |
| **STATUS** | ● Completed |

## Document History

**SENT**
**06/23/2016**
13:27:01 UTC-8
Sent for signature to Lukas Pieter (lpieter@leportschools.com) and Jim Treleaven (jtreleaven@viastrategygroup.com)
IP: 72.211.224.214

**VIEWED**
**06/23/2016**
13:27:11 UTC-8
Viewed by Lukas Pieter (lpieter@leportschools.com)
IP: 72.211.224.214

**SIGNED**
**06/23/2016**
13:27:49 UTC-8
Signed by Lukas Pieter (lpieter@leportschools.com)
IP: 72.211.224.214

**VIEWED**
**06/23/2016**
14:57:45 UTC-8
Viewed by Jim Treleaven (jtreleaven@viastrategygroup.com)
IP: 24.14.185.222

**SIGNED**
**06/23/2016**
14:58:50 UTC-8
Signed by Jim Treleaven (jtreleaven@viastrategygroup.com)
IP: 24.14.185.222

**COMPLETED**
**06/23/2016**
14:58:50 UTC-8
The document has been completed.

# EXHIBIT B

**Barney v. Pieter**
**Case No. 30-2018-01006531**
**Exhibit B**

**AMENDED AND RESTATED**
**BYLAWS OF**
**LEPORT EDUCATIONAL INSTITUTE, INC.,**
a California corporation

**August 26, 2016**

LEI000473

# TABLE OF CONTENTS

**Page**

## ARTICLE I
### Offices

Section 1.    Principal Executive Office ................................................................................... 1
Section 2.    Other Offices ...................................................................................................... 1

## ARTICLE II
### Meetings of Shareholders

Section 1.    Place and Conduct of Meetings ......................................................................... 1
Section 2.    Annual Meetings ................................................................................................ 2
Section 3.    Special Meetings ................................................................................................ 2
Section 4.    Notice of Shareholders' Meetings ..................................................................... 2
Section 5.    Manner of Giving Notice; Affidavit of Notice ................................................. 2
Section 6.    Quorum .............................................................................................................. 3
Section 7.    Adjourned Meeting and Notice Thereof ............................................................ 3
Section 8.    Voting ................................................................................................................ 4
Section 9.    Waiver of Notice; Consent ................................................................................ 4
Section 10.   Shareholder Action by Written Consent Without a Meeting ............................. 5
Section 11.   Record Date ....................................................................................................... 5
Section 12.   Proxies ............................................................................................................... 6
Section 13.   Inspectors of Election ....................................................................................... 6

## ARTICLE III
### Directors

Section 1.    Powers ............................................................................................................... 7
Section 2.    Number of Directors .......................................................................................... 7
Section 3.    Election and Term of Office .............................................................................. 7
Section 4.    Resignation; Vacancies ..................................................................................... 7
Section 5.    Place of Meetings .............................................................................................. 8
Section 6.    Annual Meeting ................................................................................................. 8
Section 7.    Other Regular Meetings .................................................................................... 8
Section 8.    Special Meetings ................................................................................................ 8
Section 9.    Waiver of Notice ............................................................................................... 8
Section 10.   Quorum .............................................................................................................. 8
Section 11.   Adjournment ...................................................................................................... 9
Section 12.   Notice of Adjournment ...................................................................................... 9
Section 13.   Action Without Meeting .................................................................................... 9
Section 14.   Remote Participation in Meetings ..................................................................... 9
Section 15.   Fees and Compensation ..................................................................................... 9

## ARTICLE IV
### Committees

Section 1.    Committees of the Board .................................................................................... 9
Section 2.    Meetings and Actions of Committees ............................................................... 10

LEI000474

ARTICLE V
Officers

Section 1.    Officers ........................................................................................................ 10
Section 2.    Appointment ................................................................................................. 10
Section 3.    Subordinate Officers .................................................................................... 10
Section 4.    Removal and Resignation ............................................................................. 10
Section 5.    Vacancies ..................................................................................................... 11
Section 6.    Chairman of the Board ................................................................................. 11
Section 7.    President ....................................................................................................... 11
Section 8.    Vice Presidents ............................................................................................ 11
Section 9.    Secretary ...................................................................................................... 11
Section 10.   Chief Financial Officer ................................................................................ 12

ARTICLE VI
Indemnification

Section 1.    Right to Indemnification .............................................................................. 12
Section 2.    Right of Indemnitee to Bring Suit ............................................................... 12
Section 3.    Non-Exclusivity of Rights ........................................................................... 13
Section 4.    Insurance ...................................................................................................... 13
Section 5.    Indemnification of Employees or Agents of the Corporation ...................... 13
Section 6.    Indemnification Contracts ............................................................................ 13
Section 7.    Nature of Rights and Effect of Amendment ................................................. 14

ARTICLE VII
Records and Reports

Section 1.    Maintenance and Inspection of Share Register ............................................ 14
Section 2.    Maintenance and Inspection of Bylaws ........................................................ 14
Section 3.    Maintenance and Inspection of other Corporate Records ............................ 14
Section 4.    Inspection by Directors ................................................................................ 15
Section 5.    Annual Report to Shareholders; Waiver ...................................................... 15
Section 6.    Financial Statements .................................................................................... 15

ARTICLE VIII
General Matters

Section 1.    Checks; Drafts; Evidences of Indebtedness ................................................ 16
Section 2.    Contracts and Instruments: How Executed ................................................. 16
Section 3.    Representation of Shares of Other Corporations ......................................... 16
Section 4.    Certificates for Shares ................................................................................. 16
Section 5.    Lost Certificates ........................................................................................... 17
Section 6.    Electronic Transmission ............................................................................... 17
Section 7.    Construction and Definitions ....................................................................... 17

ARTICLE IX
Amendments

Section 1.    Amendment by Board of Directors or Shareholders ..................................... 17

**AMENDED AND RESTATED
BYLAWS OF
LEPORT EDUCATIONAL INSTITUTE, INC.,
a California corporation**

## ARTICLE I

## OFFICES

**Section 1.      Principal Executive Office**.  The Board of Directors shall fix the location of the principal executive office of the Corporation at any place within or without the State of California.  If the principal executive office is located outside the State of California and the Corporation has one or more business offices in the State of California, then the Board of Directors shall fix and designate a principal business office in the State of California.

**Section 2.      Other Offices**.  Other business offices may at any time be established by the Board of Directors at any place or places where the Corporation is qualified to do business.

## ARTICLE II

## MEETINGS OF SHAREHOLDERS

**Section 1.      Place and Conduct of Meetings**.  Meetings of shareholders shall be held at any place within or without the State of California that may be designated by the Board of Directors.  In the absence of any such designation, shareholders' meetings will be held at the principal executive office of the Corporation or at any place consented to in writing by all persons entitled to vote at such meeting, given before or after the meeting and filed with the Secretary of the Corporation.

If authorized by the Board of Directors, in its sole discretion, and subject to the consent requirement in Section 20(b) of the California Corporations Code and any guidelines and procedures that the Board of Directors may adopt, shareholders not physically present in person or by proxy at a meeting of shareholders may, by electronic transmission by and to the Corporation, as provided in Sections 20 and 21 of the California Corporations Code, or by electronic video screen communication, participate in a meeting of shareholders, be deemed present in person or by proxy, and vote, at a meeting of shareholders whether the meeting is to be held at a designated place or in whole or in part by means of electronic transmission by and to the Corporation or by electronic video screen communication, in accordance with the following paragraph.

A meeting of the shareholders may be conducted, in whole or in part, by electronic transmission by and to the Corporation or by electronic video screen communication if (i) the Corporation implements reasonable measures to provide shareholders (in person or by proxy) a reasonable opportunity to participate in the meeting and to vote on matters submitted to the shareholders, including an opportunity to read or hear the proceedings of the meeting concurrently with those proceedings, and (ii) the Corporation maintains a record of any shareholder votes or other shareholder actions taken at the meeting by means of electronic transmission to the Corporation or electronic video screen communication. Any request by the Corporation to a shareholder pursuant to Section 20(b) of the California Corporations Code for consent to conduct a meeting of shareholders by electronic transmission shall include a notice

that, absent consent of the shareholder pursuant to Section 20(b) of the California Corporations Code, the meeting shall be held at a physical location in accordance with the first paragraph of this Section 1.

Section 2.    **Annual Meetings**.  The annual meeting of shareholders shall be held each year at a time and on such date as may be designated by the Board of Directors.  At the meeting, directors shall be elected and any other business may be transacted that is properly brought before the meeting.

Section 3.    **Special Meetings**.  A special meeting of the shareholders may be called at any time by the Board of Directors, the Chairman of the Board, the President or the holders of shares entitled to cast not less than ten percent (10%) of the votes at the meeting.

Upon request in writing to the Corporation specifying the time of the special meeting and the general nature of the business to be transacted at the special meeting and addressed to the attention of the Chairman of the Board, the President, any Vice President or the Secretary by any persons (other than the Board of Directors) entitled to call a special meeting of shareholders, the officer forthwith shall cause notice to be given to the shareholders entitled to vote that a meeting will be held at a time requested by the person or persons calling the meeting, not less than thirty-five (35) nor more than sixty (60) days after the receipt of the request.  If the notice is not given within twenty (20) days after the receipt of the request, the persons entitled to call the meeting may give the notice.  Nothing contained in this paragraph shall be construed as limiting, fixing or affecting the time when a meeting of shareholders called by action of the Board of Directors may be held.

Section 4.    **Notice of Shareholders' Meetings**.  Written notice of each annual or special meeting of shareholders shall be given not less than ten (10) (or, if sent by third-class mail, thirty (30)) nor more than sixty (60) days before the date of the meeting to each shareholder entitled to vote at the meeting. The notice shall specify the place, date and hour of the meeting, the means of electronic transmission by and to the Corporation or electronic video screen communication, if any, by which shareholders may participate in that meeting, and (i) in the case of a special meeting, the general nature of the business to be transacted, and no other business may be transacted, or (ii) in the case of the annual meeting, those matters that the Board of Directors, at the time the notice is given, intends to present for action by the shareholders (but, subject to the provisions of the next paragraph of this Section 4 and applicable law, any proper matter may be presented at the meeting for such action). The notice of any meeting at which directors are to be elected shall include the names of nominees intended at the time of the notice to be presented by the Board of Directors for election.

Any shareholder approval at a meeting, other than unanimous approval by those entitled to vote, pursuant to Section 310, 902, 1152, 1201, 1900 or 2007 of the California Corporations Code shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

Section 5.    **Manner of Giving Notice; Affidavit of Notice**.  Notice of any shareholders' meeting or any report shall be given either personally, by electronic transmission by the Corporation, or by first-class mail, or, if the Corporation has outstanding shares held of record by 500 or more persons (determined as provided in Section 605 of the California Corporations Code) on the record date for the shareholders' meeting, notice may also be sent third-class mail, or other means of written communication, addressed to the shareholder at the address of the shareholder appearing on the books of the Corporation or given by the shareholder to the Corporation for the purpose of notice. If no address for that shareholder appears on the Corporation's books or is given, notice may be given at the place where the Corporation's principal executive office is located or by publication at least once in a newspaper of

LEI000477

general circulation in the county in which the principal executive office is located. The notice or report shall be deemed to have been given at the time when delivered personally, sent by electronic transmission by the Corporation, deposited in the mail, or sent by other means of written communication.

If any notice or report mailed to a shareholder at the address of that shareholder appearing on the books of the Corporation is returned to the Corporation marked to indicate that the United States Postal Service is unable to deliver the notice or report to the shareholder at that address, all future notices or reports shall be deemed to have been duly given without further mailing if the Corporation makes the document available for the shareholder upon written demand of the shareholder at the principal executive office of the Corporation for a period of one year from the date of the giving of the notice or report to all other shareholders.

Notice given by electronic transmission by the Corporation as provided above shall be valid only if it complies with Section 20 of the California Corporations Code. Notwithstanding the foregoing, notice shall not be given by electronic transmission by the Corporation as provided in this section after either (i) the Corporation is unable to deliver two consecutive notices to the shareholder by that means, or (ii) the inability to so deliver the notices to the shareholder becomes known to the Secretary, any Assistant Secretary, the transfer agent, or other person responsible for the giving of the notice.

An affidavit of mailing or electronic transmission by the Corporation of any notice or report in accordance with the provisions of the California General Corporation Law, executed by the Secretary, Assistant Secretary or any transfer agent of the Corporation, shall be *prima facie* evidence of the giving of the notice or report.

Section 6.    **Quorum**.    Unless otherwise provided in the Articles of Incorporation, the presence in person or by proxy of the holders of a majority of the shares entitled to vote at any meeting of the shareholders shall constitute a quorum for the transaction of business.  The shareholders present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum or, if required by the General Corporation Law or the Articles of Incorporation, the vote of a greater number of shares or voting by classes.

Section 7.    **Adjourned Meeting and Notice Thereof**.  Any shareholders' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of a majority of the shares represented either in person or by proxy at the meeting, but in the absence of a quorum, no other business may be transacted at such meeting, except as provided in Section 6 of this Article II.

When any shareholders' meeting, either annual or special, is adjourned to another time or place, notice of the adjourned meeting need not be given if the time and place (or the means of electronic transmission by and to the Corporation or electronic video screen communication, if any, by which shareholders may participate) are announced at the meeting at which the adjournment is taken.  If the adjournment is for more than forty-five (45) days from the date set for the original meeting or if after adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each shareholder of record entitled to vote at the adjourned meeting in accordance with Sections 4 and 5 of this Article II.  At the adjourned meeting, the Corporation may transact any business that might have been transacted at the original meeting.

LEI000478

**Section 8.    Voting**.  The shareholders entitled to vote at any meeting of shareholders shall be determined in accordance with the provisions of Section 11 of this Article II, subject to the provisions of Sections 702 through 704 of the California Corporations Code.

Except with respect to cumulative voting rights set forth in this Section 8, and except as may be otherwise provided in the Articles of Incorporation, each outstanding share, regardless of class, shall be entitled to one vote on each matter submitted to a vote of the shareholders. Any shareholder entitled to vote on any matter may vote part of the shares in favor of the proposal and refrain from voting the remaining shares or vote them against the proposal, other than elections of directors to office; but, if the shareholder fails to specify the number of shares the shareholder is voting affirmatively, it will be conclusively presumed that the shareholder's approving vote is with respect to all shares the shareholder is entitled to vote.

The affirmative vote of a majority of the shares represented and voting at a duly-held meeting at which a quorum is present (which shares voting affirmatively also constitute at least a majority of the required quorum) shall be the act of the shareholders, unless the vote of a greater number or voting by classes is required by the California General Corporation Law or by the Articles of Incorporation.

Every shareholder entitled to vote at any election of directors may cumulate such shareholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which the shareholder's shares are normally entitled or distribute the shareholder's votes on the same principle among as many candidates as the shareholder thinks fit; provided, however, that no shareholder shall be entitled to cumulate votes (*i.e.,* cast for any candidate a number of votes greater than the number of votes that the shareholder normally is entitled to cast) unless the candidate's or candidates' names have been placed in nomination prior to the voting and the shareholder has given notice at the meeting prior to the voting of the shareholder's intention to cumulate the shareholder's votes. If any one shareholder has given such a notice, all shareholders entitled to vote may cumulate their votes for candidates in nomination.

In any election of directors, the candidates receiving the highest number of affirmative votes of the shares entitled to be voted for them, up to the number of directors to be elected by those shares, are elected. Elections for directors need not be by ballot unless a shareholder demands election by ballot at the meeting and before the voting begins.

**Section 9.    Waiver of Notice; Consent**.  The transactions of any meeting of shareholders, however called and noticed and wherever held, are as valid as though had at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each person entitled to vote that was not present, in person or by proxy, provides a written waiver of notice or consent to the holding of the meeting or an approval of the minutes of the meeting. All such waivers, consents and approvals shall be filed with the corporate records or made a part of the minutes of the meeting. Neither the business to be transacted at nor the purpose of any regular or special meeting of shareholders need be specified in any written waiver of notice, consent to the holding of the meeting or approval of the minutes of the meeting, unless otherwise provided in the Articles of Incorporation or these Bylaws and except as provided in the second paragraph of Section 4 of this Article II.

A shareholder's attendance at a meeting shall also constitute a waiver of notice of and presence at the meeting, except when the person objects, at the beginning of the meeting, to the transaction of any business because the meeting was not lawfully called or convened.  Further, attendance at a meeting does

not constitute a waiver of any right to object to the consideration of matters required by the California General Corporation Law to be included in the notice of the meeting but not so included, if the objection is expressly made at the meeting.

Section 10. **Shareholder Action by Written Consent without a Meeting**. Unless otherwise provided in the Articles of Incorporation, any action that may be taken at any annual or special meeting of shareholders may be taken without a meeting and without prior notice, if a consent in writing, as specified in Section 195 of the California Corporations Code, setting forth the action so taken, shall be provided by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all shares entitled to vote on that action were present and voted.

Notwithstanding the first paragraph of this <u>Section 10</u>, directors may not be elected by written consent except by unanimous written consent of all shares entitled to vote for the election of directors; *provided* that the shareholders may elect a director to fill a vacancy, other than a vacancy created by removal, by the written consent of a majority of the outstanding shares entitled to vote.

Any shareholder giving a written consent, or the shareholder's proxy holders, or a transferee of the shares or a personal representative of the shareholder or their respective proxy holders, may revoke the consent personally or by proxy by a writing received by the Corporation prior to the time that written consents of the number of shares required to authorize the proposed action have been filed with the Secretary of the Corporation, but may not do so thereafter. The revocation is effective upon its receipt by the Secretary of the Corporation.

Unless the consents of all shareholders entitled to vote have been solicited in writing, both of the following shall apply: (i) notice of any shareholder approval pursuant to Section 310, 317, 1152, 1201 or 2007 of the California Corporations Code without a meeting by less than unanimous written consent shall be given as provided in <u>Section 5</u> of this Article II at least ten (10) days before the consummation of the action authorized by that approval; and (ii) prompt notice shall be given as provided in <u>Section 5</u> of this Article II of the taking of any other corporate action approved by shareholders without a meeting by less than unanimous written consent, to those shareholders entitled to vote who have not consented in writing.

Section 11. **Record Date**. For purposes of determining the shareholders entitled to notice of any meeting or to vote at a meeting or give written consent to corporate action without a meeting, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days prior to the date of such meeting, or not more than sixty (60) days prior to any other action.

If the Board of Directors does not so fix a record date:

(i)    The record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(ii)    The record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, if no prior action by the Board of Directors has been taken, shall be the day on which the first written consent is given.

LEI000480

(iii)    The record date for determining shareholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto, or the sixtieth (60th) day prior to the date of such other action, whichever is later.

A determination of shareholders of record entitled to notice of or to vote at a meeting of shareholders shall apply to any adjournment of the meeting unless the Board of Directors fixes a new record date for the adjourned meeting, but the Board of Directors shall fix a new record date if the adjournment is to a date more than forty-five (45) days after the date set for the original meeting.

Only shareholders of record on the Corporation's books at the close of business on the record date are entitled to notice and to vote, notwithstanding any transfer of any shares on the books of the Corporation after the record date, except as otherwise provided in the Articles of Incorporation or by agreement or in the California General Corporation Law.

**Section 12.    Proxies**.  Every person entitled to vote shares may authorize another person or persons to act by proxy with respect to those shares. A proxy must be either a written authorization signed by the shareholder (or the shareholder's attorney-in-fact) or an electronic transmission authorized by the shareholder (or the shareholder's attorney-in-fact), in either case giving another person or persons power to vote with respect to the shares of such shareholder. A proxy shall be deemed signed if the shareholder's name or other authorization is placed on the proxy (whether by manual signature, typewriting, telegraphic or electronic transmission, or otherwise) by the shareholder or the shareholder's attorney-in-fact. A proxy may be transmitted by an oral telephonic transmission if it is submitted with information from which it may be determined that the proxy was authorized by the shareholder or the shareholder's attorney-in-fact.

No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. A proxy continues in full force and effect until revoked by the person executing it prior to the vote pursuant thereto, except as otherwise provided in Section 705 of the California General Corporation Law. Such revocation may be effected (i) by a writing delivered to the Corporation stating that the proxy is revoked, (ii) by a subsequent proxy executed by the person executing the prior proxy and presented to the meeting, or (iii) as to any meeting, by attendance at the meeting and voting in person by the person executing the proxy. The dates contained on the forms of proxy presumptively determine the order of execution, regardless of the postmark dates on the envelopes in which they are mailed. A proxy is not revoked by the death or incapacity of the maker unless, before the vote is counted, written notice of such death or incapacity is received by the Corporation.

The revocability of a proxy that states on its face that it is irrevocable shall be governed by Section 705(e) and (f) of the California Corporations Code.

**Section 13.    Inspectors of Election**.  In advance of any meeting of shareholders, the Board of Directors may appoint any persons other than nominees for office to act as inspectors of election at such meeting or any adjournment thereof. If no inspectors of election are so appointed, the chairman of any such meeting may, and on the request of any shareholder or a shareholder's proxy shall, appoint inspectors of election at the meeting. The number of inspectors shall be either one or three. If inspectors are appointed at a meeting on the request of one or more shareholders or one or more shareholder's proxies, the majority of shares represented in person or by proxy shall determine whether one or three inspectors are to be appointed. If any person appointed as inspector fails to appear or fails or refuses to act, the chairman of the meeting may, and on the request of any shareholder or a shareholder's proxy shall, appoint a person to fill that vacancy.

LEI000481

The inspectors of elections shall (i) determine the number of shares outstanding and the voting power of each, the shares represented at the meeting, the existence of a quorum, and the authenticity, validity and effect of proxies; (ii) receive votes, ballots or consents; (iii) hear and determine all challenges and questions in any way arising in connection with the right to vote; (iv) count and tabulate all votes or consents; (v) determine when the polls shall close; (vi) determine the result; and (vii) do any other acts that may be proper to conduct the election or vote with fairness to all shareholders.

## ARTICLE III

### DIRECTORS

**Section 1.    Powers**.  Subject to limitations of the Articles of Incorporation or these Bylaws and the provisions of the California General Corporation Law relating to action required to be approved by the shareholders or by the outstanding shares, the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors.

**Section 2.    Number of Directors**.  The authorized number of directors of the Corporation shall be six (6), unless otherwise provided in the Articles of Incorporation. No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of that director's term of office.

**Section 3.    Election and Term of Office**.  Directors shall be elected at each annual meeting of shareholders to hold office until the next annual meeting. Each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified.

**Section 4.    Resignation; Vacancies**.  A vacancy in the Board of Directors shall be deemed to exist in the event that (a) any director dies, resigns, or is removed by the shareholders or an appropriate court, as provided in Section 303 or 304 of the California Corporations Code, (b) the Board of Directors declares vacant the office of a director that has been declared of unsound mind by order of court or convicted of a felony, (c) the authorized number of directors is increased, or (d) the shareholders fail, at any shareholders' meeting at which any director or directors are elected, to elect the full authorized number of directors to be voted for at that meeting.

Any director may resign effective upon giving written notice to the Chairman of the Board, the President, the Secretary or the Board of Directors, unless the notice specifies a later time for the effectiveness of such resignation. If the resignation is effective at a future time, the Board of Directors may elect a successor to take office when the resignation becomes effective.

Vacancies in the Board of Directors, except for a vacancy created by the removal of a director, may be filled by approval of the Board of Directors or, if the number of directors then in office is less than a quorum, by (i) the unanimous written consent of the directors then in office, (ii) the affirmative vote of a majority of the directors then in office at a meeting held pursuant to notice or waivers of notice complying with Section 307 of the California Corporations Code, or (iii) a sole remaining director.  A vacancy on the Board of Directors created by the removal of a director may be filled only by the vote of a majority of the shares represented and voting at a duly-held meeting at which a quorum is present (which shares voting affirmatively also constitute at least a majority of the required quorum), or by the unanimous written consent of all shares entitled to vote thereon. Each director so elected to fill a vacancy

DOCSOC/1775330v1/103990-0005

LEI000482

shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified.

The shareholders may elect a director or directors at any time to fill any vacancy or vacancies not filled by the directors. Any such election by written consent, other than to fill a vacancy created by removal, shall require the consent of holders of a majority of the outstanding shares entitled to vote.

**Section 5.    Place of Meetings**. Regular meetings of the Board of Directors may be held at any place within or without the State of California that has been designated from time to time by the Board of Directors. In the absence of such designation, regular meetings shall be held at the principal executive office of the Corporation. Special meetings of the Board of Directors may be held at any place within or without the State of California that has been designated in the notice of the meeting or, if not stated in the notice or if there is no notice, at the principal executive office of the Corporation.

**Section 6.    Annual Meeting**. Immediately following each annual meeting of shareholders, the Board of Directors shall hold a regular meeting at the place of said annual meeting or at such other place as shall be fixed by the Board of Directors, for the purpose of organization, election of officers, and the transaction of other business as desired. Notice of this meeting will not be required unless some place other than the place of the annual shareholders' meeting has been designated.

**Section 7.    Other Regular Meetings**. Other regular meetings of the Board of Directors shall be held without call as provided in a resolution adopted by the Board of Directors from time to time. Such regular meetings may be held without notice.

**Section 8.    Special Meetings**. Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the Chairman of the Board, the President, any Vice President, the Secretary or by any two directors.

Special meetings of the Board of Directors will be held on four (4) days' notice by first class mail, postage prepaid, or forty-eight (48) hours' notice delivered personally or by telephone, including a voice messaging system or other system or technology designed to record and communicate messages, facsimile, electronic mail, or other electronic means. Any such notice shall be addressed or delivered in accordance with the contact information reflected in the records of the Corporation or as given to the Corporation by the director for purposes of notice or, if such contact information is not shown on the Corporation's records or is not readily ascertainable, at the principal executive office of the Corporation. The notice need not specify the purpose of the meeting.

**Section 9.    Waiver of Notice**. Notice of a meeting need not be given to any director who: (i) provides a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof in writing, whether before or after the meeting, or (ii) attends the meeting without protesting the lack of notice before or at the beginning of the meeting. All such waivers, consents and approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

**Section 10.    Quorum**. A majority of the authorized number of directors constitutes a quorum of the Board of Directors for the transaction of business, except to adjourn as provided in Section 11 of this Article III. Every act or decision done or made by a majority of the directors present at a duly held meeting at which a quorum is present will be regarded as the act of the Board of Directors, subject to the provisions of Section 310, 311 and 317(e) of the California Corporations Code, the Articles of Incorporation, these Bylaws and other applicable law. A meeting at which a quorum is initially present

DOCSOC/1775330v1/103990-0005

LEI000483

may continue to transact business, notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting or by such greater number, if any, required by the California General Corporation Law, the Articles of Incorporation or these Bylaws.

      **Section 11.    Adjournment**.  A majority of the directors present, whether or not a quorum is present, may adjourn any meeting to another time and place.

      **Section 12.    Notice of Adjournment**.  Notice of the time and place of resuming a meeting that has been adjourned need not be given unless the adjournment is for more than twenty-four (24) hours, in which case notice of such adjournment to another time and place shall be given prior to the time of the adjourned meeting to the directors who were not present at the time of adjournment.

      **Section 13.    Action without Meeting**.  Any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all members of the Board of Directors shall individually or collectively consent in writing to such action.  Such written consent or consents shall be filed with the minutes of the proceedings of the Board of Directors and shall have the same force and effect as a unanimous vote of such directors.

      **Section 14.    Remote Participation in Meetings**.  Members of the Board of Directors may participate in a meeting through use of conference telephone, electronic video screen communication or electronic transmission by and to the Corporation in accordance with Sections 20 and 21 of the California Corporations Code.  Participation in a meeting through use of conference telephone or electronic video screen communication constitutes presence in person at that meeting as long as all members participating in the meeting are able to hear one another.  Participation in a meeting through electronic transmission by and to the Corporation (other than conference telephone and electronic video screen communication) constitutes presence in person at that meeting if both of the following apply: (i) each member participating in the meeting can communicate with all of the other participating members concurrently; and (ii) each member is provided the means of participating in all matters before the Board of Directors, including, without limitation, the capacity to propose, or to interpose an objection to, a specific action to be taken by the Corporation.

      **Section 15.    Fees and Compensation**.  Directors and members of committees of the Board of Directors may receive compensation, if any, for their services, and reimbursement for expenses, as may be fixed or determined by resolution of the Board of Directors.

**ARTICLE IV**

**COMMITTEES**

      **Section 1.    Committees of the Board**.  The Board of Directors may, by resolution adopted by a majority of the authorized number of directors, designate one or more committees, each consisting of two or more directors, to serve at the pleasure of the Board of Directors.  The Board of Directors may designate one or more directors as alternate members of any committee, to replace any absent member at any meeting of the committee.  The appointment of members or alternate members of a committee requires the vote of a majority of the authorized number of directors.  Any such committee, to the extent provided in the resolution of the Board of Directors or in these Bylaws, shall have all the authority of the Board of Directors, except with respect to:  (i) the approval of any action for which the California General Corporation Law also requires the approval by the shareholders or by the outstanding shares; (ii) the filling of vacancies on the Board of Directors or any committee of the Board of Directors; (iii) the

-9-

LEI000484

fixing of compensation of directors for service on the Board of Directors or any committee of the Board of Directors; (iv) the amendment or repeal of these Bylaws or the adoption of new bylaws; (v) the amendment or repeal of any resolution of the Board of Directors which by its express terms is not so amendable or repealable; (vi) a distribution to the shareholders, except at a rate, in a periodic amount or within a price range set forth in the Articles of Incorporation or determined by the Board of Directors; or (vii) the appointment of any other committees of the Board of Directors or the members of such committees.

Section 2.    **Meetings and Actions of Committees**.  Meetings and actions of committees will be governed by, and held and taken in accordance with, bylaw provisions applicable to meetings and actions of the Board of Directors, as provided in Section 5 and Sections 7 through 14 of Article III of these Bylaws, with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board of Directors and its members; provided, however, that (i) the time of regular meetings of committees may be determined either by resolution of the Board of Directors or by resolution of the committee; (ii) special meetings of committees may also be called by resolution of the Board of Directors; and (iii) notice of special meetings of committees shall also be given to all alternate members who will have the right to attend all meetings of the committee.  Subject to the provisions of these Bylaws, the Board of Directors shall have the power to prescribe the manner in which proceedings of any committee shall be conducted, and, in the absence of prescription by the Board of Directors, a committee shall have the power to prescribe the manner in which its proceedings shall be conducted.

## ARTICLE V

## OFFICERS

Section 1.    **Officers**.  The officers of the Corporation shall be a President, a Secretary and a Chief Financial Officer.  The Corporation may also have, at the discretion of the Board of Directors, a Chairman of the Board, one or more Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers and such other officers as may be appointed in accordance with the provisions of Section 3 of this Article V.  Any number of offices may be held by the same person.

Section 2.    **Appointment**.  The officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 3 or Section 5 of this Article V, shall be chosen by, and shall serve at the pleasure of, the Board of Directors, subject to the rights, if any, of an officer under any contract of employment.

Section 3.    **Subordinate Officers**.  The Board of Directors may appoint, and may empower the President to appoint, such other officers as the business of the Corporation may require, each to hold office for such period, have such authority and perform such duties as are provided in these Bylaws or as the Board of Directors may from time to time determine.

Section 4.    **Removal and Resignation**.  Any officer may be removed, either with or without cause, by the Board of Directors at any time or, except in case of an officer chosen by the Board of Directors, by any officer upon whom such power of removal may be conferred by the Board of Directors (subject, in each case, to the rights, if any, of an officer under any contract of employment).

Any officer may resign at any time by giving written notice to the Corporation, without prejudice to the rights, if any, of the Corporation under any contract to which such officer is a party.  Any such

LEI000485

resignation shall take effect at the date of the receipt of such notice or at any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 5.     Vacancies**.  A vacancy in any office because of death, resignation, removal, disqualification or any other cause will be filled in the manner prescribed in these Bylaws for regular appointments to that office.

**Section 6.     Chairman of the Board**.  The Chairman of the Board, if there shall be such an officer, shall, if present, preside at all meetings of the Board of Directors and exercise and perform such other powers and duties as may be from time to time assigned to him by the Board of Directors or prescribed by these Bylaws.  If there is no Chief Executive Officer or President, then the Chairman of the Board shall also be the general manager and chief executive officer of the Corporation and shall have the powers and duties thereof.

**Section 7.     President**.  Subject to such powers given by the Board of Directors or these Bylaws to the Chairman of the Board, if any, the President will be the general manager and chief executive officer of the Corporation and will, subject to the control of the Board of Directors, have general supervision, direction and control over the business and officers of the Corporation.   The President will preside at all meetings of the shareholders and, in the absence of the Chairman of the Board or if there is no Chairman of the Board, will also preside at meetings of the Board of Directors. The President shall have the general powers and duties of management usually vested in the office of President of a Corporation, and shall have such other powers and duties as may be prescribed by the Board of Directors or these Bylaws.

**Section 8.     Vice Presidents**.  In the absence or disability of the President, the Vice Presidents, if any, in order of their rank as fixed by the Board of Directors or, if not ranked, a Vice President designated by the Board of Directors, shall perform all the duties of the President, and when so acting shall have such other powers of, and be subject to all of the restrictions upon, the President. The Vice Presidents shall have such other powers and duties as from time to time may be prescribed for them by the Board of Directors, these Bylaws, or the President (or Chairman of the Board if there is no President).

**Section 9.     Secretary**.  The Secretary shall keep or cause to be kept, at the principal executive office of the Corporation or such other place as the Board of Directors may order, a book of minutes of meetings and actions of the Board of Directors, committees of the Board of Directors and shareholders.

The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, a share register, or a duplicate share register, showing the names of all shareholders and their addresses, the number and classes of shares held by each, the number and date of certificates, if any, issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, notice of all meetings of the shareholders and of the Board of Directors and of any committees thereof required to be given by law or these Bylaws, and shall keep the seal of the Corporation, if one be adopted, in safe custody, and shall have such other powers and duties as may be prescribed by the Board of Directors or by these Bylaws.

-11-

LEI000486

**Section 10.    Chief Financial Officer.**  The Chief Financial Officer of the Corporation shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the Corporation.  The books of account shall at all reasonable times be open to inspection by any director.

The Chief Financial Officer shall deposit all monies and other valuables in the name and to the credit of the Corporation with such depositories as may be designated by the Board of Directors.  The Chief Financial Officer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, shall render to the President and directors, whenever they request it, an account of all transactions conducted as Chief Financial Officer and of the financial condition of the Corporation, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or these Bylaws.

## ARTICLE VI

## INDEMNIFICATION

**Section 1.    Right to Indemnification.**  Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "**proceeding**"), by reason of the fact that he or she is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation or of a partnership, joint venture, trust or other enterprise (hereinafter an "**indemnitee**"), whether the basis of such proceeding is alleged action in an official capacity as a director or officer or in any other capacity while serving as a director or officer, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the California General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred by such indemnitee in connection therewith; provided, however, that, except as provided in Section 2 of this Article VI with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation.  The right to indemnification conferred in this Section 1 shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition (hereinafter an "**advancement of expenses**"); provided, however, that, if the California General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee) shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Article VI or otherwise (hereinafter an "**undertaking**").

**Section 2.    Right of Indemnitee to Bring Suit.**  If a claim under Section 1 of this Article VI is not paid in full by the Corporation within forty-five (45) days after a written claim has been received by the Corporation, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  If successful in whole or part in any such suit or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an

-12-

LEI000487

undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) any suit by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met the applicable standard of conduct set forth in the California General Corporation Law. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the California General Corporation Law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by indemnitee, be a defense to such suit. In any suit brought by the indemnitee to enforce a right hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified or to such advancement of expenses under this Article VI or otherwise shall be on the Corporation.

      **Section 3.**    **Non-Exclusivity of Rights**. The rights of indemnification and to the advancement of expenses conferred in this Article VI shall not be exclusive of any other right which any person may have or hereafter acquire (i) for breach of duty to the Corporation and its shareholders while acting in the capacity of a director or officer of the Corporation to the extent the additional rights to indemnification are authorized in the Articles of Incorporation in a provision adopted under paragraph (11) of Section 204(a) of the California Corporations Code or (ii) for acts, omissions or transactions while acting in the capacity of, or while serving as, a director or officer of the Corporation but not involving breach of duty to the Corporation and its shareholders, under any bylaw, agreement, vote of shareholders or disinterested directors, or otherwise, to the extent the additional rights to indemnification are authorized in the Articles of Incorporation.

      **Section 4.**    **Insurance**. The Corporation may purchase and maintain insurance, at its expense, to protect itself and any current or former director, officer, employee or agent of the Corporation or who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the California General Corporation Law.

      **Section 5.**    **Indemnification of Employees or Agents of the Corporation**. The Corporation may (but shall not be obligated), to the extent authorized from time to time by the Board of Directors, grant rights to indemnification and to the advancement of expenses, to any employee or agent of the Corporation to the fullest extent of the provisions of this Article VI with respect to the indemnification and advancement of expenses of directors or officers of the Corporation.

      **Section 6.**    **Indemnification Contracts**. The Board of Directors is authorized to enter into a contract with any director, officer, employee or agent of the Corporation, or any person serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, providing for indemnification rights equivalent to or, if the Board of Directors so determines, greater than, those provided for in this Article VI, to the fullest extent not prohibited by the California General Corporation Law or any other applicable law.

LEI000488

**Section 7.    Nature of Rights and Effect of Amendment**.  The rights conferred upon indemnitees in this Article VI shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, repeal or modification of any provision of this Article VI by the shareholders or the directors of the Corporation shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time of such amendment, repeal or modification.

## ARTICLE VII

## RECORDS AND REPORTS

**Section 1.    Maintenance and Inspection of Share Register**.  The Corporation shall keep at its principal executive office, or at the office of its transfer agent or registrar (if either be appointed), a record of its shareholders, giving the names and addresses of all shareholders and the number and class of shares held by each shareholder.

A shareholder or shareholders holding at least five percent (5%) in the aggregate of the outstanding voting shares of the Corporation, or who hold at least one percent (1%) of the outstanding voting shares of the Corporation and have filed a Schedule 14A with the United States Securities and Exchange Commission, shall have the absolute right to do either of the following:  (i) inspect and copy the record of shareholders' names and addresses and shareholdings during usual business hours upon five business days' prior written demand upon the Corporation, or (ii) obtain from the transfer agent of the Corporation, upon written demand and upon the tender of its usual charges for such a list (the amount of which charges shall be stated to the shareholder by the transfer agent upon request), a list of the shareholders' names and addresses, who are entitled to vote for the election of directors, and their shareholdings, as of the most recent record date for which it has been compiled or as of a date specified by the shareholder subsequent to the date of demand.  The list shall be made available on or before the later of five business days after the demand is received or the date specified therein as the date as of which the list is to be compiled.  The record of shareholders will also be open to inspection and copying by any shareholder or holder of a voting trust certificate at any time during usual business hours upon written demand upon the Corporation, for a purpose reasonably related to such holder's interests as a shareholder or holder of a voting trust certificate.  Any inspection or copying under this Section 1 may be made in person or by agent or attorney of the shareholder or holder of a voting trust certificate making the demand.

**Section 2.    Maintenance and Inspection of Bylaws**.  The Corporation will keep at its principal executive office or, if is principal executive office is not in the State of California, at its principal business office in the State of California, the original or a copy of the Bylaws as amended to date, which will be open to inspection by the shareholders at all reasonable times during office hours.  If the principal executive office is outside the State of California and the Corporation has no principal business office in the State of California, then the Secretary of the Corporation shall, on the written request of any shareholder, furnish to that shareholder a copy of the Bylaws as amended to date.

**Section 3.    Maintenance and Inspection of other Corporate Records**.  The minutes of proceedings of the shareholders, Board of Directors, and committees of the Board of Directors, and the accounting books and records, will be kept at the principal executive officer of the Corporation, or at such other place or places as designated by the Board of Directors.  The minutes and the accounting books and records will be kept either in written form or in a form capable of being converted into written form.  The minutes and accounting books and records will be open to inspection upon the written

-14-

LEI000489

demand on the Corporation of any shareholder or holder of a voting trust certificate at any reasonable time during usual business hours, for a purpose reasonably related to such holder's interests as a shareholder or as the holder of such voting trust certificate. Such inspection by a shareholder or holder of a voting trust certificate may be made in person or by agent or attorney, and the right of inspection includes the right to copy and make extracts. These rights of inspection will extend to the records of each subsidiary of the Corporation.

**Section 4.**    **Inspection by Directors**.  Every director will have the absolute right at any reasonable time to inspect all books, records, and documents of every kind and the physical properties of the Corporation and each of its subsidiary corporations. Such inspection by a director may be made in person or by an agent or attorney, and the right of inspection includes the right to copy and make extracts.

**Section 5.**    **Annual Report to Shareholders; Waiver**.  The Board of Directors will cause an annual report to be sent to the shareholders not later than one hundred twenty (120) days after the close of the fiscal year adopted by the Corporation.  The report will be sent to the shareholders at least fifteen (15) days (or, if sent by third-class mail, thirty-five (35) days) prior to the annual meeting of shareholders to be held during the next fiscal year and in the manner specified for giving notice to shareholders in Section 5 of Article II of these Bylaws.  If approved by the Board of Directors, the report and any companying materials sent pursuant to Section 1501 of the California Corporations Code may be sent by electronic transmission.

The annual report shall contain (i) a balance sheet as of the end of the fiscal year, (ii) an income statement for the fiscal year, (iii) a statement of cash flows for the fiscal year, (iv) any report of independent accountants or, if there is no such report, the certificate of an authorized officer of the Corporation that the statements were prepared without audit from the books and records of the Corporation, and (v) any other reports or documents as required pursuant to Section 1501 of the California Corporations Code.

The foregoing requirement of an annual report shall be waived so long as the shares of the Corporation are held by fewer than one hundred (100) holders of record (determined as provided in Section 605 of the California Corporations Code).

**Section 6.**    **Financial Statements**.  If no annual report for a fiscal year has been sent to shareholders, the Corporation will, upon the written request of any shareholder made more than one hundred twenty (120) days after the close of that fiscal year, deliver or mail to the shareholder making the request, within thirty (30) days after receipt of the request, (i) a balance sheet as of the end of the fiscal year, (ii) an income statement for the fiscal year, and (iii) a statement of cash flows for the fiscal year.

A shareholder or shareholders holding at least five percent (5%) of the outstanding shares of any class of stock of the Corporation may make a written request to the Corporation for an income statement of the Corporation for the three-month, six-month or nine-month period of the then-current fiscal year ended more than thirty (30) days prior to the date of the request and a balance sheet of the Corporation as of the end of the period and, in addition, if no annual report for the last fiscal year has been sent to the shareholders, (i) a balance sheet as of the end of the last fiscal year, (ii) an income statement for the last fiscal year, and (iii) a statement of cash flows for the last fiscal year.  The statements will be delivered or mailed to the shareholder making the request within thirty (30) days after receipt of the request.  A copy of the statements shall be kept on file in the principal office of the Corporation for twelve (12) months

DOCSOC/1775330v1/103990-0005

LEI000490

and shall be exhibited at all reasonable times to any shareholder demanding an examination of the statements or a copy shall be mailed to the shareholder.

The quarterly income statements and balance sheets referred to in this section shall be accompanied by the report, if any, of any independent accountants engaged by the Corporation or the certificate of an authorized officer of the Corporation that the financial statements were prepared without audit from the books and records of the Corporation.

## ARTICLE VIII

## GENERAL MATTERS

**Section 1.     Checks; Drafts; Evidences of Indebtedness**.  All checks, drafts or other orders for payment of money, notes or other evidences of indebtedness, issued in the name of or payable to the Corporation, shall be signed or endorsed by the person or persons and in the manner as, from time to time, shall be determined by resolution of the Board of Directors.

**Section 2.     Contracts and Instruments: How Executed**.  Except as otherwise provided in these Bylaws, the Board of Directors may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to one or more specific instances.  Unless so authorized or later ratified by the Board of Directors, no officer, agent, employee or other person purporting to act on behalf of the Corporation shall have any power or authority to bind the Corporation in any way, to pledge the Corporation's credit, or to render the Corporation liable for any purpose or for any amount.

**Section 3.     Representation of Shares of Other Corporations**.  The President, any Vice President, the Chief Financial Officer, the Secretary or any Assistant Secretary of this Corporation, or any other person authorized by the Board of Directors or President or a Vice President, is authorized to vote, represent and exercise on behalf of this Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this Corporation.  The authority herein granted may be exercised either by such person directly or by any other person authorized so to do by proxy or power of attorney duly executed by such person having the authority.

**Section 4.     Certificates for Shares**.   Subject to Section 416(b) of the California Corporations Code, every holder of shares in the Corporation shall be entitled to have a certificate signed in the name of the Corporation (i) by the Chairman or Vice Chairman of the Board or the President or a Vice President and (ii) by the Chief Financial Officer, an Assistant Treasurer, the Secretary or an Assistant Secretary, certifying the number of shares and the class or series of shares owned by the shareholder.  Any or all of the signatures on the certificate may be facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were an officer, transfer agent or registrar at the date of issue.

Certificates for shares may be issued prior to full payment under such restrictions and for such purposes as the Board of Directors may provide; but any certificate issued to represent any partly-paid shares, or any initial transaction statement issued for any partly-paid shares that are uncertificated securities, shall state the total amount of the consideration to be paid therefor and the amount paid thereon.

DOCSOC/1775330v1/103990-0005

LEI000491

**Section 5.    Lost Certificates**.  Except as provided in this Section 5, no new certificates for shares shall be issued to replace a previously-issued certificate unless the previously-issued certificate is surrendered to the Corporation or its transfer agent or registrar for cancellation at the same time.  The Board of Directors may, in case any share certificate or certificate for any other security is alleged to have been lost, stolen or destroyed (as evidenced by a written affidavit or affirmation of such fact), authorize the issuance of a new certificate to replace the previously-issued certificate, and the Corporation may require that it be given a bond (or other adequate security) sufficient to indemnify the Corporation against any claim that may be made against it (including any expense or liability) on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

**Section 6.    Electronic Transmission**.  References to "electronic transmission" by and to the Corporation shall be governed by Sections 20 and 21 of the California Corporations Code, including any requirement for consent and other procedures.

**Section 7.    Construction and Definitions**.  Unless the context otherwise requires, the general provisions, rules of construction and definitions contained in the General Provisions of the California Corporations Code and in the California General Corporation Law shall govern the construction of these Bylaws.

## ARTICLE IX

## AMENDMENTS

**Section 1.    Amendment by Board of Directors or Shareholders**.  Except as otherwise required by law or by the Articles of Incorporation, these Bylaws may be amended or repealed, and new bylaws may be adopted, by the approval of the Board of Directors or by the approval of the outstanding shares.

DOCSOC/1775330v1/103990-0005

LEI000492

EXHIBIT 5

ELECTRONICALLY RECEIVED
Superior Court of California,
County of Orange
10/12/2018 at 05:14:23 PM
Clerk of the Superior Court
By eClerk, Deputy Clerk

1550587

1   Joel W. Baruch SBN 85903
    Corey A. Hall SBN 295470
2   LAW OFFICES OF JOEL W. BARUCH, PC
    2601 Main Street, Suite 980
3   Irvine, California 92614
    Telephone: (949) 864-9662 / Fax: (949) 851-3185
4   Attorneys for Plaintiff CARL BARNEY,
    as Trustee of the CARL BARNEY LIVING TRUST
5
6   Douglas A. Barritt, SBN 150955
    BARRITT SMITH MINER LLP
7   2601 Main Street, Suite 530
    Irvine, California 92614
8   Telephone: (949) 553-0700 / Fax: (949) 553-0715
    Attorneys for Defendant/Cross-Complainant LUKAS PIETER
9
    James P. Carter SBN 150052
10  Jonathan P. Schmidt SBN 293290
    JACKSON LEWIS P.C.
11  200 Spectrum Center Drive, Suite 500
    Irvine, CA 92618
12  Phone:  (949) 885-1360 / Fax: (949) 885-1380
    Attorneys for Cross-Defendant LEPORT EDUCATIONAL INSTITUTE, INC.
13

14              SUPERIOR COURT OF THE STATE OF CALIFORNIA
          FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER
15

| | |
|---|---|
| 16  CARL BARNEY, as Trustee of the CARL BARNEY LIVING TRUST, | CASE NO.:   30-2018-01006531 *[Unlimited Jurisdiction]* |
| 17 | |
| Plaintiff, 18  v. | *Assigned for all purposes to the Hon. Ronald Bauer, Dept. CX-103* |
| 19  LUKAS PIETER and DOES 1 through 20, 20  inclusive, | **STIPULATION AND PROTECTIVE ORDER – CONFIDENTIAL AND HIGHLY CONFIDENTIAL DESIGNATIONS** |
| Defendants. 21 | |
| 22  LUKAS PIETER, an individual, | |
| 23  Cross-Complainant, 24  v. | |
| 25  LEPORT EDUCATIONAL INSTITUTE, INC., a California corporation; and ROES 1 26  to 20, inclusive, | Complaint filed:  July 18, 2018 |
| 27  Cross-Defendants. | |

28

STIPULATION AND PROTECTIVE ORDER –
CONFIDENTIAL AND HIGHLY CONFIDENTIAL DESIGNATIONS
1

**IT IS HEREBY STIPULATED** by and between the parties, Plaintiff CARL BARNEY, as Trustee of the CARL BARNEY LIVING TRUST, Defendant/Cross-Complainant LUKAS PIETER and Cross-Defendant LEPORT EDUCATIONAL INSTITUTE, INC. (collectively, the "Parties"), by and through their respective counsel of record, that in order to facilitate the exchange of information and documents which may be subject to confidentiality limitations on disclosure due to federal laws, state laws, and privacy rights, the Parties stipulate as follows:

1.      In this Stipulation and Protective Order, the words set forth below shall have the following meanings:

a.      "Proceeding" means the above-entitled proceeding entitled *Barney v. Pieter, et al.*, Orange County Superior Court Case No. 30-2018-01006531-CU-FR-CJC.

b.      "Court" means the Hon. Craig Griffin, or any other judge to which this Proceeding may be assigned, including Court staff participating in such Proceeding.

c.      "Confidential" means any Documents, Testimony, or Information which is in the possession of a Designating Party who believes in good faith that such Documents, Testimony, or Information is entitled to confidential treatment under applicable law.

d.      "Confidential Materials" means any Documents, Testimony, or Information as defined below designated as "Confidential" pursuant to the provisions of this Stipulation and Protective Order.

e.      "Highly Confidential" means any information which belongs to a Designating Party who believes in good faith that the Disclosure of such information to another Party or non-Party would create a substantial risk of serious financial or other injury that cannot be avoided by less restrictive means.

f.      "Highly Confidential Materials" means any Documents, Testimony, or Information, as defined below, designated as "Highly Confidential" pursuant to the provisions of this Stipulation and Protective Order.

g.      "Designating Party" means the Party that designates Documents,

STIPULATION AND PROTECTIVE ORDER –
CONFIDENTIAL AND HIGHLY CONFIDENTIAL DESIGNATIONS
2

Testimony, or Information, as defined below, as "Confidential" or "Highly Confidential."

h.    "Disclose" or "Disclosed" or "Disclosure" means to reveal, divulge, give, or make available Materials, or any part thereof, or any information contained therein.

i.    "Documents" means (i) any "Writing," "Original," and "Duplicate" as those terms are defined by *California Evidence Code* Sections 250, 255, and 260, which have been produced in discovery in this Proceeding by any person or entity, and (ii) any copies, reproductions, or summaries of all or any part of the foregoing.

j.    "Information" means the content of Documents or Testimony.

k.    "Testimony" means all depositions, declarations, or other testimony taken or used in this Proceeding.

2.    The Designating Party shall have the right to designate as "Highly Confidential" only the non-public Documents, Testimony, or Information that the Designating Party in good faith believes would create a substantial risk of serious financial or other injury if Disclosed to another Party or non-Party, and that such risk cannot be avoided by less restrictive means.

3.    The entry of this Stipulation and Protective Order does not alter, waive, modify, or abridge any right, privilege, or protection otherwise available to any Party with respect to the discovery of matters, including but not limited to any Party's right to assert the attorney-client privilege, the attorney work product doctrine, or other privileges, rights of privacy,  or any Party's right to contest any such assertion.

4.    Any Documents, Testimony, or Information to be designated as "Confidential" or "Highly Confidential" must be clearly so designated before the Document, Testimony, or Information is Disclosed or produced. The Parties may agree that a case name and number are to be part of the "Highly Confidential" designation. The "Confidential" or "Highly Confidential" designation should not obscure or interfere with the legibility of the designated Information.

a.    For Documents (apart from transcripts of depositions or other pretrial or trial proceedings), the Designating Party must affix the legend "Confidential" or "Highly

Confidential" on each page of any Document containing such designated material.

b.  For Testimony given in depositions the Designating Party may either:

i.  identify on the record, before the close of the deposition, all "Confidential" or "Highly Confidential" Testimony, by specifying all portions of the Testimony that qualify as "Confidential" or "Highly Confidential;" or

ii.  designate the entirety of the Testimony at the deposition as "Confidential" or "Highly Confidential" (before the deposition is concluded) with the right to identify more specific portions of the Testimony as to which protection is sought within 30 days following receipt of the deposition transcript. In circumstances where portions of the deposition Testimony are designated for protection, the transcript pages containing "Confidential" or "Highly Confidential" Information shall be separately bound by the court reporter, who must affix to the top of each page the legend "Confidential" or "Highly Confidential," as instructed by the Designating Party.

c.  For Information produced in some form other than Documents, and for any other tangible items, including, without limitation, compact discs or DVDs, the Designating Party must affix in a prominent place on the exterior of the container or containers in which the Information or item is stored the legend "Confidential" or "Highly Confidential." If only portions of the Information or item warrant protection, the Designating Party, to the extent practicable, shall identify the "Confidential" or "Highly Confidential" portions.

5.  The inadvertent production by any of the undersigned Parties or non-Parties to the Proceedings of any Document, Testimony, or Information during discovery in this Proceeding without a "Confidential" or "Highly Confidential" designation, shall be without prejudice to any claim that such item is "Confidential" or "Highly Confidential" and such Party shall not be held to have waived any rights by such inadvertent production. In the event that any Document, Testimony, or Information that is subject to a "Confidential" or "Highly Confidential" designation is inadvertently produced without such designation, the Party that inadvertently produced the

document shall give written notice of such inadvertent production within twenty (20) days of discovery of the inadvertent production, together with a further copy of the subject Document, Testimony, or Information designated as "Confidential" or "Highly Confidential" (the "Inadvertent Production Notice"). Upon receipt of such Inadvertent Production Notice, the Party that received the inadvertently produced Document, Testimony, or Information shall promptly destroy the inadvertently produced Document, Testimony, or Information and all copies thereof, or, at the expense of the producing Party, return such together with all copies of such Document, Testimony or Information to counsel for the producing Party and shall retain only the "Confidential" or "Highly Confidential" materials. Should the receiving Party choose to destroy such inadvertently produced Document, Testimony, or Information, the receiving Party shall notify the producing Party in writing of such destruction within ten (10) days of receipt of written notice of the inadvertent production. This provision is not intended to apply to any inadvertent production of any Document, Testimony, or Information protected by attorney-client or work product privileges. In the event that this provision conflicts with any applicable law regarding waiver of confidentiality through the inadvertent production of Documents, Testimony or Information, such law shall govern.

6.      In the event that counsel for a Party receiving Documents, Testimony or Information in discovery designated as "Confidential" or "Highly Confidential" objects to such designation with respect to any or all of such items, said counsel shall advise counsel for the Designating Party, in writing, of such objections, the specific Documents, Testimony or Information to which each objection pertains, and the specific reasons and support for such objections (the "Designation Objections"). Counsel for the Designating Party shall have thirty (30) days from receipt of the written Designation Objections to either (a) agree in writing to de-designate Documents, Testimony, or Information pursuant to any or all of the Designation Objections and/or (b) file a motion with the Court seeking to uphold any or all designations on Documents, Testimony, or Information addressed by the Designation Objections (the

"Designation Motion"). Pending a resolution of the Designation Motion by the Court, any and all existing designations on the Documents, Testimony, or Information at issue in such Motion shall remain in place. The Designating Party shall have the burden on any Designation Motion of establishing the applicability of its "Confidential" or "Highly Confidential" designation. In the event that the Designation Objections are neither timely agreed to nor timely addressed in the Designation Motion, then such Documents, Testimony, or Information shall be de-designated in accordance with the Designation Objection applicable to such material.

      7.      Access to and/or Disclosure of Confidential Materials shall be permitted only to the following persons or entities:

      a.      the Court;

      b.      (1)  Attorneys of record in the Proceeding and their affiliated attorneys, paralegals, clerical and secretarial staff employed by such attorneys who are actively involved in the Proceeding and are not employees of any Party; (2)  In-house counsel to the undersigned Parties and the paralegal, clerical and secretarial staff employed by such counsel. Provided, however, that each non-lawyer given access to Confidential Materials shall be advised that such materials are being Disclosed pursuant to, and are subject to, the terms of this Stipulation and Protective Order and that they may not be Disclosed other than pursuant to its terms;

      c.      those officers, directors, partners, members, employees and agents of all non-designating Parties that counsel for such Parties deems necessary to aid counsel in the prosecution and defense of this Proceeding; provided, however, that prior to the Disclosure of Confidential Materials to any such officer, director, partner, member, employee or agent, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain that such person is bound to follow the terms of such Order, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A;

      d.      court reporters in this Proceeding (whether at depositions, hearings, or any other proceeding);

e.      any deposition, trial, or hearing witness in the Proceeding who previously has had access to the Confidential Materials, or who is currently or was previously an officer, director, partner, member, employee or agent of an entity that has had access to the Confidential Materials;

f.      any deposition or non-trial hearing witness in the Proceeding who previously did not have access to the Confidential Materials; provided, however, that each such witness given access to Confidential Materials shall be advised that such materials are being Disclosed pursuant to, and are subject to, the terms of this Stipulation and Protective Order and that they may not be Disclosed other than pursuant to its terms;

g.      mock jury participants, provided, however, that prior to the Disclosure of Confidential Materials to any such mock jury participant, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain that such person is bound to follow the terms of such Order, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A.

h.      outside experts or expert consultants consulted by the undersigned Parties or their counsel in connection with the Proceeding, whether or not retained to testify at any oral hearing; provided, however, that prior to the Disclosure of Confidential Materials to any such expert or expert consultant, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain its terms to such person, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A. It shall be the obligation of counsel, upon learning of any breach or threatened breach of this Stipulation and Protective Order by any such expert or expert consultant, to promptly notify counsel for the Designating Party of such breach or threatened breach; and

i.      any other person or entity that the Designating Party agrees to in writing.

8.      Access to and/or Disclosure of Highly Confidential Materials shall be permitted only to the following persons or entities:

a.      Trial Counsel for the Parties, their partners and associates, and staff and supporting personnel of such attorneys, such as paralegal assistants, secretarial, stenographic and clerical employees and contractors, and outside copying services, who are working on this Proceeding (or any further proceedings herein) under the direction of such attorneys and to whom it is necessary that the Highly Confidential Materials be Disclosed for purposes of this Proceeding.  Such employees, assistants, contractors and agents to whom such access is permitted and/or Disclosure is made shall, prior to such access or Disclosure, be advised of, and become subject to, the provisions of this Protective Order. "Trial Counsel," for purposes of this Paragraph, shall mean outside retained counsel and shall not include in-house counsel to the undersigned Parties and the paralegal, clerical and secretarial staff employed by such in-house counsel;

b.      outside experts or expert consultants consulted by the undersigned Parties or their counsel in connection with the Proceeding, whether or not retained to testify at any oral hearing; provided, however, that prior to the Disclosure of Highly Confidential Materials to any such expert or expert consultant, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain its terms to such person, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A prior to the Disclosure of Highly Confidential Materials. It shall be the obligation of Trial Counsel, upon learning of any breach or threatened breach of this Stipulation and Protective Order by any such expert or expert consultant, to promptly notify Trial Counsel for the Designating Party of such breach or threatened breach;

c.      any person who authored, received, saw or was otherwise familiar with Documents, Testimony, or Information or thing designated "Highly Confidential," including any person otherwise familiar with the Highly Confidential Information contained therein, but only to the extent of that person's prior familiarity with the Highly Confidential Information;

d.      court reporters in this Proceeding (whether at depositions, hearings, or any other proceeding); and

e.      the Court.

9.      Confidential Materials and Highly Confidential Materials shall be used by the persons or entities receiving them only for the purposes of preparing for, conducting, participating in the conduct of, and/or prosecuting and/or defending the Proceeding, and not for any business or other purpose whatsoever.

10.     Any Party to the Proceeding (or other person subject to the terms of this Stipulation and Protective Order) may ask the Court, after appropriate notice to the other Parties to the Proceeding, to modify or grant relief from any provision of this Stipulation and Protective Order.

11.     Entering into, agreeing to, and/or complying with the terms of this Stipulation and Protective Order shall not:

a.      operate as an admission by any person that any particular Document, Testimony, or Information marked "Confidential" or "Highly Confidential" contains or reflects trade secrets, proprietary, confidential or competitively sensitive business, commercial, financial or personal information; or

b.      prejudice in any way the right of any Party (or any other person subject to the terms of this Stipulation and Protective Order):

i.      to seek a determination by the Court of whether any particular Confidential Materials or Highly Confidential Materials should be subject to protection under the terms of this Stipulation and Protective Order; or

ii.     to seek relief from the Court on appropriate notice to all other Parties to the Proceeding from any provision(s) of this Stipulation and Protective Order, either generally or as to any particular Document, Material or Information.

12.     Any Party to the Proceeding who has not executed this Stipulation and Protective Order as of the time it is presented to the Court for signature may thereafter become a Party to this Stipulation and Protective Order by its counsel's signing and dating a copy thereof and filing the same with the Court, and serving copies of such signed and dated copy upon the other Parties

to this Stipulation and Protective Order.

13.    Any Information that may be produced by a non-Party witness in discovery in the Proceeding pursuant to subpoena or otherwise may be designated by such non-Party as "Confidential" or "Highly Confidential" under the terms of this Stipulation and Protective Order, and any such designation by a non-Party shall have the same force and effect, and create the same duties and obligations, as if made by one of the undersigned Parties hereto. Any such designation shall also function as consent by such producing non-Party to the authority of the Court in the Proceeding to resolve and conclusively determine any motion or other application made by any person or Party with respect to such designation, or any other matter otherwise arising under this Stipulation and Protective Order.

14.    If any person subject to this Stipulation and Protective Order who has custody of any Confidential Materials or Highly Confidential Materials receives a subpoena or other process ("Subpoena") from any government or other person or entity demanding production of such materials, the recipient of the Subpoena shall promptly give notice of the same by electronic mail transmission, followed by either express mail or overnight delivery to counsel of record for the Designating Party, and shall furnish such counsel with a copy of the Subpoena. Upon receipt of this notice, the Designating Party may, in its sole discretion and at its own cost, move to quash or limit the Subpoena, otherwise oppose production of the Confidential Materials or Highly Confidential Materials, and/or seek to obtain confidential treatment of such materials from the subpoenaing person or entity to the fullest extent available under law. The recipient of the Subpoena may not produce any Confidential Materials or Highly Confidential Materials pursuant to the Subpoena prior to the date specified for production on the Subpoena.

15.    Nothing in this Stipulation and Protective Order shall be construed to preclude either Party from asserting in good faith that certain Confidential Materials or Highly Confidential Materials require additional protection. The Parties shall meet and confer to agree upon the terms of such additional protection.

16.     If, after execution of this Stipulation and Protective Order, any Confidential Materials or Highly Confidential Materials submitted by a Designating Party under the terms of this Stipulation and Protective Order is Disclosed by a non-Designating Party to any person other than in the manner authorized by this Stipulation and Protective Order, the non-Designating Party responsible for the Disclosure shall bring all pertinent facts relating to the Disclosure of such Confidential Materials or Highly Confidential Materials to the immediate attention of the Designating Party.

17.     This Stipulation and Protective Order is entered into without prejudice to the right of any Party to knowingly waive the applicability of this Stipulation and Protective Order to any Confidential Materials or Highly Confidential Materials designated by that Party. If the Designating Party uses Confidential Materials or Highly Confidential Materials in a non-Confidential manner, then the Designating Party shall advise that the designation no longer applies.

18.     Where any Confidential Materials or Highly Confidential Materials, or Information derived therefrom, is included in any motion or other proceeding governed by *California Rules of Court*, Rules 2.550 and 2.551, the Parties and any involved non-party shall follow those rules. With respect to discovery motions or other proceedings not governed by *California Rules of Court*, Rules 2.550 and 2.551, the following shall apply:  If Confidential Materials, Highly Confidential Materials, or Information derived therefrom are submitted to or otherwise disclosed to the Court in connection with discovery motions and proceedings, the same shall be separately filed under seal with the clerk of the Court in an envelope marked: "CONFIDENTIAL – FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER AND WITHOUT ANY FURTHER SEALING ORDER REQUIRED."

19.     The Parties shall meet and confer regarding the procedures for use of any Confidential Materials or Highly Confidential Materials at trial and shall move the Court for entry of an appropriate order.

20.     Nothing in this Stipulation and Protective Order shall affect the admissibility into evidence of Confidential Materials or Highly Confidential Materials, or abridge the rights of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Court concerning the issue of the status of any Confidential Materials or Highly Confidential Materials.

21.     This Stipulation and Protective Order shall continue to be binding after the conclusion of this Proceeding and all subsequent proceedings arising from this Proceeding, except that a Party may seek the written permission of the Designating Party or may move the Court for relief from the provisions of this Stipulation and Protective Order. To the extent permitted by law, the Court shall retain jurisdiction to enforce, modify, or reconsider this Stipulation and Protective Order, even after the Proceeding is terminated.

22.     Upon written request made within thirty (30) days after the settlement or other termination of the Proceeding, the undersigned Parties shall have thirty (30) days to either (a) promptly return to counsel for each Designating Party all Confidential Materials and Highly Confidential Materials, and all copies thereof (except that counsel for each Party may maintain in its files, in continuing compliance with the terms of this Stipulation and Protective Order, all work product, and one copy of each pleading filed with the Court, (b) agree with counsel for the Designating Party upon appropriate methods and certification of destruction or other disposition of such materials, or (c) as to any Documents, Testimony, or other Information not addressed by sub-paragraphs (a) and (b), file a motion seeking a Court order regarding proper preservation of such Materials. To the extent permitted by law the Court shall retain continuing jurisdiction to review and rule upon the motion referred to in sub-paragraph (c) herein.

23.     After this Stipulation and Protective Order has been signed by counsel for all Parties, it shall be presented to the Court for entry. Counsel agree to be bound by the terms set forth herein with regard to any Confidential Materials or Highly Confidential Materials that have been produced before the Court signs this Stipulation and Protective Order.

24. The Parties and all signatories to the Certification attached hereto as Exhibit A agree to be bound by this Stipulation and Protective Order pending its approval and entry by the Court. In the event that the Court modifies this Stipulation and Protective Order, or in the event that the Court enters a different Protective Order, the Parties agree to be bound by this Stipulation and Protective Order until such time as the Court may enter such a different Order. It is the Parties' intent to be bound by the terms of this Stipulation and Protective Order pending its entry so as to allow for immediate production of Confidential Materials and Highly Confidential Materials under the terms herein.

This Stipulation and Protective Order may be executed in counterparts.

Dated: _____     LAW OFFICES OF JOEL W. BARUCH, PC


By:     */s/ Joel W. Baruch*
Joel W. Baruch
Corey A. Hall
Attorneys for Plaintiff CARL BARNEY, as Trustee
of the CARL BARNEY LIVING TRUST


Dated: _____     JACKSON LEWIS, PC


By:     */s/ James Carter*
James Carter
Attorneys for Cross-Defendant LEPORT
EDUCATIONAL INSTITUTE, INC.


Dated: _____     BARRITT SMITH LLP


By:     */s/ Douglas A. Barritt*
Douglas A. Barritt
Attorneys for Defendant/Cross-Complainant
LUKAS PIETER

## ORDER

**GOOD CAUSE APPEARING**, the Court hereby approves this Stipulation and Protective Order.

**IT IS SO ORDERED.**

Dated:_____

_____
Hon. Craig Griffin
JUDGE OF THE SUPERIOR COURT

# EXHIBIT A

### CERTIFICATION RE CONFIDENTIAL DISCOVERY MATERIALS

I hereby acknowledge that I, _____[NAME], _____ [POSITION AND EMPLOYER], am about to receive Confidential Materials and/or Highly Confidential Materials supplied in connection with the Proceeding, *Barney v. Pieter, et al.*, Orange County Superior Court Case No. 30-2018-01006531. I certify that I understand that the Confidential Materials and/or Highly Confidential Materials are provided to me subject to the terms and restrictions of the Stipulation and Protective Order filed in this Proceeding. I have been given a copy of the Stipulation and Protective Order; I have read it, and I agree to be bound by its terms.

I understand that the Confidential Materials and Highly Confidential Materials, as defined in the Stipulation and Protective Order, including any notes or other records that may be made regarding any such materials, shall not be Disclosed to anyone except as expressly permitted by the Stipulation and Protective Order. I will not copy or use, except solely for the purposes of this Proceeding, any Confidential Materials or Highly Confidential Materials obtained pursuant to this Stipulation and Protective Order, except as provided therein or otherwise ordered by the Court in the Proceeding.

I further understand that I am to retain all copies of all Confidential Materials and Highly Confidential Materials provided to me in the Proceeding in a secure manner, and that all copies of such materials are to remain in my personal custody until termination of my participation in this Proceeding, whereupon the copies of such materials will be returned to counsel who provided me with such materials.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.  Executed this _____ day of _____, 20__, at _____.

DATED:_____      BY:   _____
                                              Signature

                                              _____
                                              Title

                                              _____
                                              Address

                                              _____
                                              City, State, Zip

                                              _____
                                              Telephone Number

EXHIBIT 6

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**11/06/2018** at 06:22:00 PM
Clerk of the Superior Court
By Georgina Ramirez,Deputy Clerk

1  Joel W. Baruch  SBN 85903
   LAW OFFICE OF JOEL W. BARUCH, PC
2  2601 Main Street,  Suite 980
   Irvine, California 92614
3  Telephone (949) 864-9662
   Facsimile (949) 851-3185
4
   Attorneys for Plaintiffs CARL BARNEY,
5  as Trustee of the CARL BARNEY LIVING TRUST and
   LePORT EDUCATIONAL INSTITUTE, INC.
6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9        **FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER**

10

11  CARL BARNEY, as Trustee of the CARL          CASE NO.:   30-2018-01006531
    BARNEY LIVING TRUST; and, LePORT            [Unlimited Jurisdiction]
12  EDUCATIONAL INSTITUTE, INC., a              Assigned for all purposes to the
    California corporation,                     Hon. Ronald Bauer, Dept. CX103
13
            Plaintiffs,                         Action Filed:  July 18, 2018
14                                              Trial Date:     None set
    v.
15
    LUKAS PIETER, PETER LePORT, M.D.,
16  MONICA LePORT, FRANCISCO                    **FIRST  AMENDED  COMPLAINT  FOR**
    LePORT, and DOES 1 through 20,              **DAMAGES  AND  RESTITUTION  AND**
17  inclusive,                                  **DEMAND FOR JURY TRIAL**

18          Defendants.

19  LUKAS PIETER, an individual,                1)    Fraud- Intentional Misrepresentation
                                                2)    Fraud- Concealment
20          Cross-Complainant,                  3)    Fraud- Failure to Disclose Known
    v.                                                Facts
21                                              4)    Breach of Fiduciary Duty
    LEPORT EDUCATIONAL INSTITUTE,               5)    Unfair Business Practices- Business
22  INC., a California corporation, and ROES 1        and Professions Code §§17200, et.
    through 20, inclusive,                            seq.
23                                              6)    Breach of Fiduciary Duty
            Cross-Defendants.
24

25

26

27

28

1    COME NOW, Plaintiffs, CARL BARNEY, as Trustee of the CARL BARNEY

2    LIVING TRUST, and LePORT EDUCATIONAL INSTITUTE, INC., a California

3    corporation, who together make this Complaint for Damages and Restitution and Demand for

4    Jury Trial against Defendants LUKAS PIETER, PETER LePORT, M.D., MONICA

5    LEPORT, FRANCISCO LEPORT, and DOES 1 through 20 as follows:

6

7                    **GENERAL ALLEGATIONS RELATING TO PARTIES**

8         1.    Plaintiff, CARL BARNEY, is Trustee of the CARL BARNEY LIVING

9    TRUST ("BARNEY") which is, and at all times herein mentioned was, a living trust. In this

10   action, Plaintiff BARNEY is suing Defendants LUKAS PIETER, PETER LePORT, M.D.,

11   MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20 for his personal losses

12   and damages.

13        2.    Plaintiff, LePORT EDUCATIONAL INSTITUTE, INC. ("LEI") is, and at all

14   times herein mentioned was, a corporation organized and existing under the laws of the State

15   of California.  Plaintiff LEI is suing Defendants PETER LePORT, M.D., MONICA

16   LePORT, FRANCISCO LePORT, and DOES 1 through 20 for its losses and damages.  In

17   this action, LEI is not suing Defendant LUKAS PIETER because it is already a cross-

18   complainant against LUKAS PIETER in another related action brought by PIETER.

19        3.    Prior to the filing of this action, LEI assigned BARNEY the rights to maintain

20   this action on its behalf against Defendants PETER LePORT, M.D., MONICA LePORT,

21   FRANCISCO LePORT, and DOES 1 through 20 for its losses and damages.

22        4.    Defendant LUKAS PIETER ("PIETER") is, and at all times herein mentioned

23   was, a resident of the State of California in the County of Orange.  Defendant PIETER was

24   the Chief Financial Officer of LEI between the approximate time period of October 5, 2015

25   through December, 2016.

26        5.    Defendant, PETER LePORT, M.D. ("PETER LePORT") is, and at all times

27   herein mentioned was, a resident of the State of California in the County of Orange.  This

28

---

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND
DEMAND FOR JURY TRIAL**

1  defendant was the Founder of LEI. At various times since LEI was founded, this defendant

2  has been an LEI shareholder, board member, Chairman of the Board, and its Chief Executive

3  Officer.

4         6.     Defendant, MONICA LePORT ("MONICA LePORT") is, and at all times

5  herein mentioned was, a resident of the State of California in the County of Orange.  This

6  defendant is the sister of Defendant PETER LePORT and was formerly a Corporate

7  Secretary and a Board of Directors member of LEI, positions which she resigned in or about

8  October, 2016.  This defendant is also a shareholder of LEI.

9         7.     Defendant, FRANCISCO LePORT ("FRANCISCO LePORT") is, and at all

10  times herein mentioned was, a resident of the State of California in the County of Orange.

11  This defendant is the son of Defendant PETER LePORT and formerly a director of LEI

12  between the approximate dates of January, 2016 to April, 2017.

13         8.     At various times alleged in this First Amended Complaint, there is a reference

14  to "the LePORT defendants".  This reference pertains to Defendants PETER LePORT,

15  MONICA LePORT, and FRANCISCO LePORT only.

16         9.     Plaintiffs are not aware of the true names and/or capacities and/or liability of

17  those parties named herein as DOES 1-20, and therefore sues these potential defendants or by

18  their fictitious names.  Plaintiffs will seek leave of Court to amend this Complaint when the

19  same is ascertained.

20         10.    Unless otherwise specified herein, those fictitious potential defendants or

21  defendants named herein as DOES 1 through 20 were in some manner controlled, or in

22  association with the named defendants in this First Amended Complaint, and, together,

23  conspired and planned to defraud Plaintiff BARNEY.

24         11.    LEI was, until recently, an owner and operator ofprivate Montesssori schools

25  located in San Francisco, Los Angeles, Orange County, San Diego, Brooklyn, and Northern

26  Virginia.  These schools provide an excellent private school education for day care,

27  preschool, elementary, and middle school students.   LEI has since sold the assets of some of

28

1     the private Montessori schools to Stratford effective on or about September 1, 2018.

2         12.     On February 9, 2000, Defendant PETER LePORT incorporated LePort & Van

3     Damme Educational Institute, Inc., a California corporation. Defendant LePORT was the

4     President and Chief Executive Officer of the corporation as well as the Chairman of the

5     Board of Directors.

6         13.     On October 3, 2000, Defendant PETER LePORT amended the Articles of

7     Incorporation of LePort & Van Damme Educational Institute, Inc., changing the name of the

8     corporation to LePort Educational Institute, Inc. ("LEI").

9         14.     On June 22, 2011, LEI filed a Restated Articles of Incorporation through its

10     then President, Ramandeep Girn. Defendant PETER LePORT remained the Chairman of the

11     Board of Directors. The restated articles provided for issuance of 30,000,000 shares of

12     common stock, with 10,000,000 shares being voting stock and 20,000,000 being non-voting

13     stock.

14         15.     On April 17, 2015, LEI's Board of Directors caused to be filed with the

15     California Secretary of State a Certificate of Dissolution. The Certificate of Dissolution was

16     filed because LEI was recklessly mismanaged and was sometimes therefore not able to meet

17     its payroll for its employees. Defendants PETER LePORT, MONICA LePORT, and

18     FRANCISCO LePORT and DOES 1-20 were responsible for this reckless mismanagement

19     and lack of sufficient funds to meet its obligations. These LePORT defendants and DOES 1-

20     20 were the moving forces behind the filing of the Certificate of Dissolution. These two

21     boxes were checked in the Certificate of Dissolution: (a) "The corporation's known debts

22     and liabilities have been paid." and, (b) "The known assets have been distributed to the

23     persons entitled thereto."

24         16.     On February 18, 2016, LEI, represented by the law firm of Stradling Yocca

25     Carlson & Rauth, filed a Petition for Reinstatement of LEI with the County of Orange

26     Superior Court in Case No. 30-2016-00835690. The LePORT defendants, Defendant

27     PIETER, and DOES 1-20 were the moving force behind the filing of this Petition for

28

---

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND
DEMAND FOR JURY TRIAL**

1    Reinstatement of LEI.  LEI's attorney from the Stradling firm admitted that LEI's general

2    counsel, who was married to a director of the corporation, had lied in her filing of the

3    Certificate of Dissolution, in that the corporation's known debts and liabilities had not been

4    paid as represented, and, further, that the known assets of the corporation had not been

5    distributed to the stockholders as also falsely represented.

6         17.    On March 8, 2016, the judge presiding over the Petition for Reinstatement of

7    LEI granted the Petition.

8         18.    On September 29, 2016, the LePORT defendants, aided by Defendant PIETER,

9    caused Amended and Restated Articles of Incorporation of LEI to be filed with the California

10   Secretary of State.  The purposes of these Restated Articles was to change the total number

11   of voting shares of Common Stock to 8,471,298.  At the time, the LePORT defendants were

12   all directors of LEI, Defendant PIETER was the CFO, and Plaintiff BARNEY, as set forth

13   below in this First Amended Complaint, was the CEO of LEI by virtue of document

14   provisions in the large loans that he had made to LEI.

15        19.    On May 9, 2017, LEI filed a Statement of Information with the California

16   Secretary of State.  Plaintiff BARNEY, who had been the CEO of LEI since on or about

17   August 26, 2016, was still listed as both the CEO and CFO of LEI on this document.

18   Defendant PETER LePORT was listed as a Director of LEI on the Statement of Information.

19   Defendant PIETER, by this time, had been terminated from the employ of LEI.

20        20.    On October 27, 2017, LEI filed another Statement of Information with the

21   California Secretary of State.  Defendant PETER LePORT was listed as the CEO and a

22   director of LEI.

23

24        **GENERAL ALLEGATIONS RELATING TO CLAIMS FOR RELIEF**

25        21.    In or about April, 2014, Plaintiff BARNEY was approached by Defendant

26   PETER LePORT and DOES 1 through 20 to make an investment through the purchase of

27   LEI shares.  Plaintiff BARNEY had known Defendant LePORT for many years and, at the

28

---

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND
DEMAND FOR JURY TRIAL**
-5-

time, considered him a friend who, like Plaintiff BARNEY, was in the private school education business. Defendants PETER LePORT and DOES 1 through 20 advised Plaintiff BARNEY that the LEI share price at the time was $1.90, that it was a good value, and that LEI was "flourishing".

22.     Based on those representations by Defendants PETER LePORT and DOES 1 through 20, Plaintiff BARNEY invested in LEI through the purchase of 1,838,980 common stock for $3.5 million, or $1.90 per share. It was not until in or about the summer of 2016 that Plaintiff BARNEY learned through the belated disclosure of financial information by Defendants that the value of LEI shares was never $1.90 per share but was actually approximately $0.10 per share in April of 2014. Plaintiff BARNEY later learned that LEI was not in fact "flourishing", as represented by Defendant PETER LePORT and DOES 1 through 20, and had been, and was, in considerable financial distress. In April, 2014, when Plaintiff BARNEY purchased $3.5 million of over-valued shares, he was never informed by Defendants PETER LePORT and DOES 1 through 20 that LEI was having difficulty in meeting its obligations to its creditors, shareholders, and employees, but instead represented to BARNEY that he wanted BARNEY to invest in LEI through the acquisition of shares of stock in order to pay bonuses to LEI employees.

23.     On April 17, 2015, LEI filed a Certificate of Dissolution with the California Secretary of State. As noted previously herein, the LePORT defendants and DOES 1 through 20, made false representations of material fact to the California Secretary of State. It was not until March 8, 2016 that LEI was reinstated as an active corporation. It was not until September 29, 2016 that LEI caused Amended and Restated Articles of Incorporation to be filed with the California Secretary of State.

24.     On or about August 19, 2015, the LePORT defendants and DOES 1 through 20 caused a loan financing transaction to be negotiated and entered into with Leeds Equity Partners V, LP ("Leeds") for the principal amount of $5 million. The loan would have to be paid back in one year, by August 19, 2016. The loan was at a high regular interest rate of

1    13% and a default interest rate of 20%. The note evidencing the $5 million loan transaction

2    contained provisions that could trigger a default, which would accelerate payment and

3    interest on the loan at the default interest rate of 20%. The Leeds loan contained provisions

4    that the default interest rate of 20% would apply in the event that any senior executives of

5    LEI would increase their compensation package. Plaintiff BARNEY was intentionally not

6    advised of this Leeds $5 million loan by the LePORT defendants and DOES 1 through 20 at

7    the time of the transaction.

8            25.     Within one to two months of the closing of the LEI and Leeds financing

9    transaction of on or about August 19, 2015, Defendant PIETER was offered and then agreed

10   to accept employment as LEI's Chief Financial Officer ("CFO"). On or about October 5,

11   2015, PIETER entered into an "at will" employment contract with LEI in which he agreed to

12   accept the CFO position at a $200,000 annual salary, a grant of shares of LEI common stock

13   with a value of $250,000, and the added benefit that he could receive a tuition discount at the

14   Irvine schools for his two children. There were no bonus or severance package provisions in

15   the employment contract. On information and belief, PIETER's employment contract had

16   not been duly approved by the LEI Board in accordance with LEI's Bylaws, rendering it

17   unenforceable as against LEI.

18           26.     At the end of 2015— beginning of 2016,  the tension between Defendant

19   PETER LePORT and LEI's then-CEO, Ramandeep Girn, was palpable. Girn had told

20   Defendant PETER LePORT that he wanted "control of LEI, and if it does not happen, I am

21   going to resign as the CFO and take the executive team and staff with me." Defendant

22   PETER LePORT had told Girn that he would not give him full control of the company and

23   also accused Girn of being the person who had caused LEI to become overextended and in

24   serious debt. On information and belief, Defendant PIETER incited and inflamed the rift

25   between Defendant PETER LePORT and Girn because he wanted to cement his influence

26   with Defendant PETER LePORT and, also, because he wanted Girn's CEO position as well

27   as his CFO position. Further, Defendant PIETER learned early on in his employment that

28

---

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND
DEMAND FOR JURY TRIAL**
-7-

1  Defendant PETER LEPORT was a poor business manager and, also, practiced medicine as a

2  bariatric surgeon on nearly a full-time basis— therefore, he took advantage of his new CFO

3  position so as to promote the idea that he was indispensable to LEI's success in getting out of

4  debt.

5      27.      Ramandeep Girn was fired from his position as the CEO of LEI in or about

6  February, 2016.  LEI began a search for Girn's replacement with the assistance of

7  Defendants PETER LePORT and PIETER, and Plaintiff BARNEY himself.  They did locate

8  a temporary replacement, Jim Treleaven, who accepted the CEO position. During

9  Treleaven's short tenure as the LEI CEO, he spent most of his time in Chicago from afar.

10  Treleaven did engineer a reduction in force of about 30-40 employees in an attempt to have

11  LEI meet its expenses.  However, LEI was in such serious financial difficulty that the layoffs

12  did not significantly change the gloomy financial picture.  On or about June 2, 2016, Jim

13  Treleaven formally resigned from this position. During Mr. Treleaven's short stint as CEO,

14  Defendant PIETER had been performing CEO duties on a de facto basis. PIETER continued

15  to perform de facto the CEO duties as well as his CFO responsibilities after Mr. Treleaven's

16  employment was terminated.  PIETER performed these de facto CEO duties until on or about

17  August 26, 2016,  at which time Plaintiff BARNEY assumed the acting CEO position for

18  LEI.  Plaintiff BARNEY was officially appointed to the CEO position on or about October 5,

19  2016.

20      28.      Ramandeep Girn, after he was fired, did in fact take a significant portion of

21  LEI's executive team with him.  Losing most of its executive team further exacerbated the

22  LEI's financial crisis.  Defendant PETER LePORT became the temporary CEO after losing

23  Girn, however, he delegated most of the duties running LEI to Defendant PIETER.  The

24  LePORT Defendants and PIETER knew that the $5 million Leeds loan note was due on

25  August 19, 2016, and that the total amount owed to Leeds would be close to $7 million.

26  They had retained bankruptcy counsel on or about April 25, 2016 to discuss their bankruptcy

27  and other options.  They also knew that they would further encumber LEI by asking for

28

1  additional loans from Leeds at a very unfavorable interest rate which LEI could not possibly

2  repay.  Because none of these alternatives were acceptable, Defendants PETER LePORT and

3  PIETER conspired amongst themselves, and with DOES 1 through 20, to use Plaintiff

4  BARNEY's largesse and wealth to "save" LEI and, in the process, their own individual

5  financial interests.   They also were aware that Plaintiff BARNEY, having already invested

6  $3.5 million in near worthless LEI shares of common stock, would want to protect his

7  investment by ensuring that LEI would succeed.

8       29.  Therefore, in keeping with their conspiratorial agreement, on April 20, 2016,

9  Defendants PETER LePORT and PIETER persuaded Plaintiff BARNEY to loan $500,000 to

10  LEI with a very reasonable interest rate of 6.5% and a maturity date of October 20, 2016.

11  Also, the note on Plaintiff BARNEY's loan contained a provision to this effect:   Except as

12  obligated under any (current) employment agreement, LEI could not increase the cash or

13  non-compensation terms payable to any senior executives without the approval of non-

14  interested directors of the LEI Board.  The LePORT defendants and PIETER were fully

15  aware of this loan note provision when Plaintiff BARNEY's $500,000 loan was made to LEI.

16  Further, as noted previously in this First Amended Complaint, the $5 million Leeds note, due

17  to mature on August 19, 2016, contained a similar provision for default if senior executives

18  increased their compensation package.

19       30.  After Ray Girn was out of the picture, the LePORT defendants and PIETER

20  each wanted to enrich themselves at the expense of a financially-struggling LEI and Plaintiff

21  BARNEY himself.  Commencing on or about June 2, 2016, Defendants PETER LePORT

22  and PIETER engaged in email discussions and in face-to-face meetings with each other about

23  changing PIETER's "at will" employment agreement and increasing his compensation

24  package.  Among other things, in the back and forth email correspondence, Defendant

25  PIETER falsely represented that he had been earning $500,000 annually in cash and stock in

26  his employment prior to LEI and, further, that by accepting LEI employment, he had

27  forfeited a $200,000 bonus from his prior employer.  In fact, on information and belief,

28

1  PIETER's salary at his prior employment was $185,000 and his bonus was $37,500.

2      31.    Based partly on Defendant PIETER's false representations as to the terms of

3  his employment contract at his prior job, and after intentionally and recklessly failing to duly

4  investigate PIETER's representations, in an email of on or about June 6, 2016, Defendant

5  PETER LePORT approved a "200,000 bonus and a new contract" for PIETER on the *quid*

6  *pro quo* condition that sister MONICA LePORT's salary be doubled.  Further, Defendant

7  PETER LePORT wanted to have his dormant employment contract reactivated so that he

8  could collect on a $200,000 annual salary moving forward.  This agreement between PETER

9  LePORT and PIETER was deliberately concealed from Plaintiff BARNEY and from

10  noteholder Leeds as well as other shareholders not named LePort.

11      32.    Defendant PIETER then, without LEI's approval and at LEI's expense, enlisted

12  LEI's outside counsel to act on his behalf in drawing up a new employment contract.

13  PIETER presented outside counsel with the terms he wanted to be included, and outside

14  counsel prepared the new employment contract without anyone representing LEI in its

15  drafting. This new employment agreement drawn up by LEI's outside counsel for PIETER,

16  who was purely acting in a self-dealing capacity inimical to the interests of LEI and Plaintiff

17  BARNEY, contained more favorable terms than those in his initial "at will" employment

18  agreement.  These new terms included the following:

19      A)    PIETER's salary was increased to $250,000 from $200,000.  The increase in

20            salary was conditional either upon the sale of LEI or the consummation of

21            "qualified financing".

22      B)    PIETER would receive a $200,000 bonus triggered by the occurrence of

23            transactions which were not specifically identified.

24      C)    PIETER would receive 25 paid vacation days annually, which would carry

25            forward from year-to-year subject to a 40-day accrual cap.

26      D)    The initial "at will" provision in PIETER's prior employment agreement was

27            changed to one of "for cause" in the event of termination.  In essence,

28

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND
DEMAND FOR JURY TRIAL**
-10-

1    significant restrictions were placed on the ability of LEI to terminate PIETER,

2    including (1) written notice of intent to terminate; (2) the termination notice

3    had to specify particular acts or failure to act as the basis for termination; (3)

4    LEI must provide written notice once it learned of acts or omissions to act, and

5    (4) PIETER would have 30 days after the receipt of the written notice within

6    which to cure performance issues.

7    E)    If LEI wished to terminate PIETER on an "at will" basis, LEI had to provide

8        30 days written notice and, thereafter, PIETER would be entitled to four

9        months of severance pay and benefits.

10    F)    If PIETER wished to voluntarily resign, subject to conditions not specifically

11        noted, PIETER would also be entitled to four months severance pay and

12        benefits from LEI.

13    33.    Defendant PETER LePORT "approved" of Defendant PIETER's new

14    employment agreement because he, acting in a self-dealing manner and on behalf of his sister

15    (Defendant MONICA LePORT), also received benefits from the arrangement at the expense

16    of LEI and Plaintiff BARNEY.  First, Defendant PETER LePORT, who then was not an

17    employee of LEI, used PIETER's new employment agreement as an impetus to activate his

18    own dormant employment agreement in order to get paid a salary going forward several years

19    into the future.  Second, Defendants PETER LePORT and PIETER had agreed amongst

20    themselves to approve a compensation package for Defendant MONICA LePORT that

21    doubled her annual salary.  PIETER's new employment agreement was signed by Jim

22    Treleaven on or about June 23, 2016, although, as alleged hereinabove, Treleaven had

23    resigned as  CEO of LEI as of on or about June 2, 2016.

24    34.    The new self-dealing employment agreements of Defendants PETER LePORT,

25    MONICA LePORT, and LUKAS PIETER were then provided to the LEI Board of Directors

26    for approval.  Sitting on the LEI Board of Directors at the time were Defendants MONICA

27    LePORT, and FRANCISCO LePORT.  LEI's Bylaws at the time required six directors on the

28

1  Board with a quorum of four non-interested directors voting on issues within its purview.

2  Further, as mentioned previously herein, the terms of Plaintiff BARNEY's April 20, 2016

3  loan of $500,000 to LEI required changes in compensation of senior executives to be

4  approved by a quorum of non-interested directors.  The LEI Board of Directors, on or about

5  June 30, 2016, did purportedly approve of PIETER's new employment agreement, PETER

6  LePORTS employment agreement, and the doubling of MONICA LePORT's annual

7  compensation; however, the LEI Board acted without a quorum and, also, with two of three

8  the directors voting being "interested" in the transaction, thus causing the "approval" to be

9  against LEI's bylaws, against the terms of both the BARNEY note and the Leeds note, and

10  also against the prevailing law as contained in the California Corporations Code.

11       35.     The LePORT defendants and PIETER knew that PIETER's new employment/

12  retention agreement breached LEI's loan agreement with both Leeds and Plaintiff BARNEY,

13  and therefore they attempted to conceal this breach from them.  In fact, as noted, Treleaven

14  was told to sign the new agreement by defendants even though he was no longer the CEO of

15  LEI.  Defendants also knew that the "approval" of the agreement by the LEI Board was not

16  by a quorum of four disinterested directors as required under its Bylaws and the terms of the

17  BARNEY loan note.  Nevertheless, they proceeded with the unlawful execution of these new

18  agreements to the detriment and injury of LEI and its shareholders and its creditors.

19       36.     The LePORT defendants and PIETER did not want to advise Plaintiff

20  BARNEY of their self-dealing and financial mismanagement of LEI.  Therefore, Defendant

21  PIETER, with the knowledge and consent of the LePORT defendants, and while acting as a

22  fiduciary of LEI, entered into a second financing arrangement with Leeds.   On or about July

23  22, 2016, Leeds loaned LEI $2.2 million with an interest rate of 13% and a default interest

24  rate of 20%.  LEI was already in default over the initial Leeds $5 million loan transaction

25  because PIETER had not informed them of his new employment agreement authorizing the

26  payment of a $200,000 bonus.  Defendant PIETER again deliberately misled Leeds by not

27  advising them of his new employment agreement authorizing the payment of a $200,000

28

1  bonus upon consummation of a successful financing transaction.

2       37.    On or about July 22, 2016, Defendant PIETER with the LePORT defendants'

3  knowledge and consent, then orchestrated another loan transaction with Leeds for LEI for

4  $2.2 million at the high 13% interest rate and a 20% default interest rate.  When they

5  negotiated that second loan with Leeds, these Defendants were aware that Plaintiff BARNEY

6  would have extended a loan to LEI on much better and more favorable terms.  Yet, PIETER

7  and Defendants, acting in a self-dealing manner, and on behalf of LEI and against its

8  interests, entered into that second loan with Leeds because they also knew that PIETER

9  would be entitled to receive a higher salary and bonus under the terms of his "new"

10  employment/ retention agreement and that Defendant MONICA LePORT's compensation

11  would be increased as a consequence of the completion of this second loan.

12       38.    Defendant PIETER, acting with the knowledge and consent of the other

13  LePORT defendants, used monies from the $2.2 million financing arrangement with Leeds to

14  pay off Plaintiff BARNEY's $500,000 note, which only required LEI to pay back those funds

15  at a much more favorable interest rate of $6.5%.  Leeds agreed to loan the additional monies

16  with a note provision that no Event of Default had occurred.  PIETER, with the knowledge

17  and consent of the LePORT defendants, knew that an Event of Default under the Leeds loan

18  provisions for the initial $5 million loan had in fact occurred and thereby had obtained the

19  additional $2.2 million Leeds loan under false pretenses.

20       39.    Also, on or about July 29, 2016 and, again on or about August 8, 2016,

21  PIETER, acting with the knowledge and consent of the LePORT defendants, caused LEI to

22  borrow $500,000 on each occasion from Leeds.  Each of these two separate $500,000 loans

23  from Leeds carried an unfavorable compounded 13% interest rate and a default interest rate

24  of 20%.  PIETER, with the knowledge and consent of the LePORT defendants, knew that an

25  Event of Default under the Leeds loan provisions for the initial $5 million loan had in fact

26  occurred.

27       40.    Defendant PIETER and the LePORT defendants conspired to use monies from

28

1    these two additional $500,000 loans from LEI to pay off Plaintiff BARNEY's $500,000 loan

2    note of April 20, 2016 because they all knew that PIETER's new employment agreement,

3    PETER LePORT's employment agreement, and the doubling of MONICA LePORT's annual

4    compensation package had violated the terms of Plaintiff BARNEY's April 20, 2016 note,

5    and thereby all new employment agreements and terms would be null and void.

6         41.    The above-mentioned three additional loans from Leeds (July 22, 2016 for $2.2

7    million, the separate $500,000 Leeds loans on July 29, 2016 and on August 8, 2016) were in

8    addition to the $5 million loan note becoming due on August 19, 2016.  Once he found out

9    about the Leeds loans, Plaintiff BARNEY offered Defendants PETER LePORT and PIETER

10   the opportunity to borrow money from him at a much more favorable and relatively low

11   interest rate to pay of the Leeds loans    Plaintiff BARNEY, more specifically, made the

12   following offer: "I will take over the company and will pay off Leeds because I believe that

13   LEI stockholders, including me, are at risk and I want to avert that from happening.... I will

14   step in to rescue the company." Plaintiff BARNEY offered $10 million to pay off Leeds,

15   hoping that this would be the end of it since Plaintiff BARNEY believed that Leeds wanted

16   to take over control of LEI.  Plaintiff BARNEY had also been falsely told that LEI's

17   prospects for the coming year were promising by Jim Treleaven, who received his financial

18   information about LEI from Defendant PIETER.  Treleaven's specific representations of

19   material fact, as told to Treleaven by PIETER, were that LEI's EBITDA for the following

20   year would be $5 million, and that the common stock share price was $0.86 when it was in

21   fact $0.10 per share.

22        42.    When Plaintiff BARNEY offered the $10 million loan to bail out LEI,

23   Defendant PIETER, acting with the knowledge and consent of the LePORT defendants,

24   informed Plaintiff BARNEY that $10 million would not be enough.  LEI, they represented,

25   still needed another $5 million to see them through the following year.  Plaintiff BARNEY

26   accepted their word as to the good financial prospects of LEI in the coming year and, without

27   conducting any due diligence, offered a $15 million dollar loan to LEI at an 8% interest rate

28

---

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND
DEMAND FOR JURY TRIAL**

1    with a default interest rate of 10%.

2    43.    On or about August 25, 2016, Plaintiff BARNEY in fact loaned LEI the

3    amount of $17 million at a very favorable interest rate of 8%.  Funds from this $17 million

4    loan were used to retire all the balances due under the three Leeds notes.  Defendant PIETER

5    and the LePORT defendants attempted to obstruct Plaintiff BARNEY's loan because, as a

6    condition of the loan, Plaintiff BARNEY's loan note gave him control of LEI's Board of

7    Directors.  Further, as noted previously herein, Plaintiff BARNEY became CEO of LEI on or

8    about August 26, 2016.  Plaintiff BARNEY later resigned from his CEO position in October,

9    2017, but maintained the right to control four of the seven seats on the LEI Board of

10    Directors.

11    44.    Once LEI obtained the $17 million in funds from Plaintiff BARNEY's loan,

12    Defendant PIETER demanded the payment of his $200,000 bonus.  LEI refused to

13    immediately pay him the bonus under his new employment agreement.  PIETER was told he

14    needed "authorization" before the bonus could be paid.  By that time, however, Plaintiff

15    BARNEY was serving in the capacity as LEI's temporary CEO, and was interacting more

16    regularly with Defendant PIETER.  Plaintiff BARNEY was concerned about whether

17    Defendant PIETER had fulfilled his ethical and fiduciary responsibilities to LEI and to him

18    in his shareholder and primary secured lender capacities.

19    45.    When Leeds discovered that Defendants had obtained $17 million in loans

20    from Plaintiff BARNEY in breach of its loan documents, Leeds immediately filed two

21    lawsuits against LEI and attempted to foreclose on the collateral for these loans.  Defendants'

22    self-dealing ultimately forced LEI to pay a settlement of $450,000 to Leeds in addition to

23    about $500,000 in attorney fees and costs for defending the lawsuits.

24    46.    Ultimately, in and after the time period of late August 2016, Plaintiff

25    BARNEY determined that Defendants PETER LePORT, MONICA LePORT, FRANCISCO

26    LePORT, LUKAS PIETER, and DOES 1 through 20 had mismanaged LEI, had acted in a

27    self-dealing manner and thereby breached their fiduciary obligations to LEI's shareholders

28

and employees, and had made significant false representations of material fact in causing Plaintiff BARNEY to either invest $3.5 million in shares of common stock in 2014 and in obtaining loans from him to bail out the company. Plaintiff BARNEY discovered that, in or after July-August, 2016, these defendants to one extent or another were involved in a conspiracy to defraud LEI and Plaintiff BARNEY himself.

47.     Plaintiff BARNEY asked that PIETER voluntarily void the "new" employment agreement.  PIETER refused, claiming he needed the money because he had just bought a new home in March, 2016.  Ultimately, Defendant PIETER was to be terminated from his employment as LEI's CEO for cause by the LEI Board of Directors on or about December 9, 2016.

48.     With respect to PIETER's termination from the employment of LEI, the LEI Board agreed that Plaintiff BARNEY, with the assistance of legal counsel, would convey the message to PIETER.  Defendant PETER LePORT, however, in direct violation of the LEI Board's directions and in violation of his express agreement as a member of the Board, informed PIETER of the Board's intended decision to terminate him.  When PIETER asked PETER LePORT about his $200,000 severance package, PETER LePORT told him words to the effect of "If LEI will not pay you the $200,000, I will pay it myself."

49.     After PETER LePORT's unauthorized termination discussion referenced above, PIETER immediately resigned and left LEI's premises without ever returning.  When he left, PIETER took with him confidential, proprietary, and sensitive LEI's business records in violation of both his employment agreement representations and California law.  PIETER even unlawfully disclosed confidential, proprietary, and sensitive LEI financial information to prospective employers and others without LEI's consent and also, as noted, in violation of California law.

50.     PIETER was terminated not only because of his self-dealing fraud and breach of fiduciary duties to LEI in relation to his own employment/retention agreement, but also because of other business matters demonstrating his intentional and reckless mismanagement

in which he was involved, all causing compensatory and other damage to Plaintiff LEI  These other business matters included, but were not limited to, each of the following:

A) His reckless and intentional mismanagement of the Leeds notes which resulted in the two Leeds lawsuits.

B) His reckless and intentional mismanagement of the sale of the Solano Beach school and a subsequent lease at a significantly higher rent.

C) His reckless and intentional mismanagement by failing to obtain consent before making loans to a company known as Cobble Hill, LLC and, further, the absence of any documentation pertaining to these loans.

D) His reckless and intentional mismanagement in the handling of the removal of former LEI CEO Ray Girn and two other executives, leaving LEI without a leader except for himself.

E) His reckless and intentional mismanagement in failing to obtain lien releases from contractors.

F) His intentional breaches of fiduciary duties and mismanagement as CFO regarding the increase in Defendant MONICA LePORT's compensation as a predicate of his June, 2016 "new" employment/ retention agreement, which agreement violated the Leeds notes and BARNEY's notes as well as creating further financial distress for an already floundering organization.

G) His intentional breaches of fiduciary duties in obtaining the 2016 Leeds loans when these loans were available at a much lower interest rate from Plaintiff BARNEY.

H) His intentional breaches of fiduciary duties by fraudulently reporting his time off that was neither approved nor reported in the LEI company records.

I) His intentional and reckless mismanagement with respect to payments of the contractor(s) for LEI's Brooklyn, New York school, which resulted in an overpayment of $400,000 to $800,000.

1     J)     His intentional and reckless mismanagement with respect to ensuring that tax

2            withholding for some immigrant personnel working for LEI was correctly

3            processed.

4     51.     Defendants' self-dealing transactions with Leeds directly damaged the value of

5   Plaintiff BARNEY's investment in LEI, and, further, breached the terms of Plaintiff's prior

6   loan and placed Plaintiff BARNEY in a very difficult position.  Plaintiff BARNEY valued

7   the LEI mission to provide quality education and facilities for students of LEI's Montessori

8   schools.  Plaintiff BARNEY also knew that, if he did not step in and provide additional loan

9   relief to LEI, the organization would not survive.  Additionally, Plaintiff BARNEY also

10   wanted to protect his prior equity investment and loans to LEI, which exceeded $6 million in

11   total.  Therefore, Plaintiff BARNEY diligently sought information from Defendants and

12   DOES 1 through 20 as to LEI's ability to continue operations as well as both repay both

13   existing indebtedness and incremental indebtedness that Defendants advised was necessary.

14

15                     **FIRST CAUSE OF ACTION**

16     **(Fraud—Intentional Misrepresentation of Material Facts Brought By Plaintiff**

17     **BARNEYAgainst Defendants LUKAS PIETER, PETER LePORT, M.D., MONICA**

18        **LePORT, FRANCISCO LePORT, and DOES 1 Through 20)**

19     52.     Plaintiff BARNEY specifically alleges and incorporates herein by this

20   reference those matters contained in paragraphs 1 through 51, as though fully set forth in this

21   cause of action.

22     53.     The defendants named in this cause of action, by intentionally false

23   representations of material fact persuaded Plaintiff BARNEY to make significant loans to

24   LEI at a time when the company was financially distressed and essentially bankrupt.  The

25   defendants named in this cause of action acted intentionally in doing so because they were

26   self-dealing in their own interests as alleged herein.

27     54.     At all times herein mentioned, the defendants named in this cause of action,

28

with full intention and knowledge, falsely and fraudulently made the foregoing specific misrepresentations to Plaintiff BARNEY for the purpose of securing his investment and loan monies for their own personal use and benefit, and to Plaintiffs BARNEY and LEI's detriment. These materially false and fraudulent statements by said Defendants included, but were not limited to:

A)   Defendants falsely represented to Plaintiff BARNEY that the EBITDA for LEI for the current fiscal year was in the approximate amount of $5 million, and that the organization in the future would have sufficient cash flow from operations to meet its obligations.  The false statement of LEI's EBITDA was relied upon by Plaintiff BARNEY and its counsel in ascertaining the enterprise value of LEI and in determining to make a significant additional loan to LEI, which figure was used by Plaintiff BARNEY and his counsel to determine the value of LEI's assets.

B)   Defendants knowingly provided Plaintiff BARNEY with false and fraudulent LEI financial statements which grossly inflated LEI's financial position, despite having been represented by PIETER, as CFO, that they were materially accurate, and which Plaintiff BARNEY and his counsel used to determine the value of LEI and its assets.  These false and fraudulent financial statements were relied upon by Plaintiff BARNEY and its counsel in ascertaining the enterprise value of LEI and in determining to make a significant additional loan to LEI.

C)   Defendants initially made false and fraudulent statements to Plaintiff BARNEY that the sum of $10 million was necessary to pay off all of the loans from the Leeds notes in full and for LEI to meet its future obligations.  Defendants knew that significantly more than $10 million would be necessary to pay off the Leeds loans in full and satisfy obligations to other creditors in the immediately following months.  These false statements were relied upon by Plaintiff

1        BARNEY and his counsel in ascertaining the enterprise value of LEI and

2        determining to make a significant additional loan to LEI.

3    D)    Defendants falsely represented that LEI, under their leadership, was currently

4        "strong and successful" when they knew that they had been leading LEI further

5        into insolvency through, among other things, their intentional self-dealing and

6        reckless mismanagement and business decisions.

7    55.    Plaintiff BARNEY reasonably and justifiably relied to his detriment on the

8 false and fraudulent misrepresentations of the defendants named in this cause of action by

9 investing in LEI, acquiring its stock, and providing loans to LEI at a favorable interest rate in

10 the in the principal amount of over $20 million to LEI.  Had Plaintiff BARNEY known the

11 true facts, which were concealed by the defendants named in this cause of action, he would

12 not have invested in LEI, acquired its stock, or made loans in the principal amount of over

13 $20 million to LEI.

14    56.    As of the present date, Plaintiff BARNEY has sustained significant financial

15 losses as a result of his investments and loans; and, further, has no discernible way to achieve

16 the interest rate return on his investment/ loans to LEI.  Plaintiff BARNEY, therefore, has

17 lost the benefit of the bargain and/or lost profits as a result of the false and fraudulent

18 misrepresentations of the defendants named in this cause of action.

19    57.    Plaintiff BARNEY is entitled to his reasonable attorney's fees which are

20 authorized by statute or by contract in an amount according to proof at the trial of this action.

21    58.    The conduct of the defendants named in this cause of action, in defrauding

22 Plaintiff BARNEY as aforesaid, was intentional, malicious, fraudulent and despicable, and

23 was designed to, and did, cause injury to Plaintiff BARNEY.  Plaintiff BARNEY's entire

24 experience with LEI, from the time in 2014 when he was persuaded by Defendants PETER

25 LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of

26 them, to purchase deliberately overvalued LEI shares, was fraught with fraudulent promises

27 and representations of material fact, concealment of true facts, and the intentional failure to

28

disclose true known facts. Defendants PETER LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of them, had so intentionally and recklessly mismanaged LEI, thereby subjecting its employees, teachers, and students to concerns about the corporation's viability. When parents of young students select a private school like LEI for their children, they expected that LEI would honor its promises and obligations by providing a quality education in a classroom with fewer students, more experienced and knowledgeable teachers, the best teaching materials, and an excellent curriculum to prepare their children for success in an increasingly competitive world. Defendants PETER LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of them, instead breached their promises and obligations to their students by, as noted, intentionally and recklessly mismanaging LEI and by making poor business decisions which caused LEI to be in serious financial distress. Plaintiff BARNEY is therefore entitled to an award of punitive damages from said defendants in an amount according to proof at the trial of this action.

## **SECOND CAUSE OF ACTION**

**(Fraud—Concealment of Material Facts Brought By Plaintiff BARNEYAgainst Defendants LUKAS PIETER, PETER LePORT, M.D., MONICA LePORT, FRANCISCO LePORT, and DOES 1 Through 20)**

59.    Plaintiff BARNEY specifically alleges and incorporates herein by this rerference those matters contained in paragraphs 1 through 58, as though fully set forth in this cause of action.

60.    At all times herein mentioned, the defendants named in this cause of action, with full intention and knowledge, intentionally concealed from Plaintiff BARNEY material matters for the purpose of securing his investment and loan monies for their own personal use and benefit, and to Plaintiffs BARNEY and LEI's detriment.

61.    Plaintiff BARNEY reasonably and justifiably relied to his detriment on the

1  concealment by the defendants named in this cause of action by providing loans to LEI at a

2  favorable interest rate in the in the principal amount of over $20 million to LEI.  Had

3  Plaintiff BARNEY known the true facts, which were concealed by the defendants named in

4  this cause of action, he would not have purchased those shares nor would he have invested

5  approximately $3.5 million dollars in LEI and in acquiring stock, nor made loans in the

6  principal amount of over $20 million to LEI.

7      62.     As of the present date, Plaintiff BARNEY has sustained significant financial

8  losses as a result of his investment, stock acquisition and  loans; and, further, has no

9  discernible way to achieve the interest rate return on his investment/ loans to LEI. The

10 defendants named in this cause of action, therefore, have cost Plaintiff BARNEY to lose the

11 benefit of the bargain and/or lost profits as a result of the concealment of material facts by

12 the defendants named in this cause of action.

13     63.     Plaintiff BARNEY is entitled to his reasonable attorney's fees which are

14 authorized by statute or by contract in an amount according to proof at the trial of this action.

15     64.     The conduct of the defendants named in this cause of action, in defrauding

16 Plaintiff BARNEY as aforesaid, was intentional, malicious, fraudulent and despicable, and

17 was designed to, and did, cause injury to Plaintiff BARNEY.  Plaintiff BARNEY's entire

18 experience with LEI, from the time in 2014 when he was persuaded by Defendants PETER

19 LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of

20 them, to purchase deliberately overvalued LEI shares, was fraught with fraudulent promises

21 and representations of material fact, concealment of true facts, and the intentional failure to

22 disclose true known facts.  Defendants PETER LePORT, MONICA LePORT, FRANCISCO

23 LePORT, and DOES 1 through 20, and each of them, had so recklessly mismanaged LEI,

24 thereby subjecting its employees, teachers, and students to concerns about the corporation's

25 viability.  When parents of young students select a private school like LEI for their children,

26 they expected that LEI would honor its promises and obligations by providing a quality

27 education in a classroom with fewer students, more experienced and knowledgeable teachers,

28

the best teaching materials, and an excellent curriculum to prepare their children for success in an increasingly competitive world. Defendants PETER LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of them, instead breached their promises and obligations to their students by, as noted, recklessly mismanaging LEI and by making poor business decisions which caused LEI to be in serious financial distress. Plaintiff BARNEY is therefore entitled to an award of punitive damages from said defendants in an amount according to proof at the trial of this action.

## THIRD CAUSE OF ACTION

**(Fraud—Failure to Disclose All Known Material Facts Brought By Plaintiff BARNEY Against Defendants LUKAS PIETER, PETER LePORT, M.D., MONICA LePORT, FRANCISCO LePORT, and DOES 1 Through 20)**

65.     Plaintiff BARNEY specifically alleges and incorporates herein by this reference those matters contained in paragraphs 1 through 64, as though fully set forth in this cause of action.

66.     The named defendants in this cause of action, by failing to disclose all known essential facts persuaded Plaintiff BARNEY to make significant and substantial loans to LEI at a time when the company was financially distressed and essentially bankrupt. The named defendants in this cause of action acted intentionally in doing so because they were self-dealing in their own interests as alleged hereinabove.

67.     At all times herein mentioned, the named defendants in this cause of action with full intention and knowledge, failed to disclose all known material facts as set forth in this Complaint to Plaintiff BARNEY for the purpose of securing his investment and loan monies for their own personal use and benefit, and to Plaintiffs BARNEY and LEI's detriment.

68.     Plaintiff reasonably and justifiably relied to his detriment on the failure to disclose all known material facts by the named defendants in this cause of action in investing

in LEI and acquiring its stock, and providing loans to LEI at a favorable interest rate in the in the principal amount of over $20 million to LEI.  Had Plaintiff known the true facts, he would he have invested approximately $3.5 million dollars in LEI and to acquire its stock, nor made loans in the principal amount of over $20 million to LEI.

69.    As of the present date, Plaintiff has sustained significant financial losses as a result of his extension of loans; and, further, has no discernible way to achieve the interest rate return on his investment/ loans to LEI.  Plaintiff BARNEY, therefore, has lost the benefit of the bargain and/or lost profits as a result of the false and fraudulent failure to disclose all known facts of the named defendants in this cause of action.

70.    Plaintiff BARNEY is entitled to his reasonable attorney's fees which are authorized by statute or by contract in an amount according to proof at the trial of this action.

71.    The conduct of the defendants named in this cause of action, in defrauding Plaintiff BARNEY as aforesaid, was intentional, malicious, fraudulent and despicable, and was designed to, and did, cause injury to Plaintiff BARNEY.  Plaintiff BARNEY's entire experience with LEI, from the time in 2014 when he was persuaded by Defendants PETER LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of them, to purchase deliberately overvalued LEI shares, was fraught with fraudulent promises and representations of material fact, concealment of true facts, and the intentional failure to disclose true known facts.  Defendants PETER LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of them, had so recklessly mismanaged LEI, thereby subjecting its employees, teachers, and students to concerns about the corporation's viability.  When parents of young students select a private school like LEI for their children, they expected that LEI would honor its promises and obligations by providing a quality education in a classroom with fewer students, more experienced and knowledgeable teachers, the best teaching materials, and an excellent curriculum to prepare their children for success in an increasingly competitive world.  Defendants PETER LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of them, instead breached their

1  promises and obligations to their students by, as noted, recklessly mismanaging LEI and by

2  making poor business decisions which caused LEI to be in serious financial distress. Plaintiff

3  BARNEY is therefore entitled to an award of punitive damages from said defendants in an

4  amount according to proof at the trial of this action.

5

6  **FOURTH CAUSE OF ACTION**

7  **(Breach of Fiduciary Duty— Brought By Plaintiff BARNEY Against Defendants**

8  **LUKAS PIETER, PETER LePORT, M.D., MONICA LePORT, FRANCISCO**

9  **LePORT, and DOES 1 Through 20)**

10  72.    Plaintiff BARNEY specifically alleges and incorporates herein by this

11  reference those matters contained in paragraphs 1 through 71, as though fully set forth in this

12  cause of action.

13  73.    At all times herein mentioned, the defendants named in this cause of action,

14  officers and/or directors of LEI, owed a fiduciary duty to Plaintiff BARNEY, a substantial

15  minority shareholder in LEI.  This duty, among other things, required Defendants to put

16  Plaintiff BARNEY's interests above their own self-dealing interests when securing loans to

17  aid a financially distressed LEI.

18  74.    The defendants named in this cause of action breached their fiduciary duty to

19  Plaintiff BARNEY by, among other things, falsely representing and/or concealing material

20  facts about their own employment contract with LEI, about the financially distressed state of

21  LEI, and about their self-dealing relationship with the Leeds equity partner.

22  75.    As a direct result of Defendants' breach of fiduciary duty as alleged

23  hereinabove, Plaintiff BARNEY has been damaged in a sum according to proof.

24  76.    The conduct of the defendants named in this cause of action, in defrauding

25  Plaintiff BARNEY as aforesaid, was intentional, malicious, fraudulent and despicable, and

26  was designed to, and did, cause injury to Plaintiff BARNEY.  Plaintiff BARNEY's entire

27  experience with LEI, from the time in 2014 when he was persuaded by Defendants PETER

28

LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of them, to purchase deliberately overvalued LEI shares, was fraught with fraudulent promises and representations of material fact, concealment of true facts, and the intentional failure to disclose true known facts.  Defendants PETER LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of them, had so recklessly mismanaged LEI, thereby subjecting its employees, teachers, and students to concerns about the corporation's viability.  When parents of young students select a private school like LEI for their children, they expected that LEI would honor its promises and obligations by providing a quality education in a classroom with fewer students, more experienced and knowledgeable teachers, the best teaching materials, and an excellent curriculum to prepare their children for success in an increasingly competitive world.  Defendants PETER LePORT, MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, and each of them, instead breached their promises and obligations to their students by, as noted, recklessly mismanaging LEI and by making poor business decisions which caused LEI to be in serious financial distress. Plaintiff BARNEY  is therefore entitled to an award of punitive damages from said defendants in an amount according to proof at the trial of this action.

## FIFTH CAUSE OF ACTION

**(Violations of Business and Professions Code §§17200, Et Seq.---Brought By Plaintiff BARNEY Against Defendants LUKAS PIETER, PETER LePORT, M.D., MONICA LePORT, FRANCISCO LePORT, and DOES 1 Through 20)**

77.     Plaintiff BARNEY specifically alleges and incorporates herein those matters contained in paragraphs 1 through 76, as though fully set forth in this cause of action.

78.     At all times herein mentioned, Business and Professions Code §§17200, et seq. were in full force and effect.  This statutory scheme provides for relief in damages to an aggrieved person who is the victim of unfair competition.  Unfair competition, under this statutory scheme, is defined as including "any unlawful, unfair or fraudulent business act or

1 practice and unfair, untrue or misleading advertising, and any act prohibited by Business and

2 Professions Code §§17500, et seq."

3   79.   By engaging in the aforesaid unlawful, unfair, and/or fraudulent business acts

4 or practices, the defendants named in this cause of action violated the provisions of Business

5 and Professions Code §§17200, et seq. as to his solicitations of investment and/or loan funds

6 from Plaintiff BARNEY, and, accordingly, Plaintiff BARNEY is entitled to restitution for all

7 illicit profits and amounts received by the named defendants in this cause of action in a sum

8 according to proof at the trial of this action.

9   80.   Plaintiff BARNEY is entitled to his reasonable attorney's fees and costs in

10 prosecuting this action pursuant to the statutory scheme.

11

12                    **SIXTH CAUSE OF ACTION**

13          **(Breach of Fiduciary Duty— Brought By Plaintiff LEI Against**

14          **Defendants PETER LePORT, MONICA LePORT, FRANCISCO**

15          **LePORT and DOES 1 through 20)**

16   81.   Plaintiff LEI specifically alleges and incorporates herein by this reference those

17 matters contained in paragraphs 1 through 80 as though fully set forth.

18   82.   As noted previously in this amended complaint, Co-Plaintiff BARNEY, by

19 virtue of an assignment of actions from LEI, is suing Defendants PETER LePORT,

20 MONICA LePORT, and FRANCISCO LePORT in this cause of action on behalf of LEI.

21 This is not a derivative action because of this assignment of actions.

22   83.   At all times herein mentioned, Defendants PETER LePORT, MONICA

23 LePORT, and FRANCISCO LePORT, were directors of LEI.  Defendant PETER LePORT

24 had been the chairman of LEI's Board of Directors since he had founded the corporation in

25 2000.  Defendants MONICA LePORT and FRANCISCO LePORT held their respective

26 director positions until on or about October 5, 2016 when the Board composition was

27 reconstituted by Co-Plaintiff BARNEY pursuant to his loan agreements with LEI.

28

---

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND
DEMAND FOR JURY TRIAL**

84.    As directors on the LEI Board, the LePORT defendants owed a fiduciary, as well as duties of loyalty and candor, to LEI to put the corporation's interests above their own pecuniary interests when (a) securing loans to aid a financially distressed LEI; and, (b) when making all significant decisions affecting the financial bottom line and viability of LEI.

85.    On information and belief, Defendant PETER LePORT, as the founder of LEI, made his decisions on behalf of LEI acting primarily in his personal interest and the interests of the other LePORT defendants because he wanted to retain control of LEI.

86.    On further information and belief, whenever there was a danger of losing control of LEI, Defendant PETER LePORT acted in a self-dealing manner on behalf of himself, his son (Defendant FRANCISCO LePORT) and his sister (Defendant MONICA LePORT).

87.    On further information and belief, Defendant LePORT's dream was to have the corporation that bore his family name expand across the country to 150-200 Montesorri schools.  In 2011, Ramadeep Girm and his "team" was brought in to effectuate this "dream" of expansion.  By the time period of early 2015, however, LEI owned only a few schools and was beginning to have difficulty in paying the agreed-upon compensation to its employees and in discharging its obligations to its creditors.

88.    On April 17, 2015,   LEI's Board of Directors caused to be filed with the California Secretary of State a Certificate of Dissolution.  The Certificate of Dissolution was filed because LEI was recklessly mismanaged and was sometimes therefore not able to meet its payroll for its employees.  Defendants PETER LePORT, MONICA LePORT, and FRANCISCO LePORT and DOES 1-20 were responsible for this reckless mismanagement and lack of sufficient funds to meet its obligations. These LePORT defendants and DOES 1-20 were the moving forces behind the filing of the Certificate of Dissolution, although the actual legal work was accomplished by Rebecca Girn, then general counsel for LEI. These two boxes were checked in the Certificate of Dissolution: (a) "The corporation's known debts and liabilities have been paid." and, (b) "The known assets have been distributed to the

persons entitled thereto."

89.    On or about August 19, 2015, the LePORT defendants and DOES 1 through 20 caused a loan financing transaction to be negotiated and entered into with Leeds Equity Partners V, LP ("Leeds") for the principal amount of $5 million.  The loan would have to be paid back in one year, by August 19, 2016.  The loan was at a high regular interest rate of 13% and a default interest rate of 20%.  The note evidencing the $5 million loan transaction contained provisions that could trigger a default, which would accelerate payment and interest on the loan at the default interest rate of 20%.  The Leeds loan contained provisions that the default interest rate of 20% would apply in the event that any senior executives of LEI would increase their compensation package.  Plaintiff BARNEY was intentionally not advised of this Leeds $5 million loan by the LePORT defendants and DOES 1 through 20 at the time of the transaction.

90.    Also, in or about August, 2015, LEI started a recruitment for a CFO.  Co-Defendant PIETER was made an offer of "at will" employment in writing on specific terms.  He "accepted and agreed" to that offer and began his employment as LEI's CFO on or about October 5, 2015.  PIETER's brief experience in the financial field up to that point was more in line with investment banking rather than the customary CFO duties in an education institution setting.  Ramadeep Girm, LEI's CEO at the time, wanted a CFO with some investment banking experience because he, as well, had a then-secret plan to control the corporate governance of LEI that had not yet been fully disclosed to the LePORT defendants.

91.    In Decemver, 2015, Defendant PETER LePORT loaned $500,000 to LEI for bridge financing.

92.    On or about December 5, 2015, Ramadeep Girn wrote a several page letter to LEI's other directors, consisting of Defendants PETER LePORT and MONICA LePORT, Lindsay Journo, Guy Barnett, and Heicke Larson.  The subject of this letter was indicative of Girn's attempt to wrest control of LEI's corporate governance in himself and, also, to sell the company to an institutional investor known as Learn Capital.  Girn made it clear in the letter

that he was unhappy at LEI because of management philosophical differences, primarily with Defendant PETER LePORT. At the time, the primary management philosophical difference was that Defendant PETER LePORT wanted to build and empire of 150-200 schools, whereas Girn wanted LEI to become profitable before expansion or selling the company and receiving value for share ownership from an institutional investor. Among other things, Girn stated in this letter as follows:

A)    Learn Capital would invest $10 million and own around 18-20% of LEI (i.e. Learn Capital has estimated the company's value at $42-$46 million). Girn wrote, in pertinent part, "the one key consequences of our retaining control is that Learn's investment does assume that the company is on an ultimate path to an IPO, so we do have to be comfortable with that as out default long-term outcome."

B)    Girn then wrote, in pertinent part, about his idea of how corporate governance in LEI should be handled in the future: "Today I am writing about something a bit more sobering, which has to be addressed clearly and decisively before we can accept the Learn investment or any other outside investment...The time has come to decide the approach we will take to corporate governance, going in the next phase of our growth...Specifically, the company needs to decide whether it is comfortable consolidating control in me, as ultimate decision-maker at the board/ leadership level...I have come to the conclusion over a long period of time that this is something that I will require to male a long-term commitment to LePort....Before embarking with the company on the next phase of its organizational growth, I need to know whether this is something that the company will commit to, and incorporate in its governing documents."

C)    Girn the wrote, in pertinent part, about how he would consolidate control of LEI as follows: "In essence, we would all transfer our LEI shares into an LLC... the LLC would be the direct owner of LEI, and I would serve as

1     manager of that LLC....I would have authority to speak with one voice

2     regarding the interests of the current shareholders...."

3   93.  Defendant PETER LePORT did not, as said herein, ever want to give up his

4 control over LEI no matter how appealing the investment offer would be.  Instead, he wanted

5 to expand LEI even though it was having difficulty in sustaining the few schools that it had.

6 Therefore, once he received the December, 2015 letter, he enlisted the aid of others,

7 including his new CFO— Co-Defendant PIETER— to ensure that Ramadeep Girn and his

8 "team" would not take control of LEI.  Ultimately, in or about February, 2016, Ramadeep

9 Girn and his "team" were terminated without cause.  Girn took about one-half of LEI's

10 executive team with him, leaving LEI in the total control of Defendant PETER LePORT.

11   94.  Prior to Girn's termination in or about February, 2016, Defendant PETER

12 LePORT was devoting almost all of his time to his busy practice as a bariatric surgeon.  Once

13 Girn and his "team" departed LEI, Defendant PETER LePORT had to fill the void for a

14 period of time as the acting CEO of the company.  Defendant LePORT, therefore, allowed

15 Co-Defendant PIETER to fill in as his "CEO" and perform some of those duties in addition

16 to his CFO duties.  Eventually, Jim Treleaven was hired as the company's CEO for a period

17 of 2-3 months.  However, Treleaven was terminated on or about June 2, 2016 and his

18 contract was due to expire as of June 30, 2016.  Also, as noted previously herein, Treleaven

19 spent a lot of time at his Chicago office and was ineffective in his CEO capacity.  For all

20 intents and purposes, Co-Defendant PIETER was the LEI acting CEO from the time that

21 Girn departed in or about February, 2016 until Co-Plaintiff BARNEY took over the acting

22 CEO position on or about August 26, 2016.

23   95.  In the 2016 time period, LEI was in considerable financial distress.  The Leeds

24 $5 million note, with principal and interest near $7 million, was coming due on August 19,

25 2016.  Co-Plaintiff BARNEY loaned LEI another $500,000 on or about April 20, 2016.

26 And, on or about April 25, 2016, LEI hired bankruptcy counsel to discuss its options when it

27 appeared that the corporation was insolvent.

28

96.     Against this backdrop, the LePORT defendants and Co-Defendant PIETER

worked on a self-dealing arrangement whereby their compensation and benefits would be

significantly increased at a time when LEI was insolvent.  On information and belief,

PIETER was initially the moving force behind the plan.  Commencing on or about June 2,

2016, Defendants PETER LePORT and PIETER engaged in email discussions and in face-

to-face meetings with each other about changing PIETER's "at will" employment agreement

and increasing his compensation package.  Among other things, in the back and forth email

correspondence, Defendant PIETER falsely represented that he had been earning $500,000

annually in cash and stock in his employment prior to LEI and, further, that by accepting LEI

employment, he had forfeited a $200,000 bonus from his prior employer.  In fact, on

information and belief, PIETER's salary at his prior employment was $185,000 and his

bonus was $37,500.

97.     Based partly on Defendant PIETER's false representations as to the terms of

his employment contract at his prior job, and after intentionally and recklessly failing to duly

investigate PIETER's representations, in an email of on or about June 6, 2016, Defendant

PETER LePORT approved a "200,000 bonus and a new contract" for PIETER on the *quid

pro quo* condition that sister MONICA LePORT's salary be doubled.  Further, Defendant

PETER LePORT wanted to have his dormant employment contract reactivated so that he

could collect on a $200,000 annual salary moving forward.  This agreement between PETER

LePORT and PIETER was deliberately concealed from Plaintiff BARNEY and from

noteholder Leeds as well as other shareholders not named LePort.

98.     Defendant PIETER then, without LEI's approval and at LEI's expense, enlisted

LEI's outside counsel to act on his behalf in drawing up a new employment contract.

PIETER presented outside counsel with the terms he wanted to be included, and outside

counsel prepared the new employment contract without anyone representing LEI in its

drafting. This new employment agreement drawn up by LEI's outside counsel for PIETER,

who was purely acting in a self-dealing capacity inimical to the interests of LEI and Plaintiff

BARNEY, contained more favorable terms than those in his initial "at will" employment agreement. These new terms included the following:

A) PIETER's salary was increased to $250,000 from $200,000. The increase in salary was conditional either upon the sale of LEI or the consummation of "qualified financing".

B) PIETER would receive a $200,000 bonus triggered by the occurrence of transactions which were not specifically identified.

C) PIETER would receive 25 paid vacation days annually, which would carry forward from year-to-year subject to a 40-day accrual cap.

D) The initial "at will" provision in PIETER's prior employment agreement was changed to one of "for cause" in the event of termination. In essence, significant restrictions were placed on the ability of LEI to terminate PIETER, including (1) written notice of intent to terminate; (2) the termination notice had to specify particular acts or failure to act as the basis for termination; (3) LEI must provide written notice once it learned of acts or omissions to act, and (4) PIETER would have 30 days after the receipt of the written notice within which to cure performance issues.

E) If LEI wished to terminate PIETER on an "at will" basis, LEI had to provide 30 days written notice and, thereafter, PIETER would be entitled to four months of severance pay and benefits.

F) If PIETER wished to voluntarily resign, subject to conditions not specifically noted, PIETER would also be entitled to four months severance pay and benefits from LEI.

99. At this point in about mid-June, 2016, LEI was failing. Undoubtedly, the LePORT defendants and PIETER were then in full control of LEI, and knew that, if LEI was going to fail, they were intent on "looting" LEI at the time the company could least afford it. They also knew that LEI was going to have to borrow more money to pay off or pay down its

1  obligations to Leeds and to other investors/ shareholders like Co-Plaintiff BARNEY.  They

2  were also aware that Leeds and Co-Plaintiff BARNEY had provisions in prior loan

3  agreements that would penalize LEI if it were known that the LePORT defendants and

4  PIETER had secretly enhanced their own executive compensation and benefits to the

5  detriment of LEI, Leeds, and Co-Plaintiff BARNEY.  Therefore, with due dates on the Leeds

6  and Barney loans rapidly approaching, the LePORT defendants and PIETER had to decide

7  whether it would borrow more money from Leeds, from BARNEY, or from some other

8  investor/ lender.

9       100.    If the LePORT defendants and PIETER were thinking of the financial benefits

10  to LEI instead of their own self-dealing, Co-Plaintiff BARNEY was the more responsible

11  choice to go to for money to bail LEI out of debt and to have a chance to succeed going

12  forward— BARNEY had offered loans at a favorable interest rate compared to the Leeds

13  loans which had a high 13% interest rate and a 20% default interest rate.  Nevertheless, the

14  LePORT defendants decided to borrow more money from Leeds at the significantly higher

15  interest rates for two primary reasons: (a) they did not want to give up control of LEI to

16  BARNEY; and, (b) know he would not approve,  they wanted to avoid BARNEY

17  discovering their self-dealing.

18       101.    On or about July 22, 2016, Leeds loaned LEI $2.2 million with an interest rate

19  of 13% and a default interest rate of 20%.  LEI was already in default over the initial Leeds

20  $5 million loan transaction because of the self-dealing employment contracts and increases in

21  compensation.  The LePORT defendants did not advise Leeds of the June, 2016 increases in

22  compensation.

23       102.    On or about July 22, 2016,  another loan transaction with Leeds was

24  orchestrated for $2.2 million at the high 13% interest rate and a 20% default interest rate.

25  When they negotiated that second loan with Leeds, these Defendants were aware that

26  Plaintiff BARNEY would have extended a loan to LEI on much better and more favorable

27  terms.  Yet, the LePORT defendants and PIETER, acting in a self-dealing manner, and on

28

1  behalf of LEI and against its interests, entered into that second loan with Leeds because they

2  also knew that PIETER would be entitled to receive a higher salary and bonus under the

3  terms of his "new" employment/ retention agreement and that Defendant MONICA

4  LePORT's compensation would be increased as a consequence of the completion of this

5  second loan.

6          103.    Defendant PIETER, acting with the knowledge and consent of the other

7  LePORT defendants, used monies from the $2.2 million financing arrangement with Leeds to

8  pay off Plaintiff BARNEY's $500,000 note, which only required LEI to pay back those funds

9  at a much more favorable interest rate of $6.5%. Leeds agreed to loan the additional monies

10  with a note provision that no Event of Default had occurred. PIETER, with the knowledge

11  and consent of the LePORT defendants, knew that an Event of Default under the Leeds loan

12  provisions for the initial $5 million loan had in fact occurred and thereby had obtained the

13  additional $2.2 million Leeds loan under false pretenses.

14          104.    Also, on or about July 29, 2016 and, again on or about August 8, 2016,

15  PIETER, acting with the knowledge and consent of the LePORT defendants, caused LEI to

16  borrow $500,000 on each occasion from Leeds. Each of these two separate $500,000 loans

17  from Leeds carried an unfavorable compounded 13% interest rate and a default interest rate

18  of 20%. PIETER, with the knowledge and consent of the LePORT defendants, knew that an

19  Event of Default under the Leeds loan provisions for the initial $5 million loan had in fact

20  occurred.

21          105.    Defendant PIETER and the LePORT defendants conspired to use monies from

22  these two additional $500,000 loans from LEI to pay off Plaintiff BARNEY's $500,000 loan

23  note of April 20, 2016 because they all knew that PIETER's new employment agreement,

24  PETER LePORT's employment agreement, and the doubling of MONICA LePORT's annual

25  compensation package had violated the terms of Plaintiff BARNEY's April 20, 2016 note,

26  and thereby all new employment agreements and terms would be null and void.

27          106.    The above-mentioned three additional loans from Leeds (July 22, 2016 for $2.2

28

---

million, the separate $500,000 Leeds loans on July 29, 2016 and on August 8, 2016) were in addition to the $5 million loan note becoming due on August 19, 2016.  Once he found out about the Leeds loans, Plaintiff BARNEY offered Defendants PETER LePORT and PIETER the opportunity to borrow money from him at a much more favorable and relatively low interest rate to pay of the Leeds loans    Plaintiff BARNEY, more specifically, made the following offer: "I will take over the company and will pay off Leeds because I believe that LEI stockholders, including me, are at risk and I want to avert that from happening.... I will step in to rescue the company."  Plaintiff BARNEY offered $10 million to pay off Leeds, hoping that this would be the end of it since Plaintiff BARNEY believed that Leeds wanted to take over control of LEI.  Plaintiff BARNEY had also been falsely told that LEI's prospects for the coming year were promising by Jim Treleaven, who received his financial information about LEI from Defendant PIETER.  Treleaven's specific representations of material fact, as told to Treleaven by PIETER, were that LEI's EBITDA for the following year would be $5 million, and that the common stock share price was $0.86 when it was in fact $0.10 per share.

107.   When Plaintiff BARNEY offered the $10 million loan to bail out LEI, Defendant PIETER, acting with the knowledge and consent of the LePORT defendants, informed Plaintiff BARNEY that $10 million would not be enough.  LEI, they represented, still needed another $5 million to see them through the following year.  Plaintiff BARNEY accepted their word as to the good financial prospects of LEI in the coming year and, without conducting any due diligence, offered a $15 million dollar loan to LEI at an 8% interest rate with a default interest rate of 10%.

108.   On or about August 25, 2016, Plaintiff BARNEY in fact loaned LEI the amount of $17 million at a very favorable interest rate of 8%.  Funds from this $17 million loan were used to retire all the balances due under the three Leeds notes.  Defendant PIETER and the LePORT defendants attempted to obstruct Plaintiff BARNEY's loan because, as a condition of the loan, Plaintiff BARNEY's loan note gave him control of LEI's Board of

1   Directors.  Further, as noted previously herein, Plaintiff BARNEY became CEO of LEI on or

2   about August 26, 2016.  Plaintiff BARNEY later resigned from his CEO position in October,

3   2017, but maintained the right to control four of the seven seats on the LEI Board of

4   Directors by virtue of his loan as the primary secured creditor of LEI.

5        109.   On information and belief, in the last quarter of 2016, the LePORT defendants

6   held a secret meeting to remove Co-Plaintiff BARNEY from control over LEI.  In other

7   words, the LePORT defendants were willing to take Co-Plaintiff BARNEY's money to bail

8   out the struggling corporation they created, but were unwilling to adhere to the loan

9   provisions under which the secured financing was extended.   Further, Defendant PETER

10  LePORT was instrumental in concocting a false harassment claim about Co-Plaintiff

11  BARNEY in an effort to embarrass him and minimize his influence.

12       110.   On or about December 9, 2016, the LEI Board of Directors, this time operating

13  with a quorum according to its bylaws and California corporate law, voted to terminate Co-

14  Defendant PIETER with cause effective the following Monday, December 12, 2016.  The

15  LEI Board also voted on the method by which PIETER's termination would be conveyed to

16  him on December 12, 2016.  The LEI Board also agreed to keep its vote confidential until

17  December 12, 2016 when the decision could properly be conveyed to PIETER.  Defendant

18  PETER LePORT, however, who voted against PIETER's termination, jumped the gun and

19  privately spoke to PIETER on December 9, 2016.  He told PIETER that he had been

20  terminated by Board vote and informed him the termination meant that PIETER would not

21  get his bonus that was the product of his self-dealing in June, 2016.  Defendant PETER

22  LePORT, however, promised PIETER that "if LEI will not pay your bonus, I will."  PIETER,

23  as a consequence, cleared out of his office on December 9, 2016 and then sued LEI for

24  breach of his employment retention agreement and other causes of action.

25       111.   In 2017-2018, the LEI Board initiated efforts to sell LEI's assets to prospective

26  investors for the highest price and on the best terms possible.  It was in LEI's best interests to

27  sell its assets because the company could not meet its payroll and creditor obligations without

28

1  doing so.  Defendant PETER LePORT, however, was not on board with LEI selling its assets

2  for a reasonable return unless he could get his investment paid back first before creditors like

3  Co-Plaintiff BARNEY whose investment/ loans had saved the company from financial ruin.

4  In fact, in 2018, LEI had secured a letter of intent for an investor in educational institutions

5  to sell its Southern California schools at a very good price.  Defendant PETER LePORT,

6  however, after voting with the LEI Board to sell those assets to that educational investor,

7  reneged because he wanted to be paid first ahead of LEI's creditors and other investors.  As a

8  consequence, the deal for the purchase of LEI's assets fell through.  It was not until the end

9  of August, 2018 that another investor who had been located purchased those assets for a

10  considerably lesser price and on less favorable terms than the prior investor had offered to

11  pay.

12      112.    At all times herein mentioned, the LePORT defendants had a fiduciary duty to

13  LEI, its minority shareholders, its creditors and secured lenders to put their financial interests

14  above their own.  Instead, the LePORT defendants breached their respective fiduciary duty to

15  LEI, its minority shareholders, its creditors and secured lenders by engaging in the tactics

16  specifically set forth in this amended complaint.

17      113.    As a direct result of Defendants' breach of fiduciary duty as alleged

18  hereinabove, Plaintiff LEI has been damaged in a sum according to proof.

19

20      WHEREFORE, Plaintiffs pray for the following relief:

21      1)    For compensatory damages in an amount according to proof and in excess of

22            the minimum jurisdictional limits of this court.

23      2)    For general damages in an amount according to proof and in excess of the

24            minimum jurisdictional limits of this court.

25      3)    For attorney's fees as permitted under contract or statute in an amount

26            according to proof.

27      4)    For punitive damages in an amount according to proof in excess of the

28

---

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND
DEMAND FOR JURY TRIAL**
-38-

1    minimum jurisdiction of this Court.

2       5)    For costs of the suit herein incurred.

3       6)    For such other and further relief as this court may deem just.

5    Dated:  November 6, 2018        LAW OFFICES OF JOEL W. BARUCH, PC

By _____
Joel W. Baruch, Counsel for Plaintiffs
CARL BARNEY, as Trustee of the CARL
BARNEY LIVING TRUST and
LePORT EDUCATIONAL INSTITUTE, INC.

### **DEMAND FOR JURY TRIAL**

1.    Plaintiffs demand a trial by jury.

Dated:  November 6, 2018        LAW OFFICES OF JOEL W. BARUCH, PC

By _____
Joel W. Baruch, Counsel for Plaintiffs
CARL BARNEY, as Trustee of the CARL
BARNEY LIVING TRUST and
LePORT EDUCATIONAL INSTITUTE, INC.

---

**FIRST AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND
DEMAND FOR JURY TRIAL**
-39-

1

**PROOF OF SERVICE**

2

I am employed in the county of Orange, State of California at **THE LAW OFFICES OF**
3   **JOEL W. BARUCH.** I am over the age of 18 and not a party to the within action; my business
address is 2601 Main Street, Suite 980, Irvine, CA 92614.

4

On November 6, 2018, I served the foregoing documents described as  **FIRST**
5   **AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION AND DEMAND**
6   **FOR JURY TRIAL**  on the interested parties in this action by placing a true copy thereof
enclosed in sealed envelope(s) addressed as follows:

7

8   **SEE ATTACHED SERVICE LIST**

9

**BY MAIL:**  I enclosed the documents in a sealed envelope or package addressed to the
10   persons listed above and (1) deposited the sealed envelope with the United States Postal
Service, with the postage fully prepaid, or (2) placed the envelope for collection and
11   mailing, following our ordinary business practices. I am readily familiar with this
business's practice for collecting and processing correspondence for mailing. On the same
12   day that correspondence is placed for collection and mailing, it is deposited in the ordinary
course of business with the United States Postal Service, in a sealed envelope with postage
13   fully prepaid.

XX   **BY ELECTRONIC SERVICE VIA ONELEGAL EFILING SERVICE:** I served the
14   above-entitled document(s) through the OneLegal E-Filing Service at www.onelegal.com
addressed to all parties appearing on the electronic service list for the above-entitled case.
15   A copy of the One Legal Service Receipt Page/Confirmation will be maintained with the
16   original document(s) in this office.

17   **BY OVERNIGHT DELIVERY:** I enclosed the documents in a sealed envelope or
package provided by an overnight delivery carrier and addressed to the persons at the
18   addresses indicated above. I placed the envelope or package for collection and overnight
delivery at an office or a regularly utilized drop box of the overnight delivery carrier.
19

**BY FAX TRANSMISSION:** Based on an agreement of the parties to accept service by
20   fax transmission, I faxed the documents to the persons at the fax number of the parties
indicated above. No error was reported by the fax machine that I used. A copy of the
21   record of the fax transmission, which I printed out, is attached.

22   **BY PERSONAL SERVICE:** I personally delivered the documents to the persons at the
addresses indicated above. (1) For a party represented by an attorney, delivery was made
23   (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an
24   envelope or package clearly labeled to identify the attorney being served, with a
receptionist or an individual in charge of the office; or (c) if there was no person in the
25   office with whom the notice or papers could be left, by leaving them in a conspicuous
place in the office between the hours of nine in the morning and five in the evening. (2)
26   For a party, delivery was made to the party or by leaving the documents at the party's
residence with some person not younger than 18 years of age between the hours of eight in
27   the morning and six in the evening.

28

1

**POS**

**BY MESSENGER SERVICE:** I served the documents by placing them in an envelope or package addressed to the persons at the addresses indicated above and providing them to a professional messenger service for service.

XX  **BY EMAIL TRANSMISSION**: I caused the aforementioned document(s) to be served via electronic mail to the electronic addressee(s) listed on the attached mailing list. Such document was transmitted successfully from my e-mail address to the indicated addressee(s).

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on November 6, 2018, at Irvine, California.

_____
Sara Lucia Gonzalez, Declarant

2
**POS**

**SERVICE LIST**

Douglas Barritt
Barritt Smith Miner LLP
2601 Main Street, Suite 530
Irvine, California 92614
Phone: 949-553-0700 ext. 1
Fax: 949-553-0715
dbarritt@barrittsmith.com
*Counsel for Defendant and Cross-Complainant LUKAS PIETER*


James P. Carter (SBN 150052)
Jonathan P. Schmidt (SBN 293290)
JACKSON LEWIS P.C.
200 Spectrum Center Drive, Suite 500
Irvine, CA 92618
Phone:  (949) 885-1360
Fax: (949) 885-1380
*Attorneys for Cross-Defendant LEPORT EDUCATIONAL INSTITUTE, INC.*

3

**POS**

EXHIBIT 7

**BARRITT SMITH MINER LLP**
Douglas A. Barritt, Bar No. 150955
2601 Main Street, Suite 530
Irvine, California 92614
Phone: 949-553-0700
Fax:   949-553-0715
email:  dbarritt@barrittsmith.com

Attorneys for Defendant and Cross-Complainant
LUKAS PIETER

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**04/30/2019** at 02:15:00 PM
Clerk of the Superior Court
By Sarah Loose, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

## UNLIMITED JURISDICTION

| | |
|---|---|
| CARL BARNEY, as Trustee of the CARL BARNEY LIVING TRUST; and, LePORT EDUCATIONAL INSTITUTE, INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>LUKAS PIETER, PIETER LePORT, M.D., MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, inclusive, and DOES 1 through 20, inclusive,<br><br>Defendants.<br><hr>LUKAS PIETER, an individual,<br><br>Cross-Complainant,<br><br>v.<br><br>LEPORT EDUCATIONAL INSTITUTE, INC., a California corporation; and ROES 1 to 20, inclusive,<br><br>Cross-Defendants. | CASE NO.: 30-2018-01006531<br><br>Assigned for All Purposes to:<br>  Hon. Ronald Bauer<br>  Dept. CX-103<br><br>**(1) DEFENDANT LUKAS PIETER'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;**<br><br>**(2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER; AND**<br><br>**(3) DECLARATION RE MEET AND CONFER**<br><br>Date:   May 28, 2019<br>Time:   9:00 a.m.<br>Dept:   CX-103 |

1

**DEMURRER TO FIRST AMENDED COMPLAINT**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 28, 2019 at 9:00 a.m., or as soon thereafter as the matter may be heard in Department CX-103 of the above-entitled Court, located at 751 West Santa Ana Blvd., Santa Ana, California, defendant Lukas Pieter will, and hereby does, demur to the First Amended Complaint of plaintiff Carl Barney, as Trustee of the Carl Barney Living Trust ("Barney"), and LePort Educational Institute, Inc. ("LEI"). The Demurrer is made under to California Code of Civil Procedure Section 430.10 on the following grounds:

### DEMURRER

Under California Code of Civil Procedure Section 430.10, *et seq.*, Pieter generally demurs to the Complaint filed by Barney on these grounds:

### DEMURRER TO FIRST CAUSE OF ACTION FOR
### FRAUD – INTENTIONAL MISREPRESENTATION

Barney's First Cause of Action, labeled Fraud – Intentional Misrepresentation, fails to state facts sufficient to constitute a cause of action upon which relief can be granted. *See* Cal. Civ. Proc. Code § 430.10(e).

### DEMURRER TO SECOND CAUSE OF ACTION FOR
### FRAUD – CONCEALMENT

Barney's Second Cause of Action, labeled Fraud – Concealment, fails to state facts sufficient to constitute a cause of action upon which relief can be granted. *See* Cal. Civ. Proc. Code § 430.10(e).

### DEMURRER TO THIRD CAUSE OF ACTION FOR
### FRAUD – FAILURE TO DISCLOSE KNOWN FACTS

Barney's Third Cause of Action, labeled Fraud – Failure to Disclose Known Facts, fails to state facts sufficient to constitute a cause of action upon which relief can be granted. *See* Cal. Civ. Proc.

1    Code § 430.10(e).

2

3                **DEMURRER TO FIFTH CAUSE OF ACTION FOR**

4                        **UNFAIR COMPETITION**

5        Barney's Fifth Cause of Action, labeled Unfair Competition, fails to state facts sufficient to

6    constitute a cause of action upon which relief can be granted. *See* Cal. Civ. Proc. Code § 430.10(e).

7

8        The Demurrer is based upon this Notice, the attached Memorandum of Points and Authorities,

9    the pleadings, files and records herein, and such additional matters presented by Pieter at or before the

10   hearing on the Demurrer.

11

12   DATED: April 30, 2019

13                                **BARRITT SMITH MINER LLP**

14

15                                By: _____

16                                    Douglas A. Barritt

17                                Attorney for Defendant and Cross-Complainant
                                     LUKAS PIETER

18

19

20

21

22

23

24

25

26

27

28

**DEMURRER TO FIRST AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

I.      PRELIMINARY STATEMENT ............................................. 1

II.     BRIEF STATEMENT OF RELEVANT FACTS ................................. 1

    A.  Barney's Initial Complaint.............................................. 1

    B.  Pieter Demurrers To Barney's Initial Complaint Causing Him To File His FAC.............. 2

    C.  Pieter Meets And Confers With Barney To Resolve The Defective Fraud Allegations In His FAC  .............................................................................. 2

III.    LEGAL ARGUMENTS AND AUTHORITIES .................................. 3

    A.  California Code of Civil Procedure Section 430.10(e) Authorizes A Demurrer When The Complaint Fails To State Facts Sufficient To Constitute A Claim...................... 3

    B.  Barney Has Failed to Plead His Fraud Claims (First, Second, and Third Claims) With Particularity......................................................................... 3

    C.  If Barney's Fraud Claims Against Pieter Fail, His Unfair Competition Claim Must Also Fail    .............................................................................. 5

IV.     CONCLUSION........................................................... 6

DECLARATION RE MEET AND CONFER IN ADVANCE OF DEMURRER............................. 7

**DEMURRER TO FIRST AMENDED COMPLAINT**

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

## <u>CASES</u>

*Committee on Children's Television, Inc. v. General Foods Corp.*,
    35 Cal.3d 197 (1983) ............................................................................... 4

*Goldrich v. Natural Y Surgical Specialties, Inc.*,
    25 Cal.App.4th 772 (1994) ...................................................................... 4

*James v. Superior Court*,
    261 Cal.App.2d 415 (1968) ..................................................................... 3

*Lazar v. Superior Court*,
    12 Cal.4th 631 (1996) ............................................................................. 4

*Nagy v. Nagy*,
    210 Cal.App.3d 1262 (1989) ................................................................... 4

## <u>OTHER AUTHORITIES</u>

CACI § 1900 ................................................................................................ 3

CACI § 1901 ................................................................................................ 3

**DEMURRER TO FIRST AMENDED COMPLAINT**

## I.

## PRELIMINARY STATEMENT

Plaintiff Carl Barney filed his initial Complaint nearly ten months ago. The Complaint was defective for myriad reasons including Barney's complete failure to allege his fraud-related claims against defendant Lukas Pieter with the level of specificity the law demands; not even close. Pieter demurred to Barney's Complaint. Knowing he could not defend his defective fraud claims, Barney opted to file a First Amended Complaint ("FAC") to avoid an adverse ruling on Pieter's demurrer. Barney assured Pieter and the Court at that time he would cure the Complaint's obvious defects.

Barney took nearly two months to file his FAC. And when he did, he filed a FAC that suffers from precisely the same defects as his initial Complaint. While it is true he added more paragraphs and even added more parties, the allegations on which he bases his fraud claims are virtually identical to the allegations in the initial Complaint Pieter previously challenged

Pieter immediately brought the defects to Barney's attention – *again*.  And, *again*, Barney agreed his allegations were defective and, *again*, he agreed to cure them; this time by filing a Second Amended Complaint ("SAC"). That was five months ago. Rather than follow through, Barney has apparently decided to live or die with the fraud allegations in his FAC. There can be no legitimate dispute the allegations are hopelessly vague and light years away from providing the specificity required when accusing a defendant of committing fraud. Barney has now decided not to file a SAC. Accordingly, this Court should sustain this Demurrer without leave to amend.

## II.

## BRIEF STATEMENT OF RELEVANT FACTS

### A.   Barney's Initial Complaint

On July 18, 2018, Barney filed his initial Complaint accusing Pieter of fraud and an unfair

**DEMURRER TO FIRST AMENDED COMPLAINT**

competition claim that is completely redundant of the fraud claims. (*See* Docket No. 2.)[1] He set forth his fraud allegations in Paragraph 23 where he accused Pieter of falsely representing LEI EBITDA, falsely representing LEI would have sufficient cash flow from operations to meet its obligations, providing Barney with false and fraudulent financial statements, stating that $10 million was necessary to pay off the loans from the Leeds notes, and falsely representing LEI was "strong and successful" (*See* Docket No. 2 at ¶ 23.) Barney's contention that Pieter defrauded him into investing in LEI is baseless for several reasons; not the least of which is that LEI's Board of Directors approved every word Pieter uttered to Barney, every financial document that Pieter provided to Barney and every other interaction between Pieter and Barney.

## B.    Pieter Demurrers To Barney's Initial Complaint Causing Him To File His FAC

Pieter demurrer to Barney's Initial Complaint pointing out how his fraud allegations were hopelessly vague. (*See* Docket No. 19.) Rather than oppose Pieter's demurrer, Barney chose to file a FAC. (*See* Exhibit C.) He did so on November 6, 2018. (*See* Docket No. 55.) Barney added a slew of additional paragraphs primarily targeting the new defendants he brought into the case. (*See* Docket No. 55.) However, his fraud allegations are virtually identical to those he agreed were defective in his initial Complaint. The only change was that he moved the allegations from Paragraph 23 in his initial Complaint to Paragraph 54 in his FAC. (Compare Docket No. 2 at ¶ 23 with Docket No. 55 at ¶ 54.)

## C.    Pieter Meets And Confers With Barney To Resolve The Defective Fraud Allegations In His FAC

Pieter contacted Barney the day he filed his FAC (November 6, 2018) to point out the obvious – *i.e.*, that Barney had not cured the defects in his fraud allegations as promised. (*See* Declaration of Douglas Barritt ("Barritt Decl.") at ¶ 6; Exhibit D.) Pieter detailed the defects in an email a day later although Barney was already fully aware of the defects. (*See* Barritt Decl. at ¶ 6; Exhibit D.) Pieter and

---

[1] Barney's Complaint also included causes of action against Pieter for negligent misrepresentation, breach of fiduciary duty, and innocent misrepresentation. (*See* Complaint, Docket No. 2.). He has abandoned these claims.

**DEMURRER TO FIRST AMENDED COMPLAINT**

Barney then met and conferred in person with knees under the table about the defects on November 15, 2018. (*See* Barritt Decl. at ¶ 6.) As a result of the meet and confer process, Barney agreed his fraud allegations were defective and also agreed to file a SAC to cure the defects. (*See* Barritt Decl. at ¶ 6; Exhibit E.)

Months then passed with Barney claiming he was working on the SAC and about to file it. (*See* Barritt Decl. at ¶ 7; Exhibit E.) Then, on April 8, 2019 – just before a scheduled Case Management Conference – things changed. That's when Barney informed Pieter that, despite assuring him for nearly five months he would be filing a SAC, he would stand on his FAC. (*See* Barritt Decl. at ¶ 7; Exhibit E.) Barney's decision to stand on his FAC, and not file his SAC, necessitated this demurrer.

### III.
### <u>LEGAL ARGUMENTS AND AUTHORITIES</u>

**A.**  **<u>California Code of Civil Procedure Section 430.10(e) Authorizes A Demurrer When The Complaint Fails To State Facts Sufficient To Constitute A Claim</u>**

California Code of Civil Procedure Section 430.10(e) permits, indeed encourages, a party to demur to a complaint that "does not state facts sufficient to state a cause of action." A general demurrer "searches the complaint" or the particular claim to which it is directed, for any and every failure to state a material fact. The absence of any allegation essential to a claim makes the complaint vulnerable to a general demurrer. *See James v. Superior Court*, 261 Cal.App.2d 415, 416 (1968). As shown below, Barney's FAC fails to state facts sufficient to state his fraud claims.

**B.**  **<u>Barney Has Failed to Plead His Fraud Claims (First, Second, and Third Claims) With Particularity</u>**

The elements of fraud, based on an intentional misrepresentation, are: (1) a representation, usually a fact, which is false, (2) knowledge of its falsity, (3) intent to defraud, (4) justifiable reliance upon the misrepresentation, and (5) damage resulting from that justifiable reliance. *See CACI § 1900.* Related fraud claims based on concealment or failure to disclose known facts have similar elements.

*See* CACI § 1901. The pleading requirements for all types of fraud are identical. It is not sufficient to plead legal conclusions. To the contrary, "[f]raud must be pleaded with specificity, to provide the defendants with the fullest possible details of the charge so they are able to prepare a defense to this serious attack. To withstand a demurrer, the facts constituting every element of the fraud must be alleged with particularity, and the claim cannot be salvaged by references to the general policy favoring the liberal construction of pleadings." *See Goldrich v. Natural Y Surgical Specialties, Inc.*, 25 Cal.App.4th 772, 783 (1994) (relying upon *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 216 (1983)); *see also*, *Lazar v. Superior Court*, 12 Cal.4th 631, 645 (1996) (same); *Nagy v. Nagy*, 210 Cal.App.3d 1262, 1268 (1989) ([f]raud actions are subject to strict requirements of particularity in pleading"). The heightened pleading standard for fraud requires "pleading *facts* which 'show how, when, where, to whom, and by what mans the representations were tendered.'" *See Lazar*, 12 Cal.4th at 645 (citation omitted).

Here, Barney (after littering his Complaint with allegations not relevant to his claims and inserted solely to soil Pieter and the other defendants) alleges, in the most general terms, that "DEFENDANTS" falsely represented LEI's EBITDA, falsely represented LEI would have sufficient cash flow from operations to meet its obligations, provided Barney with false and fraudulent financial statements, stated that $10 million was necessary to pay off all of the loans from the Leeds notes, falsely represented LEI was "strong and successful" (*See* Complaint at ¶ 54.) Barney just lumps all defendants together indiscriminately with no specificity as to which defendant allegedly made a specific representation he claims is false.[2] This, by definition, violates the well-settled rule that a plaintiff must plead fraud with specificity.

Furthermore, assuming for the moment Barney had alleged in his SAC that Pieter himself made each of the alleged misrepresentations, his fraud claims are still defective. That is because the non-

---

[2] Barney's decision to lump all defendants together and not specific which defendant supposedly made which statement claimed to be fraudulent makes his SAC even more vague than his FAC.

**DEMURRER TO FIRST AMENDED COMPLAINT**

specific allegations do not allege fraud with the required particularity. More specifically, and only as examples, Barney's allegations fail to:

- identify the specific statements Pieter allegedly made regarding LEI's EBITDA, how they were made, when they were made, why Barney believes the statements are false, etc.;

- identify the specific statements Pieter allegedly made regarding LEI's cash flow, how they were made, when they were made, why Barney believes the statements are false, etc.;

- identify the specific financial statements (by date, title, etc.) Pieter provided that allegedly grossly inflated LEI's financial position, how the financial statements were provided, when they were provided, and what specific information is allegedly inflated, etc.;

- identify the specific statements Pieter allegedly made about $10 million being sufficient to pay off loans from the Leeds notes, how the statements were made, when they were made, why Barney believes the statements are false, etc.;

- identify the specific statements Pieter allegedly made about the strength of LEI's leadership, how the statements were made, when they were made, why Barney believes the statements are false, etc.;

Absent specific allegations addressing the foregoing – and the other vague fraud-related allegations in the FAC – Pieter's demurrer to Barney's fraud claims must be sustained.

**C.   If Barney's Fraud Claims Against Pieter Fail, His Unfair Competition Claim Must Also Fail**

Barney has also alleged an unfair competition claim against Pieter that is entirely redundant of his fraud claims against Pieter. (*See* Docket No. 55 at ¶¶ 77-80.) Because Barney's fraud claims fail, his unfair competition claim must also fail.

1

**IV.**

2

<u>**CONCLUSION**</u>

3    The foregoing demonstrates that Barney's first, second, and third causes of action are deficient.

4    Accordingly, Pieter requests respectfully that the Court sustain his demurrer without leave to amend as

5    Barney has chosen to live or die by these allegations.

6

7    DATED: April 30, 2019

8

**BARRITT SMITH MINER LLP**

9

10    By: _____

Douglas A. Barritt

11    Attorney for Defendant and Cross-Complainant

12    LUKAS PIETER

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

**DEMURRER TO FIRST AMENDED COMPLAINT**

### <u>DECLARATION RE MEET AND CONFER IN ADVANCE OF DEMURRER</u>

I, Douglas A. Barritt, declare and state as follows:

1.       I am a member of the State Bar of California and am an attorney responsible for representing defendant and cross-complainant Lukas Pieter in the above-entitled action. The statements contained in this declaration are based on my personal knowledge, and if called and sworn as a witness, I would and could testify competently thereto.

2.       On August 6, 2018, I sent an email to Joel Baruch, counsel for plaintiff Carl Barney, as Trustee of the Carl Barney Living Trust, for the purpose of meeting and conferring in advance of defendant and cross-complainant Lukas Pieter filing his Demurrer to Barney's initial Complaint. I requested that the meet and confer take place in-person. However, Mr. Baruch was not in town at the time and stated he preferred that the meet and confer take place in writing. I then sent a detailed email to Mr. Baruch outlining the grounds of Pieter's Demurrer to the initial Complaint. Attached hereto as Exhibit A is a true and accurate copy of the email exchange between Mr. Baruch and me.

3.       In an about-face, Mr. Baruch then stated he wanted to meet and confer in-person, but could not do so until August 15. I reluctantly agreed to meet and confer on August 15. My reluctance was due to the fact that Mr. Baruch made it clear that he would not grant any extensions to respond to the initial Complaint and, therefore, I wanted to complete the meet and confer as soon as possible so that we could informally resolve my concerns or move forward with a Demurrer. Ultimately, Mr. Baruch did not meet and confer in-person, but he did reply to my email stating he believed the initial Complaint was proper and that Barney would not amend it voluntarily. Attached hereto as Exhibit B is a true and accurate copy of Mr Baruch's email.

4.       Pieter then went to the time and expense of preparing and filing his Demurrer to the initial Complaint. Although Mr. Baruch was adamant during the meet and confer process that Barney would not voluntarily amend his initial Complaint, that is precisely what he did. On September 18, 2018 – the day his opposition to the Demurrer was due – Barney filed a Notice of Election to File First Amended Complaint Pursuant to Code of Civil Procedure Section 472. A true and accurate copy of this Notice is attached hereto as Exhibit C.

**DEMURRER TO FIRST AMENDED COMPLAINT**

5.      Barney then took seven weeks to file his First Amended Complaint ("FAC"). It was filed on November 6, 2018. Although Barney added paragraphs to his FAC and even added new parties, his fraud allegations are nearly identical. More specifically, it appears he lifted the core fraud allegations in his initial Complaint (at Paragraph 23) and inserted it in the FAC (at Paragraph 54). These are the core fraud allegations Pieter challenged in his Demurrer to the initial Complaint.

6.      On November 6, 2018, the day Barney filed his FAC, I contacted Mr. Baruch requesting to meet and confer prior to demurring to the FAC. The following day I sent Mr. Baruch an email detailing the defects in the FAC which were identical to the defects in the initial Complaint. Attached hereto as Exhibit D is a true and accurate copy of an email exchange between Mr. Baruch and me regarding the defects in the FAC and scheduling an in-person meet and confer. Mr. Baruch and I met on November 15, 2018, for the in-person meet and confer. During that meeting, Mr. Baruch acknowledged the fraud allegations against Pieter were not specific and stated Barney would file a SAC.

7.      Months then went by during which I assumed the SAC was being prepared. However, on April 8, 2019, Mr. Baruch informed me that Barney would not be filing a SAC and, instead, was standing on the allegations in the FAC. A true and accurate copy of Mr. Baruch's email informing me of Barney's change in plans is attached hereto as Exhibit E.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April 30, 2019 at Irvine, California.

_____
Douglas A. Barritt

**DEMURRER TO FIRST AMENDED COMPLAINT**

# EXHIBIT A

**Barney v. Pieter**
**Case No. 30-2018-01006531**
**Exhibit A**

| From: | Douglas Barritt |
|---|---|
| To: | "Joel Baruch" |
| Cc: | Carter, James P. (Orange County) |
| Subject: | RE: Meet and Confer re Barney"s Complaint |
| Date: | Thursday, August 9, 2018 7:47:28 AM |

Joel,

The delay in meeting and conferring is troubling; especially given your warning to me (instigated by Don Wanland) that you will not grant any extensions in responding to Barney's Complaint. Nevertheless, I will agree to meet and confer with you on August 15, but please provide me (on August 13, after you speak with Barney) with a written response to my written meet and confer. You will need to tell me specifically how you intend to proceed on August 15 when we meet as the meet and confer process can't go on any longer.

Let's also meet and confer regarding the PMQ deposition as I intend to file a motion to compel given LEI's multiple failures to permit the deposition to go forward. We've met and conferred before in-person on this issue, but let's do it again. Jim – your office will likely want to be present for this portion of the meet and confer.

There is a OSC hearing on August 15 at 8:30 a.m. We can meet and confer immediately before or after the hearing. Let me know which you prefer.

Doug

**From:** Joel Baruch <joel@joelwbaruch.com>
**Sent:** Tuesday, August 7, 2018 4:36 PM
**To:** Douglas Barritt <dbarritt@barrittsmith.com>
**Subject:** Re: Meet and Confer re Barney's Complaint

Doug:

Thank you for putting your meet and confer in writing.  Since you have done a little research and have cited cases, it would have been difficult to get your specific concerns along with cites to the law either in person or telephonically.  Writing was best for the first go-around.

Because you are asking me to dismiss causes of action, I need to consult with my client, Carl Barney, about these matters.  Mr. Barney is in Russia until Monday, August 13, and he did not take either a cell phone or laptop for security reasons.  Therefore, I have no way to contact him until he returns.  I will be in my Irvine

==office and can meet and confer with you in person anytime on August 15, 2018, which will give me time to speak with Mr. Barney about his complaint after he returns from Russia.  If we are unable to agree on one or more points, you will have more than enough time to take your demurrer.  What time in your office should we calendar on August 15?==

Joel

**JOEL W. BARUCH, ATTORNEY AT LAW**
**LAW OFFICES OF JOEL W. BARUCH, P.C.**
2601 MAIN STREET, SUITE 980, IRVINE, CA 92614
Telephone: (949) 864-9662 | Facsimile: (949) 851-3185
joel@joelwbaruch.com | www.joelwbaruch.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

On Mon, Aug 6, 2018 at 3:50 PM, Douglas Barritt <dbarritt@barrittsmith.com> wrote:

Joel,

I don't understand why everything in this case needs to be so difficult. I wish it wasn't so, but it is. And I don't understand why you cannot meet and confer telephonically if you can read lengthy emails and presumably respond to them. In addition, I have no idea what you mean by your statement that "the attorneys in this case have had some communication issues." Please explain.

I have not yet met and conferred in this case. So, I assume you are referring to the case of Pieter v. LEI (where you represent LEI, not Carl Barney or his trust). It is true that I met and conferred in writing regarding LEI's defective discovery responses. But, you know full well that Judge Bauer later insisted that the parties meet and confer in person. ==All I am trying to do is comply fully with CCP Section 430.41(a). In any event, I interpret your email below as a refusal to meet and confer telephonically and, therefore, I have outlined the defects I see in Barney's Complaint below.==

==**Barney's fraud claims (first, second, and third causes of action)**==

A plaintiff must plead fraud with particularity. *See e.g.*, *Lazar v. Superior Court*, 12 Cal.4th 631, 644-45 (1996); *Britton v. Girardi*, 235 Cal.App.4th 721, 739 (2015);  Barney has failed to do so. Examples include, but are not limited to, Barney's failure to be specific (dates, form of communication, specific representations made, etc.) regarding Pieter's alleged representations concerning (1) LEI's EBITDA, (2) LEI's cash flow, (3) LEI's financial statements, (4) the amount necessary to pay off all loans from Leeds, and (5) LEI's leadership. Similarly, Barney has failed to be specific regarding the matters Pieter supposedly concealed. He must be specific regarding (1) the laws/regulations LEI supposedly violated, (2) the misconduct Pieter allegedly did not disclose, (3) the undisclosed conflicts, and (4) the funds supposedly diverted. The foregoing are just examples, but should give you a very good idea of the defects in Barney's fraud claims.

**Barney's unfair business practices claim (fourth cause of action)**

This cause of action is duplicative of Barney's fraud claims. If the fraud claims cannot be pled with the required level of specificity, this claim will also fail. I will evaluate this claim further after Barney cures his defective fraud claims (if that is possible).

**Barney's negligent misrepresentation claim (fifth cause of action)**

This claim is based on the same non-specific allegations as Barney's fraud claims. It is defective for the same reasons listed above. *See Small v. Fritz Companies, Inc.*, 30 Cal.4th 167, 184 (2003) (claim for negligent misrepresentation must be pled with the same specificity as fraud claim).

**Barney's breach of fiduciary duty claim (sixth cause of action)**

This claim is hopelessly vague as well. What specifically did Mr. Pieter misrepresent or fail to disclose to Barney regarding his employment agreement? On what basis do you contend that an executive has a fiduciary duty to inform a minority shareholder that the company has offered him an employment agreement or the terms of the employment agreement? I have not seen any authority for this proposition. What specific facts did Mr. Pieter misrepresent or conceal regarding "the financially distressed state of LEI" and on what basis do you claim this is somehow a breach of a fiduciary duty? I have the same questions regarding Barney's allegation concerning Mr. Pieter's "self-dealing relationship with the Leeds equity partner."

**Barney's innocent misrepresentation claim (seventh cause of action)**

Candidly, I have never before seen a claim for "innocent misrepresentation." My research no such claim exists. *See City of Atascadero v. Merrill Lynch, Pierce, Fenner &* Smith, 68

Cal.App.4th 445, 482 (1998); *Hensley v. McSeeney*, 90 Cal.App.4th 1081, 1085 (2001); and *Colenzo v. Fed. Deposit Ins. Corp.*, 2011 WESTLAW 13177024, *8 (C.D. Cal.)

On a related issue, a week ago on July 31, I sent you a letter tendering the Barney Complaint to LEI (your client in the case Mr. Pieter filed against it) demanding that LEI provide him with a defense and indemnification under California Labor Code Section 2802, California Corporations Code Section 317, LEI's Amended and Restated Bylaws, Paragraph 11 of his Executive Employment Agreement, and any other state law, federal law or contractual provision that provides a defense or indemnification for Mr. Pieter. The letter was also sent to Jim Carter (LEI's other counsel) and Jean Chung (LEI's in-house counsel). I have not received a response from you, Mr. Carter, or Ms. Chung. Can you please give me the courtesy of a response?

I have also previously requested all policies LEI maintained (even if they have lapsed) that could potentially provide coverage for Barney's claims. The employment agreement between LEI and Mr. Pieter (drafted by LEI's outside counsel, unanimously approved by LEI's Board, signed by LEI's Chief Executive Officer, and disclosed to potential investors) required LEI to maintain this insurance even after Mr. Pieter's termination. Will you please provide the policies or confirm that LEI failed to secure the policies?

In addition, LEI's bylaws give Mr. Pieter the right to have LEI pay his fees and costs in advance. To whom should Mr. Pieter submit his requests for payment?

Finally, Mr. Pieter will be filing a Cross-Complaint against LEI regarding defense/indemnification issues. Will you accept service of the Cross-Complaint?

I look forward to your response on all issues listed above hopefully by close of business tomorrow. You have made it clear that you will not extend the time for Mr. Pieter to respond to Barney's Complaint (even though you have requested, and I have granted, several extensions). So, time is of the essence.

Thanks in advance for your attention to these matters. Again, I am happy to discuss the foregoing issues telephonically if you change your mind.

Doug

**From:** Joel Baruch <joel@joelwbaruch.com>
**Sent:** Monday, August 6, 2018 2:29 PM
**To:** Douglas Barritt <dbarritt@barrittsmith.com>
**Subject:** Re: Meet and Confer re Barney's Complaint

Doug:

I am unable to meet and confer by telephone or in person for the entire week because of other projects and a short trip.  Also, the attorneys in this case have had some communication issues, and it is better to do these things in writing.  I do all my meet and confers in writing anyway as a matter of policy- that way, there is no misunderstanding.  Finally, I have seen you meet and confer in writing on several matters in this case, so let's do it that way.

Joel

**JOEL W. BARUCH, ATTORNEY AT LAW**
**LAW OFFICES OF JOEL W. BARUCH, P.C.**
2601 MAIN STREET, SUITE 980, IRVINE, CA 92614
Telephone: (949) 864-9662 | Facsimile: (949) 851-3185
joel@joelwbaruch.com | www.joelwbaruch.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

On Mon, Aug 6, 2018 at 1:30 PM, Douglas Barritt <dbarritt@barrittsmith.com> wrote:

Thanks for your response Joel. California Code of Civil Procedure Section 430.41(a) requires the parties to "meet and confer in person or by telephone . . . ." It does not appear to permit a meet and confer "in writing" as you requested. I prefer to meet and confer in person. Your being away from your Irvine office makes that impossible. So, let's meet and confer "by telephone" so we can make sure we comply fully with Section 430.41(a). I don't believe the meet and confer will take very long. How about a call this afternoon?

Doug

**From:** Joel Baruch <joel@joelwbaruch.com>
**Sent:** Monday, August 6, 2018 12:36 PM
**To:** Douglas Barritt <dbarritt@barrittsmith.com>
**Subject:** Re: Meet and Confer re Barney's Complaint

No problem, Doug.  I cannot do it in person, however, because I am in La Quinta office until next Monday.   Please send your meet and confer concerns to me in writing and I will promptly respond.

Joel

**JOEL W. BARUCH, ATTORNEY AT LAW**
**LAW OFFICES OF JOEL W. BARUCH, P.C.**
2601 MAIN STREET, SUITE 980, IRVINE, CA 92614
Telephone: (949) 864-9662 | Facsimile: (949) 851-3185
joel@joelwbaruch.com | www.joelwbaruch.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

On Mon, Aug 6, 2018 at 6:59 AM, Douglas Barritt <dbarritt@barrittsmith.com> wrote:

> Joel,
>
> I would like to meet and confer with you in advance of Mr. Pieter demurring to the Complaint recently filed by Carl Barney. *See* Cal. Civ. Proc. Code Section 430.41. Please let me know your availability in the next 2-3 days.
>
> Thanks in advance,
> Doug
>
> WE'VE MOVED! PLEASE NOTE NEW ADDRESS BELOW.
> _____
> Douglas A. Barritt
> Barritt Smith Miner LLP
> 2601 Main Street, Suite 530 | Irvine, CA 92614 | **www.barrittsmith.com**
> Phone: **949-553-0700 ext. 1** | Fax: **949-553-0715** | **dbarritt@barrittsmith.com**
>
> **NOTICE**: This email message and any attachment transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee.  If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited.  If you have received this message in error, please notify the sender immediately by telephone (949-553-0700) and reply email and delete this message as well as any copies and/or backups.

# EXHIBIT B

**Barney v. Pieter**
**Case No. 30-2018-01006531**
**Exhibit B**

| | |
|---|---|
| **From:** | Joel Baruch |
| **To:** | Douglas Barritt |
| **Cc:** | Carter, James P. (Orange County) |
| **Subject:** | Re: Meet and Confer re Barney"s Complaint |
| **Date:** | Wednesday, August 15, 2018 12:54:09 PM |

Doug:

1.    We believe that the fraud-based claims are pled with sufficient particularity.  The "who, what, when, where, and why" of each fraud claim is adequately pled- in other words, dates or approximate dates are included, what was represented or concealed was included, and the manner in which the alleged misrepresentations and/or concealment occurred was included.  Mr. Pieter cannot claim he did not know or does not know that with which he has been charged in order to know whether to admit or deny the allegations.

2.    The facts regarding the causes of actions that are not fraud-based are also more than sufficiently pled, including each required element of each such cause of action.  Also, there are numerous allegations incorporated into the causes of action which sufficiently advise Mr. Pieter of the charges that plaintiff has pled against him in the complaint.

3.    The cause of action labeled "innocent misrepresentation" is valid in the case of a fiduciary.  At all times, Mr. Pieter was a fiduciary of LEI.

4.    Mr. Barney believes that the filing of a demurrer in this action would be frivolous and could substantially delay the proceeding and, therefore, would consider asking for monetary sanctions pursuant to Code of Civil Procedure, section 128.7.

Based on the above, Mr. Barney is unwilling to dismiss any cause of action contained in his complaint at this time.

Joel

**JOEL W. BARUCH, ATTORNEY AT LAW**
**LAW OFFICES OF JOEL W. BARUCH, P.C.**
2601 MAIN STREET, SUITE 980, IRVINE, CA 92614
Telephone: (949) 864-9662 | Facsimile: (949) 851-3185

[joel@joelwbaruch.com](mailto:joel@joelwbaruch.com) | [www.joelwbaruch.com](http://www.joelwbaruch.com)

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

On Mon, Aug 6, 2018 at 3:50 PM, Douglas Barritt <[dbarritt@barrittsmith.com](mailto:dbarritt@barrittsmith.com)> wrote:

> Joel,
>
> I don't understand why everything in this case needs to be so difficult. I wish it wasn't so, but it is. And I don't understand why you cannot meet and confer telephonically if you can read lengthy emails and presumably respond to them. In addition, I have no idea what you mean by your statement that "the attorneys in this case have had some communication issues." Please explain.
>
> I have not yet met and conferred in this case. So, I assume you are referring to the case of Pieter v. LEI (where you represent LEI, not Carl Barney or his trust). It is true that I met and conferred in writing regarding LEI's defective discovery responses. But, you know full well that Judge Bauer later insisted that the parties meet and confer in person. All I am trying to do is comply fully with CCP Section 430.41(a). In any event, I interpret your email below as a refusal to meet and confer telephonically and, therefore, I have outlined the defects I see in Barney's Complaint below.
>
> **Barney's fraud claims (first, second, and third causes of action)**
>
> A plaintiff must plead fraud with particularity. *See e.g.*, *Lazar v. Superior Court*, 12 Cal.4th 631, 644-45 (1996); *Britton v. Girardi*, 235 Cal.App.4th 721, 739 (2015);  Barney has failed to do so. Examples include, but are not limited to, Barney's failure to be specific (dates, form of communication, specific representations made, etc.) regarding Pieter's alleged representations concerning (1) LEI's EBITDA, (2) LEI's cash flow, (3) LEI's financial statements, (4) the amount necessary to pay off all loans from Leeds, and (5) LEI's leadership. Similarly, Barney has failed to be specific regarding the matters Pieter supposedly concealed. He must be specific regarding (1) the laws/regulations LEI supposedly violated, (2) the misconduct Pieter allegedly did not disclose, (3) the undisclosed conflicts, and (4) the funds supposedly diverted. The foregoing are just examples, but should give you a very good idea of the defects in Barney's fraud claims.
>
> **Barney's unfair business practices claim (fourth cause of action)**

This cause of action is duplicative of Barney's fraud claims. If the fraud claims cannot be pled with the required level of specificity, this claim will also fail. I will evaluate this claim further after Barney cures his defective fraud claims (if that is possible).

### Barney's negligent misrepresentation claim (fifth cause of action)

This claim is based on the same non-specific allegations as Barney's fraud claims. It is defective for the same reasons listed above. *See Small v. Fritz Companies, Inc.*, 30 Cal.4th 167, 184 (2003) (claim for negligent misrepresentation must be pled with the same specificity as fraud claim).

### Barney's breach of fiduciary duty claim (sixth cause of action)

This claim is hopelessly vague as well. What specifically did Mr. Pieter misrepresent or fail to disclose to Barney regarding his employment agreement? On what basis do you contend that an executive has a fiduciary duty to inform a minority shareholder that the company has offered him an employment agreement or the terms of the employment agreement? I have not seen any authority for this proposition. What specific facts did Mr. Pieter misrepresent or conceal regarding "the financially distressed state of LEI" and on what basis do you claim this is somehow a breach of a fiduciary duty? I have the same questions regarding Barney's allegation concerning Mr. Pieter's "self-dealing relationship with the Leeds equity partner."

### Barney's innocent misrepresentation claim (seventh cause of action)

Candidly, I have never before seen a claim for "innocent misrepresentation." My research no such claim exists. *See City of Atascadero v. Merrill Lynch, Pierce, Fenner &* Smith, 68 Cal.App.4th 445, 482 (1998); *Hensley v. McSeeney*, 90 Cal.App.4th 1081, 1085 (2001); and *Colenzo v. Fed. Deposit Ins. Corp.*, 2011 WESTLAW 13177024, *8 (C.D. Cal.)

On a related issue, a week ago on July 31, I sent you a letter tendering the Barney Complaint to LEI (your client in the case Mr. Pieter filed against it) demanding that LEI provide him with a defense and indemnification under California Labor Code Section 2802, California Corporations Code Section 317, LEI's Amended and Restated Bylaws, Paragraph 11 of his Executive Employment Agreement, and any other state law, federal law or contractual provision that provides a defense or indemnification for Mr. Pieter. The letter was also sent to Jim Carter (LEI's other counsel) and Jean Chung (LEI's in-house counsel). I have not received a response from you, Mr. Carter, or Ms. Chung. Can you please give me the courtesy of a response?

I have also previously requested all policies LEI maintained (even if they have lapsed) that could potentially provide coverage for Barney's claims. The employment agreement between LEI and Mr. Pieter (drafted by LEI's outside counsel, unanimously approved by LEI's Board, signed by LEI's Chief Executive Officer, and disclosed to potential investors) required LEI to maintain this insurance even after Mr. Pieter's termination. Will you please provide the policies or confirm that LEI failed to secure the policies?

In addition, LEI's bylaws give Mr. Pieter the right to have LEI pay his fees and costs in advance. To whom should Mr. Pieter submit his requests for payment?

Finally, Mr. Pieter will be filing a Cross-Complaint against LEI regarding defense/indemnification issues. Will you accept service of the Cross-Complaint?

I look forward to your response on all issues listed above hopefully by close of business tomorrow. You have made it clear that you will not extend the time for Mr. Pieter to respond to Barney's Complaint (even though you have requested, and I have granted, several extensions). So, time is of the essence.

Thanks in advance for your attention to these matters. Again, I am happy to discuss the foregoing issues telephonically if you change your mind.

Doug

**From:** Joel Baruch <joel@joelwbaruch.com>
**Sent:** Monday, August 6, 2018 2:29 PM
**To:** Douglas Barritt <dbarritt@barrittsmith.com>
**Subject:** Re: Meet and Confer re Barney's Complaint

Doug:

    I am unable to meet and confer by telephone or in person for the entire week because of other projects and a short trip.  Also, the attorneys in this case have had some communication issues, and it is better to do these things in writing.  I do all my meet and

confers in writing anyway as a matter of policy- that way, there is no misunderstanding. Finally, I have seen you meet and confer in writing on several matters in this case, so let's do it that way.


Joel




**JOEL W. BARUCH, ATTORNEY AT LAW**

**LAW OFFICES OF JOEL W. BARUCH, P.C.**

2601 MAIN STREET, SUITE 980, IRVINE, CA 92614

Telephone: (949) 864-9662 | Facsimile: (949) 851-3185

joel@joelwbaruch.com | www.joelwbaruch.com


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


On Mon, Aug 6, 2018 at 1:30 PM, Douglas Barritt <dbarritt@barrittsmith.com> wrote:

> Thanks for your response Joel. California Code of Civil Procedure Section 430.41(a) requires the parties to "meet and confer in person or by telephone . . . ." It does not appear to permit a meet and confer "in writing" as you requested. I prefer to meet and confer in person. Your being away from your Irvine office makes that impossible. So, let's meet and confer "by telephone" so we can make sure we comply fully with Section 430.41(a). I don't believe the meet and confer will take very long. How about a call this afternoon?
>
>
> Doug
>
>
> **From:** Joel Baruch <joel@joelwbaruch.com>
> **Sent:** Monday, August 6, 2018 12:36 PM

**To:** Douglas Barritt <dbarritt@barrittsmith.com>
**Subject:** Re: Meet and Confer re Barney's Complaint

No problem, Doug.   I cannot do it in person, however, because I am in La Quinta office until next Monday.   Please send your meet and confer concerns to me in writing and I will promptly respond.

Joel

**JOEL W. BARUCH, ATTORNEY AT LAW**

**LAW OFFICES OF JOEL W. BARUCH, P.C.**

2601 MAIN STREET, SUITE 980, IRVINE, CA 92614

Telephone: (949) 864-9662 | Facsimile: (949) 851-3185

joel@joelwbaruch.com | www.joelwbaruch.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

On Mon, Aug 6, 2018 at 6:59 AM, Douglas Barritt <dbarritt@barrittsmith.com> wrote:

> Joel,
>
> I would like to meet and confer with you in advance of Mr. Pieter demurring to the Complaint recently filed by Carl Barney. *See* Cal. Civ. Proc. Code Section 430.41. Please let me know your availability in the next 2-3 days.

Thanks in advance,

Doug


WE'VE MOVED! PLEASE NOTE NEW ADDRESS BELOW.

_____

Douglas A. Barritt

Barritt Smith Miner LLP

2601 Main Street, Suite 530 | Irvine, CA 92614 | www.barrittsmith.com

Phone: 949-553-0700 ext. 1 | Fax: 949-553-0715 | dbarritt@barrittsmith.com


NOTICE: This email message and any attachment transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee.  If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited.  If you have received this message in error, please notify the sender immediately by telephone (949-553-0700) and reply email and delete this message as well as any copies and/or backups.

# EXHIBIT C

**Barney v. Pieter**
**Case No. 30-2018-01006531**
**Exhibit C**

Joel W. Baruch SBN 85903
Corey A. Hall SBN 295470
LAW OFFICES OF JOEL W. BARUCH, PC
2601 Main Street, Suite 980
Irvine, California 92614
Telephone: (949) 864-9662
Facsimile: (949) 851-3185

Attorneys for Plaintiff CARL BARNEY,
as Trustee of the CARL BARNEY LIVING TRUST

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

| | |
|---|---|
| CARL BARNEY, as Trustee of the CARL BARNEY LIVING TRUST,<br><br>        Plaintiff,<br><br>v.<br><br>LUKAS PIETER and DOES 1 through 20, inclusive,<br><br>        Defendants. | CASE NO.: 30-2018-01006531<br>*[Unlimited Jurisdiction]*<br><br>*Assigned for all purposes to the*<br>*Hon. Craig Griffin, Dept. N17*<br><br>**NOTICE OF ELECTION TO FILE FIRST AMENDED COMPLAINT PURSUANT TO** *CODE OF CIVIL PROCEDURE* **§ 472** |
| LUKAS PIETER, an individual,<br><br>        Cross-Complainant,<br><br>v.<br><br>LEPORT EDUCATIONAL INSTITUTE, INC., a California corporation; and ROES 1 to 20, inclusive,<br><br>        Cross-Defendants. | Date:   October 1, 2018<br>Time:  2:00 p.m.<br>Dept:  N17<br><br>**Reservation No. 72871566** |

\ \ \

\ \ \

\ \ \

\ \ \

1

**NOTICE OF ELECTION TO FILE FIRST AMENDED COMPLAINT PURSUANT TO**
*CODE OF CIVIL PROCEDURE* **§ 472**

1    TO ALL PARTIES HEREIN AND TO THEIR RESPECTIVE COUNSEL OF RECORD:

2      PLEASE TAKE NOTICE that Plaintiff CARL BARNEY, as Trustee of the CARL

3    BARNEY LIVING TRUST hereby elects to file a First Amended Complaint pursuant to *Code*

4    *of Civil Procedure* § 472 in response to the Demurrer to Plaintiff's Complaint filed by

5    Defendant LUKAS PIETER.

6

7    Dated: September 18, 2018          LAW OFFICES OF JOEL W. BARUCH, PC

8

9

10                           By: _____

                                   Joel W. Baruch, Esq.

11                                    Attorneys for Plaintiff CARL BARNEY,

                                   as Trustee of the CARL BARNEY

12                                    LIVING TRUST

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                           2

**NOTICE OF ELECTION TO FILE FIRST AMENDED COMPLAINT PURSUANT TO**
**CODE OF CIVIL PROCEDURE § 472**

**PROOF OF SERVICE**

I am employed in the county of Orange, State of California at **THE LAW OFFICES OF JOEL W. BARUCH.** I am over the age of 18 and not a party to the within action; my business address is 2601 Main Street, Suite 980, Irvine, CA 92614.

On September 18, 2018, I served the foregoing documents described as **NOTICE OF ELECTION TO FILE FIRST AMENDED COMPLAINT PURSUANT TO *CODE OF CIVIL PROCEDURE* § 472** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**SEE ATTACHED SERVICE LIST**

**BY MAIL:** I enclosed the documents in a sealed envelope or package addressed to the persons listed above and (1) deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid, or (2) placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

XX    **BY ELECTRONIC SERVICE VIA ONELEGAL EFILING SERVICE:** I served the above-entitled document(s) through the OneLegal E-Filing Service at www.onelegal.com addressed to all parties appearing on the electronic service list for the above-entitled case. A copy of the One Legal Service Receipt Page/Confirmation will be maintained with the original document(s) in this office.

**BY OVERNIGHT DELIVERY:** I enclosed the documents in a sealed envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses indicated above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

**BY FAX TRANSMISSION:** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax number of the parties indicated above. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

**BY PERSONAL SERVICE:** I personally delivered the documents to the persons at the addresses indicated above. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

1

POS

**BY MESSENGER SERVICE:** I served the documents by placing them in an envelope or package addressed to the persons at the addresses indicated above and providing them to a professional messenger service for service.

**BY EMAIL TRANSMISSION**: I caused the aforementioned document(s) to be served via electronic mail to the electronic addressee(s) listed on the attached mailing list. Such document was transmitted successfully from my e-mail address to the indicated addressee(s).

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 18, 2018, at Irvine, California.

_____
Sara Lucia Gonzalez, Declarant

2
**POS**

1

**SERVICE LIST**

2     Douglas Barritt
Barritt Smith LLP
3     2601 Main Street, Suite 530
Irvine, California 92614
4     Phone: 949-553-0700 ext. 1
Fax: 949-553-0715
5     dbarritt@barrittsmith.com

6     *Counsel for Defendant and Cross-Complainant LUKAS PIETER*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

**Barney v. Pieter**
**Case No. 30-2018-01006531**
**Exhibit D**

| From: | Joel Baruch |
|---|---|
| To: | Douglas Barritt |
| Cc: | Carter, James P. (Orange County); Sara Gonzalez; Jonathan Dykstra; Schmidt, Jonathan P. (Orange County); Kuno, Cindy L. (Orange County) |
| Subject: | Re: FW: Barney"s and LEI"s First Amended Complaint |
| Date: | Wednesday, November 14, 2018 6:18:35 PM |

Yes

**JOEL W. BARUCH, ATTORNEY AT LAW**
**LAW OFFICES OF JOEL W. BARUCH, P.C.**
2601 MAIN STREET, SUITE 980, IRVINE, CA 92614
Telephone: (949) 864-9662 |  Facsimile: (949) 851-3185
joel@joelwbaruch.com | www.joelwbaruch.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

On Wed, Nov 14, 2018 at 4:29 PM Douglas Barritt <dbarritt@barrittsmith.com> wrote:

Joel,

Just confirming our meeting tomorrow afternoon at 1:30 p.m. in my office.

Doug

**From:** Joel Baruch <joel@joelwbaruch.com>
**Sent:** Sunday, November 11, 2018 10:55 AM
**To:** Douglas Barritt <dbarritt@barrittsmith.com>
**Cc:** Carter, James P. (Orange County) <james.carter@jacksonlewis.com>; Sara Gonzalez <sara@joelwbaruch.com>; Jonathan Dykstra <jdykstralaw@gmail.com>; Schmidt, Jonathan P. (Orange County) <Jonathan.Schmidt@jacksonlewis.com>; Kuno, Cindy L. (Orange County) <Cindy.Kuno@jacksonlewis.com>
**Subject:** Re: FW: Barney's and LEI's First Amended Complaint

OK, thanks. Enjoy the rest of your weekend

**JOEL W. BARUCH, ATTORNEY AT LAW**

# LAW OFFICES OF JOEL W. BARUCH, P.C.

2601 MAIN STREET, SUITE 980, IRVINE, CA 92614

Telephone: (949) 864-9662 | Facsimile: (949) 851-3185

joel@joelwbaruch.com | www.joelwbaruch.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

On Sun, Nov 11, 2018 at 10:53 AM Douglas Barritt <dbarritt@barrittsmith.com> wrote:

No problem. Let's schedule it for 1:30 p.m. See you then.

**From:** Joel Baruch <joel@joelwbaruch.com>
**Sent:** Sunday, November 11, 2018 10:52 AM
**To:** Douglas Barritt <dbarritt@barrittsmith.com>
**Cc:** Carter, James P. (Orange County) <james.carter@jacksonlewis.com>; Sara Gonzalez <sara@joelwbaruch.com>; Jonathan Dykstra <jdykstralaw@gmail.com>; Schmidt, Jonathan P. (Orange County) <Jonathan.Schmidt@jacksonlewis.com>; Kuno, Cindy L. (Orange County) <Cindy.Kuno@jacksonlewis.com>
**Subject:** Re: FW: Barney's and LEI's First Amended Complaint

Doug:    I just checked with my staff about the 9 AM time on the 15th.  I apparently forgot that I have an ex parte motion to enforce the settlement agreement in LA at 8 AM on the 15th.  I will be available any time in the afternoon instead of 9 AM.  Let me know what time works best for you in the afternoon.

Joel

**JOEL W. BARUCH, ATTORNEY AT LAW**

**LAW OFFICES OF JOEL W. BARUCH, P.C.**

2601 MAIN STREET, SUITE 980, IRVINE, CA 92614

Telephone: (949) 864-9662 | Facsimile: (949) 851-3185

joel@joelwbaruch.com | www.joelwbaruch.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

On Sun, Nov 11, 2018 at 9:48 AM Joel Baruch <joel@joelwbaruch.com> wrote:

Doug:

Let's do 9 AM on the 15th.  Thanks.

To be clear, only the specificity issue should be the subject of the meet and confer.  I will come to your office.  The other issues have to do with Pieter's indemnification claim, which is being handled by Jim Carter and his team.  At least, that is the way I see it.

Joel

**JOEL W. BARUCH, ATTORNEY AT LAW**

**LAW OFFICES OF JOEL W. BARUCH, P.C.**

2601 MAIN STREET, SUITE 980, IRVINE, CA 92614

Telephone: (949) 864-9662 | Facsimile: (949) 851-3185

joel@joelwbaruch.com | www.joelwbaruch.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

On Sun, Nov 11, 2018 at 9:43 AM Douglas Barritt <dbarritt@barrittsmith.com> wrote:

Joel,

Thanks for your email. I only referenced Monday because that is the day you suggested. I requested an in-person meet and confer because it is my understanding that is what Judge Bauer wants. Of course, given your status as a veteran, we can move the in-person meet and confer to November 15. Let me know what time works for you. Not sure what Jim's interest is in the demurrer to Barney's amended complaint, but he is welcome to join the meet and confer on November 15. We can do it in my office or your office. Your call.

And thank you for your service.

Doug

**From:** Joel Baruch <joel@joelwbaruch.com>
**Sent:** Sunday, November 11, 2018 9:37 AM
**To:** Douglas Barritt <dbarritt@barrittsmith.com>
**Cc:** Carter, James P. (Orange County) <james.carter@jacksonlewis.com>; Sara Gonzalez <sara@joelwbaruch.com>; Jonathan Dykstra <jdykstralaw@gmail.com>; Schmidt, Jonathan P. (Orange County) <Jonathan.Schmidt@jacksonlewis.com>; Kuno, Cindy L. (Orange County) <Cindy.Kuno@jacksonlewis.com>
**Subject:** Re: FW: Barney's and LEI's First Amended Complaint

IDoug:

I cannot <u>personally</u> meet with you on Monday November 12 because:
(1)  Monday is Veteran's Day, I am a veteran and do take that holiday off;
(2)  I am working in my home office in La Quinta and would not be available for a <u>personal</u> meet and confer until probably Thursday November 15 when I return to my Irvine office; and, (3)  I do not believe that a <u>personal</u> meet and confer is required for demurrer issues as opposed to discovery issues.

Having said the above, I have carefully looked at the issues about which you wish to discuss in the meet and confer on the demurrer.  There are four major issues, only one of which applies to the demurrer to Barney's amended complaint--- i.e. the alleged lack of specificity in the fraud and 17200 causes of action.  The remainder of the issues have to do with discovery matters relating to Pieter's indemnification cause of action in his cross-complaint against LEI in the Barney action.  Jim Carter and his team are representing LEI in that indemnification claim.  I have asked Jim to provide me with direction as to how, if at all, I should respond to those indemnification issues and I am awaiting his response.

As you know, the recently-filed Barney amendment is a substantial improvement over the initial complaint because:  (1)  it eliminated three causes of action based on negligent misrepresentation, concealment, and failure to disclose known facts; (2)  it eliminated the innocent misrepresentation cause of action to which you strenuously objected; and, (3)  despite your stated concerns in this email chain, it significantly improved to the extent possible the "who, what, when, where, and why" allegations relating to the fraud-based cause of actions.

Having said the above, I will be in Irvine on Thursday, November 15 and can meet with you since we are in the same office building.  This will give me the opportunity to consult with Jim Carter and his team first, and, also, should give you plenty of time to file your demurrer if we disagree.  If you need an extension on the demurrer, you can have it while we iron out these issues.

Thanks, Doug.  Let me know if Thursday, November 15 works for you.

Joel


**JOEL W. BARUCH, ATTORNEY AT LAW**

**LAW OFFICES OF JOEL W. BARUCH, P.C.**

2601 MAIN STREET, SUITE 980, IRVINE, CA 92614

Telephone: (949) 864-9662 | Facsimile: (949) 851-3185

[joel@joelwbaruch.com](mailto:joel@joelwbaruch.com) | [www.joelwbaruch.com](http://www.joelwbaruch.com)


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


On Sat, Nov 10, 2018 at 9:39 AM Douglas Barritt <[dbarritt@barrittsmith.com](mailto:dbarritt@barrittsmith.com)> wrote:

> What time do you want to meet on Monday?
>
> ---
>
> **From:** Douglas Barritt
> **Sent:** Wednesday, November 7, 2018 8:24 AM
> **To:** '[joel@joelwbaruch.com](mailto:joel@joelwbaruch.com)' <[joel@joelwbaruch.com](mailto:joel@joelwbaruch.com)>
> **Subject:** RE: Barney's and LEI's First Amended Complaint
>
>
> Joel,
>
>
> Although you've added additional paragraphs to the First Amended Complaint,

you have failed to provide the specificity that was lacking in the original Complaint. Most of the defects that I pointed out to you regarding the original Complaint still exist. Here's a brief summary to focus our discussion on Monday (11/12/18). Please let me know the specific time you prefer.

**Barney's fraud claims (first, second, and third causes of action)**

A plaintiff must plead fraud with particularity. *See e.g.*, *Lazar v. Superior Court*, 12 Cal.4th 631, 644-45 (1996); *Britton v. Girardi*, 235 Cal.App.4th 721, 739 (2015); Barney has failed to do so. Examples include, but are not limited to, Barney's failure to be specific (dates, form of communication, specific representations made, etc.) regarding Pieter's alleged representations concerning (1) LEI's EBITDA, (2) LEI's cash flow, (3) LEI's financial statements, (4) the amount necessary to pay off all loans from Leeds, and (5) LEI's leadership. Similarly, Barney has failed to be specific regarding the matters Pieter supposedly concealed. It is also improper for Barney to lump all defendants together and claim that, collectively, they made false or fraudulent statements. The foregoing are just examples, but should give you a very good idea of the defects that remain in Barney's fraud claims.

**Barney's unfair business practices claim (fifth cause of action)**

This cause of action is duplicative of Barney's fraud claims. If the fraud claims cannot be pled with the required level of specificity, this claim will also fail. I will evaluate this claim further after Barney cures his defective fraud claims (if that is possible).

On a related issue, a week ago on July 31, I sent you a letter tendering the Barney Complaint to LEI (your client in the case Mr. Pieter filed against it) demanding that LEI provide him with a defense and indemnification under California Labor Code Section 2802, California Corporations Code Section 317, LEI's Amended and Restated Bylaws, Paragraph 11 of his Executive Employment Agreement, and any other state law, federal law or contractual provision that provides a defense or indemnification for Mr. Pieter. The letter was also sent to Jim Carter (LEI's other counsel) and Jean Chung (LEI's in-house counsel). I have not received a response from you, Mr. Carter, or Ms. Chung. Can you please give me the courtesy of a response?

I have also previously requested all policies LEI maintained (even if they have lapsed) that could potentially provide coverage for Barney's claims. The

employment agreement between LEI and Mr. Pieter (drafted by LEI's outside counsel, unanimously approved by LEI's Board, signed by LEI's Chief Executive Officer, and disclosed to potential investors) required LEI to maintain this insurance even after Mr. Pieter's termination. Will you please provide the policies or confirm that LEI failed to secure the policies?

In addition, LEI's bylaws give Mr. Pieter the right to have LEI pay his fees and costs in advance. To whom should Mr. Pieter submit his requests for payment?

Thanks in advance for your attention to these matters. I look forward to meeting with you in person on Monday. Again, let me know the specific time you prefer.

Doug

---

**From:** joel@joelwbaruch.com <joel@joelwbaruch.com>
**Sent:** Tuesday, November 6, 2018 9:23 PM
**To:** Douglas Barritt <dbarritt@barrittsmith.com>
**Subject:** Re: Barney's and LEI's First Amended Complaint

Doug. I took out the negligent and innocent causes of action.  It is very specific.   I will meet and confer with you, but not this week because I have other matters.  Possibly Monday.  Please send me your issues in writing.

Sent from my iPhone

On Nov 6, 2018, at 7:19 PM, Douglas Barritt <dbarritt@barrittsmith.com> wrote:

> Joel,

> I have reviewed the First Amended Complaint that you decided to file to avoid the court ruling on the demurrer Mr. Pieter filed to the original Complaint. In my view, the First Amended Complaint does little to resolve the issues raised in the demurrer. Accordingly, I would like to meet and confer with you in advance of filing another demurrer. Please let me know your availability the remainder of this week for the meet and confer.

Thanks in advance,

Doug


p.s. – I have sent multiple emails to Jonathan (you were copied) to obtain the long overdue supplemental responses to Mr. Pieter's first round of written discovery. No response has been received. Can you please let me know the status?


**WE'VE MOVED! PLEASE NOTE NEW ADDRESS BELOW.**

_____

**DOUGLAS A. BARRITT**

**BARRITT SMITH MINER LLP**

**2601 Main Street, Suite 530 | Irvine, CA 92614 | www.barrittsmith.com**

**Phone: 949-553-0700 ext. 1 | Fax: 949-553-0715 | dbarritt@barrittsmith.com**


**NOTICE**: This email message and any attachment transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee.  If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited.  If you have received this message in error, please notify the sender immediately by telephone (949-553-0700) and reply email and delete this message as well as any copies and/or backups.

# EXHIBIT E

**Barney v. Pieter**
**Case No. 30-2018-01006531**
**Exhibit E**

| | |
|---|---|
| **From:** | Douglas Barritt |
| **To:** | "Joel Baruch"; norm@osolawcorp.com |
| **Cc:** | Sara Gonzalez |
| **Subject:** | RE: Barney v. Pieter, et al- Upcoming CMC and Current FAC |
| **Date:** | Monday, April 8, 2019 5:18:24 PM |
| **Attachments:** | Re FW Barney"s and LEI"s First Amended Complaint.msg |
| | RE In-Person Meet and Confer.msg |
| | FW Barney"s Supplemental Responses.msg |
| | RE Barney v. Pieter - Supplemental Discovery Responses.msg |
| | Re FW Meet and Confer Today.msg |
| | Re Pieter adv. Barney.msg |

Joel,

Please know that I disagree with the implication in your email that Mr. Pieter made the decision to terminate Mr. Girn's employment. He didn't have the authority to do so. It was a decision influenced heavily by Carl Barney and ultimately made by LEI's Board.

You filed Barney's First Amended Complaint on November 6, 2018 (not November 16, 2018). One day later, on November 7, I informed you specifically that the First Amended Complaint was defective as to Mr. Pieter. (*See* attached email.) We then met on November 15 and discussed the defects in person. You told me then, and you've been telling me over the last four months, that Barney was going to file a Second Amended Complaint and would likely dismiss Mr. Pieter (without prejudice and with a tolling agreement). In reliance on these assurances and to avoid the further expenditure of time and resources, I did not challenge the First Amended Complaint. I also put a hold on all of Barney's discovery misconduct (for which you provided an extension until 30 days after the Second Amended Complaint is filed to seek court intervention). (*See* other attached emails.)

You now state, even after all of the assurances that you have been working on a Second Amended Complaint and were close to filing it, that you have not prepared it. And, I am confused on whether you ever intend to do so. The bottom line for Mr. Pieter is that he does intend to file a demurrer. We've met and conferred on the grounds. So, unless you have something else to add, I don't see a need to confer further. Also, please provide full, complete, and verified supplemental responses (and all responsive documents) no later than close of business on April 15, 2019. Please don't request another extension. Afterall, Mr. Pieter served his discovery on August 2, 2018 – *eight months ago*. Barney has had 8 times longer than most litigants to provide the information and documents requested. He should have known he would be required to provide these items if he chose not to dismiss Mr. Pieter as he said he was going to do.

Doug

**From:** Joel Baruch <joel@joelwbaruch.com>
**Sent:** Monday, April 8, 2019 12:57 PM
**To:** norm@osolawcorp.com; Douglas Barritt <dbarritt@barrittsmith.com>
**Cc:** Sara Gonzalez <sara@joelwbaruch.com>
**Subject:** Barney v. Pieter, et al- Upcoming CMC and Current FAC

Doug/ Norm:

I am going to call Doug separately about this matter and other things in which the LePorts are not involved.  Previously, it was my understanding that all of the LePorts have been served with a copy of the FAC and we have held off on any responsive pleadings because I wanted to do a Second Amended Complaint.  Carl Barney wanted to do a Second Amended Complaint in large part to add Ray Girn and his company as defendants.  Doug knows about Ray Girn who was terminated on February 2, 2016 by LEI, acting through Peter LePort and Lukas Pieter.  There are document(s) which indicate thatCarl was on board with the termination.  When Girn left on February 2, 2016, he took about 1/2 of the executive management staff with him at a very precarious time for LEI and then formed a similar company.  We had to hold off on naming Girn as a defendant for a long period of time because Girn and his company were suitors for the sale of LEI California and LEI Delaware schools.  LEI California schools were (all but one) sold in a strictly assets sale to Stratford on or about August 31, 2018.  However, Girn and his company still remained as suitors for the sale of the LEI Delaware schools.

The initial Complaint in Carl's case was filed on July 18, 2018 and only Lukas Pieter was named as a defendant.  The allegations in the Complaint were almost exclusively as to Lukas Pieter's alleged wrongdoing.  Doug demurred to the Complaint on grounds of specificity and inapplicability of some of the causes of action alleged against Lukas Pieter.  Therefore, on November 16, 2018, I filed a First Amended Complaint which was about double the page length of the initial Complaint, which I believe was much more specific, and which also identified the three LePorts as named defendants.  Even though the FAC identified Ray Girn and his deleterious actions, we could not name he and his company in the FAC because, as stated above in the first paragraph of this email, Girn was still a suitor for the sale of the LePort Delaware schools.  It was anticipated that he and his company would later be brought in as one of the Doe Defendants 1-20.

This weekend, before preparing the Second Amended Complaint (which I believe both of you agreed to stipulate to the filing of before responding), I did some legal research regarding adding Ray Girn and his company into the SAC which I planned to prepare.  My research disclosed the following:

1)    The applicable statute of limitations on fraud-based causes of action is 3 years.

For breach of fiduciary duty, it is 3 or 4 years depending on the circumstances.  The discovery of Girn's alleged wrongdoing is February 2, 2016, so that means a complaint would have to be filed against him on or before February 2, 2019.

2)    In order to take advantage of the "relation back" doctrine when named defendants are substituted in for Doe defendants, there has to be a complaint on file which discussed those allegations.  As said above, the initial Complaint of July 18, 2018 only mentioned Pieter.  The FAC which was filed on November 6, 2018 did mention Girn and wrongdoing.  Therefore, under the "relation back" doctrine, Carl/ LEI would be within the 3-year SOL for both fraud and breach of fiduciary duty allegations that were factually pled in the FAC.  *If I were to file a SAC today and bring in Girn and company as named defendants in the SAC, I would be outside the applicable 3-year SOL which arguably expired about 7 weeks ago on February 1, 2019.*

Therefore, I would like to remain with the FAC for the time being, and am certainly willing to extend response dates.  One thing I am cognizant of is that we have CMC before Judge Bauer at 830 AM on April 16, 2019.  I going to submit a CMC statement, but explain in a declaration the above and, also, explain that I had given you time to file a demurrer or answer as to Pieter and the three LePorts pending the filing of a SAC.  I will, before the CMC, get a Doe amendments to bring in Ray Girn and company and then serve them so all parties are in the case on the FAC.  I believe Doug is going to file another demurrer, maybe not. However:

1)    Norm- are you going to demur or answer?

2)    Doug- are you going to demur or answer?

I can give three weeks from today's date within which to do either.  Is that OK with both of you?


Joel


**JOEL W. BARUCH, ATTORNEY AT LAW**
**LAW OFFICES OF JOEL W. BARUCH, P.C.**
2601 MAIN STREET, SUITE 980, IRVINE, CA 92614

Telephone: (949) 864-9662 | Facsimile: (949) 851-3185
joel@joelwbaruch.com | www.joelwbaruch.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

## PROOF OF SERVICE

### *Barney v. Pieter*
Orange County Superior Court Case No. 30-2018-01006531

I am employed in the County of Orange, State of California. I am over the age of 18 years and am not a party to the within action. My business address is 2601 Main Street, Suite 530, Irvine, California. On April 30, 2019, I served the following documents, described as follows:

**(1) DEFENDANT LUKAS PIETER'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT; (2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER; AND (3) DECLARATION RE MEET AND CONFER**

on interested parties in this action, addressed as follows:

| | |
|---|---|
| Joel W. Baruch | James Carter |
| (joel@joelwbaruch.com) | (james.carter@jacksonlewis.com) |
| Law Offices of Joel W. Baruch, P.C. | Jackson Lewis P.C. |
| 2601 Main Street, Suite 980 | 200 Spectrum Center Drive, Suite 500 |
| Irvine, California 92614 | Irvine, CA  92618 |
| | |
| Attorneys for Cross-Claimant | Attorneys for Defendant |
| CARL BARNEY | LEPORT EDUCATIONAL INSTITUTE, INC. |

☐ **(BY U.S. Mail)** I am readily familiar with my firm's business practice for collection and processing of correspondence for mailing with the United States Postal Service. I deposited such envelope(s) with postage thereon fully prepaid to be placed in the United States Mail at Irvine, California.

☒ **(ELECTRONIC SERVICE) (CCP § 1010.6(a)(4))** I caused such document(s) to be electronically mailed, via OneLegal, to the email addresses for the individuals listed above.

☒ **(State)** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 30, 2019 at Irvine, California.

_____
Douglas A. Barritt

# EXHIBIT 8

| ATTORNEY OR PARTY WITHOUT ATTORNEY:    STATE BAR NO.: 85903 | FOR COURT USE ONLY |
|---|---|
| NAME:  JOEL W. BARUCH<br>FIRM NAME:  LAW OFFICES OF JOEL W. BARUCH, PC<br>STREET ADDRESS: 2601 Main Street, Suite 980<br>CITY:  Irvine        STATE:  CA    ZIP CODE: 92614<br>TELEPHONE NO.: (949) 864-9662    FAX NO.: (949) 851-3185<br>E-MAIL ADDRESS:  joel@joelwbaruch.com<br>ATTORNEY FOR *(name):*  Plaintiffs CARL BARNEY, etc., et al. | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br>**05/06/2019** at 01:39:00 PM<br>Clerk of the Superior Court<br>By Olga Lopez, Deputy Clerk |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>JUSTICE CENTER:<br>☒ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701<br>☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701<br>☐ Harbor- Newport Beach Facility - 4601 Jamboree Rd., Newport Beach, CA 92660-2595<br>☐ North - 1275 N. Berkeley Ave., P. O. Box 5000, Fullerton, CA 92838-0500<br>☐ West – 8141 13th Street, Westminster, CA 92683-4593 | |
| PLAINTIFF:  CARL BARNEY, etc., et al.<br><br>DEFENDANT:  LUKAS PIETER, et al. | CASE NUMBER:<br>30-2018-01006531 |
| AMENDMENT TO ☒ COMPLAINT ☐ CROSS-COMPLAINT | Case assigned to:<br>Judge: Hon. Ronald Bauer<br>Department:  CX 103<br>Date complaint filed: 7/18/2018<br>Hearing/trial date:<br>  CMC 7/25/2019 |

**FICTITIOUS NAME UNDER SECTION 474, CODE OF CIVIL PROCEDURE (NO ORDER REQUIRED)**

I have discovered the true name of ☒ Doe __2__ ☐ Roe _____ to be    HIGHER GROUND EDUCATION INC.
_____.

The complaint/cross-complaint is amended to reflect the true name wherever it appears in the pleading.

Date: ___May 6, 2019_____

Joel W. Baruch
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY)

**INCORRECT NAME UNDER SECTION 473, CODE OF CIVIL PROCEDURE (ORDER REQUIRED)**

The complaint/cross-complaint incorrectly named the defendant/cross-defendant as_____.

I have discovered the true name of the party to be _____

_____.

I request the complaint/cross-complaint be amended to reflect the true name wherever it appears in the pleading.

Date: _____

_____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY)

**ORDER**
The complaint/cross-complaint is amended to reflect the true name wherever it appears in the pleading.

Date:_____

_____
                                                JUDICIAL OFFICER

Approved for Optional Use
L-0132 (Rev. March 2019)        **AMENDMENT TO COMPLAINT/CROSS-COMPLAINT**        Code of Civil Procedure,
§§ 473, 474

For your protection and privacy please press the
CLEAR THIS FORM button after you have
printed the form

1

**PROOF OF SERVICE**

2

3      I am employed in the county of Orange, State of California at **THE LAW OFFICES OF JOEL W. BARUCH.** I am over the age of 18 and not a party to the within action; my business address is 2601 Main Street, Suite 980, Irvine, CA 92614.

4

5      On May 6, 2019, I served the foregoing documents described as **AMENDMENT TO COMPLAINT – DOE 2 HIGHER GROUND EDUCATION INC.** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

6

7    **SEE ATTACHED SERVICE LIST**

8

9    XX  **BY MAIL:** I enclosed the documents in a sealed envelope or package addressed to the persons listed above and (1) deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid, or (2) placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

10

11

12

13    XX  **BY ELECTRONIC SERVICE VIA ONELEGAL EFILING SERVICE:** I served the above-entitled document(s) through the OneLegal E-Filing Service at www.onelegal.com addressed to all parties appearing on the electronic service list for the above-entitled case. A copy of the One Legal Service Receipt Page/Confirmation will be maintained with the original document(s) in this office.

14

15

16    **BY OVERNIGHT DELIVERY:** I enclosed the documents in a sealed envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses indicated above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

17

18

19    **BY FAX TRANSMISSION:** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax number of the parties indicated above. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

20

21    **BY PERSONAL SERVICE:** I personally delivered the documents to the persons at the addresses indicated above. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

22

23

24

25

26

27

28

1<br>POS

1  **BY MESSENGER SERVICE:** I served the documents by placing them in an envelope or
package addressed to the persons at the addresses indicated above and providing them to a
2  professional messenger service for service.

3  **BY EMAIL TRANSMISSION**: I caused the aforementioned document(s) to be served
via electronic mail to the electronic addressee(s) listed on the attached mailing list. Such
4  document was transmitted successfully from my e-mail address to the indicated
addressee(s).

5
I declare under penalty of perjury under the laws of the State of California that the above is
6  true and correct.

7  Executed on May 6, 2019, at Irvine, California.

8

9  _____
Sara Lucia Gonzalez, Declarant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
_____
2
**POS**

1

<b>SERVICE LIST</b>

2   Douglas Barritt
    Barritt Smith Miner LLP
3   2601 Main Street, Suite 530
    Irvine, California 92614
4   Phone: 949-553-0700 ext. 1
    Fax: 949-553-0715
5   dbarritt@barrittsmith.com
    *Counsel for Defendant and Cross-Complainant LUKAS PIETER*
6

7   James P. Carter (SBN 150052)
    Jonathan P. Schmidt (SBN 293290)
8   JACKSON LEWIS P.C.
    200 Spectrum Center Drive, Suite 500
9   Irvine, CA 92618
    Phone:  (949) 885-1360
10  Fax: (949) 885-1380
11  *Attorneys for Cross-Defendant LEPORT EDUCATIONAL INSTITUTE, INC.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3<br><b>POS</b>

EXHIBIT 9

ATTORNEY OR PARTY WITHOUT ATTORNEY:   STATE BAR NO.: 85903
NAME:  JOEL W. BARUCH
FIRM NAME:  LAW OFFICES OF JOEL W. BARUCH, PC
STREET ADDRESS: 2601 Main Street, Suite 980
CITY:  Irvine                                 STATE:  CA        ZIP CODE: 92614
TELEPHONE NO.: (949) 864-9662        FAX NO.: (949) 851-3185
E-MAIL ADDRESS:  joel@joelwbaruch.com
ATTORNEY FOR *(name):*  Plaintiffs CARL BARNEY, etc., et al.

*FOR COURT USE ONLY*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**05/06/2019** at 01:39:00 PM
Clerk of the Superior Court
By Olga Lopez,Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
JUSTICE CENTER:
[x] Central - 700 Civic Center Dr. West, Santa Ana, CA 92701
[ ] Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701
[ ] Harbor- Newport Beach Facility - 4601 Jamboree Rd., Newport Beach, CA 92660-2595
[ ] North - 1275 N. Berkeley Ave., P. O. Box 5000, Fullerton, CA 92838-0500
[ ] West – 8141 13th Street, Westminster, CA 92683-4593

PLAINTIFF:  CARL BARNEY, etc., et al.

DEFENDANT:  LUKAS PIETER, et al.

CASE NUMBER:

30-2018-01006531

**AMENDMENT TO [x] COMPLAINT [ ] CROSS-COMPLAINT**

Case assigned to:
Judge: Hon. Ronald Bauer
Department:  CX 103
Date complaint filed: 7/18/2018
Hearing/trial date:
CMC 7/25/2019

**FICTITIOUS NAME UNDER SECTION 474, CODE OF CIVIL PROCEDURE (NO ORDER REQUIRED)**

I have discovered the true name of [x] Doe ___1___ [ ] Roe _____ to be   RAMANDEEP GIRN

The complaint/cross-complaint is amended to reflect the true name wherever it appears in the pleading.

Date:  May 6, 2019

Joel W. Baruch
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY)

**INCORRECT NAME UNDER SECTION 473, CODE OF CIVIL PROCEDURE (ORDER REQUIRED)**

The complaint/cross-complaint incorrectly named the defendant/cross-defendant as _____.

I have discovered the true name of the party to be _____

I request the complaint/cross-complaint be amended to reflect the true name wherever it appears in the pleading.

Date: _____

_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF PARTY OR ATTORNEY)

**ORDER**
The complaint/cross-complaint is amended to reflect the true name wherever it appears in the pleading.

Date: _____

_____
JUDICIAL OFFICER

Approved for Optional Use
L-0132 (Rev. March 2019)

**AMENDMENT TO COMPLAINT/CROSS-COMPLAINT**

Code of Civil Procedure,
§§ 473, 474

For your protection and privacy please press the
CLEAR THIS FORM button after you have
printed the form

**PROOF OF SERVICE**

I am employed in the county of Orange, State of California at **THE LAW OFFICES OF JOEL W. BARUCH.** I am over the age of 18 and not a party to the within action; my business address is 2601 Main Street, Suite 980, Irvine, CA 92614.

On May 6, 2019, I served the foregoing documents described as **AMENDMENT TO COMPLAINT – DOE 1 RAMANDEEP GIRN** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**SEE ATTACHED SERVICE LIST**

XX   **BY MAIL:** I enclosed the documents in a sealed envelope or package addressed to the persons listed above and (1) deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid, or (2) placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

XX   **BY ELECTRONIC SERVICE VIA ONELEGAL EFILING SERVICE:** I served the above-entitled document(s) through the OneLegal E-Filing Service at www.onelegal.com addressed to all parties appearing on the electronic service list for the above-entitled case. A copy of the One Legal Service Receipt Page/Confirmation will be maintained with the original document(s) in this office.

**BY OVERNIGHT DELIVERY:** I enclosed the documents in a sealed envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses indicated above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

**BY FAX TRANSMISSION:** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax number of the parties indicated above. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

**BY PERSONAL SERVICE:** I personally delivered the documents to the persons at the addresses indicated above. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

1
**POS**

**BY MESSENGER SERVICE:** I served the documents by placing them in an envelope or package addressed to the persons at the addresses indicated above and providing them to a professional messenger service for service.

**BY EMAIL TRANSMISSION**: I caused the aforementioned document(s) to be served via electronic mail to the electronic addressee(s) listed on the attached mailing list. Such document was transmitted successfully from my e-mail address to the indicated addressee(s).

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 6, 2019, at Irvine, California.

_____

Sara Lucia Gonzalez, Declarant

1

**SERVICE LIST**

2

Douglas Barritt
Barritt Smith Miner LLP

3

2601 Main Street, Suite 530
Irvine, California 92614

4

Phone: 949-553-0700 ext. 1
Fax: 949-553-0715

5

dbarritt@barrittsmith.com

6

*Counsel for Defendant and Cross-Complainant LUKAS PIETER*

7

James P. Carter (SBN 150052)
Jonathan P. Schmidt (SBN 293290)

8

JACKSON LEWIS P.C.
200 Spectrum Center Drive, Suite 500

9

Irvine, CA 92618
Phone:  (949) 885-1360

10

Fax: (949) 885-1380

11

*Attorneys for Cross-Defendant LEPORT EDUCATIONAL INSTITUTE, INC.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 10

1   Joel W. Baruch  SBN 85903
    LAW OFFICE OF JOEL W. BARUCH
2   2601 Main Street,  Suite 980
    Irvine, California 92614
3   Telephone (949) 864-9662
    Facsimile (949) 851-3185
4
    Attorneys for Plaintiffs CARL BARNEY,
5   as Trustee of the CARL BARNEY LIVING TRUST and
    LePORT EDUCATIONAL INSTITUTE, INC.
6

7

8                  **SUPERIOR COURT OF CALIFORNIA**

9        **FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER**

10

11  CARL BARNEY, as Trustee of the          ) CASE NO.:  30-2018-01006531
    CARL BARNEY LIVING TRUST;              ) [Unlimited Jurisdiction]
12  and, LePORT EDUCATIONAL                 ) Assigned for all purposes to the
    INSTITUTE, INC., a California           ) Hon. Ronald Bauer, Dept. CX103
13  corporation,                            )
                                            )
14         Plaintiffs,                      )
                                            ) Action Filed:  July 18, 2018
15  v.                                      ) Trial Date:     None set
                                            )
16  LUKAS PIETER, PETER LePORT,             ) **DECLARATION OF JOEL W. BARUCH**
    M.D., MONICA LePORT,                    ) **RE: PARTIAL OPPOSITION TO**
17  FRANCISCO LePORT, and DOES 1            ) **DEMURRER OF DEFENDANT LUKAS**
    through 20, inclusive,                  ) **PIETER TO FIRST AMENDED**
18                                          ) **COMPLAINT**
                                            )
19         Defendants.                      ) **Date:   May 28, 2019**
    _____     ) **Time:   9:00 A.M.**
20                                          ) **Dept.   CX-103**
    LUKAS PIETER, an individual,            )
21                                          )
           Cross-Complainant,               )
22                                          )
    v.                                      )
23                                          )
    LEPORT EDUCATIONAL                      )
24  INSTITUTE, INC., a California           )
    corporation, and ROES 1 through 20,     )
    inclusive,                              )
25                                          )
           Cross-Defendants.                )
26  _____     )

27

28

        **DECLARATION OF JOEL W. BARUCH RE: PARTIAL OPPOSITION TO**
        **DEMURRER OF DEFENDANT LUKAS PIETER TO FIRST AMENDED**
                              **COMPLAINT**
                                  1

1    I, JOEL W. BARUCH, declare and state as follows:

2    1.    I am the counsel for Plaintiff CARL BARNEY, as Trustee of the CARL

3    BARNEY LIVING TRUST; and, LePORT EDUCATIONAL INSTITUTE, INC., a

4    California corporation, in this action.  If called as a witness herein, I could and would

5    competently attest to the following facts under oath from my own personal knowledge.

6    2.    This declaration is in partial opposition to Defendant PIETER's Demurrer to

7    the First Amended Complaint.   This partial opposition is based on the following: I believe

8    the Demurrer should be granted, but with leave to amend so that I can file a Second

9    Amended Complaint.  Counsel for Defendant PIETER has asked the Court to rule on the

10    Demurrer in his favor and not permit leave to amend.

11    3.    The Court is aware of the 2017 case in Case No. 30-2017-00915762  in

12    which Defendant PIETER is the plaintiff and in which LEI was the named defendant.  This

13    was a hotly-contested case which was ultimately settled by the parties shortly before the trial

14    was due to start before this Court on March 4, 2019.  One OSC re dismissal has come and

15    gone in this case because, as it was explained to the Court, a settlement agreement had not

16    yet been executed by the parties and their counsel.  The current OSC re dismissal date on that

17    2017 case is set for May 24, 2019 before this Court.  Today, I spoke with Doug Barritt,

18    counsel for PIETER in both cases, and we discussed whether or not a settlement agreement

19    would be signed or whether the parties would sign a mutual request for dismissal without a

20    settlement agreement before the May 24th OSC re dismissal date. *According to the oral*

21    *agreement for mutual dismissals of the settled 2017 case, the parties agreed to carve out the*

22    *current 2018 case (this First Amended Complaint) from any waiver of the general release*

23    *provisions of Civil Code section 1542.*

24    4.    Initially, on July 18, 2018, while the 2017 case was being hotly contested, I

25    filed the Complaint in this case in which Plaintiff BARNEY sought personal damages for an

26    alleged breach of fiduciary duty by Defendant PIETER and DOE defendants.  Mr. Barritt, on

27    behalf of Defendant PIETER, filed a similar Demurrer to the one he has now filed and that is

28    now before the Court.  I, therefore, filed a First Amended Complaint as a matter of right.

**DECLARATION OF JOEL W. BARUCH RE: PARTIAL OPPOSITION TO
DEMURRER OF DEFENDANT LUKAS PIETER TO FIRST AMENDED
COMPLAINT**

2

1  With that filing, I added LEI as a Plaintiff and named Defendants PETER LEPORT,

2  MONICA LEPORT, and FRANCISCO LEPORT as defendants.  As the Court knows from

3  the last CMC conference in this case, I had to serve the three LEPORTS with a copy of the

4  First Amended Complaint, which has been done.  The three LEPORTS had a lawyer

5  (Norman Schmeltzer) who was going to respond on his clients' behalf, but Mr. Schmeltzer

6  recently indicated he was slowly retiring from his business, the three LEPORTS were going

7  with a different attorney, and their new lawyer needed until June 15, 2019 to get familiar

8  with the case and respond to the First Amended Complaint.  Mr. Barritt knows this.

9      5.    About six weeks ago, Plaintiff BARNEY directed me to add former LEI CEO

10  Rhamadeep Girn and his company Higher Ground, Inc. as DOES 1 and 2, respectively.  As

11  we speak, my office has submitted DOE 1 and DOE 1 amendments to the First Amended

12  Complaint, which have not yet been signed by the Court (although we are checking often).

13      6.    I had planned to file a Second Amended Complaint a couple of months ago

14  once the three LEPORTS were added and properly served as defendants.  In fact, I would

15  have had to obtain the permission of Mr. Barritt, PIETER's lawyer, to do so since, as said

16  above, I had already filed the pending First Amended Complaint as a matter of right to

17  PIETER'S Demurrer to the initial Complaint— *Mr. Barritt and I discussed that I would need*

18  *his stipulation to file a Second Amended Complaint and it is my understanding that he would*

19  *stipulate to it.*

20      7.    The problem was when, about six weeks ago, Plaintiff BARNEY instructed

21  me to add Rhamadeep Girn and Higher Ground, Inc. as DOE 1 and 2 defendants in this case.

22  I then took a look at the initial Complaint filed on July 18, 2018 and determined that it did

23  not contain any facts or charging allegations against Mr. Girn and his company.  The First

24  Amended Complaint, which I filed on behalf of Plaintiff BARNEY in November, 2018, did

25  in fact contain factual allegations against Mr. Girn and his company but the charging

26  allegations were primarily directed against Defendant PIETER and the three LEPORTS.

27  Arguably, I had to get service of the First Amended Complaint on Mr. Girn and his company

28

**DECLARATION OF JOEL W. BARUCH RE: PARTIAL OPPOSITION TO
DEMURRER OF DEFENDANT LUKAS PIETER TO FIRST AMENDED
COMPLAINT**

3

1  so as to avoid a "relation back" problem and the pending statute of limitations.  I determined

2  that if I filed a Second Amended Complaint after on or about February 2, 2019, there could

3  be an argument on the statute of limitations.  Accordingly, I determined I needed to keep the

4  First Amended Complaint intact and get Mr. Girn and his company served as DOES in

5  connection with the First Amended Complaint just to be safe.  Therefore, I have delayed in

6  filing a Second Amended Complaint (which Mr. Barritt said he would previously stipulate to

7  the filing) until I can get the DOE amendments signed by the Court and then serve Mr. Girn

8  and his company as DOES in connection with the First Amended Complaint filed in

9  November 2018.

10      8.      Accordingly, Plaintiff BARNEY is not opposed to the Court, on May 28, 2019,

11  granting Defendant PIETER's Demurrer.  However, I need to completely change the

12  allegations as to Defendant PIETER, the three LEPORT defendants, and even as to Mr. Girn

13  and his company once the Court signs the DOE amendments and I can get them served.

14  Therefore, I request the Court to grant leave to amend the First Amended Complaint and file

15  a Second Amended Complaint within 20 days of the March 28, 2019 hearing date.  This case

16  is not yet at issue.

17

18      I declare under penalty of perjury under the laws of the State of California.  Executed

19  this 14th day of May, 2019 at Irvine, California.

20

21

22

23  Joel W. Baruch, Declarant

24

25

26

27

28

**DECLARATION OF JOEL W. BARUCH RE: PARTIAL OPPOSITION TO DEMURRER OF DEFENDANT LUKAS PIETER TO FIRST AMENDED COMPLAINT**

4

**PROOF OF SERVICE**

I am employed in the county of Orange, State of California at **THE LAW OFFICES OF JOEL W. BARUCH.** I am over the age of 18 and not a party to the within action; my business address is 2601 Main Street, Suite 980, Irvine, CA 92614.

On May 14, 2019, I served the foregoing documents described as **DECLARATION OF JOEL W. BARUCH RE: PARTIAL OPPOSITION TO DEMURRER OF DEFENDANT LUKAS PIETER TO FIRST AMENDED COMPLAINT** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**SEE ATTACHED SERVICE LIST**

XX     **BY MAIL:** I enclosed the documents in a sealed envelope or package addressed to the persons listed above and (1) deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid, or (2) placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

XX     **BY ELECTRONIC SERVICE VIA ONELEGAL EFILING SERVICE:** I served the above-entitled document(s) through the OneLegal E-Filing Service at www.onelegal.com addressed to all parties appearing on the electronic service list for the above-entitled case. A copy of the One Legal Service Receipt Page/Confirmation will be maintained with the original document(s) in this office.

**BY OVERNIGHT DELIVERY:** I enclosed the documents in a sealed envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses indicated above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

**BY FAX TRANSMISSION:** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax number of the parties indicated above. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

**BY PERSONAL SERVICE:** I personally delivered the documents to the persons at the addresses indicated above. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

1

**POS**

**BY MESSENGER SERVICE:** I served the documents by placing them in an envelope or package addressed to the persons at the addresses indicated above and providing them to a professional messenger service for service.

**BY EMAIL TRANSMISSION**: I caused the aforementioned document(s) to be served via electronic mail to the electronic addressee(s) listed on the attached mailing list. Such document was transmitted successfully from my e-mail address to the indicated addressee(s).

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 14, 2019, at Irvine, California.

Laura Boada, Declarant

2
**POS**

# EXHIBIT 11

# SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF ORANGE
## CIVIL COMPLEX CENTER

### MINUTE ORDER

DATE: 05/28/2019                TIME: 09:00:00 AM        DEPT: CX103

JUDICIAL OFFICER PRESIDING: Ronald L. Bauer
CLERK:  Janet E Frausto
REPORTER/ERM: Robin Casillas CSR# CSP 14042
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2018-01006531-CU-FR-CJC**  CASE INIT.DATE: 07/18/2018
CASE TITLE: **Carl Barney, as Trustee of the Carl Barney Living Trust vs. Pieter**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Fraud

EVENT ID/DOCUMENT ID: 73036815

**EVENT TYPE**: Demurrer to Amended Complaint
MOVING PARTY: Lukas Pieter
CAUSAL DOCUMENT/DATE FILED: Demurrer to Amended Complaint, 04/30/2019

**APPEARANCES**
Joel W. Baruch, from Law Offices of Joel W. Baruch PC, present for Cross - Defendant,Plaintiff(s) telephonically.
Douglas Barritt, specially appearing for Barritt Smith Miner LLP, present for Cross - Complainant,Defendant(s).
 Julie Z. Kimball appeared via courtcall for Defendants Peter LePort, Monica Leport and Francisco Leport.

**30 2018 01006531 CARL BARNEY AS TRUSTEE OF THE CARL BARNEY LIVING TRUST VS PIETER**

Defendant Pieter's Demurrer to the First Amended Complaint .

Plaintiff wants to file a 2nd Amended Complaint.

Defendant Pieter's Demurrer to the First Amended Complaint is sustained with 20 days leave to amend.

Douglas Barritt to give notice.

# B A R R I T T | S M I T H | M I N E R ▦

#9 – Def

## Douglas A. Barritt

(949) 553-0700 Phone
(949) 553-0715 Fax
dbarritt@barrittsmith.com

2601 Main St.
Suite 530
Irvine, CA 92614

---

| | |
|---|---|
| **Case #:** 30-2018-01006531 | |
| **Case Name:** | |
| Carl Barney vs. Lukas Pieter | |
| **Proceeding Type:** | |
| Court Approved Demurrer | |

| | |
|---|---|
| Firm: | Elkins Kalt Weintraub Reuben Gartside LLP |
| Phone: | (310) 746-4400 ext. |
| Contact: | Julie Z. Kimball |
| For: | Defendant(s), Peter LePort, Monica LePort, and Francisco LePort |
| CCID: | 9794567 |

| | |
|---|---|
| Firm: | Law Offices of Joel W. Baruch, P.C. |
| Phone: | (949) 864-9662 ext. |
| Contact: | Joel W. Baruch |
| For: | Plaintiff(s), Carl Barney |
| CCID: | 9817987 |

| | | |
|---|---|---|
| 9 | Carl Barney, as Trustee of the Carl Barney Living Trust vs. Pieter | 30-2018-01006531 CU-FR-CJC |

EXHIBIT 12

**BARRITT SMITH MINER LLP**
Douglas A. Barritt, Bar No. 150955
2601 Main Street, Suite 530
Irvine, California 92614
Phone: 949-553-0700
Fax:    949-553-0715
email:  dbarritt@barrittsmith.com

Attorneys for Defendant and Cross-Complainant
LUKAS PIETER

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**05/28/2019** at 11:12:00 AM
Clerk of the Superior Court
By Sarah Loose, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

## UNLIMITED JURISDICTION

| | |
|---|---|
| CARL BARNEY, as Trustee of the CARL BARNEY LIVING TRUST; and, LePORT EDUCATIONAL INSTITUTE, INC., a California corporation, <br><br> Plaintiffs, <br><br> v. <br><br> LUKAS PIETER, PIETER LePORT, M.D., MONICA LePORT, FRANCISCO LePORT, and DOES 1 through 20, inclusive, and DOES 1 through 20, inclusive, <br><br> Defendants. <br> LUKAS PIETER, an individual, <br><br> Cross-Complainant, <br><br> v. <br><br> LEPORT EDUCATIONAL INSTITUTE, INC., a California corporation; and ROES 1 to 20, inclusive, <br><br> Cross-Defendants. | CASE NO.: 30-2018-01006531 <br><br> Assigned for All Purposes to: <br> Hon. Ronald Bauer <br> Dept. CX-103 <br><br> **NOTICE OF RULING RE DEFENDANT LUKAS PIETER'S DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT** <br><br> Date:    May 28, 2019 <br> Time:    9:00 a.m. <br> Dept:    CX-103 |

1    **TO PLAINTIFFS CARL BARNEY, as Trustee of the CARL BARNEY LIVING TRUST**

2    **AND LEPORT EDUCATIONAL INSTITUTE, INC. ("LEI") AND ITS ATTORNEYS OF**

3    **RECORD:**

4

5    **PLEASE TAKE NOTICE THAT** defendant Lukas Pieter's Demurrer to plaintiff Carl

6    Barney's First Amended Complaint was sustained with leave to file a Second Amended Complaint

7    within twenty (20) days. Barney's Second Amended Complaint must be filed on or before June 17,

8    2019.

9

10    DATED: May 28, 2019

**BARRITT SMITH MINER LLP**

By: _____
     Douglas A. Barritt
     Attorney for Defendant and Cross-Complainant
     LUKAS PIETER

**NOTICE OF RULING**

## PROOF OF SERVICE

### *Barney v. Pieter*
Orange County Superior Court Case No. 30-2018-01006531

I am employed in the County of Orange, State of California. I am over the age of 18 years and am not a party to the within action. My business address is 2601 Main Street, Suite 530, Irvine, California. On May 28, 2019, I served the following documents, described as follows:

**NOTICE OF RULING RE DEFENDANT LUKAS PIETER'S DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

on interested parties in this action, addressed as follows:

| | |
|---|---|
| Joel Baruch<br>(joel@joelwbaruch.com)<br>Law Offices of Joel W. Baruch, P.C.<br>2601 Main Street, Suite 980<br>Irvine, California 92614 | James Carter<br>(james.carter@jacksonlewis.com)<br>Jackson Lewis P.C.<br>200 Spectrum Center Drive, Suite 500<br>Irvine, CA  92618 |
| Attorneys for Cross-Claimant<br>CARL BARNEY | Attorneys for Defendant<br>LEPORT EDUCATIONAL INSTITUTE, INC. |

Julie Kimball
(jkimball@elkinskalt.com)
Elkins Kalt
10345 W. Olympic Blvd.
Los Angeles, California 90064

Attorneys for Defendants
PETER LePORT, MONICA LePORT, and
FRANCISCO LePORT

☒      **(ELECTRONIC SERVICE) (CCP § 1010.6(a)(4))** I caused such document(s) to be electronically mailed, via OneLegal, to the email addresses for the individuals listed above.

☒      **(State)** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 28, 2019 at Irvine, California.

_____
Douglas A. Barritt

EXHIBIT 13

| ATTORNEY OR PARTY WITHOUT ATTORNEY:  STATE BAR NO.: 150052<br>NAME: James P. Carter / Jonathan D. Kent (292415)<br>FIRM NAME: JACKSON LEWIS P.C.<br>STREET ADDRESS: 200 Spectrum Center Drive, Suite 500<br>CITY: Irvine                    STATE: CA          ZIP CODE: 92618<br>TELEPHONE NO.: 949/885-1360          FAX NO.: 949/885-1380<br>E-MAIL ADDRESS: james.carter@jacksonlewis.com; jonathan.kent@jacksonlewis.com<br>ATTORNEY FOR *(name)*: Plaintiffs Carl Barney, etc., et al. | *FOR COURT USE ONLY*<br><br>ELECTRONICALLY FILED<br>Superior Court of California,<br>County of Orange<br>**06/14/2019** at 06:56:00 PM<br>Clerk of the Superior Court<br>By Olga Lopez,Deputy Clerk |
|---|---|

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
JUSTICE CENTER:
☒ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701
☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701
☐ Harbor- Newport Beach Facility - 4601 Jamboree Rd., Newport Beach, CA 92660-2595
☐ North - 1275 N. Berkeley Ave., P. O. Box 5000, Fullerton, CA 92838-0500
☐ West - 8141 13th Street, Westminster, CA 92683-4593

| PLAINTIFF: CARL BARNEY, etc., et al.<br><br>DEFENDANT: LUKAS PIETER, et al. | CASE NUMBER:<br>30-2018-01006531 |
|---|---|
| **AMENDMENT TO ☒ COMPLAINT ☐ CROSS-COMPLAINT** | Case assigned to:<br>Judge: Hon. Ronald Bauer<br>Department: CX 103<br>Date complaint filed: 7/18/18<br>Hearing/trial date: CMC 7/25/19 |

---

**FICTITIOUS NAME UNDER SECTION 474, CODE OF CIVIL PROCEDURE (NO ORDER REQUIRED)**

I have discovered the true name of ☒ Doe3 ☐ Roe_____ to be    REBECCA GIRN
_____.

The complaint/cross-complaint is amended to reflect the true name wherever it appears in the pleading.

Date:  June 14, 2019

Jonathan D. Kent
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY)

---

**INCORRECT NAME UNDER SECTION 473, CODE OF CIVIL PROCEDURE (ORDER REQUIRED)**

The complaint/cross-complaint incorrectly named the defendant/cross-defendant as _____.

I have discovered the true name of the party to be _____

_____.

I request the complaint/cross-complaint be amended to reflect the true name wherever it appears in the pleading.

Date: _____

_____                          _____
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY)

**ORDER**
The complaint/cross-complaint is amended to reflect the true name wherever it appears in the pleading.

Date: _____

                                                         _____
                                                         JUDICIAL OFFICER

---

American LegalNet, Inc.
www.FormsWorkFlow.com

1      **PROOF OF SERVICE**

2      **SUPERIOR COURT FOR THE STATE OF CALIFORNIA, COUNTY OF ORANGE**

3      **CASE NAME:**   *BARNEY v. PIETER, et al.*

4      **CASE NO.:**    **30-2018-01006531-CU-FR-CJC**

5      **STATE OF CALIFORNIA, COUNTY OF ORANGE**

6          I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is: 200 Spectrum Center Drive, Suite 500, Irvine, CA

7      92618.

8          On **June 14, 2019,** I caused the following document(s) described as:

9                        **AMENDMENT TO COMPLAINT**

10     to be served on all interested parties in this action by placing ☒ a true copy ☐ the original thereof enclosed in sealed envelope(s) addressed as follows:

11

12     Joel W. Baruch, Esq.                    ***Former Attorneys for Plaintiff***
       Corey A. Hall, Esq.                     ***CARL BARNEY, as Trustee of the CARL***
       Law Offices of Joel W. Baruch, PC       ***BARNEY LIVING TRUST, individually and***
13     2601 Main Street, Ste. 980              ***derivately on behalf of LePORT EDUCATIONAL***
       Irvine, CA 92614                        ***INSTITUTE, INC.***
14

15                                             Phone:    (949) 864-9662
                                               Fax:      (949) 851-3185
16                                             E-Mail:   joel@joelwbaruch.com

17     Douglas Barritt, Esq.                   ***Attorneys for Defendant and Cross-Complainant,***
       Barritt Smith LLP                       ***LUKAS PIETER***
18     2601 Main Street, Ste. 530
       Irvine, CA 92614                        Phone:    (949) 553-0700 Ext. 1
19                                             Fax:      (949) 553-0715
20                                             E-Mail:   dbarritt@barrittsmith.com

21     Norman B. Schmeltzer, III               ***Former Attorneys for Defendants PETER***
       O'Connor, Schmeltzer & O'Connor         ***LePORT, M.D., MONICA LePORT, FRANCISCO***
22     300 Spectrum Center Dr., Ste. 1550      ***LePORT***
       Irvine, CA 92618
23                                             Phone:    (949) 753-0700
24                                             E-Mail:   norm@osolawcorp.com

25     Julie Zankel Kimball                    ***Attorneys for Defendants PETER LePORT, M.D.,***
       Elkins Kalt                             ***MONICA LePORT, FRANCISCO LePORT***
26     10345 West Olympic Boulevard
       Los Angeles, CA  90064-2524             Phone:    (310) 746-4420
27                                             Email:    jkimball@elkinskalt.com

28

1

☒ **MAIL:**  by placing a true copy of the document(s) listed above for collection and mailing
2   following the firm's ordinary business practice in a sealed envelope with postage thereon fully
    prepaid for deposit in the United States mail at Irvine, California addressed as set forth herein.

3

4   **STATE**:  I declare under the laws of the State of California that the foregoing is true and correct.

5   Executed on **June 14, 2019**, at Irvine, California.

6                                                         *Laura Castillo*
                                                          Laura Castillo

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 14

**SUM-100**

## SUMMONS - 2nd Amended Complaint
### *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
LUKAS PIETER, PETER LEPORT, M.D., MONICA LEPORT, FRANCISCO
LEPORT, RAMANDEEP GIRN, REBECCA GIRN, HIGHER GROUND
EDUCATION, INC. and DOES 4 through 50, inclusive,
**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CARL BARNEY, AS TRUSTEE OF THE CARL BARNEY LIVING TRUST,

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**06/20/2019** at 06:47:00 PM

Clerk of the Superior Court
By Sarah Loose, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10.000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Orange County Superior Court - Central Justice Center
700 Civic Center Drive West
Santa Ana, Ca 92701

CASE NUMBER:
*(Número del Caso):*
30-2018-01006531-CU-FR-CJC

Judge Ronald L. Bauer

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
James P. Carter; Jonathan D. Kent
Jackson Lewis P.C., 200 Spectrum Center Dr., Ste. 500, Irvine, CA 92618
James.Carter@jacksonlewis.com; Jonathan.Kent@jacksonlewis.com
Phone: (949) 885-1360   Fax: (949) 885-1380

DAVID H. YAMASAKI, Clerk of the Court

DATE: 06/20/2019
*(Fecha)*

Clerk, by _____ Loose , Deputy
*(Secretario)*                      *(Adjunto)*

Sarah Loose

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☒ on behalf of *(specify)*: Higher Ground Education Inc.
   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

American LegalNet, Inc.
www.FormsWorkflow.com

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

06/17/2019 at 06:07:00 PM
Clerk of the Superior Court
By Georgina Ramirez,Deputy Clerk

1  James P. Carter (SBN 150052)
   Jonathan P. Schmidt (SBN 293290)
2  JACKSON LEWIS P.C.
   200 Spectrum Center Drive, Suite 500
3  Irvine, CA 92618
   Phone: (949) 885-1360
4  Fax: (949) 885-1380
   James.Carter@jacksonlewis.com
5  Jonathan.Schmidt@jacksonlewis.com

6  Attorneys for Plaintiff CARL BARNEY,
   as Trustee of the CARL BARNEY LIVING TRUST
7

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9             **FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER**

10

11 | CARL BARNEY, AS TRUSTEE OF THE | CASE NO.:  30-2018-01006531
   | CARL BARNEY LIVING TRUST,       | [Unlimited Jurisdiction]
12 |                                  | Assigned for all purposes to the
   |        Plaintiff,                | Hon. Ronald Bauer, Dept. CX103
13 |
   | v.                               | Action Filed:  July 18, 2018
14 |                                  | Trial Date:    None set
   | LUKAS PIETER, PETER LEPORT, M.D.,
15 | MONICA LEPORT, FRANCISCO LEPORT,
   | RAMANDEEP GIRN, REBECCA GIRN,    | **SECOND AMENDED COMPLAINT FOR**
16 | HIGHER GROUND EDUCATION, INC. and | **DAMAGES, ACCOUNTING, RESTITUTION**
   | DOES 4 through 50, inclusive,    | **AND INJUNCTIVE RELIEF**
17 |
   |        Defendants.               | **[DEMAND FOR JURY TRIAL]**
18 |
   | LUKAS PIETER, an individual,     | 1.  **Breach of Contract**
19 |                                  | 2.  **Breach of Fiduciary Duty**
   |        Cross-Complainant,        | 3.  **Misappropriate of Trade Secrets**
20 | v.                               | 4.  **Conversion**
   |                                  | 5.  **Tortious Interference with Contract**
21 | LEPORT EDUCATIONAL INSTITUTE, INC., | 6.  **Intentional Interference with Contract**
   | a California corporation, and ROES 1 through | 7.  **Legal Malpractice**
22 | 20, inclusive,                   | 8.  **Unfair Competition / Business Practices**
   |                                  | 9.  **Disgorgement of Salary and Benefits**
23 |        Cross-Defendants.         | 10. **Fraud by Intentional Misrepresentation**
   |                                  | 11. **Fraud by Intentional Concealment**
24 |                                  | 12. **Duress and Coercion**

25                                      [Filed Pursuant to May 28 Order Sustaining
                                        Demurrer to First Amended Complaint With
26                                      Leave to Amend.]

27

28

                         **SECOND AMENDED COMPLAINT**
                                      1

I.      **GENERAL ALLEGATIONS RELATING TO PARTIES AND RELATIONSHIPS**

1.      Plaintiff, CARL BARNEY ("BARNEY") as the Trustee of the CARL BARNEY LIVING TRUST ("TRUST") is, and at all times herein mentioned was, a duly formed and maintained living trust, and BARNEY is expressly authorized to bring this action on behalf of the TRUST as its trustee. The TRUST is, and has been since 2014, a shareholder of LEPORT EDUCATIONAL INSTITUTE, INC., and which owns nearly two million shares of stock of said corporation. Plaintiff therefore sues Defendants herein as an injured shareholder and as the assignee of the damages and injuries suffered by said corporation.

2.      LEPORT EDUCATIONAL INSTITUTE, INC. ("LEI") is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of California. Prior to the filing of this pleading, LEI duly and lawfully assigned all of its rights, claims and interests against and involving the Defendants herein to the TRUST. The TRUST therefore sues in its own capacity and as the legal and beneficial owner, and assignee and transferee, of all claims, rights, and interests which belonged to and were owned by LEI as alleged herein.

3.      Defendant LUKAS PIETER ("PIETER") is, and at all times herein mentioned was, a resident of the State of California in the County of Orange.  Defendant PIETER was the Chief Financial Officer of LEI between the approximate time period of October 5, 2015 through on or about December 9, 2016.

4.      Defendant, PETER LEPORT, M.D. ("PETER LEPORT") is, and at all relevant times herein mentioned was, a resident of the State of California in the County of Orange.  PETER LEPORT was the Founder of LEI. At various times since LEI was founded, PETER LEPORT has been and is an LEI shareholder, board member, Chairman of the Board, and its Chief Executive Officer.

5.      Defendant, MONICA LEPORT ("MONICA") is, and at all relevant times herein mentioned was, a resident of the State of California in the County of Orange.  MONICA is the sister of PETER LEPORT and was formerly an employee, Corporate Secretary, and a Board of Directors member of LEI, positions from which she previously resigned.  MONICA is also currently a shareholder of LEI.

1    6.    Defendant, FRANCISCO LEPORT ("FRANCISCO") is, and at all relevant times
2    herein mentioned was, a resident of the State of California in the County of San Francisco.
3    FRANCISCO is the son of PETER LEPORT and formerly a member of the Board of Directors of
4    LEI between the approximate dates of January 2016 and April 2017. Francisco is also a current
5    shareholder of LEI.

6    7.    PETER LEPORT, MONICA and FRANCISCO shall be collectively referred to and
7    alleged herein as the "LEPORT Defendants". Said Defendants collectively own a majority of the
8    shares of LEI stock and actively participated in a conspiracy to injure and damage Plaintiff and LEI
9    as more particularly alleged herein.

10    8.    Prior to the filing of this Second Amended Complaint, Plaintiff ascertained the true
11    name, capacity, and identity of DOE no. 1 herein, RAMANDEEP GIRN ("RAY"), who is
12    individually named and sued herein as a Defendant. Defendant RAY is, and at all relevant times was,
13    an individual residing in the State of California, County of Orange. Defendant RAY has been a
14    shareholder in LEI at all relevant times alleged herein including through the present.

15    9.    Prior to the filing of this Second Amended Complaint, Plaintiff ascertained the true
16    name, capacity, and identity of DOE no. 2 herein, HIGHER GROUND EDUCATION, INC.
17    ("HGE"), which is individually named and sued herein as a Defendant. Defendant HGE is a Delaware
18    corporation doing business and with its headquarters in the State of California, County of Orange.
19    RAY and REBECCA GIRN own, control and operate Defendant HGE and have from its inception as
20    their alter ego.

21    10.    Prior to the filing of this Second Amended Complaint, Plaintiff ascertained the true
22    name, capacity, and identity of DOE no. 3 herein, REBECCA GIRN ("REBECCA") who is
23    individually named and sued herein as a Defendant. Defendant REBECCA is, and at all relevant
24    times was, an individual residing in the State of California, County of Orange. Defendant REBECCA
25    is the wife of RAY and, at all relevant times herein, was a licensed attorney admitted to practice law
26    in the State of California. Defendant REBECCA has been a shareholder in LEI at all relevant times
27    alleged herein including through the present.

28    //

11.     Defendants RAY, REBECCA and HGE shall be collectively referred to and alleged herein as the "GIRN Defendants". Said Defendants actively participated in a conspiracy together to injure and damage Plaintiff and LEI as more particularly alleged herein.

12.     Plaintiff is not aware of the true names and/or capacities and/or liability of those parties named herein as DOES 4-50, and therefore sues these potential defendants by their fictitious names. Plaintiff will seek leave of Court to amend this Second Amended Complaint or file DOE amendments when the same is ascertained.

13.     Unless otherwise specified herein, those fictitious potential Defendants or Defendants named herein as DOES 4 through 50 were in some manner controlled, or in association with the named Defendants in this Second Amended Complaint, and, together, conspired and planned to defraud, injure, and damage Plaintiff and LEI.

14.     LEI was, until recently, an owner and operator of numerous private Montessori schools located in San Francisco, Los Angeles, Orange County, San Diego, Brooklyn, and Northern Virginia. These Montessori schools provide an excellent private school education for day care, preschool, elementary, and middle school students. LEI has recently sold and divested itself of ownership of all of its schools except the Brooklyn school.

15.     On February 9, 2000, PETER LEPORT incorporated LePort & Van Damme Educational Institute, Inc., a California corporation. PETER LEPORT was the President and Chief Executive Officer of the corporation as well as the Chairman of the Board of Directors.

16.     On October 3, 2000, PETER LEPORT amended the Articles of Incorporation of LePort & Van Damme Educational Institute, Inc., changing the name of the corporation to LePort Educational Institute, Inc. ("LEI").

17.     On June 22, 2011, LEI filed a Restated Articles of Incorporation. PETER LEPORT remained the Chairman of the Board of Directors. The restated articles provided for issuance of 30,000,000 shares of common stock, with 10,000,000 shares being voting stock and 20,000,000 being non-voting stock.

18.     On April 17, 2015, LEI's Board of Directors caused to be filed with the California Secretary of State a Certificate of Dissolution. The Certificate of Dissolution was filed because LEI

1    was recklessly mismanaged by the LEPORT Defendants and was sometimes therefore not able to

2    meet its payroll obligations for its employees. The LEPORT Defendants, RAY and REBECCA were

3    the driving forces behind the filing of the Certificate of Dissolution which was physically prepared by

4    REBECCA as General Counsel.  Two boxes were fraudulently checked on the Certificate of

5    Dissolution, stating: (a) "The corporation's known debts and liabilities have been paid"; and (b) "The

6    known assets have been distributed to the persons entitled thereto."

7         19.    On February 18, 2016, LEI, then represented by the law firm of Stradling Yocca

8    Carlson & Rauth, filed a Petition for Reinstatement of LEI with the County of Orange Superior Court

9    in Case No. 30-2016-00835690. The LEPORT Defendants were the driving force behind the filing of

10   this Petition for Reinstatement of LEI.  LEI's attorney from the Stradling firm admitted that LEI's

11   general counsel, REBECCA, had lied in her filing of the Certificate of Dissolution in that the

12   corporation's known debts and liabilities had not been paid as represented and that the known assets

13   of the corporation had not been distributed to the stockholders as also falsely represented. This

14   intentional conduct was known to and concealed by all Defendants and caused injury and damages to

15   LEI which Plaintiff only discovered within two years of filing this action.

16        20.    On March 8, 2016, the court granted the Petition for Reinstatement of LEI at great

17   time, trouble and expense to LEI which damaged LEI in an amount to be proved at trial.

18        21.    On September 29, 2016, the LEPORT Defendants, aided by PIETER, caused

19   Amended and Restated Articles of Incorporation of LEI to be filed with the California Secretary of

20   State.  The purpose of these Restated Articles was to change the total number of voting shares of

21   Common Stock to 8,471,298.  At the time, the LEPORT Defendants were all directors of LEI,

22   PIETER was the CFO, and BARNEY was the CEO of LEI by virtue of loan documents for large

23   loans that he had made to LEI.

24        22.    On May 9, 2017, LEI filed a Statement of Information with the California Secretary of

25   State. BARNEY, who had been the CEO of LEI since on or about August 26, 2016, was incorrectly

26   listed as both the CEO and CFO of LEI on this document. PETER LEPORT was listed as a Director

27   of LEI on the Statement of Information.

28   //

23.    On October 27 (29?), 2017, LEI filed another Statement of Information with the California Secretary of State. PETER LEPORT was listed as the CEO and a Director of LEI.

24.    Plaintiff is suing each of the Defendants herein, except REBECCA as an attorney, based solely on, and solely for, their intentional, malicious, fraudulent, oppressive, or willful misconduct and not for any form of negligence or negligent or other conduct that could arguably require LEI to indemnify any of them under any contract or the California Labor Code and/or under California public policy prohibiting indemnification of intentional wrongful conduct. Plaintiff therefore expressly disclaims, except as to REBECCA, any right to any relief from the conduct alleged herein which is not intentional, fraudulent, malicious, oppressive, or willful.

## II.    GENERAL ALLEGATIONS RELATING TO CLAIMS FOR RELIEF AGAINST RAY, THE LEPORT DEFENDANTS AND PIETER

25.    In or about April 2014, BARNEY was approached by PETER LEPORT to make an investment through the purchase of LEI shares. BARNEY had known PETER LEPORT for many years and, at the time, considered him a friend who, like BARNEY, was in the private school education business. PETER LEPORT then represented to BARNEY that the LEI share price at the time was $1.90; that it was a good value; and that LEI was "flourishing." Also, at the time, LEI was being managed by RAY and his appointed executive team. Unbeknownst to Plaintiff, PETER LEPORT was largely absent from involvement in LEI affairs since he spent about 80-90% of his time operating and managing his bariatric surgery office. Instead RAY, listed as LEI's CEO, was the person who was actually managing and running LEI's operations. At that time, and prior to making its investment, RAY represented to BARNEY that the TRUST's investment was "sound" and that the value of its to-be-acquired stock would increase. Based on RAY's and PETER LEPORT's superior knowledge and positions within LEI as Founder/Chairman of the Board and CEO, respectively, Plaintiff trusted and relied on RAY's and PETER LEPORT's representations.

26.    Based on the aforementioned representations by PETER LEPORT and RAY, in or about April 2014, BARNEY, by way of his TRUST, invested in LEI through the purchase and loan conversion of 1,838,980 shares of common stock for $3.5 million, or $1.90 per share. However, through no fault of Plaintiff, it was not until in or about September of 2016 that Plaintiff first learned

through the belated disclosure of financial information that the value of LEI's shares was nowhere near $1.90 per share but was actually worth approximately $0.10 per share in April of 2014. Plaintiff only learned of these facts after he loaned an additional $15 million to LEI, as described below, and became its Chief Executive Officer with access to LEI historical financial information and records for the first time. Plaintiff also learned at or about that time that LEI was not in fact "flourishing," as represented by PETER LEPORT, nor "sound" and would increase in value as represented by RAY, but had instead been in considerable financial distress that was spiraling out of control through massive cash flow problems created by a host of circumstances including RAY and REBECCA's injurious departure from LEI, as described below. In or about April 2014, when Plaintiff purchased/converted nearly $3.5 million of the seriously over-valued and misrepresented shares, PETER LEPORT and RAY concealed from Plaintiff that LEI was having difficulty in meeting its obligations to its creditors, lenders, and employees, and instead represented to BARNEY that PETER LEPORT wanted Plaintiff to invest in LEI through the acquisition of shares of stock in order to pay bonuses to LEI employees.

27.     On or about August 19, 2015, the LEPORT Defendants caused a loan financing transaction to be negotiated and entered into with Leeds Equity Partners V, LP ("Leeds") for the principal amount of $5 million. The loan had to be re-paid in one year or by August 19, 2016. The loan was at a high interest rate of 13% and a default interest rate of 20%. The note evidencing the $5 million loan transaction contained provisions that could trigger a default, which would accelerate payment and interest on the loan at the default interest rate. The Leeds loan documents contained provisions that the default interest rate of 20% would apply in the event that any senior executives of LEI increased their compensation package without its consent.

28.     The LEPORT Defendants concealed from Plaintiff, then a substantial shareholder, the Leeds $5 million loan at the time of the transaction.

29.     In or about the summer of 2015, LEI desperately needed a Chief Financial Officer (CFO) to help manage its financial affairs. RAY, as CEO of LEI, put out a job posting for the CFO position with executive recruiting agencies at or about the time of the Leeds $5 million loan to LEI. This job posting for the CFO position included the following qualifications:

Primary Duties and Accountabilities Include:
- ■     Strategic partner to the CEO
- ■     Building a world class finance organization
- ■     Designing and implementing the corporate infrastructure to grow from the current 12 locations to 100 locations
- ■     Treasury function including CAPEX planning, funding, insurance, banking relations, and taxes
- ■     Articulate the company's message to institutional investors and investor relations
- ■     Forecasting and modeling
- ■     Accounting department management
- ■     Information technology
- ■     Human resources would eventually report to the CFO
- ■     Supervising and training staff

Desired Skills and Experience:
- ■     CFO position required a Bachelors degree in business/ finance or accounting
- ■     A CPA license was required
- ■     An MBA was a plus
- ■     Multi-locations and expansion
- ■     At least 5 years of experience as the CFO of a growing company
- ■     Institutional capital raising experience required
- ■     Investor relations experience required
- ■     Expertise in managing IT functions and ERP systems
- ■     Proven ability to evangelize a product or concept
- ■     Demonstrated leadership is a must
- ■     Collaborator and team builder
- ■     Passion for education and a lifelong learner
- ■     Outstanding references.

30.     In or about August 2015, Jessica Reister, a recruiter for the Hardesty agency which contracted with LEI to locate a CFO as its agent, contacted PIETER about the available CFO position at LEI and advised him about the aforementioned qualifications. PIETER, at the time, was working for a company known as GenMark, a publicly traded company located in Carlsbad, California. PIETER reported to a CFO at GenMark and did not have many of the essential "desired skills and experience" for the advertised CFO position at LEI. PIETER was also living in Orange County at the time and was making the daily commute to Carlsbad.

31.     PIETER was immediately interested in the CFO opportunity at LEI for a variety of reasons including the fact that he was "unhappy" with his position and lack of upward career mobility at GenMark. PIETER therefore falsely represented to Ms. Reister, knowing his misrepresentations

1 | would be communicated to LEI by her as its agent, the nature of his position at GenMark, including
2 | intentionally misrepresenting that his compensation package would be in the $500,000 annual range
3 | in the next 30-60 days when he would be promoted at GenMark to its Vice-President of Strategic
4 | Finance. PIETER further specifically misrepresented that, in the soon to be promoted title of Vice-
5 | President, his compensation package would consist of a $200,000 annual salary, a 30% bonus of
6 | $60,000, and 100% of his salary in stock compensation. He estimated the total value of his salary,
7 | bonus, and stock options to be in the annual range of $460,000. Based on this asserted and impending
8 | promotion to the Vice-President position at GenMark, PIETER represented to Ms. Reister that he
9 | wanted compensation in the annual range of $500,000 to $700,000 to leave GenMark and to join a
10 | company like LEI at the CFO level. PIETER's misrepresentations, including those hereinbelow,
11 | were not discovered until 2018 when formal discovery was conducted in a lawsuit filed by PIETER
12 | against LEI.

13 |      32.    PIETER concealed from Ms. Reister that his current compensation at GenMark in the
14 | position had an actual value of $346,000, at most, including an annual base salary of only $185,000,
15 | an as yet unreceived and non-vested bonus of $37,000, and possible stock option compensation of
16 | $124,000. However, as to his reported $124,000 value in stock compensation, PIETER concealed
17 | from Ms. Reister that his vested GenMark options and unvested options were essentially worthless
18 | because the strike price of his options was considerably higher than the GenMark stock was publicly
19 | trading for at the time. Further, PIETER deliberately misrepresented to Ms. Reister that a promotion
20 | to the Vice-President position at GenMark was forthcoming, i.e., given his circumstances at
21 | GenMark, he had no reasonable expectation that he in fact would be promoted under the current
22 | management at GenMark.

23 |      33.    In response to the facts represented to her by PIETER, Ms. Reister repeated PIETER's
24 | representations to LEI's CEO, RAY, and recommended that PIETER was a viable candidate for the
25 | CFO position.

26 |      34.    In early September 2016, PIETER was interviewed by, among, others, RAY and
27 | PETER LEPORT. During those interviews, PIETER affirmed to RAY and PIETER LEPORT his
28 | earlier misrepresentations to Ms. Hardesty regarding the nature of his employment and the amount of

**SECOND AMENDED COMPLAINT**
9

his compensation. On September 8, 2015, RAY authored an email to Defendant PIETER in which he

informed PIETER that he could have the position of LEI's CFO.  In that email, among other items,

RAY stated the following:

> "Bonus: No bonus in the 2015-2016 fiscal year.  A competitive
> bonus plan for leadership, one that rewards handsomely for real
> and tangible success, will be developed and introduced for FY
> 2016-2017, to be paid at the close of that year.  Whatever the
> parameters of that plan, you will be eligible for the highest level
> of bonus aside from the CEO."
> "Ongoing equity—TBD: We will be implementing an employee
> equity/ options plan as soon as possible.  The parameters of this
> plan, and how it will relate to the bonus plan have yet to be
> determined.  You will have whatever eligibility is consistent
> with that plan, starting no earlier than the second year of your
> employment."

35.    On September 9, 2015, PIETER replied to RAY's September 8, 2015 email, indicating

that he would be "thrilled" to accept an LEI offer with certain adjustments that, as asserted by

PIETER, would bring him closer to his total 2015-2016 compensation at GenMark.  PIETER, among

other things, represented the following in his email:

A)    PIETER wanted a $60,000-$100,000 signing bonus because he would lose his 2015

bonus at GenMark and would not be eligible for a cash bonus at LEI until the end of FY 2016-2017

(i.e. on or before August 31, 2017.

B)    PIETER wanted the initial stock grant to be increased from $200,000 to $250,000

because that $250,000 was 0.5% of total LEI equity value at $2.40 per share. As to the

implementation of the stock option plan, which he knew was not yet in existence at LEI, PIETER

wanted to know if he would be eligible for the grant in his second year with LEI in September 2016

and not at the end of his second year in September 2017.

36.    On September 14, 2015, REBECCA responded to Defendant PIETER's email of

September 9, 2015 in which she stated, among other things, as follows:

A)    REBECCA rejected PIETER's request for a signing bonus.

B)    REBECCA raised the initial stock grant to $250,000.

C)    REBECCA advised PIETER that LEI's intention was to put the stock option plan in

place at the beginning of the fall in the 2016-2017 FY; however, she expressed uncertainty whether

1 the plan would be performance-based with the results awarded at the end of that fiscal year, or

2 whether it would be a fixed amount that would be a percentage of his base annual salary and award

3 would be made dependent on what LEI management determined.

4       37.    PIETER responded to REBECCA's email as follows:

5       A)    PIETER agreed that a signing bonus was not necessary.  He claimed the decision was

6 not ideal, but it would be an outcome he would be "happy to accept given how excited I am about

7 joining your team, helping you achieve your mission and building sustainable value in the future."

8       B)    PIETER acknowledged his appreciation in the raise of his initial stock grant from

9 $200,000 to $250,000.

10       C)    PIETER asked that, "to bridge the gap" in his leaving a bonus of $60,000 to $100,000

11 at GenMark if he were to become employed at LEI, he would like to add to the initial stock grant

12 value of $250, 000.

13       38.    On September 17, 2015, REBECCA sent an email reply to PIETER's new demand in

14 his email of September 14, 2015.  In essence, REBECCA advised PIETER that LEI could not do

15 anything more than what she had previously stated.  She essentially told PIETER that her last

16 concession in the email of September 14, 2015 regarding raising the initial stock grant's value from

17 $200,000 to $250,000 was "take it or leave it."  She promised that an Offer Letter conveying the

18 agreed-upon terms would be prepared and sent to him on the next day.

19       39.    On September 17, 2015, an Offer Letter was submitted to Defendant PIETER by LEI.

20 PIETER was told he would be hired as the LEI CFO.  His effective starting date would be on or about

21 October 5, 2015.  The Offer Letter indicated PIETER's employment would be on an "at will" basis,

22 and it summarized the following essential terms of the job offer:

23          ■    Starting base annual salary of $200,000 and ordinary benefits of the
            position at set forth in the LEI employment handbook.

24          ■    A grant of restricted LEI stock with a dollar value of $250,000, with

25             stock in the amount of $62,500 vesting each year tied to his starting
            employment date of October 5, 2015.

26          ■    The offered restricted stock would be awarded to PIETER at a 10%

27             discount from the company's valuation employed in its next
            capital raise of at least $5,000,000 and would be issued in

28             conjunction with such transaction.

**SECOND AMENDED COMPLAINT**
11

- In the event that a capital raise event of at least $5,000,000 did not occur within a year of PIETER's starting date of $5,000,000, then the restricted stock would be issued to him on his one year anniversary based on the restricted price of $2.40 per share.
- PIETER's employment would be on an "at will" basis unless there was a written agreement with the CEO of LEI for a specified period of time.
- PIETER's benefits package at LEI also included a 100% employee tuition discount for up to two children (including free extended care) worth approximately $40,000 at LEI's Irvine school(s).
- The Offer Letter did not contain any bonus provision nor did it include a severance provision.
- Once starting, PIETER would be monitored on a 90-day probationary period—at the end of this 90-day period, PIETER would receive a performance evaluation to determine whether his employment at LEI would continue beyond this period.

40.    On September 19, 2015, Defendant PIETER signed and agreed to the terms of the Offer Letter creating an employment agreement between the parties. LEI's Board never approved PIETER's "at will" employment contract, as required by its Bylaws and charter which was known to PIETER, RAY, REBECCA and PETER LEPORT. PIETER was therefore never legally entitled to the compensation he received from LEI which should be repaid and restored to LEI and Plaintiff under principles of equity and the Corporations Code which was violated by PIETER.

41.    RAY and PETER LEPORT had previously informed PIETER of the Leeds $5,000,000 loan to LEI, which was due to mature and be paid off on or before August 19, 2016, before PIETER signed and agreed to the Offer Letter.

42.    PIETER, as agreed, started his employment as LEI's CFO on October 5, 2015. Over the next 90 days, prior to the end of 2015, PIETER learned of major issues which included, but were not limited to, the following:

A)    That a power struggle for control of LEI was occurring between RAY and his management team including REBECCA, on the one hand, and PETER LEPORT, on the other;

B)    That LEI's plan to expand its schools from about 12 to at least 100 was a pipe dream, and that LEI was becoming mired in debt;

C)    That PETER LEPORT was essentially an absentee founder and Chairman of the Board (Note: Peter was listed as CEO from time to time with state of California but he never had a valid

1   employment agreement and was never paid "salary" from the company – the only payment he

2   received was for founder agreement) and that he spent 80-90% of his time managing and operating

3   his bariatric surgery medical practice;

4           D)      That Plaintiff was a substantial minority shareholder in LEI, and that he/it was a

5   potential source of investment/ loan funds;

6           E)      That LEI would, in the absence of additional investment/ loan funding, likely become

7   bankrupt;

8           F)      That PETER LEPORT wanted to obtain further investment/loan funding from Leeds

9   Equity to the exclusion of other investors/ lenders; and

10          G)      That LEI was a suspended California corporation because of errors and omissions by

11  RAY and REBECCA.

12          43.     PIETER seized upon the power struggle and intentionally took advantage of the

13  executive management void left by the later departure of RAY and REBECCA. Among other things,

14  PIETER advised PETER LEPORT of RAY's mismanagement and openly admitted to Plaintiff that

15  he "outed Ray to PETER LEPORT and got RAY fired." PIETER had also come to recognize that

16  PETER LEPORT was an "absentee" management executive and was spending a substantial amount

17  of his time managing and operating his medical practice. Although PETER LEPORT had himself

18  appointed as the LEI CEO after RAY's departure, nevertheless, he was absent most of the time, did

19  not attend to LEI's burgeoning financial distress, and essentially let PIETER handle his CEO duties

20  as well as PIETER's CFO duties. PIETER seized upon and intentionally took advantage of the

21  executive management void left by the departure of most of the executive management team.

22          44.     LEI began a search for RAY's replacement with the assistance of PETER LEPORT

23  and PIETER. They did locate a temporary replacement, Jim Treleaven, who accepted the CEO

24  position on a short-term basis. During Treleaven's short tenure as the LEI CEO, he spent most of his

25  time in Chicago far from the Company's headquarters in Orange County.

26          45.     Therefore, pursuant to their conspiracy to defraud Plaintiff, on or about April 20, 2016,

27  PETER LEPORT and PIETER persuaded Plaintiff to loan $500,000 to LEI with a very modest 6.5%

28  interest rate and a maturity date of October 20, 2016. This $500,000 loan was made by Plaintiff in

1    good faith without conducting any due diligence. This $500,000 loan was made at about the time that

2    LEI had retained bankruptcy counsel and was contemplating bankruptcy as a solution to avoid paying

3    its debts, including, but not limited to, the looming debt of approximately $7 million on the Leeds $5

4    million plus interest due note which was due to mature and require repayment on or about August 19,

5    2016, all of which was concealed by the LEPORT Defendants and PIETER from Plaintiff. Also, the

6    note on Plaintiff's loan contained a provision: "Except as obligated under any (current) employment

7    agreement, LEI could not increase the cash or non-compensation terms payable to any senior

8    executives without the approval of non-interested directors of the LEI Board." The LEPORT

9    Defendants and PIETER were fully aware of this note provision prohibiting them and any other

10    executives to increase the cash or non-compensation terms of their own oral or written executive

11    employment contracts.

12        46.     On or about June 2, 2016, PETER LEPORT terminated Jim Treleaven's contract for

13    the CEO position at LEI. During Mr. Treleaven's short stint as CEO, PIETER had been performing

14    CEO duties on a de facto basis in Mr. Treleaven's frequent physical absence from the Company.

15    PIETER continued to perform de facto the CEO duties as well as his CFO responsibilities after Mr.

16    Treleaven's employment was terminated. PIETER performed these de facto CEO duties until on or

17    about August 26, 2016, at which time BARNEY assumed the acting CEO position for LEI. Plaintiff

18    was officially appointed to the CEO position by the LEI Board of Directors on or about October 5,

19    2016.

20        47.     After RAY and REBECCA were out of the picture, the LEPORT Defendants and

21    PIETER each wanted to enrich themselves at the expense of a financially struggling LEI and

22    Plaintiff, and therefore entered into a conspiracy to enrich themselves at the expense of LEI and

23    Plaintiff. Commencing on or about June 2, 2016, PETER LEPORT and PIETER engaged in email

24    discussions and in face-to-face meetings with each other about changing PIETER's "at will"

25    employment agreement and increasing his compensation package. Among other things, in the back

26    and forth email correspondence, PIETER again falsely represented that he had been earning $500,000

27    annually in cash and stock in his employment prior to LEI and, further, that by accepting LEI

28    //

1  employment, he had forfeited a $200,000 bonus from his prior employer.  In fact, PIETER's salary at

2  his prior employment was $185,000 and his bonus was $37,500.

3       48.    Based partly on PIETER's false representations as to the terms of his employment

4  contract at his prior job, and after intentionally and recklessly failing to duly investigate PIETER's

5  representations, in an email of on or about June 6, 2016, PETER LEPORT approved a "200,000

6  bonus and a new contract" for PIETER on the quid pro quo condition that his sister MONICA's

7  salary be doubled. Further, PETER LEPORT wanted to have his dormant Founder's Agreement

8  reactivated so that he could collect on a $200,000 annual salary moving forward even though LEI

9  could not afford to do so as it was facing bankruptcy.  This clandestine agreement between PETER

10  LEPORT and PIETER was deliberately concealed from Plaintiff and from Leeds because of the terms

11  in their loan documents which prohibited these compensation increases without their express

12  approval.

13       49.    PIETER then, without LEI's approval and at LEI's expense, enlisted LEI's outside

14  counsel to act on his behalf in drawing up a new employment contract.  PIETER presented outside

15  counsel with the terms he wanted to be included, and outside counsel prepared the new employment

16  contract without anyone representing LEI in its drafting. This new employment agreement drawn up

17  by LEI's outside counsel for PIETER, who was purely acting in a self-dealing capacity inimical to the

18  interests of LEI and Plaintiff, contained more favorable terms than those in his initial "at will"

19  employment agreement.  These new terms included the following:

20       A)    PIETER's salary was increased to $250,000 from $200,000. The increase in salary

21            was conditional either upon the sale of LEI or the consummation of "qualified

22            financing".

23       B)    PIETER would receive a $200,000 bonus triggered by the occurrence of transactions

24            which were not specifically identified.

25       C)    PIETER would receive 25 paid vacation days annually, which would carry forward

26            from year-to-year subject to a 40-day accrual cap.

27       D)    The initial "at will" provision in PIETER's prior employment agreement was changed

28            to one of "for cause" in the event of termination.  In essence, significant restrictions

1       were placed on the ability of LEI to terminate PIETER, including (1) written notice of

2       intent to terminate; (2) the termination notice had to specify particular acts or failure

3       to act as the basis for termination; (3) LEI must provide written notice once it learned

4       of acts or omissions to act, and (4) PIETER would have 30 days after the receipt of

5       the written notice within which to cure performance issues.

6  E)  If LEI wished to terminate PIETER on an "at will" basis, LEI had to provide 30 days

7       written notice and, thereafter, PIETER would be entitled to four months of severance

8       pay and benefits.

9  F)  If PIETER wished to voluntarily resign, subject to conditions not specifically noted,

10       PIETER would also be entitled to four month's severance pay and benefits from LEI.

11   50.  PETER LEPORT "approved" of PIETER's new employment agreement despite the

12 fact that it lacked consideration and was therefore invalid, because he, acting in a self-dealing manner

13 and on behalf of his sister MONICA, also received benefits from the arrangement at the expense of

14 LEI and Plaintiff.  First, PETER LEPORT, who then was not an employee of LEI, used PIETER's

15 new employment agreement as an impetus to activate his own dormant employment agreement in

16 order to get paid a salary going forward 10 years into the future.  This was agreed to by these co-

17 conspirators, with MONICA and FRANCISCO, despite the fact the PETER LEPORT was not an

18 employee of LEI and was devoting virtually zero time in or at the business outside of his

19 responsibilities as a director for which he was separately compensated. Second, PETER LEPORT and

20 PIETER had agreed amongst themselves to approve a compensation package for MONICA that

21 doubled her annual salary.  PIETER's so-called new employment agreement was signed by Jim

22 Treleaven as the supposed CEO of LEI on or about June 23, 2016 although Treleaven's employment

23 contract had been terminated on or about June 2, 2016. LEI was therefore coerced into executing

24 these agreements by the LEPORT Defendants and PIETER.

25   51.  The new self-dealing employment agreements of PETER LEPORT, MONICA, and

26 PIETER were then provided to the LEI Board of Directors for approval. Sitting on the LEI Board of

27 Directors at the time were only PETER LEPORT, MONICA and FRANCISCO who then conspired

28 to approve the new compensation packages for PIETER, PETER LEPORT and MONICA despite

1    knowing they were inimical the LEI's and Plaintiff's interests. LEI's Bylaws at the time required six

2    directors on the Board with a quorum of four non-interested directors voting on issues within its

3    purview. In fact, at an earlier Board meeting held on May 24, 2016, Corporate Counsel, Goodarz

4    Agahi, advised the directors of their fiduciary duties in the context of the Bylaws requirements for a

5    quorum of directors in order to take corporate actions. The Board had only three active directors and

6    did not meet the quorum requirement. Further, the terms of Plaintiff's April 20, 2016 loan of

7    $500,000 to LEI required changes in compensation of senior executives to be approved by a quorum

8    of non-interested directors. The LEI Board of Directors, on or about June 30, 2016, did purportedly

9    approve of PIETER's new employment/retention agreement, PETER LEPORT'S so-called

10    employment agreement, and the doubling of MONICA's annual compensation, however, the LEI

11    Board acted without a quorum and, also, with two of three the directors voting being "interested" in

12    the transaction, thus causing the "approval" to be against LEI's bylaws, against the terms of both the

13    BARNEY note and the Leeds note, and also against California law. These agreements were therefore

14    unenforeable and the benefits received by said Defendants should be disgorged and returned to

15    Plaintiff.

16        52.    The LEPORT Defendants and PIETER knew that PIETER's new employment/

17    retention agreement, reactivation of PETER LEPORT's dormant employment agreement, and

18    MONICA's increase in salary breached LEI's loan agreements with both Leeds and Plaintiff, and

19    therefore they attempted to conceal these breaches from them. In fact, as noted, Mr. Treleaven was

20    told to sign the new agreement by said Defendants even though he was no longer the CEO of LEI to

21    give it ostensible validity, which he did on June 23, 2016. Defendants also knew that the "approval"

22    of the agreements by the LEI Board was not by a quorum of four disinterested directors as required

23    under its Bylaws and the terms of Plaintiff's note. Nevertheless, they proceeded with the unlawful

24    execution of these new agreements to the detriment and injury of LEI and Plaintiff. These agreements

25    should be rescinded, and all compensation received by said Defendants accounted for and repaid to

26    Plaintiff. Subsequently, when PIETER asked about payment of his $200,000 bonus, PETER

27    LEPORT replied, "If Carl doesn't agree to pay it, I will pay it personally." But PETER LEPORT later

28    refused to do so.

53.     The LEPORT Defendants and PIETER did not want to advise Plaintiff of their self-dealing and financial mismanagement of LEI.  Therefore, PIETER, with the knowledge and consent of the LEPORT Defendants, and while acting as a fiduciary of LEI, entered into a second financing arrangement with Leeds. On or about July 22, 2016, Leeds loaned LEI $2.2 million with an annual interest rate of 13% and a default interest rate of 20%. LEI was already in default over the initial Leeds $5 million loan transaction because the initial offer letter to PIETER included grant options, which were not previously approved by Leeds, and also PIETER had not informed Leeds of his new employment agreement authorizing the payment of a $200,000 bonus.  Defendant PIETER again deliberately misled Leeds by not advising them of his new employment agreement authorizing the payment of a $200,000 bonus upon consummation of a successful financing transaction.  Defendant PIETER also withheld from Leeds the June 23, 2016 employment agreement doubling MONICA's salary, which was a violation of the Leeds $5 million loan transaction.

54.     On or about July 22, 2016, Defendant PIETER with the LEPORT Defendants' knowledge and consent, then orchestrated another loan transaction with Leeds for $2.2 million at the high 13% interest rate and a 20% default interest rate.  When they negotiated that second loan with Leeds, these Defendants were aware that Plaintiff would have extended a loan to LEI on much better and more favorable terms but that he would have objected to the favorable employment agreements they negotiated for themselves in violation of his existing $500,000 note. So, PIETER and the LEPORT Defendants, acting in a self-dealing manner, and on behalf of LEI and against its interests, entered into that second loan with Leeds because they also knew that PIETER would be entitled to receive a higher salary and bonus under the terms of his "new" employment/retention agreement and that MONICA's compensation would be increased as a consequence of the completion of this second loan. This caused further damages to LEI through excessive interest payments that should have been avoided.

55.     PIETER, acting with the knowledge and consent of the other LEPORT Defendants, used monies from the $2.2 million financing arrangement with Leeds to pay off Plaintiff's $500,000 note at a 6.5% interest rate versus the 13% interest rate in the Leeds note.  Leeds agreed to loan the additional monies with a note provision that no Event of Default had occurred.  PIETER, with the

1    knowledge and consent of the LEPORT Defendants, knew that an Event of Default under the Leeds

2    loan provisions for the initial $5 million loan had in fact occurred and thereby had obtained the

3    additional $2.2 million Leeds loan by way of concealing material facts from Leeds.

4        56.    Also, on or about July 29, 2016 and, again on or about August 8, 2016, PIETER,

5    acting with the knowledge and consent of the LEPORT Defendants, caused LEI to borrow $500,000

6    on each occasion from Leeds.  Each of these two separate $500,000 loans from Leeds carried an

7    unfavorable compounded 13% interest rate and a default interest rate of 20%.  PIETER, with the

8    knowledge and consent of the LEPORT Defendants, knew that an Event of Default under the Leeds

9    loan provisions for the initial $5 million loan had in fact occurred.

10       57.    PIETER and the LEPORT Defendants then agreed and conspired to use monies from

11   these two additional $500,000 loans from LEI to pay off Plaintiff's $500,000 note of April 20, 2016

12   because they all knew that PIETER's new employment agreement, PETER LEPORT's reactivated

13   employment agreement, and the doubling of MONICA's annual compensation package had violated

14   the terms of Plaintiff's April 20, 2016 note.

15       58.    The above-mentioned three additional loans from Leeds (July 22, 2016 for $2.2

16   million, the separate $500,000 Leeds loans on July 29, 2016 and on August 8, 2016) were in addition

17   to the $5 million note coming due on August 19, 2016.  Once Plaintiff found out about the Leeds

18   loans, Plaintiff offered PETER LEPORT and PIETER the opportunity for LEI to borrow money from

19   him at a much more favorable and relatively low interest rate to pay of the Leeds loans. Plaintiff

20   made the following offer: "I will take over the company and will pay off Leeds because I believe that

21   LEI stockholders, including me, are at risk and I want to avert that from happening.... I will step in to

22   rescue the company."  Plaintiff offered $10 million to pay off Leeds, hoping that this would be the

23   end of it since Plaintiff believed that Leeds wanted to take over control of LEI and eventually acquire

24   the company through default proceedings which they were known in the industry to do.  Plaintiff

25   made this offer after having been falsely told that LEI's prospects for the coming year were promising

26   by Jim Treleaven, who received his financial information about LEI from PIETER who knew how it

27   would be used.  Mr. Treleaven's specific representations of material fact to Plaintiff, as told to Mr.

28   //

1 | Treleaven by PIETER, were that LEI's EBITDA for the following year would be $5 million, and that
2 | the common stock share price was $0.86 when it was in fact $0.10 per share.

3 |      59.    When Plaintiff offered the $10 million loan to bail out LEI, PIETER, acting with the
4 | knowledge and consent of the LEPORT Defendants, informed Plaintiff that $10 million would not be
5 | enough. LEI, they represented, still needed another $5 million to see them through the following
6 | year. During the negotiations between LEI and Plaintiff, BARNEY was told by PIETER and Jim
7 | Treleaven that $15 million would be enough; however, expenses for Brooklyn and NOVA were
8 | severely underestimated so that much more than $15 million was actually needed, which was also
9 | concealed from Plaintiff. During these negotiations, PIETER specifically represented that that the
10 | Brooklyn school would be profitable which never occurred and further led to LEI's losses. Plaintiff
11 | believed their representations as to the good financial prospects of LEI in the coming year. Plaintiff
12 | then offered a $15 million loan to LEI at an 8% interest rate (versus Leeds at 13%) and with a default
13 | interest rate of 10% (versus Leeds at 20%).

14 |      60.    On or about August 25, 2016, ignorant of the true facts and financial condition of LEI,
15 | Plaintiff in fact loaned LEI the amount of $17 million ($15 million new money and approximately $2
16 | million wrapped from a prior loan) at a favorable interest rate of 8%. Funds from this $17 million
17 | loan were used to pay off the three Leeds notes. Shortly thereafter, Plaintiff first learned about
18 | PETER LEPORT's inequitable Founder's Agreement, which had been concealed from Plaintiff
19 | during the investment negotiations. PETER LEPORT sent the Founder's Agreement documents to
20 | Plaintiff with a note to the effect that he supposedly thought Plaintiff had previously received them,
21 | but that he wasn't sure. In reality, PETER LEPORT knew that these documents had not been
22 | previously provided to Plaintiff. PETER LEPORT later told Plaintiff that the documents had been
23 | available, but they had not been given to Plaintiff because PIETER had denied Plaintiff the
24 | opportunity to conduct due diligence.

25 |      61.    Once LEI obtained the $17 million in funds from Plaintiff's loan obtained by fraud,
26 | PIETER demanded the payment of his $200,000 bonus. LEI refused to immediately pay him the
27 | bonus under his new employment agreement. PIETER was told he needed "authorization" before the
28 | bonus could be paid. By that time, BARNEY was serving in the capacity as LEI's temporary CEO

1  and was interacting more regularly with PIETER. BARNEY was concerned about whether PIETER

2  had fulfilled his ethical and fiduciary responsibilities to LEI and to his TRUST as a shareholder and

3  primary secured lender.

4       62.    When Leeds discovered that PIETER and the LEPORT Defendants had obtained $17

5  million in loans from Plaintiff in breach of its loan documents, Leeds immediately filed two lawsuits

6  against LEI and attempted to foreclose on the collateral for these loans.  Defendants' self-dealing and

7  fraudulent acts toward Leeds ultimately forced LEI to pay a settlement of approximately $550,000 to

8  Leeds in addition to about $500,000 in attorney fees and costs incurred by LEI for defending the

9  lawsuits.

10       63.    Ultimately, in or about late September 2016, Plaintiff discovered that PETER

11  LEPORT, MONICA, FRANCISCO, and PIETER had intentionally mismanaged LEI, had acted in a

12  self-dealing manner and thereby breached their fiduciary obligations to LEI and the terms of

13  Plaintiff's note, and had, along with RAY, made significant false representations of material fact in

14  causing Plaintiff to originally invest $3.5 million in shares of common stock in 2014 (except PIETER

15  who was not yet hired) and in obtaining loans from him to bail out the company. Plaintiff discovered

16  in or about September 2016 that these Defendants were involved in a conspiracy to defraud LEI and

17  Plaintiff.

18       64.    Plaintiff then asked that PIETER voluntarily void his "new" employment agreement.

19  PIETER refused, claiming he needed the money because he had just bought a new home in March

20  2016.

21       65.    On Friday, December 9, 2016, the LEI Board decided to terminate PIETER for cause.

22  A procedure was identified for handling the termination appropriately by its legal counsel who was

23  present at the meeting. During said meeting PETER LEPORT expressly represented to the Board that

24  he would personally pay PIETER's $200,000 requested bonus if he pursued it. However, immediately

25  after the Board meeting adjourned, PETER LEPORT, without authorization and in direct violation of

26  the Board's decision moments earlier, went into the office of PIETER and told PIETER he was to be

27  terminated the next workday, on Monday. When PIETER asked PETER LEPORT about his $200,000

28  bonus, PETER LEPORT stated (for the second time): "If LEI will not pay you the $200,000, I will

1   pay it myself." However, PETER LEPORT repeatedly failed and refused to abide by his

2   representation to the LEI Board and PIETER. As a result of PETER LEPORT's intentional

3   misconduct, PIETER filed a breach of contract and Labor Code violations suit against LEI which was

4   only recently settled at great cost to LEI in an amount to be proved at trial. LEI's D&O insurance

5   policy had expired earlier in the year.  Because of numerous claims previously filed against the

6   policy, D&O coverage could not be obtained from any carrier, which exposed the directors and

7   corporate officers to risk.

8           66.     After PETER LEPORT's unauthorized termination discussion alleged above, Plaintiff,

9   along with in-house counsel and the corporate secretary, entered PIETER's office and PIETER was

10  asked to leave LEI's premises since they did not want PIETER to have the opportunity to cause

11  further damage to LEI knowing he was about to be terminated.  PIETER was asked to return all

12  company property including the laptop he used, and he was given an opportunity to clean out his desk

13  and collect his personal property. When he left, PIETER maintained confidential, proprietary, and

14  sensitive LEI business records and trade secrets which he had previously removed from LEI in

15  violation of both his employment agreement and California law.  PIETER even unlawfully disclosed

16  confidential, proprietary, and sensitive LEI financial information to prospective employers and others

17  without LEI's consent and in violation of California law. LEI staff also then discovered that PIETER

18  was not recording his time out of the office (vacation and other leave) in the company's payroll

19  management software though he was the CFO and responsible for overseeing financial matters of this

20  nature. For example, PIETER took approximately three weeks off when his child was born which was

21  not recorded. This intentional failure to record his time off, for which he was not entitled to be paid,

22  caused further damages to LEI for which PIETER has never accounted to LEI. PIETER also then

23  demanded that PETER LEPORT honor his personal agreement to pay his $200,000 bonus, which

24  PETER LEPORT had earlier orchestrated to line his and his sister's pockets, but PETER LEPORT

25  refused to do so which caused PIETER to sue LEI to recover his bonus which in turn caused LEI to

26  suffer hundreds of thousands of dollars in attorney's fees to defend the action against LEI, during

27  which PETER LEPORT repeatedly refused to honor his representations to PIETER and the Board.

28  //

67.     PIETER was terminated not only because of his self-dealing, fraud and breach of fiduciary duties to LEI in relation to his own employment/retention agreement, but also because of other business matters demonstrating intentional mismanagement in which he was involved, all causing compensatory and other damage to LEI and Plaintiff as a shareholder.  These other business matters included, but were not limited to, each of the following:

A)     His intentional mismanagement of the Leeds notes which resulted in the two Leeds lawsuits.

B)     His intentional mismanagement of the sale of the Solano Beach school and a subsequent lease at a significantly higher rent.

C)     His intentional mismanagement by failing to obtain consent before making loans to a company known as Cobble Hill, LLC and, further, the absence of any documentation pertaining to these loans.

D)     His intentional mismanagement in the handling of the removal of RAY and two other executives, leaving LEI without a leader except for himself.

E)     His intentional mismanagement in failing to obtain lien releases from contractors.

F)     His intentional breaches of fiduciary duties and mismanagement as CFO regarding the increase in Defendant MONICA LEPORT's compensation as a predicate of his June 23, 2016 "new" employment/ retention agreement, which agreement violated the Leeds notes and the April 2016 BARNEY note as well as creating further financial distress for an already floundering organization.

G)     His intentional breaches of fiduciary duties in obtaining the 2016 Leeds loans when these loans were available at a much lower interest rate from Plaintiff.

H)     His intentional breaches of fiduciary duties by fraudulently reporting his time off that was neither approved nor reported in the LEI company records.

I)     His intentional mismanagement with respect to payments of the contractor(s) for LEI's Brooklyn, New York school, which resulted in an overpayment of $400,000 to $800,000.

J)      His intentional mismanagement with respect to ensuring that tax withholding for some immigrant personnel working for LEI was correctly processed.

**III.    GENERAL ALLEGATIONS RELATING TO CLAIMS FOR RELIEF AGAINST THE GIRN DEFENDANTS**

68.      Critical to LEI's success was that it hired, trained and developed talented key executives who were loyal to LEI and its mission to provide quality education to its students. Without such key executives LEI's ability to function and its value would be severely diminished.

**GIRNS' Employment Contracts**

69.      RAY and REBECCA were each employed by LEI during 2015 and 2016 pursuant to a written "Executive Employment Agreement." Each of their contracts contained the following material terms:

> **5.     Confidential Information.**
>
> **(a)** The Executive agrees not to disclose, either while in the Company's employ or at any time thereafter, to any person not employed by the Company, or not engaged to render services to the Company, any confidential information obtained while in the employ of the Company, including, without limitation, any of the Company's inventions, processes, methods, curriculum, training programs, student, family or customer lists, or trade secrets; provided, however, that the provisions of this Section shall not preclude the Executive: (1) from disclosing such information to the Executive's professional tax advisor or legal counsel solely to the extent necessary to the rendering of their professional services to the Executive if such individuals agree to keep such information confidential; and (2) from use or disclosure of information known generally to the public or from disclosure required by law or court order.
>
> **6.     Intellectual Property.**
>
> **(a) Work for Hire.** Executive understands and agrees that, to the extent permitted by law, all work, curriculum, textbooks, educational or pedagogical materials, manipulatives, written work product, handouts, assessments, lesson plans or notes, audio-visual materials, marketing materials or strategic documents, materials defining or relating to educational philosophy, documents of educational methods, papers, reports, documentation, drawings, images, product ideas, service ideas, photographs, negatives, tapes and masters therefor, computer programs including their source code and object code, prototypes and other materials (collectively, "Work Product"), including, without limitation,

any and all such Work Product generated and maintained on any form of electronic media, that Executive generates, either alone or jointly with others, during employment with Company will be considered a "work made for hire," and ownership of any and all copyrights in any and all such Work Product will belong to Company. In the event that any portion of the Work Product should be deemed not to be a "work made for hire" for any reason, Executive hereby assigns, conveys, transfers and grants, and agrees to assign, convey, transfer and grant to Company all of Executive's right, title, and interest in and to the Work Product and any copyright therein, and agrees to cooperate with Company in the execution of appropriate instruments assigning and evidencing such ownership rights. Executive hereby waive any claim or right under "droit moral" or moral rights to object to Company's copyright in or use of the Work Product. Any Work Product not generally known to the public shall be deemed Confidential Information and shall be subject to the use and disclosure restrictions herein.

**(b) Inventions.** Executive hereby assigns and agrees to assign to Company all of Executive's right, title, and interest in and to any discoveries, inventions and improvements (each, an "Invention," and collectively, "Inventions"), whether patentable or not, that Executive makes, conceives or suggests, either alone or jointly with others, in the course of the Executive's employment with the Company. Any Invention that was made, conceived or suggested by Executive, either solely or jointly with others, within four (4) months following the Executive's Termination Date and that pertains to any Confidential Information or business activity of Company will be irrebuttably presumed to have been made, conceived or suggested in the course of Executive's employment and with the use of the time, materials or facilities of Company. Any Invention not generally known to the public shall be deemed Confidential Information and shall be subject to the use and disclosure restrictions herein.

**12.    Non-Solicitation of Employees.**    During the term of the Executive's employment with the Company and for a period of 24 months following the Executive's Termination Date, the Executive shall not directly or indirectly solicit any other employee of the Company to terminate his or her employment with the Company.

### RAY and REBECCA Unfairly Attempt To Extort Control Of LEI

70.    In or about the summer of 2015, RAY and REBECCA formed an agreement and conspiracy to wrest control of LEI from its shareholders, pursuant to which, on December 6, 2015, RAY, in consultation with REBECCA, sent a letter to LEI's Board of Directors demanding that he be permitted to assume total control of LEI.  Plaintiff is informed and believes that the 2015 Board of

1  Directors members were PETER LEPORT, RAY, REBECCA, Guy Barnett, Cornelia Lockitch and

2  Lindsay Journo.

3    71. On December 18, 2015, while he was still Chief Executive Officer of LEI, RAY

4  proposed to reallocate the share of profits of LEI from its shareholders to himself by proposing that

5  an entity owned and controlled by him would manage and control the schools owned by LEI, and that

6  he be paid an exorbitant management fee for operating the schools. RAY also proposed to LEI's

7  Board of Directors that LEI transfer all of LEI's intellectual property to this management company.

8  RAY demanded that this proposal be presented to all of LEI's employees. A shareholders' meeting

9  was held on February 1, 2016, at which a new Board of Directors was voted into office. The

10  members were PETER LEPORT, MONICA, Jesse McCarthy, FRANCISCO, Keith Schacht, and Pari

11  Schacht. LEI's new Board of Directors rejected Ray's proposal of December 18, 2015.

12    **GIRN Defendants' Ongoing Conspiracy to Form an Unfairly Competitive Business and**
   **Unlawfully Solicit LEI's Employees**

13

14    72. After LEI's Board of Directors rejected the above proposal, RAY and REBECCA

15  further agreed and conspired that they would, while CEO and General Counsel respectively,

16  unlawfully, unethically, and unfairly solicit LEI employees to terminate their employment with LEI

17  to join them in a new business they would form to unfairly, illegally, unethically and in violation of

18  their employment agreements compete with LEI, with the intention of crippling or putting LEI out of

19  business and taking their students, and with the intention of buying from LEI the NOVA schools

20  which they had previously orchestrated be purchased by LEI at great expense and despite the fact that

21  LEI could not afford to do so. Pursuant to this conspiracy, RAY expressly threatened LEI that he

22  would solicit key employees of LEI to join a new entity (HGE) that he would form to compete with

23  LEI, despite the express non-solicitation clause in his employment agreement.

24    73. Before and after the termination of their employment with LEI, RAY and REBECCA

25  unfairly and unlawfully used confidential and private information, consisting of contact information,

26  salary and benefits information, and job descriptions, to solicit and induce LEI's key executives and

27  other employees to resign their employment with LEI and to join them in a new venture in

28  competition with LEI. RAY and REBECCA were successful in part because RAY had curried favor

1  with select employees and key executives of LEI by intentionally providing them outrageously high

2  salary increases at the expense of LEI. Pursuant to RAY's and REBECCA's agreement and

3  conspiracy and unfair business practices, in three years, Ray increased the payroll burden 193% with

4  a total increase of $977,445 for 11 of his favorite executives (the Girn Group) while not increasing

5  the salaries of other employees.

6          74.    On or about January 23, 2016, while still employed as LEI's Chief Executive Officer,

7  and in concert with REBECCA, RAY submitted to LEI a document wherein he proposed for himself

8  and the LEI employees that he had successfully recruited (the "Girn Group"). In this document RAY

9  proposed the following:

- That the members of the Girn Group formally resign as directors of the company;
- That the Girn Group resign as officers and employees of the company with two weeks' notice for RAY and REBECCA;
- That LEI pay each member of the Girn Group four months' severance and/or LEI pay to the Girn Group one full month's severance for each full year or partial year that each had been employed;
- That until the Girn Group shares were repurchased, each member of the group would receive monthly their current salary after the base severance is complete;
- That children of the Girn Group and children of existing LEI staff who joined the Girn Group (or a business started by the Girn Group) (up to 15 students) would continue to receive tuition discounts through June 2017;
- That the Girn Group would be permitted to compete and to engage in any business opportunity including, without limitation, any projects for which LEI has not submitted an LOI, or which LEI has affirmatively declined to pursue, such as the prospective Arlington campus;
- That the Girn Group would not open a school campus within ten miles of an existing LEI school for one year; and within five miles of an existing LEI campus for two years;
- That the Girn Group for two years will not directly solicit existing enrolled families of LEI for enrollment;
- That the Girn Group would be permitted to solicit up to eight staff members of LEI, to be specified, to join them in such solicitation containing the following terms:
  - a) Up to four of these employees may join the Girn Group with two weeks' notice;
  - b) Up to two of them may join with one month's notice;
  - c) Up to two of them may join with two months' notice; and
  - d) Prior to solicitation of eight employees, the Girn Group would provide 48 hours prior notice to Dr. LePort.
- That until September 1, 2016, other than the eight employees referred to above, the Girn Group will not solicit any additional existing LEI corporate level staff;
- That the Girn Group will not solicit any campus-level staff (other than if such staff is included in the eight employees referred to above) until after July 1, 2017;

- That members of the Girn Group shall not constitute part of the eight employees above;
- That notwithstanding all of the foregoing, any general solicitation for hiring or the independent solicitation of a LEI employee of the Girn Group shall not be deemed to be a violation of such restriction;
- That the Girn Group would individually retain certain intellectual property of LEI;
- That the Girn Group would have access to all of the plans and work product related to the design, construction and approval of the Arlington campus;
- That LEI agree to a specific share buy-back of stock arrangement for RAY's stock;
- That LEI agree to an arrangement that provides for an escalating value to the shares as time elapses;
- That the Girn Group have pre-emptive rights and the right of exercise of such shares in connection with a purchase of Girn Group Shares;
- That each party would be responsible for its/their own legal costs and fees; and
- That each party would have all rights to indemnification to the fullest extent of the law.

LEI's Board of Directors rejected these extortionist and coercive proposals.

75.     At the instigation of RAY and REBECCA, during December 2015 and January 2016, the Girn Group had discussions with a number of LEI's employees explaining their proposed new company and the opportunities that it represented.  After these discussions, additional employees of LEI joined e-mail threads regarding the proposed new company, including Cornelia Lockitch, Maris Mendes and Joel Mendes, all of whom ultimately resigned their employment with LEI and accepted immediate employment with HGE.

**LEI Terminates RAY's Employment and REBECCA Immediately Resigns**

76.     At the February 2, 2016 meeting of LEI's Board of Directors, RAY was terminated for his unlawful, unethical, unfair, immoral, extortionist and illegal conduct.

77.     Shortly after RAY was terminated and REBECCA resigned as General Counsel with no reasonable notice, they conducted weekly evening meetings with LEI's employees whom RAY and REBECCA had solicited prior to their terminations, and who were considering joining their new venture.

78.     After February 2, 2016 several Girn Group members resigned, most only providing LEI with two to four weeks' notice.  All had been offered employment at HGE by RAY and REBECCA, consistent with their pre-termination plan to take LEI's leadership and pre-termination

//

1    solicitation of that LEI leadership.  These employees constituted the majority of LEI's executive team

2    upon whom LEI relied for its success.

3        79.    RAY and REBECCA encouraged these executives and other employees of LEI to only

4    give short notice to LEI in connection with their resignation. As a result of these resignations on short

5    notice, LEI was unable to promptly replace the key employees resulting in LEI's operations being

6    severely hampered.

7        80.    In February 2016 REBECCA worked to set up payroll, health insurance and other

8    aspects of the new venture to make it possible for people to transition their employment from LEI to

9    HGE without a lapse in pay or benefits based on the confidential information she had concerning

10   these employees.

11   **RAY and REBECCA Continue to Unfairly Solicit Key Executives of LEI to Resign in
     order to Accept Employment with HGE**

12

13       81.    In or about mid-February 2016 LEI attempted to convince employees who had not yet

14   resigned their employment with LEI to remain with LEI. In response, on February 22, 2016 RAY sent

15   an e-mail to the Girn Group unfairly, unethically, and unlawfully disparaging, defaming and libeling

16   LEI, and arguing why people should not be swayed by LEI's efforts.  RAY proposed that employees

17   resign their employment with LEI and if they felt the need to assist LEI that they should contract their

18   work for LEI as consultants.

19       82.    On February 23, 2016, the GIRN Defendants, through an HGE employee and former

20   employee of LEI, sent an e-mail to the Girn Group wherein they attempted to dissuade the Girn

21   Group from even assisting LEI in the capacity of consultants. On February 22, 2016 LEI's employee,

22   Heike Larson, sent an e-mail to RAY informing him that she would not be joining the new venture

23   and instead would remain in LEI's employment for the foreseeable future. RAY responded to this e-

24   mail wherein he attempted to convince Ms. Larson to resign from her employment with LEI and, if

25   she so desired, work for LEI as a consultant rather than as a full-time employee. RAY encouraged

26   Ms. Larson to make it clear that she "stood with the Girn Group" even if she was willing to continue

27   working for LEI for several more months.

28   //

83.     Ultimately, at least 20 LEI employees resigned and accepted positions with HGE, including most key executives, which was immensely detrimental to LEI especially because it occurred during a critical time of the year during the middle of re-enrollment and the hiring season, and because LEI had to manage the acquisition of newly acquired NOVA schools which caused LEI and Plaintiff damages of not less than $24 million.

**GIRNS' Illegal Hiring of Undocumented Workers**

84.     Prior to the departure of RAY and REBECCA, in her capacity as head of human resources of LEI, and with the knowledge and approval of RAY, REBECCA caused LEI to hire at least four employees whom she and RAY knew were not legally authorized to work in the United States, exposing LEI to criminal penalties under 8 U.S.C. § 1324(a).  REBECCA and RAY attempted to conceal this unlawful conduct by paying the undocumented employees in gift cards and cash in lieu of a salary, paying the legal spouse of an undocumented employee instead of the employee himself, and clandestinely paying at least one of the employees out of an ostensible bonus payment to another employee.

85.     In the case of at least one of the employees, the unlawful compensation arrangement appears to have lasted a year or more. Due to this concealment, the other members of LEI's Board of Directors and senior management were unaware of this misconduct, which came to light as part of a due diligence process for a financing transaction with Leeds.

86.     Leeds therefore alleged that these immigration-related violations caused LEI to be in default under a certain August 19, 2015 Note Purchase Agreement between the parties ("NPA") and an event of default under the Convertible Senior Secured Note ("Note") issued thereunder, as well as several amendments to the NPA and the Note, in which Defendants caused LEI to breach a series of representations contained in the NPA and amendments.  As a result of Defendants' violations, LEI incurred costs and fees in connection with two lawsuits commenced by Leeds. LEI also was forced to obtain a bridge loan due to delays in obtaining longer term financing caused by the discovery of Defendants' illegal and unauthorized actions, and to conduct an I-9 investigation.

//

//

87.     As a direct result of the hiring of undocumented employees LEI faces potential exposure of millions of dollars for illegal hiring practices, income tax violations, stock grants, tuition discounts and visa refunds.

**GIRN Defendants' Conspiratorial Misappropriation of LEI's Trade Secret, Confidential and Proprietary Information During and After Their Employments Ended.**

88.     At great expense, LEI has developed a substantial amount of trade secret and other confidential and proprietary information that affords LEI a competitive edge in its industry.  This information includes, but is not limited to curriculum, textbooks, educational or pedagogical materials, manipulatives, written work product, handouts, assessments, lesson plans or notes, audio-visual materials, marketing materials or strategic documents, materials defining or relating to educational philosophy, documents of educational methods, papers, reports, documentation, drawings, images, product ideas, service ideas, photographs, negatives, tapes and masters therefor, computer programs including their source code and object code, prototypes and other materials.

89.     RAY and REBECCA conspired and intentionally misappropriated LEI's proprietary and trade secret information. Specifically, on January 21, 2016, while still the Chief Executive Officer of LEI, RAY sent an e-mail from his personal e-mail account, raygirn@gmail.com, to the personal e-mail accounts of numerous employees of LEI, including Jane Erickson jane.erickson99@gmail.com, Lindsay Journo lindsayjourno@gmail.com, Heike Larson heikelarson@gmail.com, Nicole St. Pierre nnstpierre@gmail.com, Guy Barnett guyusj@hotmail.com and REBECCA rebecca.girn@gmail.com, with instructions on how to export Google App data to an external hard drive wherein RAY stated:  "Hi all, Here's a link on how you can easily archive all your google app data (email, drive, etc.) to an external hard drive: https://support.google.com/accounts/answer/3024190.  Ray."

90.     Another Girn Group employee replied to all recipients of RAY's January 21, 2016 e-mail wherein he stated: "I've also ordered a huge external drive, arriving Friday, that will let me archive everything on Dropbox.  I might coordinate with some of you to get access to things that I might be missing."

//

1    91.    Pursuant to the above-described conspiracy, the GIRN Defendants downloaded LEI's

2  trade secret, confidential and proprietary information and converted it to their own use and continue

3  to use this information in direct competition with LEI.

4    92.    The GIRN Defendants have breached the confidentiality and assignment provisions of

5  their employment agreements by retaining and misusing LEI's confidential, proprietary and trade

6  secret information in connection with establishing HGE, their competing venture. Without LEI's

7  authorization, the GIRN Defendants are using LEI's confidential, proprietary and trade secret

8  information to their unfairly competitive advantage.

9    **REBECCA GIRN's Professional Miconduct**

10    93.    As General Counsel for LEI, REBECCA was charged with the responsibility of

11  completing the task of converting LEI from a California corporation to a Delaware corporation.

12  During May 2014 REBECCA filed a certificate of incorporation in Delaware for the new Delaware

13  corporation and filed a certificate of dissolution of LEI in California. However, REBECCA

14  knowingly made several false statements in the certificate, including, but not limited to, the statement

15  that the Board of Directors of LEI had authorized the dissolution.  As a result of this misconduct,

16  LEI's assets never properly transferred or vested in the Delaware entity.  REBECCA concealed this

17  from LEI's Board of Directors and other members of senior management.

18    94.    As a result, Leeds alleged that LEI's representations and warranties concerning its

19  corporate existence and authorized capital stock were false. As a consequence, LEI incurred costs in

20  connection with two lawsuits commenced by Leeds and wherein Leeds alleged that LEI was liable for

21  default interest on the aggregate principal amount the Note and amendments thereto at an annual rate

22  of 20%, attorney's fees and transaction costs. Plaintiff learned of these damages within two years of

23  filing this action.

24    95.    REBECCA managed LEI's human resources activities. REBECCA knowingly and

25  intentionally facilitated illegal activity in hiring and improperly paying employees lacking the

26  required immigration status, instead of informing officers and directors of LEI who were not involved

27  in the scheme.  Her actions exposed LEI to criminal liability under federal law and caused LEI to

28  breach representations made by it in the Leeds NPA, which representations REBECCA had reviewed

**SECOND AMENDED COMPLAINT**

1  and approved in her position as LEI's General Counsel.  LEI has incurred approximately $1.2 million

2  in costs in attempting to remedy the problem created by REBECCA, and costs continue to accrue.

3      96.    REBECCA, herself, intentionally negotiated RAY's and her own employment

4  agreements with LEI in direct conflict with her duties to LEI as General Counsel.

5      97.    REBECCA advised PETER LEPORT on the transfer of LEI's shares owned by Dr.

6  LePort to RAY, her husband, in direct conflict with her duties to LEI as its General Counsel.

7      98.    REBECCA prepared inter-company agreements without the requisite shareholder

8  approvals.

9      99.    REBECCA was responsible for the termination of Jason Monaghan's employment

10  with LEI resulting in a discrimination lawsuit against LEI.

11      100.   As a direct result of REBECCA's professional negligence within two years of the

12  filing of this action, LEI has incurred costs and suffered damages in excess of $2 million, excluding

13  the amount for the illegal hiring set forth above.

14      **Improper Lukas Pieter Option Agreement**

15      101.   In her capacity as head of human resources for LEI, REBECCA included an option

16  grant in LEI's employment offer to Lukas Pieter.  This option grant constituted a breach of LEI's loan

17  agreement with Leeds and triggered $400,000 in additional interest plus fees and legal expenses of

18  approximately $1 million in damages which accrued within two years of the filing of this action.

19      **GIRN Defendants' Wrongful Acquisition of NOVA Schools**

20      102.   Pursuant to their ongoing conspiracy and unfair business practices, in November 2015,

21  RAY and his key executives convinced PETER LEPORT and LEI to agree to the purchase of seven

22  NOVA schools for the purchase price of approximately $7 million.  In December 2015, RAY

23  announced that the deal had concluded even though he and REBECCA knew LEI did not have the

24  financial ability to carry these additional schools especially if and when they left LEI and stole its key

25  employees.

26      103.   RAY ominously threatened BARNEY that he would one day get the NOVA schools

27  for a song. In keeping with this threat, after approximately 12 months of machinations and

28  negotiations, and in order to mitigate the ongoing damages the GIRN Defendants have caused to LEI,

1    including massive losses of operating those schools from the GIRNS' departure and wrongful actions

2    in early 2016 through the present, within the last 30 days, LEI was forced to sell the NOVA schools

3    to the GIRN Defendants for no cash consideration but merely assumption of certain liabilities, which

4    resulted in significant damages to LEI in excess of $7 million. The GIRN Defendants therefore

5    accomplished their mission and conspiracy in recent weeks.

6                               **FIRST CAUSE OF ACTION**

7           *(Breach of Contract and Implied Covenant of Good Faith and Fair Dealing Against*

8                        *PIETER, PETER LEPORT, RAY and REBECCA)*

9           104.   Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through

10   104, inclusive, hereinabove and by reference thereto incorporates them herein as though set forth in

11   full.

12          105.   RAY, REBECCA, PETER LEPORT and PIETER entered into written employment

13   and shareholder agreements with LEI wherein they expressly agreed that during and after their

14   employment with LEI they would not disclose LEI's confidential information to persons not

15   employed by or engaged by LEI, that all intellectual property that they developed while employed by

16   LEI was the property of LEI, that all inventions that they developed were the property of LEI, and

17   that they would not solicit employees of LEI for a period of two years after the cessation of their

18   employment with LEI.

19          106.   LEI has performed all of its obligations under these contracts except for those that are

20   excused because of said Defendants' conduct and prior breaches.

21          107.   Said Defendants, and each of them, breached the provisions of their employment and

22   shareholder agreements with LEI, including the implied covenant of good faith and fair dealing

23   therein, by soliciting LEI's employees to terminate their employment with LEI on short notice and to

24   work for HGE in competition with LEI, and by surreptitiously downloading and converting to their

25   own use and HGE's use LEI's trade secret and other confidential and proprietary information.

26          108.   As a direct and proximate result of Defendants' breaches of their employment

27   contracts LEI and Plaintiff have been damaged in an amount to be proven at trial, but in no event less

28   than $24 million.

1    109.    Wherefore, Plaintiff prays for judgment as stated hereinafter.

2    **SECOND CAUSE OF ACTION**

3    *(Breach of Fiduciary Duty and Abetting Breach of Fiduciary Duty Against All*

4    *Defendants except HGE)*

5    110.    Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through

6    104, inclusive, hereinabove and by reference thereto incorporates them herein as though set forth in

7    full.

8    111.    RAY, the LEPORT Defendants and PIETER, as shareholders, corporate officers and

9    directors, owed LEI and Plaintiff fiduciary duties, including the duties of care and loyalty.

10    REBECCA, as General Counsel also owed fiduciary duties to LEI.

11    112.    During said Defendants' tenures as officers, directors and General Counsel of LEI,

12    said Defendants, and each of them, violated their fiduciary duty of loyalty to LEI and Plaintiff, and

13    aided and abetted each other, by engaging in the acts and omissions alleged hereinabove.

14    113.    As a direct and proximate result of said Defendants' breaches of fiduciary duties, and

15    aiding and abetting one another in so doing, LEI and Plaintiff were harmed and damaged in an

16    amount to be proven at trial but in no event in an amount less than $24 million.

17    114.    Said Defendants' conduct was a substantial factor in causing LEI's and Plaintiff's

18    harm and damages.

19    115.    The above-described conduct by said Defendants was committed maliciously,

20    fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of LEI within the

21    meaning of California Civil Code section 3294. Thus, Plaintiff is entitled to recover punitive damages

22    against said Defendants, and each of them, in an amount sufficient to punish and make an example of

23    said Defendants.

24    116.    WHEREFORE, Plaintiff prays for judgment against said Defendants as hereinafter set

25    forth.

26    //

27    //

28    //

**SECOND AMENDED COMPLAINT**

**THIRD CAUSE OF ACTION**

*(Misappropriation of Trade Secrets and Violation of Trade Secrets Act*

*Against PIETER and GIRN Defendants)*

117.    Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 104, inclusive, hereinabove and by reference thereto incorporates them herein as though set forth in full.

118.    Through expenditure of funds and labor LEI developed and owns trade secrets, including, but not limited to, employee lists and personal information, customer information, educational policies, practices and procedures, and pricing information, as more particularly alleged above (collectively, "Trade Secrets").

119.    The Trade Secrets are not known outside of LEI.

120.    The Trade Secrets are difficult for others to properly acquire or independently duplicate.

121.    The Trade Secrets have actual independent economic value because they are not generally known and they allow LEI to have a competitive advantage in its industry.

122.    LEI undertook reasonable efforts to keep the Trade Secrets secret, including, *inter alia*, requiring employees to sign employment agreements that contain the provisions set forth above.

123.    The Trade Secrets were necessarily disclosed to PIETER and the GIRN Defendants in the course and scope of their employment with LEI after each Defendant signed agreements to maintain them confidential.

124.    Said Defendants, and each of them, have misappropriated LEI's Trade Secrets, and are using the Trade Secrets in direct completion with LEI for their own economic benefit and/or the economic benefit of HGE.

125.    HGE acquired LEI's Trade Secrets by improper and illegal means, as alleged above. LEI is informed and believes and thereon alleges that HGE is using LEI's Trade Secrets in violation of LEI's rights.

//

//

1     126.    As a direct and proximate result of said Defendants' misappropriation of LEI's Trade

2  Secrets LEI and Plaintiff were injured and harmed in an amount to be proven at trial, but in no event

3  in an amount less than $10 million.

4     127.    Said Defendants' conduct was a substantial factor in causing LEI's and Plaintiff's

5  harm.

6     128.    Plaintiff is entitled to an injunction pursuant to California Civil Code Section

7  3426.2(a) enjoining said Defendants from further use of LEI's Trade Secrets.

8     129.    Defendants have been and continue to be unjustly enriched as a result of using LEI's

9  Trade Secrets, and therefore said Defendants, including HGE, should be required to disgorge all

10  profits derived from said conduct pursuant to California Civil Code Section 3426.3(a).

11     130.    Alternatively, Plaintiff should be awarded royalty payments for said Defendants' use

12  of its Trade Secrets pursuant to California Civil Code Section 3426.2(a).

13     131.    Defendants' misappropriation of LEI's Trade Secrets was willful and malicious within

14  the meaning of California Civil Code section 3426.3(c). Therefore, Plaintiff is entitled to recover

15  punitive damages against Defendants, and each of them, in accordance with California Civil Code

16  section 3426.3(c) in an amount sufficient to punish and make an example of said Defendants.

17     132.    WHEREFORE, Plaintiff prays for judgment as stated hereinafter.

18             **FOURTH CAUSE OF ACTION**

19            *(Conversion Against GIRN Defendants and PIETER)*

20     133.    Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through

21  104, inclusive, hereinabove and by reference thereto incorporates them herein as though set forth in

22  full.

23     134.    Pursuant to California Labor Code Section 2860 "Everything which an employee

24  acquires by virtue of his employment, except the compensation which is due to him from his

25  employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the

26  expiration of the term of his employment."

27     135.    LEI holds exclusive title to Trade Secrets, confidential and proprietary information, as

28  alleged above, and has an immediate right to exclusive possession of same.

1    136.    Secretly and without LEI's knowledge or consent the GIRN Defendants and PIETER,

2    and each of them, intentionally and substantially interfered with LEI's property by downloading and

3    copying from LEI's computer systems LEI's Trade Secrets, confidential and proprietary information,

4    and converted the same to their own use and economic benefit in direct competition with LEI.

5    137.    HGE acquired LEI's Trade Secrets, confidential and proprietary information through

6    improper and illegal means in violation of LEI's rights and is using same in violation of LEI's

7    exclusive rights.  HGE has been and continues to be unjustly enriched as a result of using Trade

8    Secrets, confidential and proprietary information, and therefore HGE should be required to disgorge

9    all profits derived from said conduct.

10    138.    LEI and Plaintiff have demanded that said Defendants cease and desist from

11    continuing to use LEI's Trade Secrets, confidential and proprietary information, but said Defendants

12    refuse to do so.

13    139.    As a direct and proximate result of conversion of LEI's Trade Secrets, confidential and

14    proprietary information LEI and Plaintiff were harmed in an amount to be proven at trial, but in no

15    event in an amount less than $10 million.

16    140.    Said Defendants' conduct was a substantial factor in causing LEI's and Plaintiff's

17    harm.

18    141.    The above-described conduct by said Defendants was committed maliciously,

19    fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of LEI within the

20    meaning of California Civil Code section 3294. Thus, Plaintiff is entitled to recover punitive damages

21    against said Defendants, and each of them, in an amount sufficient to punish and make an example of

22    said Defendants.

23    142.    WHEREFORE, Plaintiff prays for judgment as stated hereinafter.

### FIFTH CAUSE OF ACTION

### *(Tortious Interference with Contractual Relations Against GIRN Defendants)*

26    143.    LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 104,

27    inclusive, hereinabove and by reference thereto incorporates them herein as though set forth in full.

28    //

1    144.   In 2015 and 2016 written employment contracts existed between LEI and the
2    following persons, among others:

3         a)  Jane Erickson

4         b)  Lindsay Journo

5         c)  Cornelia Lockitch

6         d)  Maris Mendes

7         e)  Nicole St. Pierre

8         f)  Elan Walshe

9         g)  Guy Barnett

10        h)  Matt Bateman

11   145.   The GIRN Defendants, and each of them, knew of the above referenced contracts.

12   146.   By their conduct as alleged above, said Defendants intentionally and willfully
13   interfered with the contractual relations between LEI and its aforementioned employees, thereby
14   preventing performance of the contracts.

15   147.   Said Defendants intended to disrupt the performance of the aforementioned contracts.

16   148.   The GIRN Defendants have been and continue to be unjustly enriched as a result of
17   said Defendants' tortious interference with LEI's contractual relations, and therefore said Defendants
18   should be required to disgorge all profits derived from said conduct.

19   149.   As a direct and proximate result of said Defendants' tortious interference with LEI's
20   contractual relations LEI and Plaintiff were harmed in an amount to be proven at trial but in no event
21   in an amount less than $10 million.

22   150.   Said Defendants' conduct was a substantial factor in causing LEI's and Plaintiff's
23   harm.

24   151.   The above-described conduct by said Defendants was committed maliciously,
25   fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of LEI within the
26   meaning of California Civil Code section 3294. Thus, Plaintiff is entitled to recover punitive damages
27   against said Defendants, and each of them, in an amount sufficient to punish and make an example of
28   said Defendants.

**SECOND AMENDED COMPLAINT**
39

1    152.    WHEREFORE, Plaintiff prays for judgment as stated hereinafter.

2    **SIXTH CAUSE OF ACTION**

3    *(Intentional Interference with Prospective Economic Advantage Against GIRN Defendants)*

4    153.    Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through

5    104, inclusive, hereinabove and by reference thereto incorporates them herein as though set forth in

6    full.

7    154.    The following LEI employees, among others, were in an economic relationship that

8    would have resulted in a continuing and prospective economic benefit to LEI:

9         a)  Jane Erickson

10        b)  Lindsay Journo

11        c)  Cornelia Lockitch

12        d)  Maris Mendes

13        e)  Nicole St. Pierre

14        f)  Elan Walshe

15        g)  Guy Barnett

16        h)  Matt Bateman

17    155.    The GIRN Defendants, and each of them, knew of these economic relationships.

18    156.    By their conduct as alleged above, the GIRN Defendants intended to and did disrupt

19    these economic relationships.

20    157.    Said Defendants' conduct was independently wrongful because they committed the

21    acts in violation of their Executive Employment Agreements and in breach of their duty of loyalty

22    owed to LEI.

23    158.    Said Defendants have been and continue to be unjustly enriched as a result of said

24    Defendants' intentional interference with LEI's prospective economic advantage, and therefore said

25    Defendants should be required to disgorge all profits derived from said conduct.

26    159.    As a direct and proximate result of said Defendants' intentional interference with

27    LEI's prospective economic advantage LEI and Plaintiff were harmed in an amount to be proven at

28    trial, but in no event in an amount less than $10 million.

**SECOND AMENDED COMPLAINT**

1    160.    Said Defendants' conduct was a substantial factor in causing LEI's and Plaintiff's

2  harm.

3    161.    The above-described conduct by said Defendants was committed maliciously,

4  fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of LEI within the

5  meaning of California Civil Code section 3294. Thus, Plaintiff is entitled to recover punitive damages

6  against Defendants, and each of them, in an amount sufficient to punish and make an example of said

7  Defendants.

8    162.    WHEREFORE, Plaintiff prays for judgment as stated hereinafter.

9    **SEVENTH CAUSE OF ACTION**

10    ***(Legal Malpractice Against REBECCA)***

11    163.    Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through

12  104, inclusive, hereinabove and by reference thereto incorporates them herein as though set forth in

13  full.

14    164.    At all times relevant to this action REBECCA was General Counsel to LEI.

15    165.    In acting as General Counsel for LEI REBECCA owed a duty to LEI and Plaintiff to

16  use such skill, prudence, and diligence as other members of her profession commonly possess and

17  exercise.

18    166.    REBECCA breach her duty owed to LEI and Plaintiff by negligently, carelessly and

19  recklessly committing the acts and omissions alleged above.

20    167.    As a direct and proximate cause of the breach of REBECCA's duty owed to LEI and

21  Plaintiff, LEI and Plaintiff were harmed in an amount to be proven at trial, but in no event in an

22  amount less than $10 million.

23    168.    WHEREFORE, Plaintiff prays for judgment as stated hereinafter.

24  //

25  //

26  //

27  //

28  //

**SECOND AMENDED COMPLAINT**
41

**EIGHTH CAUSE OF ACTION**

*(Unfair Competition/Business Practices – Violation of Business & Professions Code*

*Sections 17200, Et Seq. Against All Defendants)*

169.    Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 104, inclusive, hereinabove and by reference thereto incorporates them herein as though set forth in full.

170.    California Business Code Section 17200 prohibits any unlawful, unfair, unethical, immoral or fraudulent business act or practice.

171.    The aforementioned conduct of Defendants, and each of them, alleged above constitutes acts of unfair competition, as defined by Business & Professions Code Sections 17200, *et seq.* for which they should be ordered to restore to Plaintiff all ill-gotten profits and make restitution to Plaintiff of all amounts by which they profited from their illegal actions.

172.    LEI and Plaintiff are entitled to a temporary restraining order, preliminary injunction and permanent injunction enjoining Defendants from, among other things, continuing to solicit LEI's employees and from using LEI's Trade Secrets and confidential and proprietary information.

173.    WHEREFORE, Plaintiff prays for judgment as stated hereinafter.

**NINTH CAUSE OF ACTION**

*(Disgorgement of Salary and Benefits Against RAY and REBECCA for Violation of*

*Labor Code Section 2863)*

174.    Plaintiff repeats and realleges all of the allegations contained in Paragraphs 1 through 104, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

175.    Under California law every employee owes a duty of loyalty to his or her employer.

176.    California Labor Code Section 2863 provides: "An employee who has any business to transact on his own account, similar to that entrusted to him by his employer, shall always give the preference to the business of the employer."

177.    Any profit made in breach of the employee's duty of loyalty belongs to the employer. *Rest.2d Agency* § 403, comment "a." This includes disgorgement of salary and benefits paid to a

1  faithless employee while secretly competing with his employer. *Service Employees Int'l Union, Local*
2  *250 v. Colcord*, 160 Cal. App. 4th 362, 371 (2008).

3         178.    While still employed by LEI, RAY and REBECCA conspired to and did compete with
4  LEI.  Thus, Plaintiff is entitled to an order requiring Defendants to disgorge all salary and benefits
5  they received from LEI from the time that they commenced competing with LEI, in an amount to be
6  proven at trial.

7         179.    WHEREFORE, Plaintiff prays for judgment as stated hereinafter.

8                              **TENTH CAUSE OF ACTION**

9         *(Fraud by Intentional Misrepresentation Against Defendants RAY, PIETER and PETER*
10                                     *LEPORT)*

11        180.    Plaintiff specifically alleges and incorporates herein by this reference those allegations
12  contained in paragraphs 1 through 104, inclusive, hereinabove as though fully set forth herein.

13        181.    RAY, PIETER and PETER LEPORT intentionally misrepresented material facts as
14  more particularly alleged hereinabove. Said Defendants knew their representations were false and
15  made them despite knowledge of their falsity.

16        182.    Plaintiff and LEI reasonably and justifiably relied to their detriment on the false and
17  fraudulent misrepresentations of said Defendants by, among other things, hiring PIETER, paying him
18  benefits, investing in LEI, acquiring its stock, and providing loans to LEI at a favorable interest rate
19  in the principal amount of over $20 million to LEI.  Had LEI and Plaintiff known the true facts,
20  which were concealed by said Defendants, they would not have acted as they did.

21        183.    Plaintiff and LEI have sustained significant financial losses and damages as a result of
22  said Defendants' conduct in an amount to be proved at trial, but which is not less than $5 million.

23        184.    The conduct of said Defendants was intentional, malicious, fraudulent, oppressive and
24  despicable, and was designed to, and did, cause injury to Plaintiff and LEI.  Plaintiff is therefore
25  entitled to an award of punitive damages from said Defendants in an amount according to proof at the
26  trial of this action in an amount to punish and deter said Defendants.

27        185.    WHEREFORE, Plaintiff prays for judgment as hereinafter stated.

28  //

---

**SECOND AMENDED COMPLAINT**
43

**ELEVENTH CAUSE OF ACTION**

*(Fraud by Intentional Concealment of Material Facts Against RAY, PIETER, PETER*
*LEPORT, MONICA and FRANCISCO)*

186.    Plaintiff specifically alleges and incorporates herein by this reference those allegations contained in paragraphs 1 through 104, inclusive, hereinabove as though fully set forth herein.

187.    RAY, PIETER and the LEPORT DEFENDANTS knowingly and intentionally concealed from Plaintiff and LEI material matters and facts as alleged hereinabove.

188.    Plaintiff and LEI reasonably and justifiably relied to their detriment on the concealment by said Defendants as alleged hereinabove.

189.    As a direct and proximate result of said concealed material facts, Plaintiff and LEI have sustained significant financial losses and damages as alleged hereinabove.

190.    The conduct of said Defendants was intentional, malicious, fraudulent, oppressive and despicable, and was designed to, and did, cause injury to Plaintiff and LEI.  Plaintiff is therefore entitled to an award of punitive damages from said Defendants in an amount according to proof at the trial of this action in an amount to punish and deter them.

191.    WHEREFORE, Plaintiff prays for judgment as hereinafter stated.

**TWELFTH CAUSE OF ACTION**

*(Duress and Coercion Against All Defendants)*

192.    Plaintiff specifically alleges and incorporates herein by this reference those allegations contained in paragraphs 1 through 104, inclusive, hereinabove as though fully set forth herein.

193.    Defendants, and each of them, intentionally used their positions of trust and superior knowledge and detrimental circumstances to force LEI, through economic duress and coercion, to act in the ways and manners alleged hereinabove.

194.    As a direct and proximate result of the wrongful actions of Defendants, and each of them, LEI and Plaintiff suffered damages and Defendants unduly profited at LEI's expense for which, under principles of equity, Defendants should be required to account to Plaintiff and restore to it said sums by way of appropriate restitution in an amount to be proved at trial, but in excess of $24 million.

//

1    195.    WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them as

2  hereinafter stated.

3  **IV.    PRAYER FOR RELIEF**

4    **WHEREFORE,** Plaintiff prays for judgment against Defendants, and each of them, as

5  follows:

6  **ON THE FIRST CAUSE OF ACTION**

7    1.    For compensatory and consequential damages according to proof, but in no event less

8        than $10 million.

9  **ON THE SECOND CAUSE OF ACTION**

10    1.    For compensatory and consequential damages according to proof, but in no event less

11        than $24 million;

12    2.    For an order requiring said Defendants to disgorge all salary and benefits during the

13        time that they competed with LEI while employed by LEI, according to proof; and

14    3.    For punitive and exemplary damages in an amount sufficient to punish and make an

15        example of said Defendants.

16  **ON THE THIRD CAUSE OF ACTION**

17    1.    For compensatory and consequential damages according to proof, but in no event less

18        than $10 million;

19    2.    For an award in addition to LEI's actual damages in the amount that said Defendants

20        have been unjustly enriched pursuant to California Civil Code Section 3426.3(a);

21    3.    For a temporary restraining order, preliminary injunction and permanent injunction

22.        enjoining said Defendants from further use of LEI's Trade Secrets;

23    4.    Alternatively, for an order requiring said Defendants to pay a royalty for their past and

24        future use of LEI's Trade Secrets;

25    5.    For punitive and exemplary damages in an amount sufficient to punish and make an

26        example of said Defendants pursuant to California Civil Code Section 3426.3(c).

27  //

28  //

**SECOND AMENDED COMPLAINT**

## ON THE FOURTH CAUSE OF ACTION

1. For compensatory and consequential damages according to proof, but in no event less than $10 million;

2. For an order requiring Defendants to disgorge all salary and benefits during the time that they competed with LEI while employed by LEI, according to proof; and

3. For punitive and exemplary damages in an amount sufficient to punish and make an example of said Defendants.

## ON THE FIFTH CAUSE OF ACTION

1. For compensatory and consequential damages according to proof, but in no event less than $24 million;

2. For an order requiring said Defendants to disgorge all salary and benefits during the time that they competed with LEI while employed by LEI, according to proof; and

3. For punitive and exemplary damages in an amount sufficient to punish and make an example of said Defendants.

## ON THE SIXTH CAUSE OF ACTION

1. For compensatory and consequential damages according to proof, but in no event less than $24 million;

2. For an order requiring said Defendants to disgorge all salary and benefits during the time that they competed with LEI while employed by LEI, according to proof; and

3. For punitive and exemplary damages in an amount sufficient to punish and make an example of said Defendants.

## ON THE SEVENTH CAUSE OF ACTION

1. For compensatory damages according to proof, but in no event less than $2 million.

## ON THE EIGHTH CAUSE OF ACTION

1. For a temporary restraining order, preliminary injunction and permanent injunction enjoining said Defendants from continuing to solicit LEI's employees and from using LEI's Trade Secrets and confidential and proprietary information.

2. For restitution in an amount according to proof.

## ON THE NINTH CAUSE OF ACTION

1.    For an order requiring said Defendants to disgorge all salary and benefits during the time that they competed with LEI while employed by LEI, according to proof.

## ON THE TENTH CAUSE OF ACTION

1.    For compensatory and consequential damages according to proof, but in no event less than $10 million.

2.    For punitive and exemplary damages in an amount sufficient to punish and make an example of said Defendants.

## ON THE ELEVENTH CAUSE OF ACTION

1.    For compensatory and consequential damages according to proof, but in no event less than $10 million.

## ON THE TWELFTH CAUSE OF ACTION

1.    For damages or restitution according to proof, but in no event less than $24 million;

2.    For an accounting from Defendants as to all amounts unlawfully obtained by them from LEI while employed by LEI.

## ON ALL CAUSES OF ACTION

1.    For prejudgment interest at the maximum legal rate;

2.    For costs of suit incurred herein, including attorney's fees as provided for by statute, case law and/or agreement of the parties; and

3    For such other and further relief as this Court deems just and proper.

Dated:  June 17, 2019               JACKSON LEWIS P.C.

By _____

James P. Carter, Counsel for Plaintiff

## DEMAND FOR JURY TRIAL

1.    Plaintiff demands a trial by jury.

Dated:   June 17, 2019

JACKSON LEWIS P.C.

By _____

James P. Carter, Counsel for Plaintiff

1  **PROOF OF SERVICE**

2  **SUPERIOR COURT FOR THE STATE OF CALIFORNIA, COUNTY OF ORANGE**

3  **CASE NAME:** *BARNEY v. PIETER, et al.*

4  **CASE NO.:** 30-2018-01006531-CU-FR-CJC

5  **STATE OF CALIFORNIA, COUNTY OF ORANGE**

6      I am employed in the County of Orange, State of California. I am over the age of 18 and not a
7  party to the within action. My business address is: 200 Spectrum Center Drive, Suite 500, Irvine, CA
   92618.

8      On **June 17, 2019,** I caused the following document(s) described as:

9      **SECOND AMENDED COMPLAINT FOR DAMAGES, ACCOUNTING,
   RESTITUTION AND INJUNCTIVE RELIEF**

10
11  to be served on all interested parties in this action by placing ☒ a true copy ☐ the original thereof
   enclosed in sealed envelope(s) addressed as follows:

12  Joel W. Baruch, Esq.          *Former Attorneys for Plaintiff*
   Corey A. Hall, Esq.           *CARL BARNEY, as Trustee of the CARL*
13  Law Offices of Joel W. Baruch, PC   *BARNEY LIVING TRUST, individually and*
   2601 Main Street, Ste. 980       *derivately on behalf of LePORT EDUCATIONAL*
14  Irvine, CA 92614             *INSTITUTE, INC.*

15
16                     Phone:   (949) 864-9662
                        Fax:     (949) 851-3185
17                     E-Mail:  joel@joelwbaruch.com

18  Douglas Barritt, Esq.        *Attorneys for Defendant and Cross-Complainant,*
   Barritt Smith LLP           *LUKAS PIETER*
19  2601 Main Street, Ste. 530
   Irvine, CA 92614            Phone:   (949) 553-0700 Ext. 1
20                     Fax:     (949) 553-0715
21                     E-Mail:  dbarritt@barrittsmith.com

22  Norman B. Schmeltzer, III    *Former Attorneys for Defendants PETER*
   O'Connor, Schmeltzer & O'Connor  *LePORT, M.D., MONICA LePORT, FRANCISCO*
23  300 Spectrum Center Dr., Ste. 1550  *LePORT*
   Irvine, CA 92618
24                     Phone:   (949) 753-0700
                   E-Mail:  norm@osolawcorp.com
25
26  Julie Zankel Kimball        *Attorneys for Defendants PETER LePORT, M.D.,*
   Elkins Kalt             *MONICA LePORT, FRANCISCO LePORT*
   10345 West Olympic Boulevard
27  Los Angeles, CA 90064-2524
                   Phone:   (310) 746-4420
28                     Email:   jkimball@elkinskalt.com

☒ **MAIL:**  by placing a true copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at Irvine, California addressed as set forth herein.

**STATE**:  I declare under the laws of the State of California that the foregoing is true and correct.

Executed on **June 17, 2019**, at Irvine, California.

Denise MacMurray

4825-5914-4051, v. 1

EXHIBIT 15

1    ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
     JULIE Z. KIMBALL, State Bar No. 252449
2      *jkimball@elkinskalt.com*
     LEANNE OATES VANECEK, State Bar No. 279317
3      *lvanecek@elkinskalt.com*
     10345 W. Olympic Blvd.
4    Los Angeles, California 90064
     Telephone: 310.746.4400
5    Facsimile: 310.746.4499

6    Attorneys for Defendants Peter LePort,
     M.D., Monica LePort, Francisco LePort
7

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**07/22/2019** at 11:58:00 AM

Clerk of the Superior Court
By Sarah Loose, Deputy Clerk

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9         COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11    CARL BARNEY, AS TRUSTEE OF THE
     CARL BARNEY LIVING TRUST,
12
            Plaintiff,
13
       v.
14
     LUKAS PIETER, PETER LEPORT,
15    M.D., MONICA LEPORT, FRANCISCO
     LEPORT, RAMANDEEP GIRN,
16    REBECCA GIRN, HIGHER GROUND
     EDUCATION, INC. and DOES 4
17    thorugh 50, inclusive,
18           Defendants.

19    LUKAS PIETER, an individual,
20
            Cross-Complainant,
21
       v.
22
     LEPORT EDUCATIONAL INSTITUTE,
23    INC., a California corporation, and
     DOES 1 through 20, inclusive,
24
          Cross-Defendants.
25

CASE No. 30-2018-01006531

[Assigned for all Purposes to Hon.
Ronald Bauer, Dept. CX-103]

DEFENDANTS PETER LEPORT, M.D.,
MONICA LEPORT, AND FRANCISCO
LEPORT'S NOTICE OF DEMURRERS
AND DEMURRERS TO PLAINTIFF'S
SECOND AMENDED COMPLAINT;
DECLARATION OF JULIE Z.
KIMBALL

Date:      August 19, 2019
Time:      9:00 a.m.
Dept.:     CX-103

Action Filed:      July 18, 2018
FAC Filed:        November 6, 2018
SAC Filed:        June 17, 2019
Trial Date:       None Set

26

27

28

1211259

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 19, 2019 at 9:00 a.m. or as soon thereafter as may be heard, in Department CX-103 of the above-entitled Court, located at ~~700 W. Civic Center Dr.~~ 751 W. Santa Ana Blvd Santa Ana, California, Defendants Peter LePort, M.D., Monica LePort, and Francisco LePort (collectively, "LePort Defendants") will and hereby do demur to all causes of action contained in the Second Amended Complaint against the LePort Defendants filed by Plaintiff Carl Barney, as trustee of the Carl Barney Living Trust.  The LePort Defendants' demurrers are made pursuant to California Code of Civil Procedure section 430.10 on the following grounds:

The first cause of action for breach of contract and breach of the implied covenant of good faith and fair dealing is fatally uncertain because it combines two different claims with different elements into one cause of action.  Plus, Plaintiff's allegations under either theory as to Peter LePort (the only one of the LePort Defendants against whom Plaintiff brought the claim) fail because there is no allegation that he participated in the conduct that Plaintiff alleges to be a breach.

The second cause of action also improperly attempts to combine two different claims with different elements into one cause of action, making it fatally uncertain, and only contains conclusory allegations against all "Defendants."

The eighth claim for violation of Business & Professions Code § 17200 alleges no independent bases for the claim, and fails as to the LePort Defendants for the same reasons the other claims fail.

The tenth claim for intentional misrepresentation does not plead specific facts regarding any alleged intentional representations by Defendant Peter LePort.

The eleventh claim for intentional concealment fails with respect to the LePort Defendants because the SAC contains only conclusory allegations that fraudulent concealment occurred.  There is also no allegation that the LePort Defendants had a duty to disclose the purportedly concealed facts, a necessary element of the claim.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

LEPORT DEFENDANTS' DEMURRERS TO PLAINTIFF'S SECOND
AMENDED COMPLAINT; DECLARATION OF JULIE Z. KIMBALL

The twelfth claim for duress and coercion fails because there is no cause of action for "duress and coercion," and if Plaintiff meant to plead economic duress he failed to plead facts sufficient to allege such a claim.

The demurrers are based upon the attached demurrers, the attached memorandum of points and authorities, the declaration of Julie Z. Kimball, all of the pleadings and records on file in this action, all matters of which the Court may take judicial notice, and upon such further evidence and argument as the Court may consider at or before the hearing on these demurrers.  Counsel for the LePort Defendants attempted to meet and confer regarding the grounds for these demurrers pursuant to California Code of Civil Procedure section 430.41(a).

DATED:  July 22, 2019

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP

By: _____
JULIE Z. KIMBALL
Attorneys for Defendants Peter LePort, M.D., Monica LePort, Francisco LePort

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

LEPORT DEFENDANTS' DEMURRERS TO PLAINTIFF'S SECOND
AMENDED COMPLAINT; DECLARATION OF JULIE Z. KIMBALL

1

## DEMURRERS

Defendants Peter LePort, M.D., Monica LePort, and Francisco LePort (collectively "LePort Defendants") demur to each cause of action alleged in Plaintiff's Second Amended Complaint on the following grounds:

## DEMURRER TO FIRST CAUSE OF ACTION

(Breach of Contract and Implied Covenant of Good Faith and Fair Dealing Against PIETER, PETER LEPORT, RAY and REBECCA)

The First Cause of Action fails to state facts sufficient to constitute a cause of action against Peter LePort, M.D.  CCP § 430.10(e).

In addition, the First Cause of Action fails because it is uncertain. *Id*. 430.10(f).

## DEMURRER TO SECOND CAUSE OF ACTION

(Breach of Fiduciary Duty and Abetting Breach of Fiduciary Duty Against All Defendant except HGE)

The Second Cause of Action fails to state facts sufficient to constitute a cause of action against the LePort Defendants.  CCP § 430.10(e).

In addition, the Second Cause of Action fails because it is uncertain. *Id*. 430.10(f).

## DEMURRER TO EIGHTH CAUSE OF ACTION

(Unfair Competition/Business Practices – Violation of Business & Professions Code Sections 17200, Et Seq. Against All Defendants)

The Eighth Cause of Action fails to state facts sufficient to constitute a cause of action against the LePort Defendants.  CCP § 430.10(e).

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1

<u>DEMURRER TO TENTH CAUSE OF ACTION</u>

(Fraud by Intentional Misrepresentation Against Defendants RAY, PIETER and PETER LEPORT)

The Tenth Cause of Action fails to state facts sufficient to constitute a cause of action against Peter LePort, M.D.  CCP § 430.10(e).

<u>DEMURRER TO ELEVENTH CAUSE OF ACTION</u>

(Fraud by Intentional Concealment of Material Facts Against RAY, PIETER, PETER LEPORT, MONICA and FRANCISCO)

The Eleventh Cause of Action fails to state facts sufficient to constitute a cause of action against the LePort Defendants.  CCP § 430.10(e).

<u>DEMURRER TO TWELFTH CAUSE OF ACTION</u>

(Duress and Coercion Against All Defendants)

The Twelfth Cause of Action fails to state facts sufficient to constitute a cause of action against the LePort Defendants.  CCP § 430.10(e).

In addition, the Twelfth Cause of Action fails because it is uncertain. *Id*. 430.10(f).

DATED:  July 22, 2019              ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP



By: _____
JULIE Z. KIMBALL
Attorneys for Defendants Peter LePort, M.D., Monica LePort, Francisco LePort

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION .................................................................7

II.   ALLEGATIONS IN THE SECOND AMENDED COMPLAINT ........................9

    A.    Allegations Regarding Defendant Peter LePort.......................9

        1.    Plaintiff Invests in LEI .......................9

    B.    Allegations Regarding Pieter Employment Contract.................9

    C.    Allegations Regarding Leeds Loans..............................10

    D.    Allegations Regarding Defendant Monica LePort....................11

    E.    Allegations Regarding Defendant Francisco LePort.................11

III.  THE DEMURRERS SHOULD BE SUSTAINED ...............................11

    A.    Legal Standard ...............................................11

    B.    The First Claim for Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing Fails as a Matter of Law as to Peter LePort ................................................12

    C.    The Second Claim for Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty Fails as a Matter of Law as to the LePort Defendants .........................................13

    D.    The Eighth Cause of Action for Violation of Business and Professions Code Section 17200 Fails as a Matter of Law as to the LePort Defendants..........................................15

    E.    The Tenth Cause of Action for Intentional Misrepresentation Fails as a Matter of Law as to Peter LePort.....................15

    F.    The Eleventh Cause of Action for Intentional Concealment Fails as a Matter of Law as to the LePort Defendants ...................17

    G.    The Twelfth Claim for Duress and Coercion Fails as a Matter of Law as to the LePort Defendants ................................18

IV.  CONCLUSION ...................................................19

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

LEPORT DEFENDANTS' DEMURRERS TO PLAINTIFF'S SECOND
AMENDED COMPLAINT; DECLARATION OF JULIE Z. KIMBALL

TABLE OF AUTHORITIES

Page(s)

Cases

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC,*
    158 Cal. App. 4th 226 (2007) ................................................................. 15

*Blickman Turkus, LP v. MF Downtown Sunnyvale. LLC,*
    162 Cal. App. 4th 858 (2008) ................................................................. 17

*Casey v. U.S. Bank Nat'l Ass'n,*
    127 Cal. App. 4th 1138 (2005) ............................................................... 14

*Comm. for Green Foothills v. Santa Clara Cty. Bd. of Supervisors,*
    48 Cal. 4th 32 (2010) ............................................................................ 12

*Committee on Children's Television, Inc. v. General Foods Corp.,*
    35 Cal. 3d 197 (1983) ........................................................................... 13

*Consumer Advocates v. Echostar Satellite Corp.,*
    113 Cal. App. 4th 1351 (2003) ............................................................... 16

*Czajkowski v. Haskell & White, LLP,*
    208 Cal. App. 4th 166 (2012) ................................................................. 11

*Daniels v. Select Portfolio Servicing, Inc.,*
    246 Cal. App. 4th 1150 (2016) ............................................................... 15

*Evans v. City of Berkeley,*
    38 Cal. 4th 1 (2006) .............................................................................. 12

*Hambrick v. Healthcare Partners Medical Group, Inc.,*
    238 Cal. App. 4th 124 (2015) ................................................................. 17

*Hauter v. Zogarts,*
    14 Cal. 3d 104 (1975) ........................................................................... 16

*Hoffman v. 162 North Wolfe LLC,*
    228 Cal. App. 4th 1178 (2014) ............................................................... 17

*Lazar v. Superior Court,*
    12 Cal. 4th 631 (1996) ...................................................................... 15, 16

*Los Angeles Memorial Coliseum Commission v. Insomniac, Inc.,*
    233 Cal. App. 4th 803 (2015) ................................................................. 17

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

4

*Lovejoy v. AT & T Corp.,*
   119 Cal. App. 4th 151 (2004) ................................................................. 17

*State ex rel. McCann v. Bank of America, N.A.,*
   191 Cal. App. 4th 897 (2011) ................................................................. 15

*Med. Marijuana, Inc. v. ProjectCBD.com,*
   6 Cal. App. 5th 602 (2016) ..................................................................... 13

*Nasrawi v. Buck Consultants LLC,*
   231 Cal. App. 4th 328 (2014) ................................................................. 14

*Olson v. Hornbrook Community Services Dist.,*
   33 Cal. App. 5th 502 (2019) ............................................................ 14, 19

*Perez v. Uline, Inc.,*
   157 Cal. App. 4th 953 (2007) ................................................................. 18

*Pulvers v. Kaiser Foundation Health Plan, Inc.,*
   99 Cal. App. 3d 560 (1979) ..................................................................... 16

*Rich & Whillock, Inc. v. Ashton Development, Inc.,*
   157 Cal. App. 3d 1154 (1984) ................................................................. 19

*San Francisco Design Center Associates v. Portman Companies,*
   41 Cal. App. 4th 29 (1995) ..................................................................... 16

*Schonfeld v. City of Vallejo,*
   50 Cal. App. 3d 401 (1975) ..................................................................... 16

*Slovensky v. Friedman,*
   142 Cal. App. 4th 1518 (2006) ............................................................... 13

*Stansfield,v. Starkey,*
   220 Cal. App. 3d 59 (1990) ..................................................................... 15

*Tarpy v. County of San Diego,*
   110 Cal. App. 4th 267 (2003) ................................................................. 18

*Tilbury Constructors, Inc. v. State Comp. Ins. Fund,*
   137 Cal. App. 4th 466 (2006) ................................................................. 12

*Titus v. Canyon Lake Property Owners Assn.,*
   118 Cal. App. 4th 906 (2004) ................................................................. 12

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

5

<u>Statutes</u>

Business & Professions Code § 17200 ............................................................. 8, 15

Civil Code § 1710, subd. (3) ............................................................................. 17

Code of Civil Procedure § 430.10(e) ............................................................... 12

Code of Civil Procedure § 430.10(f) ........................................................... 13, 18

Code of Civil Procedure § 430.30(a) ............................................................... 12

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

LEPORT DEFENDANTS' DEMURRERS TO PLAINTIFF'S SECOND
AMENDED COMPLAINT; DECLARATION OF JULIE Z. KIMBALL

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.    <u>INTRODUCTION</u>

Plaintiff Carl Barney and Defendant Peter LePort were friends. Peter LePort suggested that Plaintiff invest in his company, LePort Educational Institute, Inc. ("LEI"). After doing his own due diligence, Plaintiff invested.

Unfortunately, the investment did not turn out as anyone hoped. As alleged in the Second Amended Complaint ("SAC"), the acts of the Girn Defendants and Defendant Lukas Pieter resulted in an even worse financial situation for LEI. After that, Plaintiff insisted on lending more money to LEI (in favor of the alternative, borrowing from another lender), which again did not turn out as Plaintiff expected.

Looking to blame everyone other than himself for making a bad investment, Plaintiff filed this lawsuit against several prior LEI employees and board members, including Peter LePort, Peter's sister (Monica), and Peter's son (Francisco). There is no merit to the claims against the three LePort Defendants, which Plaintiff apparently brought to punish the Peter LePort's family as revenge for Peter suggesting the investment in LEI that did not turn out as hoped.

Not only do the claims against the LePort Defendants lack merit, they are also defective as a matter of law for the following reasons:

The first cause of action for breach of contract and breach of the implied covenant of good faith and fair dealing is fatally uncertain because it combines two different claims with different elements into one cause of action. Even if the claims could be combined, Plaintiff's allegations under either theory as to Peter LePort (the only one of the LePort Defendants against whom Plaintiff brought the claim) fail because there is no allegation that he participated in the conduct that Plaintiff alleges to be a breach.

The second cause of action also improperly attempts to combine two different claims with different elements into one cause of action, making it fatally uncertain, and only contains conclusory allegations against all "Defendants."

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

7

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    The eighth claim for violation of Business & Professions Code § 17200 alleges

2    no independent bases for the claim, and fails as to the LePort Defendants for the

3    same reasons the other claims fail.

4    The tenth claim for intentional misrepresentation does not plead specific facts

5    regarding any alleged intentional representations by Defendant Peter LePort. One

6    paragraph of the 104 that Plaintiff incorporates by reference in the intentional

7    misrepresentation claim includes statements that Peter LePort allegedly made – that

8    LEI was good value and "flourishing" – but such statements cannot state a claim for

9    intentional misrepresentation because, among other reasons, they are non-actionable

10   opinions, i.e. mere puffery.

11   Likewise, the eleventh claim for intentional concealment fails with respect to

12   the LePort Defendants because the SAC does not specifically plead what material

13   facts were allegedly concealed by whom, and instead contains only conclusory

14   allegations that fraudulent concealment occurred. There is also no allegation that

15   the LePort Defendants had a duty to disclose the purportedly concealed facts, a

16   necessary element of the claim.

17   Finally, the twelfth claim for duress and coercion fails because there is no

18   cause of action for "duress and coercion." If Plaintiff intended to plead a claim for

19   "economic duress," the claim still fails because economic duress applies when a

20   contract was procured by an act that is so coercive as to "cause a reasonably prudent

21   person, _faced with no reasonable alternative_, to agree to an unfavorable contract."

22   the defense would not apply here where Plaintiff obviously had other alternatives

23   (than to loan LEI money). Indeed, the defense is typically used when _the borrower_

24   agreed to an unfavorable contract because he or she needed the money desperately;

25   not where the lender chooses to provide a loan.

26   The LePort Defendants' demurrers should be sustained. Plaintiff already tried

27   and failed to state valid claims twice, he should not be given leave to amend again.

28

1211259

II.    ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

The following are the relevant allegations of the SAC, which the LePort Defendants concede must be taken as true only for purposes of the Demurrers:

A.    Allegations Regarding Defendant Peter LePort

1.    Plaintiff Invests in LEI

Defendant Peter LePort ("Peter" or "Peter LePort") is the founder of LePort Educational Institute, Inc. ("LEI"). SAC, ¶ 4. He has been and is a shareholder, board member, Chairman of the Board, and CEO. SAC, ¶ 4.

Plaintiff alleges that he invested in LEI in 2014 based on inaccurate representations about LEI's financial state by Peter LePort and Defendant Ray Girn. *See* SAC, ¶¶ 25-26.

2.    Allegations Regarding Pieter Employment Contract

Plaintiff also alleges that, as a result of misrepresentations by Defendant Lukas Pieter (which are not relevant here), LEI agreed to hire Lukas Pieter as CFO of LEI pursuant to an "at will" employment contract and pay him the compensation he demanded. SAC, ¶¶ 29-40.[1] The LEI did not approve the employment agreement between LEI and Lukas Pieter, as required. SAC, ¶¶ 29-40.

Plaintiff claims that Peter LePort later approved a $200,000 bonus and new employment contract for Defendant Lukas Pieter "on the condition that [Peter LePort's] sister Monica's salary be doubled." SAC, ¶¶ 48-52. Peter LePort also purportedly had his "dormant Founder's Agreement reactivated so that he could collect" salary. *See* SAC, ¶ 48. The new agreements for Peter LePort, Monica LePort, and Lukas Pieter were provided to the LEI Board of Directors (including Peter, Monica and Francisco LePort at that time), who approved the agreements. SAC, ¶ 51.

---

[1] Pieter served as CFO from October 2015 through December 2016. SAC, ¶ 4.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    Plaintiff claims that the Board decided to terminate Lukas Pieter in December

2    2016.  SAC, ¶ 65.  During this December 2016 meeting, Peter LePort allegedly agreed

3    to pay the $200,000 bonus to Lukas Pieter if he pursued it after he was terminated.

4    SAC, ¶ 65.  Plaintiff alleges that Peter then forewarned Lukas Pieter he was going to

5    be terminated.  SAC, ¶¶ 65-66.  Peter did not pay Lukas Pieter the $200,000, which

6    Lukas Pieter apparently sued LEI to recover at great expense to LEI.  SAC, ¶ 65.

7               3.    Allegations Regarding Leeds Loans

8    Plaintiff alleges that, in August 2015, "the LePort Defendants"[2] entered into a

9    loan financing transaction with Leeds Equity Partners V, LP ("Leeds").  SAC, ¶ 27.

10    The LePort Defendants allegedly "concealed" the Leeds loan from Plaintiff, who was

11    a "substantial shareholder . . . at the time of the transaction."  SAC, ¶ 27.  (Yet

12    Plaintiff also admits that two of the LePort Defendants – Monica and Francisco –

13    were not on the board of LEI until February 2016, *see* SAC, ¶¶ 6, 71.)

14    Plaintiff then alleges that, from July through August 2016, Lukas Pieter

15    entered into various financing transactions with Leeds on behalf of LEI "with the

16    knowledge and consent of the LePort Defendants . . ."  *See* SAC, ¶¶ 53-57.

17    Plaintiff claims that once he found out about the Leeds loans, he offered Peter

18    LePort and Lukas Pieter "the opportunity for LEI to borrow money from him at a

19    much more favorable and relatively low interest rate to pay of[f] the Leeds loans."

20    SAC, ¶ 58.  Plaintiff claims that he offered $10 million but Lukas Pieter, with

21    knowledge of the LePort Defendants, said that would not be enough.  SAC, ¶ 59.  So

22    Plaintiff loaned LEI $17 million (in August 25, 2016) at a "favorable interest rate of

23    8%."  SAC, ¶ 60.

24    When Leeds discovered that Lukas Pieter had obtained $17 million in loans

25    from Plaintiff in breach of its loan documents, Leeds filed two lawsuits against LEI

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

---

[2] The SAC defines "LePort Defendants" as (a) Peter, (b) Defendant Monica LePort
(Peter's sister), and (c) Defendant Francisco LePort (Peter's son).

1211259                                    10

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  and tried to foreclose on the collateral for the loans.  SAC, ¶ 62.  LEI was forced to

2  pay a settlement and expend attorneys' fees in connection with the Leeds lawsuits.

3  SAC, ¶ 62.

4         B.   <u>Allegations Regarding Defendant Monica LePort</u>

5        Plaintiff contends that Defendant Monica LePort became a member of the

6  board of directors in February 2016.  SAC, ¶ 71.  Plaintiff further alleges that Monica

7  LePort, sitting on the LEI board, "conspired to approve" the employment agreements

8  described above in Section II.A.2 for Lukas Pieter, Peter LePort, and herself.  *See*

9  SAC ¶¶ 50-52.  Plaintiff also alleges that LEI entered into financing agreements with

10  Leeds in July through August 2016 described in Section II.A.3 above with the

11  "knowledge and consent" of the LePort Defendants, including Monica.[3]  SAC, ¶¶ 53-

12  57.

13         C.   <u>Allegations Regarding Defendant Francisco LePort</u>

14        Francisco LePort was a board member of LEI between approximately January

15  2016 and April 2017.  SAC ¶ 6.  There are no individual allegations against

16  Francisco; only the allegations detailed above that the LePort Defendants collectively

17  "conspired to approve" the employment agreements for Lukas Pieter, Peter LePort,

18  and Monica LePort, and had "knowledge of" and "consented to" the Leeds loans.[4]  *See*

19  SAC, ¶¶ 50-57.

20  III.   <u>THE DEMURRERS SHOULD BE SUSTAINED</u>

21         A.   <u>Legal Standard</u>

22        "A demurrer tests the legal sufficiency" of the pleading.  *Czajkowski v. Haskell*

23  *& White, LLP*, 208 Cal. App. 4th 166, 173 (2012).  In ruling on a demurrer, "the trial

---

25  [3] The SAC also alleges that all of the LePort Defendants "concealed" the August 2015
26  Leeds loan from Plaintiff; however, Plaintiff also admits that Monica was not on the
   board of LEI until February 2016.  *See* SAC, ¶ 71.

27  [4] Again, although the SAC alleges that all the LePort Defendants "concealed" the
28  August 2015 Leeds loan from Plaintiff, Plaintiff admits that Francisco was not on the
   board at that time.  *See* SAC, ¶ 6.

1211259

1   court examines the pleading to determine whether it alleges facts sufficient to state a

2   cause of action . . ." *Comm. for Green Foothills v. Santa Clara Cty. Bd. of*

3   *Supervisors,* 48 Cal. 4th 32, 42 (2010).  *See also* CCP § 430.10(e).  The court accepts

4   the truth of material facts properly pleaded, but not contentions, deductions, or

5   conclusions of fact or law." *Evans v. City of Berkeley,* 38 Cal. 4th 1, 6 (2006) (citations

6   omitted).  The court "may also consider matters subject to judicial notice."  *Id.;* CCP §

7   430.30(a).

8          Leave to amend the SAC should be denied where the facts are undisputed, and

9   the nature of the claim renders it clear that there can be no liability under the

10   applicable substantive law.  *See Titus v. Canyon Lake Property Owners Assn.*, 118

11   Cal. App. 4th 906, 917 (2004).

12   **B.    The First Claim for Breach of Contract and the Implied Covenant of
             Good Faith and Fair Dealing Fails as a Matter of Law as to Peter
13           LePort**

14          The first cause of action for breach of contract and breach of the implied

15   covenant of good faith and fair dealing is fatally uncertain because it combines two

16   different claims with different elements into one cause of action.  *See Tilbury*

17   *Constructors, Inc. v. State Comp. Ins. Fund,* 137 Cal. App. 4th 466, 474 (2006)

18   ("[B]reach of the implied covenant of good faith and fair dealing involves something

19   beyond breach of the contractual duty itself ...").

20          Even if the two different claims could be combined into one cause of action,

21   Plaintiff's allegations fail when analyzed under either theory as to Peter LePort, the

22   only one of the LePort Defendants against whom the claim is brought.

23          Plaintiff claims that "Defendants" breached the employment and shareholder

24   agreements with LEI, including the implied covenants of good faith and fair dealing,

25   "by soliciting LEI' s employees to terminate their employment with LEI on short

26   notice and to work for HGE in competition with LEI, and by surreptitiously

27   downloading and converting to their own use and HGE's use LEI's trade secret and

28   other confidential and proprietary information."  *See* SAC, ¶ 107.  But the only

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259                                12

1    allegations in the SAC regarding that conduct – soliciting employees to terminate

2    employment and downloading confidential information – are specifically alleged

3    against the Girn Defendants.  *See* SAC, ¶¶ 88-92.  "[S]pecific allegations in a

4    complaint control over an inconsistent general allegation."  *Med. Marijuana, Inc. v.*

5    *ProjectCBD.com*, 6 Cal. App. 5th 602, 619 (2016), *as modified on denial of reh'g* (Dec.

6    19, 2016).  There is no allegation that Peter LePort participated in that conduct (he

7    did not).  And there is no allegation that Peter LePort participated in other conduct

8    that would constitute a breach of contract (in fact, he did not).  Thus, this claim fails

9    as to Peter LePort.  The demurrer to this claim should be sustained without leave to

10   amend because there is no manner of amendment that could save the claim.

   C.    <u>The Second Claim for Breach of Fiduciary Duty and Aiding and</u>
11       <u>Abetting Breach of Fiduciary Duty Fails as a Matter of Law as to the</u>
12       <u>LePort Defendants</u>

13       Once again, Plaintiff attempts to combine two different claims with different

14   elements into one cause of action, making the second cause of action fatally

15   uncertain.  *See* CCP § 430.10(f).

16       "The elements of a cause of action for breach of fiduciary duty are: (1) existence

17   of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately

18   caused by the breach."  *Slovensky v. Friedman*, 142 Cal. App. 4th 1518, 1534 (2006).

19   Absent a special relationship or agreement between the parties, courts will not

20   impose a fiduciary relationship.  *See, e.g., Committee on Children's Television, Inc. v.*

21   *General Foods Corp.,* 35 Cal. 3d 197, 222 (1983) (holding that "before a person can be

22   charged with a fiduciary obligation, he must either knowingly undertake to act on

23   behalf and for the benefit of another, or must enter into a relationship which imposes

24   that undertaking as a matter of law").

25       The elements of a claim for aiding and abetting a breach of fiduciary duty are

26   (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual

27   knowledge of that breach of fiduciary duties; (3) substantial assistance or

28   encouragement by defendant to the third party's breach; and (4) causation (i.e.,

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259                                          13

1    defendant's conduct was a substantial factor in causing plaintiff's harm).  *Nasrawi v.*

2    *Buck Consultants LLC,* 231 Cal. App. 4th 328, 343 (2014); *Casey v. U.S. Bank Nat'l*

3    *Ass'n,* 127 Cal. App. 4th 1138, 1144, (2005).

4        Rather than plead specific facts to support either claim – the alleged existence

5    of a fiduciary duty, or aiding and abetting of such a breach – Plaintiff alleges in a

6    conclusory fashion that during "Defendants tenures as officers, directors and General

7    Counsel of LEI said Defendants, and each of them, violated their fiduciary duty of

8    loyalty to LEI and Plaintiff, and aided and abetted each other, by engaging in the

9    acts and omissions alleged hereinabove."  *See* SAC, ¶ 112.  Such allegations are

10   generally vague and uncertain; and they are particularly insufficient as to the LePort

11   Defendants.

12       In particular with respect to Monica and Francisco, the SAC admits that

13   Monica LePort and Francisco LePort did not become officers until January or

14   February 2016, so they owed no duties to Plaintiff before that time.  *See* SAC, ¶¶ 5, 6,

15   71.  There are no individual allegations against Monica or Francisco, only allegations

16   that the LePort Defendants collectively "conspired to approve" the employment

17   agreements for Lukas Pieter, Peter LePort, and Monica LePort, and had "knowledge

18   of" and "consented to" the Leeds loans.  *See* SAC, ¶¶ 50-57.  Even if true, this cannot

19   constitute breach or aiding abetting a breach of fiduciary duty.  There is no allegation

20   that Monica or Francisco provided "substantial assistance or encouragement to the

21   third party's breach" or were a substantial factor in causing Plaintiff's harm.

22       The claim is deficient as to all the LePort Defendants; but at a minimum fails

23   to allege sufficient facts to state a claim as to Monica and Francisco LePort. The

24   demurrer to this claim should also be sustained without leave to amend.  *See Olson v.*

25   *Hornbrook Community Services Dist.*, 33 Cal. App. 5th 502, 517 (2019) ("Where there

26   is no reasonable possibility the plaintiff can cure a defect in a complaint with an

27   amendment, an order sustaining a demurrer without leave to amend is not an abuse

28   of discretion.") (citations omitted).

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

14

D.    The Eighth Cause of Action for Violation of Business and Professions Code Section 17200 Fails as a Matter of Law as to the LePort Defendants

The eighth claim for violation of Business & Professions Code § 17200 alleges no independent bases for the claim; it instead incorporates the other allegations in the SAC against "all defendants" by reference and requests injunctions relating to conduct alleged by the Girn Defendants only.  Thus, this claim fails as to the LePort Defendants for the same reasons stated in Sections III.B & C, *supra,* and Sections III.E-G, *infra*, and should be sustained without leave to amend.

E.    The Tenth Cause of Action for Intentional Misrepresentation Fails as a Matter of Law as to Peter LePort

"[F]raud must be pled specifically; general and conclusory allegations do not suffice." *Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (1996).  "Causes of action for intentional and negligent misrepresentation sound in fraud and, therefore, each element must be pleaded with specificity." *Daniels v. Select Portfolio Servicing, Inc.*, 246 Cal. App. 4th 1150, 1166 (2016).

One of the objectives of pleading fraud with detail is to permit the court to determine whether, on the facts pleaded, there is any prima facie foundation for the allegation of fraud.  *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 240 (2007).  Another purpose of requiring specificity is to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect defendants from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.  *State ex rel. McCann v. Bank of America, N.A.,* 191 Cal. App. 4th 897, 909 (2011).  "The idea seems to be that allegations of fraud involve a serious attack on character, and fairness to the defendant demands that he should receive the fullest possible details of the charge in order to prepare his defense." *Stansfield,v. Starkey,* 220 Cal. App. 3d 59, 72-73 (1990).

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

LEPORT DEFENDANTS' DEMURRERS TO PLAINTIFF'S SECOND AMENDED COMPLAINT; DECLARATION OF JULIE Z. KIMBALL

1    Thus, a plaintiff *must plead facts which show how, when, where, to whom, and*

2    *by what means the allegedly intentional representations were made.*  *Lazar*, 12 Cal.

3    4th at 645.  Furthermore, an action for fraud must be based on a statement of fact,

4    not opinion.  *See San Francisco Design Center Associates v. Portman Companies,* 41

5    Cal. App. 4th 29, 43-44 (1995) ("[P]redictions as to future events, or statements as to

6    future action by some third party, are deemed opinions, and not actionable fraud."),

7    *citing Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Assn.,* 205 Cal. App. 3d

8    1415, 1423 (1988); *see also Hauter v. Zogarts,* 14 Cal. 3d 104, 111-112 (1975) (holding

9    that "puffery" or "puffing" is a seller's statement of its subjective opinion about the

10   merits of a product, as opposed to a factual description of a characteristic of the

11   product, and such puffery is not actionable fraud).

12   The allegations in the tenth claim for intentional misrepresentation do not

13   meet this pleading standard as to Peter LePort.  In fact, the allegations in the

14   intentional misrepresentation claim do not specifically state *any* representation made

15   by Peter LePort.  *See* SAC ¶¶ 181-184.

16   Although the intentional misrepresentation claim incorporates by reference

17   the first 104 paragraphs of the SAC, only one of the 104 paragraphs incorporated by

18   reference alleges specific statements made by Peter LePort.  *See* SAC, ¶ 25 (stating

19   that Peter LePort represented LEI was good value and "flourishing").  Those

20   statements (that LEI was of good value and "flourishing") are not sufficient to state a

21   claim for intentional misrepresentation because, among other reasons, they are non-

22   actionable opinions – mere puffery.  *See Hauter*, 14 Cal. 3d at 111-12; *see*

23   *also Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1361-62

24   (2003) (representations that a television system provided "crystal clear digital video"

25   and "CD-quality audio" were non-actionable "boasts [and] all-but meaningless

26   superlatives[.]"); *Pulvers v. Kaiser Foundation Health Plan, Inc.,* 99 Cal. App. 3d 560,

27   564-565 (1979) (representing that a health plan will provide "high standards of

28   medical service" is a non-actionable opinion); *Schonfeld v. City of Vallejo,* 50 Cal.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  App. 3d 401, 412 (1975) (representing a marina as a "first class harbor" and "the best

2  berthing facility in Northern California"), overruled on another ground in *Morehart v.*

3  *County of Santa Barbara* 7 Cal. 4th 725, 743 (1994).

4      The demurrer to this claim should also be sustained without leave to amend as

5  to Peter LePort.

6      F.    The Eleventh Cause of Action for Intentional Concealment Fails as a
            Matter of Law as to the LePort Defendants

7      Plaintiff's eleventh cause of action for "Fraudulent Concealment" is a species of

8  fraud, and "fraud must be pleaded with specificity." *See Lovejoy v. AT & T Corp.,* 119

9  Cal. App. 4th 151, 158 (2004); *Blickman Turkus, LP v. MF Downtown Sunnyvale.*

10  *LLC,* 162 Cal. App. 4th 858, 878 (2008).

11      To state a cause of action for fraudulent concealment, Plaintiff must allege:

12      (1) Concealment or suppression of a material fact;

13      (2) by a defendant with *a duty to disclose the fact* to the plaintiff;

14      (3) the defendant *intended to defraud the plaintiff by intentionally concealing*

15  *or suppressing the fact*;

16      (4) the plaintiff was unaware of the fact and would not have acted as he or she

17  did if he or she had known of the concealed or suppressed fact; and

18      (5) plaintiff sustained damage as a result of the concealment or suppression of

19  the fact.

20      *Hambrick v. Healthcare Partners Medical Group, Inc.,* 238 Cal. App. 4th 124,

21  162 (2015) (emphasis added).

22      "To maintain a cause of action for fraud through nondisclosure or concealment

23  of facts, there must be allegations demonstrating that the defendant was under a

24  legal duty to disclose those facts." *Los Angeles Memorial Coliseum Commission v.*

25  *Insomniac, Inc.*, 233 Cal. App. 4th 803, 831 (2015); *see also Hoffman v. 162 North*

26  *Wolfe LLC*, 228 Cal. App. 4th 1178 (2014); Civ. Code, § 1710, subd. (3) (a deceit

27  includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

17

1  information of other facts which are likely to mislead for want of communication of

2  that fact").

3      The SAC does not specifically plead what material facts were allegedly

4  concealed by whom, and instead contains only conclusory allegations that fraudulent

5  concealment occurred.  *See* SAC, ¶¶ 186-191.  The claim fails for that reason alone.

6      Furthermore, there is no allegation that the LePort Defendants had a duty to

7  disclose the purportedly concealed facts.  *See* SAC, ¶¶ 186-191.  Nor is there an

8  allegation that any purported concealments were made with an intent to defraud

9  Plaintiff.  Thus, Plaintiff's eleventh cause of action for fraudulent concealment is

10  insufficient as a matter of law as to the LePort Defendants, and the demurrer to this

11  claim should be sustained without leave to amend.

12      G.    <u>The Twelfth Claim for Duress and Coercion Fails as a Matter of Law as
        to the LePort Defendants</u>

13      There is no cause of action in California for "Duress and Coercion."  "Duress"

14  and "coercion" are potential defenses to a contract at best, but not independent

15  causes of action.  Thus, the claim for "Duress and Coercion" is fatally uncertain.  *See*

16  CCP § 430.10(f).

17      If Plaintiff intended to plead a claim for "economic duress," which is also

18  generally an affirmative defense, the claim still fails.  Economic duress is a defense to

19  a contract when it was procured by an act that is so coercive so as to "cause a

20  reasonably prudent person, <u>*faced with no reasonable alternative*</u>, to agree to an

21  unfavorable contract."  *Tarpy v. County of San Diego,* 110 Cal. App. 4th 267, 277

22  (2003) (emphasis added) (citations omitted); s*ee also Perez v. Uline, Inc.*, 157 Cal.

23  App. 4th 953, 959-960 (2007).

24      Here, Plaintiff alleges that Defendants "intentionally used their positions of

25  trust and superior knowledge and detrimental circumstances to force LEI, through

26  economic duress and coercion, to act in the ways and manners alleged hereinabove."

27  SAC, ¶ 193.  Such allegations do not constitute a cause of action for economic duress.

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

LEPORT DEFENDANTS' DEMURRERS TO PLAINTIFF'S SECOND
AMENDED COMPLAINT; DECLARATION OF JULIE Z. KIMBALL

1  Plaintiff has not alleged any facts supporting the requisite conclusion that it had no

2  "reasonable alternative" but to accede to Defendants' demands with respect to the

3  loans or other allegations. *See Rich & Whillock, Inc. v. Ashton Development, Inc.,* 157

4  Cal. App. 3d 1154, 1159 (1984) (stating that economic duress may be established if

5  the plaintiff faces "bankruptcy or financial ruin" if it does not succumb).  Plaintiff has

6  not asserted that he executed the loans under economic duress.  Rather, Plaintiff has

7  merely alleged that Defendants made misrepresentations that induced him to do so,

8  which even if true (it is not) would not constitute "economic duress" since he had the

9  "reasonable alternative" to decide not to provide $17 million loan to LEI.

10      The LePort Defendants' demurrer to the twelfth claim should be sustained

11  without leave to amend.

12  IV.    <u>CONCLUSION</u>

13      Thus, the LePort Defendants respectfully request that the Court sustain the

14  demurrers to Plaintiff's Second Amended Complaint without leave to amend because

15  there is no reasonable possibility the defects can be cured.  *See Olson,* 33 Cal. App.

16  5th at 517 ("Where there is no reasonable possibility the plaintiff can cure a defect in

17  a complaint with an amendment, an order sustaining a demurrer without leave to

18  amend is not an abuse of discretion.") (citations omitted).  In particular with respect

19  to Monica and Francisco, it is clear there are no valid claims that can be stated.

20

21  DATED:  July 22, 2019        ELKINS KALT WEINTRAUB REUBEN
22                              GARTSIDE LLP

23

24  By:

25                              JULIE Z. KIMBALL
                                Attorneys for Defendants Peter LePort, M.D.,
26                              Monica LePort, Francisco LePort

27

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1211259

LEPORT DEFENDANTS' DEMURRERS TO PLAINTIFF'S SECOND
AMENDED COMPLAINT; DECLARATION OF JULIE Z. KIMBALL

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
JULIE Z. KIMBALL, State Bar No. 252449
 *jkimball@elkinskalt.com*
LEANNE OATES VANECEK, State Bar No. 279317
 *lvanecek@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California  90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Attorneys for Defendants Peter LePort,
M.D., Monica LePort, Francisco LePort

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| CARL BARNEY, AS TRUSTEE OF THE CARL BARNEY LIVING TRUST, ,<br><br>Plaintiff,<br><br>v.<br><br>LUKAS PIETER, PETER LEPORT, M.D., MONICA LEPORT, FRANCISCO LEPORT, RAMANDEEP GIRN, REBECCA GIRN, HIGHER GROUND EDUCATION, INC. and DOES 4 thorugh 50, inclusive, ,<br><br>Defendants. | CASE No. 30-2018-01006531<br><br>[Assigned for all Purposes to Hon. Ronald Bauer, Dept. CX-103]<br><br>DECLARATION OF JULIE Z. KIMBALL IN SUPPORT OF DEFENDANTS' NOTICE OF DEMURRERS AND DEMURRERS TO PLAINTIFF'S SECOND AMENDED COMPLAINT<br><br>[*Filed Concurrently with Defendants' Notice of Demurrers and Demurrers to Plaintiff's Second Amended Complaint*] |
| LUKAS PIETER, an individual, ,<br><br>Cross-Complainant,<br><br>v.<br><br>LEPORT EDUCATIONAL INSTITUTE, INC., a California corporation, and DOES 1 through 20, inclusive,,<br><br>Cross-Defendants. | Date:      August 19, 2019<br>Time:      9:00 a.m.<br>Dept.:     CX-103<br><br>Action Filed:   July 18, 2018<br>FAC Filed:      November 6, 2018<br>SAC Filed:      June 17, 2019<br>Trial Date:     None Set |

1214228v1

DECLARATION OF JULIE Z. KIMBALL IN SUPPORT OF DEFENDANTS' NOTICE OF
DEMURRERS AND DEMURRERS TO PLAINTIFF'S SECOND AMENDED COMPLAINT

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

## DECLARATION OF JULIE Z. KIMBALL

I, Julie Z. Kimball, declare as follows:

1.     I am an attorney duly admitted to practice before this Court.  I am a partner with Elkins Kalt Weintraub Reuben Gartside LLP, attorneys of record for Defendants Peter LePort, M.D., Monica LePort, Francisco LePort.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify to the matters stated herein.

2.     On July 3, 2019, I attempted to contact counsel for Plaintiff via telephone and left a voicemail.  On July 16, I left Plaintiff's counsel another voicemail and sent a follow up email requesting to "meet and confer" pursuant to CCP § 430.41(a)(1)-(2).  A true and correct copy of the email I sent to Plaintiff's counsel requesting to meeting and confer is attached hereto as Exhibit A.  I received no response from Plaintiff's attorney to my voicemail or email.

3.     On July 19, I left Plaintiff's counsel another voicemail and sent another follow up email requesting to "meet and confer" and notifying Plaintiff that my clients would be filing demurrers on July 22, 2019 unless I received a response.  *See* Exhibit A.  Again, I received no response to my voicemail or email.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed July 22, 2019, at Los Angeles, California.

_____
Julie Z. Kimball

1214228v1

DECLARATION OF JULIE Z. KIMBALL IN SUPPORT OF DEFENDANTS' NOTICE OF DEMURRERS AND DEMURRERS TO PLAINTIFF'S SECOND AMENDED COMPLAINT

# EXHIBIT A

| From: | Julie Z. Kimball |
|---|---|
| To: | James.Carter@jacksonlewis.com |
| Cc: | Leanne Oates Vanecek |
| Bcc: | LePort_Peter_Francisco_and Monica_LEI Dispute E_Mail |
| Subject: | RE: Carl Barney, as Trustee of the Carl Barney Living Trust vs. Pieter, #30-2018-01006531-CU-FR-CJC [IWOV-dms-01.FID308518] |
| Date: | Friday, July 19, 2019 2:34:00 PM |
| Attachments: | image001.png |

Hi-

I just left you another voicemail. I have been trying to meet and confer about our anticipated demurrers, which we will be filing on Monday since I have not been able to reach you. However, if upon receipt of our demurrers you determine that it is in your client's best interest to amend rather than oppose the demurrer, please let me know.

Thanks,
Julie

---

**From:** Julie Z. Kimball
**Sent:** Tuesday, July 16, 2019 3:57 PM
**To:** 'James.Carter@jacksonlewis.com' <James.Carter@jacksonlewis.com>
**Cc:** Leanne Oates Vanecek <LVanecek@elkinskalt.com>
**Subject:** Carl Barney, as Trustee of the Carl Barney Living Trust vs. Pieter, #30-2018-01006531-CU-FR-CJC [IWOV-dms-01.FID308518]

Hi-

As you know, I represent the LePort Defendants in the above matter. Following up on my voicemail, I am first returning a call I received from you but also wanted to set up a time to meet and confer regarding our anticipated demurrers to the Second Amended Complaint. Please let me know a time that you are available tomorrow to meet and confer telephonically pursuant to CCP 430.41. I am generally available tomorrow except that I have another meeting from about 11-1 pm.

Thanks,
Julie

**Julie Z. Kimball**
jkimball@elkinskalt.com
**Direct Dial:** (310) 746-4420 | **Fax:** (310) 746-4499 | Download VCard
Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Boulevard, Los Angeles, CA 90064
www.elkinskalt.com



**Please note our new address.**

## 10345 W. Olympic Boulevard, Los Angeles, CA 90064

CONFIDENTIALITY NOTICE: This e-mail message and any attachments are confidential and may be attorney-client privileged. Dissemination, distribution or copying of this message or attachments without proper authorization is strictly prohibited.  If you are not the intended recipient, please notify Elkins Kalt Weintraub Reuben Gartside LLP immediately by telephone or by e-mail, and permanently delete the original, and destroy all copies, of this message and all attachments.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1

## PROOF OF SERVICE

2

Barney v. LePort, et al.
Case No. 30-2018-01006531

3

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4

5      At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California.  My business address is 10345 W. Olympic Blvd., Los Angeles, CA 90064.

6

7      On July 22, 2019, I served true copies of the following document(s) described as DEFENDANTS PETER LEPORT, M.D., MONICA LEPORT, AND FRANCISCO LEPORT'S NOTICE OF DEMURRERS AND DEMURRERS TO PLAINTIFF'S SECOND AMENDED COMPLAINT; DECLARATION OF JULIE Z. KIMBALL on the interested parties in this action as follows:

8

9

10      James P. Carter, Esq.                  Douglas Barritt, Esq.
Jonathan P. Schmidt, Esq.              Barritt Smith LLP
Jackson Lewis P.C.                     2601 Main Street, Ste. 530

11      200 Spectrum Center Dr., Suite 500     Irvine, CA 92614
Irvine, CA 92618                       E-mail: dbarritt@barrittsmith.com

12      E-mail:
james.carter@jacksonlewis.com;

13      jonathan.schmidt@jacksonlewis.com

14      BY MAIL:  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the

15      envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Elkins Kalt Weintraub Reuben Gartside LLP for

16      collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary

17      course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing

18      occurred.  The envelope was placed in the mail at Los Angeles, California.

19      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

20

21      Executed on July 22, 2019, at Los Angeles, California.

22

23      _____
Melanie Yuen

24

25

26

27

28

20

# EXHIBIT 16

1    James P. Carter (SBN 150052)
     Jonathan D. Kent (SBN 292415)
2    Jonathan P. Schmidt (SBN 293290)
     JACKSON LEWIS P.C.
3    200 Spectrum Center Drive, Suite 500
     Irvine, CA 92618
4    Phone:  (949) 885-1360
     Fax:      (949) 885-1380
5    James.Carter@jacksonlewis.com
     Jonathan.Kent@jacksonlewis.com
6    Jonathan.Schmidt@jacksonlewis.com

7    Attorneys for Plaintiffs and Cross-Defendant
     CARL BARNEY, AS TRUSTEE OF THE CARL BARNEY LIVING TRUST;
8    and LEPORT EDUCATIONAL INSTITUTE, INC.

9

10                    **SUPERIOR COURT OF CALIFORNIA**

11              **COUNTY OF ORANGE, CIVIL COMPLEX CENTER**

12

13   CARL BARNEY, AS TRUSTEE OF THE          CASE NO. 30-2018-01006531-CU-FR-CJC
     CARL BARNEY LIVING TRUST,               *[Related Case 30-2017-00915762-CU-OE-CJC*
14                                           *Pieter v. LePort Educational Institute]*
                      Plaintiff,
15                                           [Assigned for all purposes to the
     v.                                      Hon. Ronald L. Bauer, Dept. CX103]
16
     LUKAS PIETER, PETER LEPORT, M.D.,       **PLAINTIFF'S OPPOSITION TO**
17   MONICA LEPORT, FRANCISCO LEPORT,        **DEFENDANTS PETER LEPORT, MONICA**
     RAMANDEEP GIRN, REBECCA GIRN,           **LEPORT, AND FRANCISCO LEPORT'S**
18   HIGHER GROUND EDUCATION, INC.           **DEMURRERS TO PLAINTIFF'S SECOND**
     and DOES 4 through 50, inclusive,       **AMENDED COMPLAINT**
19
                      Defendants.            Date:    August 19, 2019
20                                           Time:    9:00 a.m.
                                             Dept.:   CX103
21   LUKAS PIETER, an individual,

22                    Cross-Complainant,
     v.
23
     LEPORT EDUCATIONAL INSTITUTE,           Complaint Filed:    July 18, 2018
24   INC., a California corporation, and ROES 1    Cross-Complaint:   August 7, 2018
     through 20, inclusive,                  FAC:       November 6, 2018
25                                           SAC:       June 17, 2019
                      Cross-Defendants.      Trial Date:    TBD
26

27

28

                                           1
     PLAINTIFF'S OPPOSITION TO PETER LEPORT, MONICA LEPORT, AND FRANCISCO LEPORT'S DEMURRERS
                      TO THE SECOND AMENDED COMPLAINT

I.    **INTRODUCTION**

Carl Barney, individually and through an assignment of rights by LePort Educational Institute, Inc. ("LEI")[1] (LEI and Barney are collectively referred to as "Plaintiff"), endeavors to hold Peter LePort, Monica LePort, and Francisco LePort (the "LePort Defendants") accountable for their roles in a coordinated scheme to trick Barney into filling their pockets while they ran LEI into the ground.  As alleged in the Second Amended Complaint (the "SAC"), Barney made numerous attempts to save LEI from its internal collapse, not realizing at the time that he was the only shareholder acting in the interests of LEI.

Consistent with their financing inducement practices, the LePort Defendants continue their art of concealment in their instant Demurrer as they seek to dispose of claims they contend are uncertain and unspecific by ignoring 103 paragraphs of pointed, factual allegations.  A comprehensive review of the entire SAC shows facts sufficient to meet each element of every cause of action challenged by the Demurrer.  For the reasons discussed below, the Court should deny the Demurrer in its entirety.  Nevertheless, if the Court is inclined to grant any aspect of the Demurrer, it should do so with leave to amend because the LePort Defendants have not shown that any cause of action is fatally defective and cannot be cured through an amended complaint.

II.    **LEGAL ANALYSIS**

"In reviewing the sufficiency of a complaint against a general demurrer, we…treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law." (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 384-385.)  "Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context, and ignoring erroneous or confusing labels if the complaint pleads facts which would entitle the plaintiff to relief." (*Id.*)  "In short, our task is to determine whether the pleaded facts state a cause of action on any available legal theory." (*Id.*)

"[I]t is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory." (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1358.)

---

[1] The SAC also alleges that LEI assigned all of its rights, claims, and interests against the LePort Defendants to Barney. (SAC ¶ 2.)  Therefore, any allegations specific to LEI apply to Barney as well.

"And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

A.   **Plaintiff's First Cause of Action for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Is Not Uncertain and Is Properly Plead as to Peter LePort**

In demurring to the First Cause of Action, the LePort Defendants distort the meaning of uncertainty within the context of Code of Civil Procedure § 430.10(f). "[D]emurrers for uncertainty are disfavored, and are granted only if the pleading is so incomprehensible that a defendant cannot reasonably respond." (*Lickiss v. Financial Industry Regulatory Authority* (2012) 208 Cal.App.4th 1125, 1135.)  Courts strictly construe demurrers based on uncertainty "because ambiguities can reasonably be clarified under modern rules of discovery." (*Id.* citing *Khoury v. Maly's of California, Inc.* (1993) 14 Cal.App.4th 612, 616.)

"Where the pleading contains substantive factual allegations sufficiently apprising the party of the issues he or she is being asked to meet, a demurrer for uncertainty should be overruled. (See *Williams v. Beechnut Nutrition Corp.* (1986) 185 Cal.App.3d 135, 139 fn. 2; *Lickiss v. Financial Industry Regulatory Authority* (2012) 208 Cal.App.4th 1125, 1135.)  As described below, the SAC includes sufficient facts to state claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Peter LePort.

1.   **The Second Amended Complaint Contains Sufficient Facts to State Claims against Peter LePort for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing**

In asserting a claim for breach of contract against Peter LePort, Plaintiff need only allege facts supporting the following elements:  "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." (See *Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 402.)  Code of Civil Procedure § 430.10(g) also requires the plaintiff to clarify whether the contract was written or oral.

/ / /

3

The SAC alleges that Peter LePort and LEI entered into both a written employment agreement, which remained dormant for several years until Peter LePort improperly reactivated it to claim an unauthorized salary, and a written shareholder agreement, thereby satisfying the first element.  (SAC ¶¶ 52, 105.)  The SAC further alleges that LEI performed all of its obligations under those contracts, except those obligations excused by Defendants' actions, which satisfies the second element.   (SAC ¶ 106.) Although the SAC provides greater detail as to the Girns' misappropriation of LEI's trade secrets and solicitation of its employees, paragraph 107 of the SAC alleges that each of the specified defendants, including Peter LePort, breached the agreements by soliciting employees and misappropriating trade secrets.  (SAC ¶ 107.)  This allegation sufficiently pleads the third element to a breach of contract claim. If Peter LePort takes the position that he had no involvement in such conduct, then that is a factual dispute that will need to be resolved through discovery.  For the purposes of the Demurrer, the Court must assume that such allegations are true.  (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 384-385.)  Plaintiff then alleges that such breaches resulted in at least $24,000,000 in damages, thereby satisfying the fourth element of Barney's breach of contract claim.  (SAC ¶ 108.)

In addition to the allegations specifically pleaded in paragraphs 105 through 108, Plaintiff also alleges that Peter LePort breached LEI's bylaws by taking corporate actions without the required quorum of the board of directors, which resulted in substantial financial harm to LEI.  (SAC ¶ 51.)  Peter LePort's failure to abide the contractual terms of LEI's bylaws also resulted in breaches of the loan agreements between LEI and Leeds Equity Partners V, LP ("Leeds"), as well as notes between LEI and Barney.  (SAC ¶ 52.)  The SAC further alleges that Peter LePort made an oral agreement to personally payout Lukas Pieter's alleged $200,000 bonus, and Peter LePort's subsequent refusal resulted in significant financial harm to LEI.  (SAC ¶ 65.)  These additional contracts and breaches by Peter LePort are incorporated by reference into the first cause of action.  (SAC ¶ 104.)  If the Court grants the Demurrer as to the first cause of action, then it should allow Plaintiff leave to amend to specify the contractual claims against Peter LePort arising out of the incorporated facts.

The SAC also sufficiently pleads a breach of the implied covenant of good faith and fair dealing, because that cause of action requires less facts than those required to state a claim for breach of contract. "There is an implied covenant of good faith and fair dealing in every contract that neither party will do

1    anything which will injure the right of the other to receive the benefits of the agreement." (*Foley v.*

2    *Interactive Data Corp.* (1988) 47 Cal.3d 654, 684.) "Breach of a specific provision of the contract is not

3    a necessary prerequisite to a claim for breach of the implied covenant of good faith and fair dealing."

4    (*Brehm v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225, 1236.)  The facts alleged in the SAC

5    sufficiently state a claim for breach of contract, and even if they did not specify the provisions of the

6    agreements breached by Peter LePort, such facts still form a claim for breach of the implied covenant of

7    good faith and fair dealing.

8        2.    **Barney's Inclusion of Two Theories of Liability in the First Cause of**

9            **Action Is Appropriate**

10       The LePort Defendants improperly seek to dismiss all contractual claims against Peter LePort

11   simply because Plaintiff's first cause of action alleges liability based on breach of contract and breach of

12   the implied covenant of good faith and fair dealing.  However, the LePort Defendants cite no authority

13   suggesting that multiple claims cannot be plead under a single cause of action.  The reason for this lack

14   of authority is because long standing law has held that a plaintiff may include multiple theories of

15   liability under a single cause of action. (*Garris v. Mitchell* (1935) 7 Cal.App.2d 430, 435 ["There is no

16   merit in the special demurrers based on uncertainty, unintelligibility and ambiguity, or on the ground

17   that several causes of action have been improperly united, or are not separately stated."].)  The Court

18   should not, therefore, sustain the LePort Defendants' demurrer on that unsupported theory of

19   uncertainty.  If the Court does sustain the Demurrer on this ground, then Plaintiff should be granted

20   leave to plead the claims as two separate causes of action.

21       B.    **The Second Cause of Action for Breach of Fiduciary Duty, as well as Aiding and**

22           **Abetting the Breach of Fiduciary Duty, Is Sufficiently Certain as to all LePort**

23           **Defendants**

24       The LePort Defendants again improperly seek to dispose of two theories of liability simply

25   because the theories are included under the same captioned second cause of action.  As discussed above,

26   the focus of a pleading is on the certainty of the facts and whether those facts support a legal theory of

27   liability. (*Lickiss v. Financial Industry Regulatory Authority* (2012) 208 Cal.App.4th 1125, 1135.)  The

28   LePort Defendants cite no authority supporting their request to dispose of a claim on demurrer because it

1  is alleged simultaneously with another claim under the same cause of action because no such rule exists.

2  (See *Garris v. Mitchell* (1935) 7 Cal.App.2d 430, 435.)

3        Both claims of breach of fiduciary duty and aiding and abetting the same are properly supported

4  by the factual allegations. The LePort Defendants' attempt to convince the Court that the SAC includes

5  only conclusory allegations ignores the 103 paragraphs incorporated by reference into the second cause

6  of action. As the LePort Defendants cite in their Demurrer, a claim for breach of fiduciary duty requires

7  the: "(1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately

8  caused by the breach." (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1534.)

9        The SAC alleges that each LePort Defendant was either a shareholder, officer, or director of LEI

10  owing fiduciary duties to the company and other minority shareholders. (SAC ¶¶ 4 -7, 111.) The first

11  element is properly alleged. The SAC further includes allegations specific to the following breaches of

12  fiduciary duties owed by the LePort Defendants: filing a fraudulent Certificate of Dissolution (SAC ¶

13  18); concealing from Barney the existence of a $5,000,000 loan from Leeds (SAC ¶ 28); conspiring to

14  personally enrich themselves at the expense of LEI (SAC ¶ 47); approving compensation increases to

15  Pieter, Monica LePort, and Peter LePort in violation of the prohibitions contained in the separate loan

16  agreements with Leeds and Barney (SAC ¶¶ 50, 51, 52); approving the prohibited salary increases as a

17  three person board of directors consisting of Monica, Francisco, and Peter, without a proper quorum

18  despite the instructions on their fiduciary duties from LEI's counsel at the time (SAC ¶ 51); concealing

19  the events of default from Leeds to secure an additional $2,200,000 in loans (SAC ¶ 53); and securing a

20  loan from Leeds at rates they knew to be less favorable to LEI than those they could obtain from Barney

21  to avoid informing Barney of the existing defaults (SAC ¶ 54). The SAC is replete with factual

22  allegations of each LePort Defendant breaching their fiduciary duties to both LEI and Barney as a

23  minority shareholder. The third element is easily satisfied through allegations that the LePort

24  Defendants' breaches of fiduciary duty damaged LEI and Barney through financial liability to Leeds

25  (SAC ¶ 62,) and the costs of litigation needed to defend against Pieter's claims for the improper

26  compensation increase (SAC ¶ 61).

27        Aiding and abetting a breach of fiduciary duty requires allegations of: (1) a third party's breach

28  of fiduciary duty; (2) defendant's actual knowledge of that breach of fiduciary duty; (3) substantial

1    assistance or encouragement by defendant to the third party's breach; and (4) causation or a substantial

2    factor in causing the harm.  (*Nasrawi v.  Buck Consultants, LLC* (2014) 231 Cal.App.4th 328, 343.)

3         Most of the allegations described above in support of the claim for breach of fiduciary duty also

4    include the conduct of Pieter, whose breach of fiduciary duty was only made possible through the

5    actions of the LePort Defendants, thereby giving rise to the claims for aiding and abetting.  (SAC ¶ 63.)

6    For instance, Pieter attempted to secure a raise and bonus in violation of the loan agreements through

7    board approval signed by Peter, Monica, and Francisco LePort.  (SAC ¶ 51.)  In addition, the SAC

8    contains numerous allegations of Pieter's breach of fiduciary duty, which Barney alleged was enabled

9    by the LePort Defendants.  (SAC ¶¶ 53-57, 59, 112.)  Such conduct resulted in the harm to LEI.  (SAC

10    ¶¶ 113-114.)  Through such allegations, Barney properly stated claims for breach of fiduciary duty and

11    aiding and abetting against each of the LePort Defendants.  The Court should deny the demurrer to the

12    second cause of action in its entirety.

13    **C.**    **The Court Should Deny the Demurrer as to the Eighth Cause of Action Because the**

14         **SAC Properly Stated a Claim for Unfair Competition and Unfair Business Practices**

15         The LePort Defendants' contention that Plaintiff must allege an independent basis to support a

16    claim of unfair business practices is mistaken.  Claims under Business & Professions Code § 17200 can

17    be derivative.  (See *Goulatte v. Citimortgage, Inc.* 2014 U.S.Dist.LEXIS 190366, at *13.)  Unfair

18    competition is "broadly defined to include anything that can properly be called a business practice and

19    that at the same time is forbidden by law," including violations of statutes.  (*Bureerong v. Uvawas*

20    (C.D.Cal. 1996) 922 F.Supp. 1450, 1477.)  "[E]ven if not specifically prohibited by law," alleged

21    conduct can still be "deemed an unfair act or practice."  (*Durell v. Sharp Healthcare* (2010) 183

22    Cal.App.4th 1350, 1359.)  The unfair business practices by each of the LePort Defendants is specifically

23    pleaded in paragraphs 18, 19, 25, 26, 28, 43, 45, 48-62, and 65 of the SAC.  All breaches of fiduciary

24    duty, improper employment practices, and breaches of the Corporations Code or LEI's governing

25    documents can form the basis for this cause of action.

26    ///

27    ///

28    ///

### D.    Plaintiff's Tenth Cause of Action of Intentional Misrepresentation against Peter LePort Is Adequately Alleged

Peter LePort's Demurrer to the tenth cause of action focuses solely on the statement that LEI was "flourishing," while ignoring the multiple other misrepresentations specifically pleaded. For instance, the SAC alleges that Peter LePort falsely stated that LEI's share price was $1.90 when inducing Barney to invest in LEI. (SAC ¶ 25.) After Barney purchased the shares, he discovered they were actually worth about $0.10. (SAC ¶ 26.) This allegation alone supports a claim for fraudulent misrepresentation, and the Demurrer should be denied on this ground.

Moreover, whether Peter LePort's statement that LEI was "flourishing," is an opinion or an actionable misrepresentation is a question of fact for the jury. (*Furla v. Jon Douglas Co.* (1998) 65 Cal.App.4th 1069, 1081 ["Whether a statement is nonactionable opinion or actionable misrepresentation of fact is a question of fact for the jury."].) The pleading stage, therefore, is not the appropriate time for Peter LePort to raise this defense. Instead, the Court should deny the Demurrer and require Peter LePort to pose this defense to a jury.

Nevertheless, Peter LePort's statement that LEI was "flourishing," is an actionable statement, even if it is an opinion because of Peter LePort possessed special knowledge of LEI's financial status. "A statement couched as an opinion, by one having special knowledge of the subject, may be treated as an actionable misstatement of fact." (*Furla v. Jon Douglas Co.* (1998) 65 Cal.App.4th 1069, 1080.) As alleged in the SAC, Peter LePort was the founder, a shareholder, officer, and director of LEI at various relevant times. (SAC ¶ 4.) It is presumed that Peter LePort would therefore have intimate knowledge of LEI's financial state that would have been unknown to Barney at the time. In other words, because Peter LePort was in a position to know that LEI was not actually "flourishing," his statement otherwise constitutes an actionable misrepresentation. The Court should therefore deny the Demurrer as to the tenth cause of action in its entirety.

/ / /

/ / /

/ / /

/ / /

PLAINTIFF'S OPPOSITION TO PETER LEPORT, MONICA LEPORT, AND FRANCISCO LEPORT'S DEMURRERS TO THE SECOND AMENDED COMPLAINT

E. **The Demurrer as to the Eleventh Cause of Action Fails because Plaintiff Pleaded Specific Facts that the LePort Defendants Concealed Despite their Legal Duty to Disclose**

The Demurrer as to the eleventh cause of action similarly ignores the first 103 paragraphs containing allegations of specific facts that the LePort Defendants fraudulently concealed. For instance, when selling shares in LEI to Barney, Peter LePort concealed the fact that he was largely absent from participating in LEI's business. (SAC ¶ 25.) This was a material fact that Barney relied upon in deciding to purchase the shares in his friend's company. (SAC ¶ 188.) The LePort Defendants also concealed from Barney the existence of a $5,000,000 loan from Leeds that would have greatly affected Barney's decision to issue subsequent loans and share purchases. (SAC ¶ 28.) When securing an additional $500,000 loan from Barney in April 2016, the LePort Defendants concealed from Barney the existence of a near $7,000,000 debt to Leeds that was due five months later, and the fact that the company had retained counsel to assist with filing for bankruptcy. (SAC ¶ 45.) Such indications of insolvency would undoubtedly be material issues to a potential creditor. The LePort Defendants further concealed from Plaintiff the salary increases they provided to Peter LePort, Monica LePort, and Lukas Pieter in violation of Barney's loan agreement. (SAC ¶¶ 48, 52.) All of these allegations were specific and material facts that the LePort Defendants concealed from Plaintiff.

The LePort Defendants' contention that the SAC lacks any allegation of a duty to disclose is similarly mistaken because it contains facts supporting both a statutory duty to disclose and a fiduciary duty to disclose. In each of the alleged purchases of shares in LEI, the LePort Defendants had a statutory duty to disclose all material facts. (See *Eldridge v. Tymshare* (1986) 186 Cal.App.3d 767, 772 [15 U.S.C. § 78n(e) imposes a duty "to disclose any 'material fact' 'in connection with' the purchase or sale of any security."].) Thus, factual allegations that the transactions involved a transfer of LEI shares are sufficient to trigger the statutory duty of disclosure for the purposes of pleadings.

Moreover, Plaintiff's allegations that the LePort Defendants owed a fiduciary duty also form the basis of a duty to disclose. (*La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131, 1151 ["a duty to disclose may arise without a confidential or fiduciary relationship"] overruled on other grounds.) The SAC alleges that the LePort Defendants, as officers, directors, and

1   shareholders owed fiduciary duties to both LEI and Barney as a minority shareholder. (*Jones v. H. F.*
2   *Ahmanson & Co.* (1969) 1 Cal.3d 93, 108 ["majority shareholders, either singly or acting in concert to
3   accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation"].)  As
4   majority shareholders acting in concert, the LePort Defendants owed a fiduciary duty to disclose
5   material information to Barney, the minority shareholder.  The SAC, therefore, pleads sufficient facts to
6   form the basis of a duty to disclose and the Demurrer should therefore be denied.

7       **F.**    **The SAC Properly States Equitable Claims for Relief through Theories of Coercion**
8             **and Duress**

9          The LePort Defendants' Demurrer to the twelfth cause of action is predicated solely on the
10  notion that because they have never heard of a cause of action stated as a coercion or duress, it should
11  not be allowed.  Yet, claims for duress have been adequately pleaded in actions seeking to recover
12  money or property that was exchanged under duress.  (E.g. *Leeper v. Beltrami* (1959) 53 Cal.2d 195,
13  203 [stating a "cause of action for wrongful acts in the nature of duress"]; e.g. also, *McBride v.*
14  *Boughton* (2004) 123 Cal.App.4th 379, 388 [recognizing a cause of action seeking restitution "where the
15  defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct"].)

16         The labeling of legal theory is not a sufficient grounds for a demurrer without leave to amend.
17  (See *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 384-385 [courts ignore "erroneous or confusing
18  labels if the complaint pleads facts which would entitle the plaintiff to relief"].)  The facts underlying the
19  claims are the focal point of an analysis on Demurrer.  In the twelfth cause of action, Plaintiff alleged
20  facts supporting a theory of restitution of funds obtained by the LePort Defendants through duress and
21  coercion.  Whether the LePort Defendants prefer this to be titled an action for restitution or a claim
22  based on duress and coercion is immaterial.  The facts still support Plaintiff's claim for the relief sought,
23  and the Demurrer should therefore be denied.

24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

PLAINTIFF'S OPPOSITION TO PETER LEPORT, MONICA LEPORT, AND FRANCISCO LEPORT'S DEMURRERS
TO THE SECOND AMENDED COMPLAINT

1    III.    **CONCLUSION**

2        Based on the foregoing, Plaintiff respectfully requests that the Court deny the Demurrer in its

3 entirety. In the event the Court is inclined to sustain any portion of the Demurrer, Plaintiff requests

4 leave to amend.

5 Dated: August 6, 2019             JACKSON LEWIS P.C.

6

7                      James P. Carter

8                      Jonathan D. Kent
                        Jonathan P. Schmidt

9

10                      Attorneys for Plaintiffs and Cross-Defendant
                     CARL BARNEY, AS TRUSTEE OF THE CARL
                     BARNEY LIVING TRUST; and

11                      LEPORT EDUCATIONAL INSTITUTE, INC.

PLAINTIFF'S OPPOSITION TO PETER LEPORT, MONICA LEPORT, AND FRANCISCO LEPORT'S DEMURRERS TO THE SECOND AMENDED COMPLAINT

**PROOF OF SERVICE**

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA, COUNTY OF ORANGE**

**CASE NAME:**   *BARNEY* v. *PIETER, et al.*

**CASE NO.:**    30-2018-01006531-CU-FR-CJC

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is: 200 Spectrum Center Drive, Suite 500, Irvine, CA 92618.

On **August 6, 2019**, I caused the following document(s) described as: **PLAINTIFF'S OPPOSITION TO DEFENDANTS PETER LEPORT, MONICA LEPORT, AND FRANCISCO LEPORT'S DEMURRERS TO PLAINTIFF'S SECOND AMENDED COMPLAINT** to be served on all interested parties in this action by placing ☒ a true copy ☐ the original thereof enclosed in sealed envelope(s) addressed as follows:

| | |
|---|---|
| Douglas Barritt, Esq.<br>Barritt Smith LLP<br>2601 Main Street, Suite 530<br>Irvine, California 92614 | ***Attorneys for Defendant and Cross-Complainant,<br>LUKAS PIETER***<br><br>Phone:  (949) 553-0700 Ext. 1<br>Fax:    (949) 553-0715<br>E-Mail:  dbarritt@barrittsmith.com |
| Julie Zankel Kimball<br>Elkins Kalt<br>10345 West Olympic Boulevard<br>Los Angeles, California 90064-2524 | ***Attorneys for Defendants PETER LePORT, M.D.,<br>MONICA LePORT, FRANCISCO LePORT***<br><br>Phone:  (310) 746-4420<br>Email:   jkimball@elkinskalt.com |
| Mona S. Amer, Esq.<br>Orrick, Herrington & Sutcliffe LLP<br>777 South Figueroa Street, Suite 3200<br>Los Angeles, California 90017-5855 | ***Attorneys for Defendants<br>REBECCA GIRN and RAMANDEEP GIRN***<br><br>Phone:  (213) 612-2349<br>Fax:    (213) 612-2499<br>Email:   mamer@orrick.com |
| Cogency Global<br>850 New Burton Road., Room 201<br>Dover, Delaware 19901 | ***Registered Agent for Defendant Higher Ground<br>Education, Inc.*** |

☒   **UPS / OVERNIGHT:** by depositing a true copy of the same enclosed in a sealed envelope, with delivery fees provided for, in an overnight delivery service pick up box or office designated for overnight delivery, and addressed as set forth herein.

**STATE**: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **August 6, 2019**, at Irvine, California.

*Laura Castillo*
_____
Laura Castillo

12

PLAINTIFF'S OPPOSITION TO PETER LEPORT, MONICA LEPORT, AND FRANCISCO LEPORT'S DEMURRERS
TO THE SECOND AMENDED COMPLAINT

EXHIBIT 17

1  ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
   JULIE Z. KIMBALL, State Bar No. 252449
2    *jkimball@elkinskalt.com*
   LEANNE OATES VANECEK, State Bar No. 279317
3    *lvanecek@elkinskalt.com*
   10345 W. Olympic Blvd.
4  Los Angeles, California  90064
   Telephone: 310.746.4400
5  Facsimile: 310.746.4499

6  Attorneys for Defendants Peter LePort,
   M.D., Monica LePort, Francisco LePort
7

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**08/12/2019** at 04:03:00 PM

Clerk of the Superior Court
By e Clerk,Deputy Clerk

8         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9         **COUNTY OF ORANGE, CIVIL COMPLEX CENTER**

10

| | |
|---|---|
| 11  CARL BARNEY, AS TRUSTEE OF THE CARL BARNEY LIVING TRUST, | CASE No. 30-2018-01006531 |
| 12 | [Assigned for all Purposes to Hon. Ronald Bauer, Dept. CX-103] |
| 13          Plaintiff, | |
| 14          v. | **REPLY IN SUPPORT OF PETER LEPORT, M.D., MONICA LEPORT, AND FRANCISCO LEPORT'S DEMURRERS TO PORTIONS OF PLAINTIFF'S SECOND AMENDED COMPLAINT** |
| 15  LUKAS PIETER, PETER LEPORT, M.D., MONICA LEPORT, FRANCISCO LEPORT, RAMANDEEP GIRN, REBECCA GIRN, HIGHER GROUND EDUCATION, INC. and DOES 4 through 50, inclusive, | |
| 16 | |
| 17 | |
| 18          Defendants. | Date:      August 19, 2019 Time:      9:00 AM Dept.:     CX103 |
| 19  LUKAS PIETER, an individual, | Action Filed:   July 18, 2018 FAC Filed:    November 6, 2018 SAC Filed:    June 17, 2019 Trial Date:    None Set |
| 20 | |
| 21          Cross-Complainant, | |
| 22          v. | |
| 23  LEPORT EDUCATIONAL INSTITUTE, INC., a California corporation, and DOES 1 through 20, inclusive, | |
| 24 | |
| 25          Cross-Defendants. | |
| 26 | |

27

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 5

II.   THE DEMURRERS SHOULD BE SUSTAINED ........................................... 6

   A.   The First Claim for Breach of Contract and Implied Covenant of
        Good Faith and Fair Dealing Fails as a Matter of Law as to Peter
        LePort .......................................................................................................... 6

        1.   The First Claim Improperly Combines Two Legal Theories
             into a Single Cause of Action ........................................................ 6

        2.   Th First Claim Fails to State Sufficient Facts as to Peter
             LePort .............................................................................................. 7

   B.   The Second Claim for Breach of Fiduciary Duty and Aiding and
        Abetting Breach of Fiduciary Duty Fails as a Matter of Law as to
        the LePort Defendants .................................................................................. 8

   C.   The Eighth Cause of Action for Violation of Business &
        Professions Code Section 17200 Fails as a Matter of Law as to the
        LePort Defendants ...................................................................................... 10

   D.   The Tenth Cause of Action for Intentional Misrepresentation
        Fails as a Matter of Law as to Peter LePort .............................................. 10

   E.   The Eleventh Claim for Intentional Concealment Fails as a
        Matter of Law as to the LePort Defendants ............................................... 12

   F.   The Twelfth Claim for Duress and Coercion Fails as a Matter of
        Law as to the LePort Defendants ............................................................... 14

III.  CONCLUSION ................................................................................................. 14

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

REPLY IN SUPPORT OF LEPORT DEFENDANTS' DEMURRERS TO PORTIONS OF PLAINTIFF'S
SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Anunziato v. eMachines, Inc.,*
  402 F. Supp. 2d 1133 (C.D. Cal. 2005) .......................................... 11

*McKinney v. Google, Inc.,*
  2011 WL 3862120 (N.D. Cal. 2011) .............................................. 11

**State Cases**

*Campbell v. Rayburn,*
  129 Cal. App. 2d 232 (1954) .................................................. 6, 8

*Cansino v. Bank of America,*
  224 Cal. App. 4th 1462 (2014) ............................................. 10, 12

*Casey v. U.S. Bank Nat'l Ass'n,*
  127 Cal. App. 4th 1138 (2005) ................................................. 9

*Chavez v. Citizens for a Fair Farm Labor Law,*
  84 Cal. App. 3d 77 (1978) ..................................................... 11

*Eustace v. Dechter,*
  28 Cal. App. 2d 706 (1938) ..................................................... 6

*Frances T. v. Village Green Owners Assn.,*
  42 Cal. 3d 490 (1986) ....................................................... 9, 13

*Furla v. Jon Douglas Co.,*
  65 Cal. App. 4th 1069 (1998) ................................................. 11

*Garris v. Mitchell,*
  7 Cal. App. 2d 430 (1935) ...................................................... 6

*Gentry v. eBay, Inc.,*
  99 Cal. App. 4th 816 (2002) .................................................. 10

*Graham v. Bank of America,*
  226 Cal. App. 4th 594 (2014) .............................................. 10, 12

*Kim v. Sumitomo Bank,*
  17 Cal. App. 4th 974 (1993) .................................................. 11

*Leeper v. Beltrami,*
  53 Cal. 2d 195 (1959) ....................................................... 6, 14

1237921v2

REPLY IN SUPPORT OF LEPORT DEFENDANTS' DEMURRERS TO PORTIONS OF PLAINTIFF'S
SECOND AMENDED COMPLAINT

*McBride v. Boughton,*
  123 Cal. App. 4th 379 (2004) .......................................................................... 14

*Med. Marijuana, Inc. v. ProjectCBD.com,*
  6 Cal. App. 5th 602 (2016), *as modified on denial of reh'g* (Dec. 19,
  2016) ...................................................................................................................... 7

*Moulton Niguel Water Dist. v. Colombo,*
  111 Cal. App. 4th 1210 (2003) ................................................................. 11, 13

*Nasrawi v. Buck Consultants LLC,*
  231 Cal. App. 4th 328 (2014) ............................................................................ 9

*Pacesetter Homes v. Brodkin,*
  5 Cal. App. 3d 206 (1970) ................................................................................. 12

*People v. Stanley,*
  10 Cal. 4th 764 (1995) ...................................................................................... 11

*Tilbury Constructors, Inc. v. State Comp. Ins. Fund,*
  137 Cal. App. 4th 466 (2006) ............................................................................ 7

*Uhrich v. State Farm Fire & Cas. Co.,*
  109 Cal. App. 4th 598 (2003), *as modified on denial of reh'g* (July 9,
  2003) ...................................................................................................................... 8

**State Statutes**

Cal. Business & Professions Code § 17200 ......................................................... 10

CCP § 430.10(g) .......................................................................................................... 8

**Other Authorities**

Cal. Prac. Guide Civ. Pro. Before Trial Ch. 6-B .................................................. 6

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

I.      <u>INTRODUCTION</u>

Plaintiff's Second Amended Complaint ("SAC") primarily alleges conduct by Defendant Pieter Lukas and the Girn Defendants, yet contains six tortured and defective claims against Defendant Peter Leport, his sister Monica, and his son Francisco.

Plaintiff's Opposition effectively admits that the allegations in the paragraphs of the SAC comprising the six claims alleged against the LePort Defendants are insufficient by arguing that the LePort Defendants' Demurrers ignore the preceding 103 paragraphs of the SAC, which are incorporated by reference into each of those six claims.  But the vast majority of those paragraphs (about sixty of the 103) contain no allegations about the Leport Defendants.  In fact, Monica LePort and Francisco LePort are mentioned only a small handful of times, and those few scattered references do not save the claims.

The first claim for breach of contract and breach of implied covenant of good faith and fair dealing fails because Plaintiff improperly combines two different legal theories in one cause of action (which is a proper ground for demurrer despite Plaintiff's incorrect argument to the contrary).  The second claim for breach of fiduciary duty and aiding and abetting breach of fiduciary duty fails for the same reason, among others.  The twelfth claim for coercion and duress fails because, *as Plaintiff admits*, no such cause of action exists.

The Opposition fails to explain the other fatal defects of the claims against the LePort Defendants in the SAC and makes no showing that amendment could cure the deficient causes of action.  In particular with respect to Monica and Francisco, it is clear Plaintiff cannot state any valid claims.  The Demurrers should be sustained without leave to amend.

/ / /

/ / /

/ / /

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1237921v2

5

II.    THE DEMURRERS SHOULD BE SUSTAINED

    A.    The First Claim for Breach of Contract and Implied Covenant of Good Faith and Fair Dealing Fails as a Matter of Law as to Peter LePort

        1.    The First Claim Improperly Combines Two Legal Theories into a Single Cause of Action

Plaintiff's contention that "no rule exists" requiring him to plead separately different legal theories (Opp. at pp. 5-6) is wrong. Improperly combining legal theories into a single cause of action is grounds for a demurrer. *See Campbell v. Rayburn*, 129 Cal. App. 2d 232, 235 (1954) (holding that "the special demurrer was properly sustained because the complaint was defective in that two purported causes of action were not separately stated"); *Eustace v. Dechter,* 28 Cal. App. 2d 706, 710 (1938) (holding that the "complaint herein is undoubtedly demurrable on the ground of uncertainty and ambiguity, as well as misjoinder of two causes of action . . ."); *see also* Complaints, Cal. Prac. Guide Civ. Pro. Before Trial (Rutter) Ch. 6-B ("Each version of the facts or each legal theory should be pleaded in a separate cause of action in the complaint.") (citing *Campbell*).

Indeed, one of the cases Plaintiff cites in his Opposition, which he apparently did not read, discusses how combining legal theories may be grounds for demurrer. *See Leeper v. Beltrami,* 53 Cal. 2d 195, 202–203 (1959) ("The defendants did not demur on the ground that separate causes of action were not separately stated. Therefore, this ground of demurrer was waived. But the nature of the causes of action must be differentiated because the substantive law differs . . .").

The one case Plaintiff cites for the proposition that he can combine different theories of liability into one cause of action does not so hold. In that case, the court merely held that the one count complaint was sufficient because "it set forth in ordinary and concise language a cause of action for fraud and misapplication of funds in the hands of the receiver, in the perpetration of which fraud the defendant general creditors participated." *Garris v. Mitchell*, 7 Cal. App. 2d 430, 430–431 (1935), cited in Opp. at 5:15-17.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    Here, the two legal theories Plaintiff is improperly trying to combine have

2  different elements and standards.  Plaintiff is wrong that breach of the implied

3  covenant of good faith just requires "less facts" (*see* Opp. at 4:26-27); it requires

4  different facts.  *See Tilbury Constructors, Inc. v. State Comp.  Ins. Fund,* 137 Cal.

5  App. 4th 466, 474 (2006) (holding that a "breach of the implied covenant of good faith

6  and fair dealing involves something beyond breach of the contractual duty itself ...").

7  Thus, Plaintiff must plead the two causes of action separately.

8                    2.    Th First Claim Fails to State Sufficient Facts as to Peter LePort

9    Even if Plaintiff could combine the two different claims into one cause of

10  action, the claim still fails as to Peter LePort (the only LePort Defendant against

11  whom the claim is brought).

12    First, the only allegations in the SAC about the conduct alleged to be a breach

13  – soliciting employees to terminate employment and downloading confidential

14  information – are specifically alleged against the Girn Defendants.  *See* SAC, ¶¶ 88-

15  92.  Plaintiff's Opposition argues that the conclusory allegation in paragraph 107 of

16  the SAC that "all" of the Defendants participated in the conduct is sufficient to allege

17  such conduct against Peter LePort as well.  Opp. at 4:6-9.  But Plaintiff is wrong

18  because "specific allegations in a complaint control over an inconsistent general

19  allegation."  *Med. Marijuana, Inc. v. ProjectCBD.com*, 6 Cal. App. 5th 602, 619

20  (2016), *as modified on denial of reh'g* (Dec. 19, 2016).  There is no allegation that

21  Peter LePort participated in that conduct in the SAC, and specific allegations that it

22  was in fact the Girn Defendants who participated in the conduct alleged to be a

23  breach control over general allegations that all defendants participated.

24    Second, Plaintiff contends in his Opposition that the SAC sufficiently alleged

25  Peter LePort breached a purported oral agreement to pay Defendant Lukas Pieter's

26  bonus.  Opp. at 4.  But the SAC's first cause of action alleges that the defendants

27  breached "written employment and shareholder agreements with LEI . . ." (*see* SAC,

28  ¶ 105); there is no mention of an oral agreement in the first cause of action.  As

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   Plaintiff admits, he must at a minimum plead whether the contract at issue was

2   written or oral to state a claim for breach of contract.  *See* Opp. at 3, *citing* CCP §

3   430.10(g).  Since Plaintiff alleges the breach relates to written agreements (*see* SAC,

4   ¶ 105), stray allegations in the SAC that are incorporated by reference related to an

5   oral agreement cannot save the claim.

6          Third, the Opposition contends that the SAC contains allegations that Peter

7   LePort breached the LEI bylaws by taking corporate actions without the requisite

8   quorum and "fail[ing] to abide by the contractual terms"  Opp. at 4, citing SAC, ¶¶

9   51-52).  But again, the breach of contract cause of action states that Peter LePort

10   (and other Defendants) breached "written employment and shareholder agreements

11   with LEI," not the corporate bylaws.  *See* SAC, ¶¶ 105-108, ¶ 105 (Peter LePort . . .

12   entered into *written employment and shareholder agreements* with LEI . . .")

13   (emphasis added); ¶ 106 ("LEI has performed all of its obligations under these

14   contracts"); ¶ 107 ("Said Defendants, and each of them, *breached the provision of*

15   *their employment and shareholder agreements* with LEI . . .") (emphasis added); ¶ 108

16   ("As  a direct and proximate result of *Defendants' breaches of their employment*

17   *contracts* . . .") (emphasis added).

18          The Defendants (and Court) should not have a duty to scour the pleading to

19   determine all of the potential causes of action therein.  This is why incorporating

20   previous paragraphs by reference is disfavored and "should be avoided as it tends to

21   cause ambiguity and creates redundancy."  *Uhrich v. State Farm Fire & Cas. Co.*, 109

22   Cal. App. 4th 598, 605 (2003), *as modified on denial of reh'g* (July 9, 2003), *citing and*

23   *quoting Kelly v. General Telephone Co.*, 136 Cal. App. 3d 278, 285 (1982).

24          B.   <u>The Second Claim for Breach of Fiduciary Duty and Aiding and</u>
             <u>Abetting Breach of Fiduciary Duty Fails as a Matter of Law as to the</u>
25           <u>LePort Defendants</u>

26          Again, Plaintiff is wrong that he can combine two legal theories into a single

27   cause of action.  *See Campbell*, 129 Cal. App. 2d at 235 (holding that "the special

28   demurrer was properly sustained because the complaint was defective in that two

1    purported causes of action were not separately stated").  The claim for breach of

2    fiduciary duty and aiding and abetting breach fails for that reason alone.

3         In addition, the SAC admits that Monica LePort and Francisco LePort did not

4    become officers until January or February 2016, so they owed no fiduciary duty to

5    Plaintiff before that time.  *See* SAC, ¶¶ 5, 6, 71.  The allegations cited in the

6    Opposition about (a) the purported fraudulent certificate of dissolution (citing SAC, ¶

7    18) and (b) concealing the $5 million loan (citing SAC, ¶ 28), are both alleged to have

8    occurred in 2015 before Monica or Francisco owed any fiduciary duties.  *See* Opp. at

9    6.  Plaintiff also cites Paragraph 47, which merely includes allegations regarding

10   emails and meetings between Lukas Pieter and Peter LePort but does not mention

11   Monica or Francisco.  *See id.*  There is no allegation that Monica or Francisco

12   provided "substantial assistance or encouragement to the third party's breach" or

13   were a substantial factor in causing Plaintiff's harm, which is essential to a claim for

14   aiding and abetting.  *See Nasrawi v. Buck Consultants LLC,* 231 Cal. App. 4th 328,

15   343 (2014); *Casey v. U.S. Bank Nat'l Ass'n,* 127 Cal. App. 4th 1138, 1144 (2005).

16        Furthermore, "an officer or director will not be liable for torts in which he does

17   not personally participate, of which he has no knowledge, or to which he has not

18   consented."  *Frances T. v. Village Green Owners Assn.,* 42 Cal. 3d 490, 503 (1986).

19   While there are some conclusory allegations that the LePort Defendants collectively

20   "conspired to approve" the employment agreements for Lukas Pieter, Peter LePort,

21   and Monica LePort, and had "knowledge of" and "consented to" the Leeds loans (*see*

22   SAC, ¶¶ 50-57), this cannot constitute breach or aiding abetting a breach of fiduciary

23   duty because, again, there is no allegation that Monica or Francisco provided

24   "substantial assistance or encouragement to the third party's breach" or were a

25   substantial factor in causing Plaintiff's harm.

26        The claim is deficient as to all the LePort Defendants; but at a minimum fails

27   to allege sufficient facts to state a claim as to Monica and Francisco LePort.

28

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

C.    The Eighth Cause of Action for Violation of Business & Professions Code Section 17200 Fails as a Matter of Law as to the LePort Defendants

The eighth claim for violation of Business & Professions Code § 17200 incorporates the other allegations in the SAC against "all defendants" by reference and requests injunctions relating to conduct alleged by the Girn Defendants only. Plaintiff's Opposition argues that the claim incorporates all the other unfair practices alleged in the SAC, and therefore admits the demurrer to this claim should be sustained to the extent demurrers are sustained as to the other claims alleged against the LePort Defendants.  *See* Opp. at 7:15-25.

D.    The Tenth Cause of Action for Intentional Misrepresentation Fails as a Matter of Law as to Peter LePort

Peter LePort's statement that LEI was "flourishing" is a non-actionable opinion that cannot be the basis of an intentional misrepresentation claim.  Plaintiff's Opposition asserts that such a determination cannot be made on demurrer, but Plaintiff is wrong. *See Graham v. Bank of America,* 226 Cal. App. 4th 594, 605 (2014) (affirming the sustaining of a demurrer to fraud claim without leave to amend and holding that lender's statements that value of property was increasing and that home could soon be resold for profit or refinanced to obtain better terms were statements of opinion or predictions of future events, and thus were not actionable fraud); *Cansino v. Bank of America*, 224 Cal. App. 4th 1462, 1469 (2014) (affirming the sustaining of a demurrer without leave to amend and holding that lender's representations that home would continue to appreciate and that homeowners could then sell home or refinance were predictions about future market conditions, rather than statements of fact, and thus were not actionable fraud); *Gentry v. eBay, Inc.,* 99 Cal. App. 4th 816, 835 (2002) (affirming the sustaining of a demurrer to negligent misrepresentation because "taking as true the fact eBay makes the statement on its Web site that a positive eBay rating is 'worth its weight in gold,' such an assertion cannot support a cause of action for negligent misrepresentation regardless of federal statutory immunity because it amounts to a general statement of opinion, not a positive

1237921v2

10

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   assertion of fact."); *Chavez v. Citizens for a Fair Farm Labor Law,* 84 Cal. App. 3d 77

2   (1978) (affirming the sustaining of demurrer because the statements "were

3   statements of opinion which were not subject to legal challenge as false and

4   misleading statements of fact"); *see also Anunziato v. eMachines, Inc.,* 402 F. Supp.

5   2d 1133, 1139-42 (C.D. Cal. 2005) ("Generalized, vague, and unspecified assertions

6   constitute 'mere puffery' upon which a reasonable consumer could not rely, and hence

7   are not actionable." (citations omitted); holding that manufacturer's references to

8   quality, reliability, and performance, in user manual, were non-actionable puffery on

9   motion to dismiss); *McKinney v. Google, Inc.*, 2011 WL 3862120, at *6 (N.D. Cal.,

10  Aug. 30, 2011) (dismissing claims where plaintiff "has only identified statements

11  from a T–Mobile sales representative that the phone had 3G speed and 'was essential

12  for web surfing and email,' which, even if they were attributable to Defendants,

13  would appear to be non-actionable puffery.") (citations omitted).

14          Plaintiff also cites no case holding statements that a business is "flourishing"

15  (or similar types of assertions) constitute actionable fraud, even where the speaker

16  has special knowledge.  *See* Opp. at 8; *Moulton Niguel Water Dist. v. Colombo*, 111

17  Cal. App. 4th 1210, 1215 (2003) ("Contentions are waived when a party fails to

18  support them with reasoned argument and citations to authority"); *People v. Stanley*,

19  10 Cal. 4th 764, 793 (1995) ("[E]very brief should contain a legal argument with

20  citation of authorities on the points made.  If none is furnished on a particular point,

21  the court may treat it as waived"); *Kim v. Sumitomo Bank*, 17 Cal. App. 4th 974, 979

22  (1993) ("This court is not required to discuss or consider points which are not argued

23  or which are not supported by citation to authorities or the record").[1]

24  _____

25  [1] The only case Plaintiff cites in his Opposition does not apply here.  That case did
    not involve statements about a business "flourishing" or anything similar; it involved

26  a "wildly exaggerated" approximation of square footage by an owner of property,
    which the court held could possibly constitute a fraudulent statement since the

27  owner had possessed special knowledge of the size of the property, and so the issue
    was a question of fact for the jury.  *Furla v. Jon Douglas Co.,* 65 Cal. App. 4th 1069,

28  1069–1070 (1998).

    1237921v2

1    In fact, courts routinely hold that statements similar to those alleged in the

2    SAC (that LEI was "flourishing") do not constitute fraud, even where the speaker

3    possessed special knowledge about the topic.  *See* LePort Defendants' Demurrers at

4    pp. 16-17 and cases cited therein; *see also Graham,* 226 Cal. App. 4th at 605 (holding

5    that lender's statements that value of property was increasing and that home could

6    soon be resold for profit or refinanced to obtain better terms were statements of

7    opinion or predictions of future events, and thus were not actionable fraud); *Cansino*,

8    224 Cal. App. 4th at 1469 (holding that lender's representations that home would

9    continue to appreciate and that homeowners could then sell home or refinance were

10   predictions about future market conditions, rather than statements of fact, and thus

11   were not actionable fraud); *Pacesetter Homes v. Brodkin*, 5 Cal. App. 3d 206, 211-12

12   (1970) (affirming trial court's determination that statements by vendor of duplex

13   buildings that they would be an excellent investment "[i]f you receive the rents as we

14   contemplate" were non-actionable opinion statements).

15   Finally, Plaintiff's Opposition claims "the SAC alleges that Peter Leport falsely

16   stated that LEI's share price was $1.90 . . ."  Opp. at 8:5, *citing* SAC, ¶¶ 25-26.  But

17   that's not what the SAC alleges in paragraphs 25 through 26.  Plaintiff merely

18   alleges that years after Peter Leport represented that the share price was $1.90,

19   Plaintiff received financial information that disclosed an alleged discrepancy in share

20   price at that time.  *See id.*, ¶ 26.  Plaintiff does not allege that Peter made any

21   knowing misrepresentations about the share price being $1.90 when such

22   representations were made.  *See* SAC, ¶¶ 25-26.

23   E.    The Eleventh Claim for Intentional Concealment Fails as a Matter of
          Law as to the LePort Defendants

24   The eleventh cause of action does not specifically plead what material facts

25   were allegedly concealed by whom, and instead contains only conclusory allegations

26   that fraudulent concealment occurred.  *See* SAC, ¶¶ 186-191.

27

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

In Plaintiff's Opposition he claims that other scattered paragraphs of the SAC contain the specific facts required to state a cause of action for intentional concealment, but those allegations do not meet the requisite pleading standard either, and in particular do not state sufficient facts regarding Monica or Francisco to constitute intentional concealment.

The SAC admits that Monica LePort and Francisco LePort did not become officers until January or February 2016, and does not allege that they owed duties to Plaintiff before that time. *See* SAC, ¶¶ 5, 6, 71. Thus, Plaintiff's citation to allegations relating to purported concealments in 2014 and 2015 cannot possibly state a claim against Monica or Francisco. *See* Opp. at 9, *citing* SAC, ¶¶ 25, 28.

Furthermore, officers are not automatically liable for the company's torts. "[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented." *Frances T.,* 42 Cal. 3d at 503.

Plaintiff's Opposition also contends that paragraphs 45, 48, and 52 adequately allege intentional concealments by the LePort Defendants (*see* Opp. at 9), but paragraph 45 contains a single conclusory allegation that the terms of certain loans were "concealed by the LePort Defendants" which is insufficient to state a fraud claim against Monica or Francisco; paragraph 48 does not even contain a conclusory allegation against the LePort Defendants but contains allegations against Peter LePort and Lukas Pieter only; and paragraph 52 discusses compensation agreements but alleges no concealment by any defendant.

There is also no allegation that Monica or Francisco concealed information with an intent to defraud Plaintiff, and Plaintiff does not argue that there is such an allegation in his Opposition. *See, e.g., Moulton Niguel Water Dist.*, 111 Cal. App. 4th at 1215 ("Contentions are waived when a party fails to support them with reasoned argument and citations to authority").

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1237921v2

REPLY IN SUPPORT OF LEPORT DEFENDANTS' DEMURRERS TO PORTIONS OF PLAINTIFF'S
SECOND AMENDED COMPLAINT

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

F.      <u>The Twelfth Claim for Duress and Coercion Fails as a Matter of Law as to the LePort Defendants</u>

There is no cause of action in California for "Duress and Coercion." Plaintiff's Opposition concedes this, but argues that he can allege a cause of action that does not exist because he "alleged facts supporting a theory of restitution" and the labeling of the cause of action is not a ground for demurrer. *See* Opp. at 10:19-23.

Plaintiff is wrong that he can state a non-existent cause of action. The cases cited in the Opposition do not support his flawed theory, and in fact support the LePort Defendants' position that the claim fails. *See McBride v. Boughton*, 123 Cal. App. 4th 379, 387, 392 (2004) (holding that "unjust enrichment" is not a cause of action and "[a]ccordingly, we conclude that the trial court properly sustained respondents' demurrer to McBride's cause of action alleging unjust enrichment."); *Leeper v. Beltrami*, 53 Cal. 2d 195, 203-204 (1959) (holding that a cause of action cannot be established when the party claiming duress had reasonably available alternatives to submitting to the duress).

III.    CONCLUSION

The LePort Defendants respectfully request that the Court sustain their Demurrers to the First, Second, Eighth, Tenth, Eleventh, and Twelfth Causes of Action in the SAC, without leave to amend.

DATED: August 12, 2019              ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP

By: _____
    JULIE Z. KIMBALL
    Attorneys for Defendants Peter LePort, M.D.,
    Monica LePort, Francisco LePort

## PROOF OF SERVICE

**Barney v. LePort, et al.**
**Case No. 30-2018-01006531**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California.  My business address is 10345 W. Olympic Blvd., Los Angeles, CA 90064.

On August 12, 2019, I served true copies of the following document(s) described as **REPLY IN SUPPORT OF PETER LEPORT, M.D., MONICA LEPORT, AND FRANCISCO LEPORT'S DEMURRERS TO PORTIONS OF PLAINTIFF'S SECOND AMENDED COMPLAINT** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY OVERNIGHT DELIVERY:**  I enclosed said document(s) in an envelope or package provided by the overnight service carrier and addressed to the persons at the addresses listed in the Service List.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight service carrier or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 12, 2019, at Los Angeles, California.

_____
Tracey N. Perkins

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1237921v2

i

REPLY IN SUPPORT OF LEPORT DEFENDANTS' DEMURRERS TO PORTIONS OF PLAINTIFF'S
SECOND AMENDED COMPLAINT

**SERVICE LIST**
**Barney v. LePort, et al.**
**Case No. 30-2018-01006531**

James P. Carter, Esq.
Jonathan P. Schmidt, Esq.
Jackson Lewis P.C.
200 Spectrum Center Dr., Suite 500
Irvine, CA 92618
E-mail: james.carter@jacksonlewis.com;
jonathan.schmidt@jacksonlewis.com
*Attorneys for Plaintiffs Carl Barney, as*
*Trustee of the Carl Barney Living Trust;*
*and LePort Educational Institute, Inc.*

Douglas Barritt, Esq.
Barritt Smith LLP
2601 Main Street, Ste. 530
Irvine, CA 92614
E-mail: dbarritt@barrittsmith.com
*Attorneys for Defendant and Cross-*
*Complainant Lukas Pieter*

Rebecca Girn
c/o Higher Ground Education, Inc.
10 Orchard Road, Ste. 200
Lake Forest, CA 92630
*Defendant in Pro Per*

Ramandeep Girn
c/o Higher Ground Education, Inc.
10 Orchard Road, Ste. 200
Lake Forest, CA 92630
*Defendant in Pro Per*

Cogency Global
850 New Burton Rd., Room 201
Dover, DE 19901
*Registered Agent for Defendant Higher*
*Ground Education. Inc.*

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1237921v2

REPLY IN SUPPORT OF LEPORT DEFENDANTS' DEMURRERS TO PORTIONS OF PLAINTIFF'S
SECOND AMENDED COMPLAINT

# EXHIBIT 18

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CIVIL COMPLEX CENTER**

**MINUTE ORDER**

DATE: 08/19/2019                TIME: 09:00:00 AM            DEPT: CX103

JUDICIAL OFFICER PRESIDING: Ronald L. Bauer
CLERK:  Ka Po Chung-Marquez
REPORTER/ERM: Glenn Miller CSR# 12265
BAILIFF/COURT ATTENDANT:  Gracie Valenzuela

CASE NO: **30-2018-01006531-CU-FR-CJC**  CASE INIT.DATE: 07/18/2018
CASE TITLE: **Carl Barney, as Trustee of the Carl Barney Living Trust vs. Pieter**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Fraud

EVENT ID/DOCUMENT ID: 73092482

**EVENT TYPE**: Demurrer to Amended Complaint
MOVING PARTY: PETER LePORT, M.D., MONICA LePORT, FRANCISCO LePORT
CAUSAL DOCUMENT/DATE FILED: Demurrer to Amended Complaint, 07/22/2019

**APPEARANCES**
Julie Z. Kimball, from Elkins Kalt Weintraub Reuben Gartside LLP, present for Defendant(s).
James P. Carter, from Jackson Lewis P. C, present for Cross - Defendant,Plaintiff(s).

The Court having fully considered the arguments of all parties, both written and oral, as well as the
evidence presented, now rules as follows:

The Court orders Defendants', Peter LePort, M.D., Monica LePort, and Francisco LePort Demurrers to
Plaintiff's Second Amended Complaint overruled.

Defendants have 10 days to file an answer.

Parties waive notice.

EXHIBIT 19

MARK MERMELSTEIN (STATE BAR NO. 208005)
mmermelstein@orrick.com
MONA S. AMER (STATE BAR NO. 187090)
mamer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA  90017-5855
Telephone:    +1 213 629 2020
Facsimile:    +1 213 612 2499

Attorneys for Defendants Ramandeep Girn, Rebecca
Girn, and Higher Ground Education, Inc.

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**08/21/2019** at 08:42:00 PM

Clerk of the Superior Court
By Sarah Loose, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

| | |
|---|---|
| CARL BARNEY, AS TRUSTEE OF THE CARL BARNEY LIVING TRUST,<br><br>                    Plaintiff,<br><br>          v.<br><br>LUKAS PIETER, PETER LEPORT, M.D., MONICA LEPORT, FRANCISCO LEPORT, RAMANDEEP GIRN, REBECCA GIRN, HIGHER GROUND EDUCATION, INC. and DOES 4 through 50, inclusive,<br><br>                    Defendants. | CASE NO.:   30-2018-01006531<br>[Unlimited Jurisdiction]<br>Assigned for all purposes to the<br>Hon. Ronald Bauer, Dept. CX103<br><br>Action Filed: July 18, 2018<br>Trial Date:     None set<br><br>**DECLARATION OF MARK MERMELSTEIN IN SUPPORT OF DEFENDANTS RAMANDEEP GIRN, REBECCA GIRN, AND HIGHER GROUND EDUCATION, INC.'S NOTICE OF MOTION AND MOTION QUASH SUMMONS AND MOTION TO STRIKE;** |
| LUKAS PIETER, an individual,<br><br>                    Cross-Complainant,<br>          v.<br><br>LEPORT EDUCATIONAL INSTITUTE, INC., a California corporation, and ROES 1 through 20, inclusive,<br><br>                    Cross-Defendants. | Date:    September 16, 2019<br>Time:   9:00 a.m.<br>Dept.:   CX103<br>Place:   700 Civic Center Drive West<br>              Santa Ana, CA 92701 |

DECLARATION OF MARK MERMELSTEIN ISO MOTION TO STRIKE AND QUASH

## <u>DECLARATION OF MARK MERMELSTEIN</u>

I, Mark Mermelstein, declare as follows:

     1.     I am a member of the State Bar of California and am a partner in the law firm of Orrick, Herrington & Sutcliffe LLP. I have personal knowledge of the facts set forth herein, and if called as a witness, could and would testify competently to those facts.

     2.     I am counsel of record for defendants Ramandeep and Rebecca Girn, and Higher Ground Education, Inc. (collectively, the "Girn Defendants"). This declaration is made in support of the Girn Defendants' Motion to Strike.

     3.     Attached hereto as Exhibit A is a true and correct copy of a November 17, 2016 demand letter received from Plaintiff.

     4.     Attached hereto as Exhibit B is a true and correct copy of a draft complaint Plaintiff sent to the Girn Defendants in March 2017.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 21st day of August 2019, at Los Angeles, California.

\s\
Mark Mermelstein

1

DECLARATION OF MARK MERMELSTEIN ISO MOTION TO STRIKE AND QUASH

EXHIBIT A



**Stradling**
Attorneys at Law

**STRADLING YOCCA CARLSON & RAUTH, P.C.**
660 NEWPORT CENTER DRIVE, SUITE 1600
NEWPORT BEACH, CA 92660-6422
SYCR.COM

*CALIFORNIA*
  NEWPORT BEACH
  SACRAMENTO
  SAN DIEGO
  SAN FRANCISCO
  SANTA BARBARA
  SANTA MONICA
*COLORADO*
  DENVER
*NEVADA*
  RENO
*WASHINGTON*
  SEATTLE

KARLA KRAFT
949.725.4060
KKRAFT@SYCR.COM

November 17, 2016

**Via Email**                                                    **Privileged & Confidential**

Larry Kane, Esq.
Michael D. Weil, Esq.
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
lkane@orrick.com
mweil@orrick.com

Mr. Guy Barnett
guyusj@hotmail.com

Re:     *LePort Educational Institute, Inc.'s Demand to Ramandeep Girn, Rebecca Girn, Guy Barnett; Offer of Compromise*

Dear Sirs:

This firm represents the Carl Barney Living Trust (the "Trust") and LePort Educational Institute, Inc. ("LEI") (collectively, the "Claimants"). I write concerning the unlawful conduct by Ramandeep "Ray" Girn, Rebecca Girn, and Guy Barnett (collectively, the "Respondents"), which has resulted in significant harm to Claimants. Claimants continue to investigate the extent of wrongdoing and whether other individuals—including, but not limited to, Lindsay Journo, Cornelia Lockitch, Jane Erickson, and Matthew Batemen—also are liable. The wrongdoing revealed to date gives rise to several causes of action against Respondents, including breach of fiduciary duty, professional negligence, and breach of contract. As described below, following malfeasance during their tenures with LEI, Respondents effectively looted the company's major assets—its key people and its proprietary information—for the purpose of forming a competing venture. Respondents' campaign of deception, mismanagement and betrayal has rendered LEI a virtual shell of its former self, and has decimated LEI's value to the detriment of the Trust and other LEI shareholders. Claimants' damages exceed $10 million, and Respondents' most egregious conduct warrants punitive damages. For the reasons described below, Claimants demand that Respondents immediately cease and desist from ongoing violations and take other corrective action. If Respondents comply with Claimants' demands by December 7, 2016, Claimants are willing to forego formal legal action. Absent a satisfactory resolution, Claimants will be forced to take such action against Respondents,

Larry Kane, Esq.
Michael D. Weil, Esq.
Orrick, Herrington & Sutcliffe LLP
November 17, 2016
Page Two

and any other liable parties identified through their ongoing investigation or civil discovery, to enforce their rights and remedies.  This communication is made pursuant to Cal. Evidence Code § 1152, Federal Rule of Evidence 408, and any similar applicable privilege.

### A.  Respondents Breached Their Fiduciary Duties to Claimants.

Corporate officers owe the company and its shareholders fiduciary duties, including the duties of care and loyalty.  *See L.A. Mem'l Coliseum Com. v. Insomniac, Inc.*, 233 Cal. App. 4th 803, 834 (2015).  A company's General Counsel also owes fiduciary duties.  *See Yanez v. Plummer*, 221 Cal. App. 4th 180, 189 (2013).  Mr. Girn is LEI's former CEO, Mrs. Girn its former Vice President, Secretary and General Counsel, and Mr. Barnett its former CFO.  During their tenures as officers, and Mr. Girn's tenure as a director, Respondents violated their fiduciary duties to LEI, Mr. Barney, and the company's other shareholders in at least three ways.

First, Respondents breached their fiduciary duties of care and loyalty by conspiring to hire at least four employees who they knew were not legally authorized to work in the United States, exposing LEI to criminal penalties under 8 U.S.C. § 1324a(a).  Respondents tried to conceal this unlawful conduct by paying the undocumented employees in gift cards and cash in lieu of a salary, paying the legal spouse of an undocumented employee instead of the employee himself, and clandestinely paying at least one of the employees out of an ostensible bonus payment to Mr. Barnett. In the case of at least one of the employees, the unlawful compensation arrangement appears to have lasted a full year or more.  Due to Respondents' concealment, the other members of LEI's board of directors and senior management were until recently unaware of this misconduct, which came to light as part of a due diligence process for a financing transaction with Leeds Equity Partners ("Leeds"). Leeds now alleges that these immigration-related violations caused LEI to be in default under the August 19, 2015 Note Purchase Agreement between the parties and an event of default under the Convertible Senior Secured Note issued thereunder, as well as several amendments to the Note Purchase Agreement and the Convertible Senior Secured Note, in which Respondents caused LEI to breach a series of representations contained in the Note Purchase Agreement and amendments.  As a result of Respondents' violations, LEI is incurring costs in connection with two lawsuits commenced by Leeds, and may be liable for default interest on the aggregate principal amount of the Convertible Senior Secured Note and amendments thereto at an annual rate of 20%, attorneys' fees, and transaction costs with Leeds.  LEI also was forced to obtain a bridge loan due to delays in obtaining longer term financing caused by the discovery of Respondents' illegal and unauthorized actions, and to conduct an I-9 investigation.  LEI's damages in this regard exceed $1 million at the present time.

Second, Mrs. Girn breached her fiduciary duty of care in failing to complete the fundamental task of converting LEI from a California corporation to a Delaware corporation.  During May 2014, Mrs. Girn filed a certificate of incorporation in Delaware for the new Delaware corporation, and filed a certificate of dissolution of LEI in California.  However, Mrs. Girn knowingly made several false statements in the certificate, including, but not limited to, the statement that the board of directors of LEI had authorized the dissolution.  As a result of this misconduct, LEI's assets never properly transferred or vested in the Delaware entity.  Mrs. Girn concealed this from the board of directors and other members of senior management.  As a result, when LEI entered into the first Note Purchase

Larry Kane, Esq.
Michael D. Weil, Esq.
Orrick, Herrington & Sutcliffe LLP
November 17, 2016
Page Three

Agreement with Leeds in August 2015, **its basic representations and warranties concerning its corporate existence and authorized capital stock were incorrect**. As a consequence of these misrepresentations, LEI is incurring costs in connection with two lawsuits commenced by Leeds and may be liable for default interest on the aggregate principal amount of the Convertible Senior Secured Note and amendments thereto at an annual rate of 20%, attorney's fees and transaction costs. LEI's damages in this regard are increasing on a daily basis and, if Leeds succeeds in any of its claims, will be substantial.

Third, Respondents breached their fiduciary duties by forming the competing venture Higher Ground Education and soliciting LEI employees to join it. In late 2015, while he was still CEO of LEI, Mr. Girn first revealed his disloyalty by proposing to reallocate the share of profits of LEI from its shareholders to himself by proposing that an entity owned and controlled by him would manage the schools owned by LEI and be paid an exorbitant management fee for operating these schools, and then demanding to present this self-dealing plan to all employees of LEI. In the same time frame, Mr. Girn expressly threatened to solicit key employees of LEI to join a new entity that he would form to compete with LEI, despite the express non-solicitation clauses in Respondents' Employment Agreements. LEI has now confirmed that Respondents followed through on Mr. Girn's threats. One obvious example: Mr. Barnett solicited an LEI employee via e-mail on or around March 2, 2016.

Since Mr. Girn's initial threats, Respondents have led a mass exodus of at least 20 employees—including key executives such as Ms. Journo, Ms. Lockitch, Ms. Erickson, and Mr. Batemen—from LEI to Higher Ground Education, crippling LEI's operations and leaving it with expenses that have caused significant operating losses. Claimants' damages in this regard exceed $10 million at the present time. Respondents' misconduct—including but not limited to misrepresentations Mr. Girn made to Mr. Barney to induce the Trust's investment in the company— also resulted in significant erosion of shareholder value. Mr. Barney estimates that the Trust's losses alone are in the millions of dollars and he intends to pursue the Trust's personal claims against Mr. Girn.

A "breach of fiduciary duty" arising from "a conscious disregard is precisely the type of tortious conduct that an award of punitive damages is designed to deter." *Hobbs v. Bateman Eichler, Hill Richards*, 164 Cal. App. 3d 174, 196, 210 (1985) (upholding punitive damages award of more than twice the amount of compensatory damages). Respondents exhibited a conscious disregard for LEI's best interests in intentionally and surreptitiously causing LEI to violate immigration-related laws, causing LEI to make fundamental misrepresentations and warranties in its agreements with Leeds, and soliciting employees to join a competing venture in violation of express legal duties to LEI. As a consequence of the flagrant and intentional nature of Respondents wrongful acts and omissions, it is likely that a court will award punitive damages, among other relief, to LEI, the Trust and LEI's other shareholders.

### B. As Officers, Respondents Cannot Avail Themselves of the Business Judgment Rule.

Respondents are not able to rely on the business judgment rule as a defense to such egregious breaches of fiduciary duty. Moreover, the business judgment rule is inapplicable as a matter of law.

Larry Kane, Esq.
Michael D. Weil, Esq.
Orrick, Herrington & Sutcliffe LLP
November 17, 2016
Page Four

"California's statutory [business judgment rule] does not extend its protection to corporate officers." *FDIC v. Perry*, No. CV 11-5561-ODW (MRWx), 2011 U.S. Dist. LEXIS 143222, at *10 (C.D. Cal. Dec. 13, 2011) (citing Cal. Corporations Code § 309). Indeed, the business judgment rule "does not protect officers' corporate decisions." *Id.* at *14 (surveying state case law and denying defendants' motion to dismiss breach of fiduciary duty claims against corporate officers). Respondents' actions transcend negligence that may be protected by the business judgment rule due to their intent to violate applicable law as well as the intent to engage in self-dealing to the detriment of LEI, Mr. Barney and LEI's other shareholders.

### C. As LEI's General Counsel, Rebecca Girn, Committed At Least Three Forms Of Malpractice.

"The elements of a cause of action in tort for professional negligence are (1) the duty of the professional to use such skill, prudence, and diligence as other members of her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Budd v. Nixen*, 6 Cal. 3d 195, 200 (1971). A company may bring a claim of professional negligence against its general counsel. *See Yanez v. Plummer*, 221 Cal. App. 4th 180 (2013). Mrs. Girn committed several instances of professional negligence in her capacity as LEI's General Counsel.

As first described above, Mrs. Girn, who also managed LEI's human resources activities, knowingly facilitated illegal activity in hiring and improperly paying employees lacking the required immigration status, instead of informing officers and directors of LEI who were not involved in the scheme. Her actions exposed LEI to criminal liability under federal law and caused LEI to breach representations made by it in the Note Purchase Agreement, which representations Ms. Girn had reviewed and approved in her position as LEI's General Counsel.

Second, Mrs. Girn negotiated Mr. Girn's and her own employment agreements with LEI, in direct conflict with her duties to LEI as General Counsel.

Third, Mrs. Girn advised Dr. LePort on the transfer of LEI shares owned by him to Mr. Girn, her husband, in direct conflict with her duties to LEI as its General Counsel. LEI is entitled to file a complaint with the California State Bar concerning Mrs. Girn's malpractice. LEI's damages in this regard also exceed $1 million at the present time.

### D. Respondents Breached Their Employment Agreements And Appear To Be Misappropriating LEI's Proprietary Information.

Paragraph 12 of Respondents' Employment Agreements states: "Non-Solicitation of Employees. During the term of the Executive's employment with the Company **and for a period of 24 months following the Executive's Termination Date**, the Executive shall not directly or indirectly solicit any other employee of the Company to terminate his or her employment with the Company." (Emphasis added.) As described above, Respondents were soliciting LEI employees

Larry Kane, Esq.
Michael D. Weil, Esq.
Orrick, Herrington & Sutcliffe LLP
November 17, 2016
Page Five

potentially as early as December 2015, and certainly at or around the time that they left LEI.
Claimants expect to uncover additional solicitation as their investigation continues and when they
conduct discovery in a civil action against Respondents.

Additionally, Respondents are believed to have breached the confidentiality and assignment
provisions of their employment agreements and of LEI's Shareholder's Agreement by retaining and
misusing LEI's confidential and proprietary information in connection with establishing Higher
Ground Education, their competing venture. Additionally, LEI is informed and believes that
Respondents are using LEI's intellectual property without authorization. Ms. Journo and LEI are
parties to an Intellectual Property Agreement dated September 8, 2011 in which Ms. Journo agreed to
transfer all Intellectual Property (as broadly defined in that agreement) owned by her as of the
effective date to LEI in exchange for an irrevocable, perpetual royalty-free license for Ms. Journo to
use this Intellectual Property. However, Ms. Journo further agreed that all Intellectual Property she
created after September 8, 2011 as part of her employment is owned by LEI and that she has no right
to use this Intellectual Property. Upon information and belief, Respondents misappropriated
Intellectual Property owned by LEI for the benefit of Higher Ground Education. LEI's investigation
of this issue is ongoing.

**E. Claimants' Demands**

Given the long history between the parties, and a preference to move forward past these
disruptive and distressing events, Claimants may be willing to forego a lawsuit provided that
Respondents comply with the following demands:

- Respondents shall return all of their shares of LEI stock to Dr. LePort and to LEI and
  forfeit all of their actual or asserted rights, including but not limited to warrants, to
  acquire equity interests in LEI or any subsidiary or affiliate of LEI;

- Respondents shall agree to restrict the locations served by Montessori schools
  operated by Higher Ground Ventures so that such schools are not proximate to LEI's
  schools;

- Respondents shall agree not to provide services to schools located proximate to LEI's
  schools; and

- Respondents shall cease and desist using LEI's confidential information and
  Intellectual Property.

Unless the preceding four demands are fully and completely addressed **within twenty (20)
days** of the date this letter, LEI and/or the Trust will commence one or more actions against
Respondents in the appropriate court to recover more than $10 million in damages and obtain all
other remedies and relief, including but not limited to an award of punitive damages, to redress the
many wrongful acts and omissions of Respondents.

Larry Kane, Esq.
Michael D. Weil, Esq.
Orrick, Herrington & Sutcliffe LLP
November 17, 2016
Page Six

This letter is not intended to be a complete and exhaustive list of Claimants' causes of action and claims for damages. Claimants expressly reserve all of their rights and remedies.

Very truly yours,

Karla Kraft
STRADLING YOCCA CARLSON & RAUTH, P.C.

EXHIBIT B

1  Ronald S. Hodges – Bar No. 150586
   J. Ronald Ignatuk – Bar No. 150737
2  Samuel J. Romero – Bar No. 232824
   **SHULMAN HODGES & BASTIAN LLP**
3  100 Spectrum Center Drive, Suite 600
   Irvine, California 92618
4  Telephone:    (949) 340-3400
   Facsimile:    (949) 340-3000
5  Email:    RHodges@shbllp.com; RIgnatuk@shbllp.com;
             SRomero@shbllp.com
6
   Attorneys for Plaintiffs LePort Educational
7  Institute, Inc. and Carl Barney

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                  **FOR THE COUNTY OF ORANGE**

10                    **CENTRAL JUSTICE CENTER**

11  LEPORT   EDUCATIONAL   INSTITUTE,   | Case No.
    INC.  AND  CARL  BARNEY  IN  HIS     |
12  CAPACITY  AS  THE  TRUSTEE  OF  THE  | **COMPLAINT FOR:**
    CARL BARNEY LIVING TRUST            |
13                                       | **(1)    BREACH OF EMPLOYMENT**
14              **PLAINTIFFS,**          |          **CONTRACT;**
                                         | **(2)    BREACH OF FIDUCIARY DUTY;**
    vs.                                  | **(3)    AIDING AND ABETTING BREACH**
15                                       |          **OF FIDUCIARY DUTY;**
    HIGHER GROUND EDUCATION, INC.,       | **(4)    MISAPPROPRIATION OF TRADE**
16  A DELAWARE COPORATION,               |          **SECRETS;**
    RAMANDEEP GIRN, GUY BARNETT,         | **(5)    CONVERSION;**
17  MATTHEW BATEMEN, JANE                | **(6)    TORTIOUS INTERFERENCE**
    ERICKSON, REBECCA GIRN, LINDSAY      |          **WITH CONTRACTUAL**
18  JOURNO, CORNELIA LOCKITCH AND        |          **RELATIONS;**
    DOES 1 THROUGH 50, INCLUSIVE,        | **(7)    INTENTIONAL INTERFERENCE**
19                                       |          **WITH PROSPECTIVE ECONOMIC**
20              **DEFENDANTS.**          |          **ADVANTAGE;**
                                         | **(8)    LEGAL MALPRACTICE;**
21                                       | **(9)    UNFAIR COMPEITION;**
                                         | **(10)   DISGORGEMENT OF SALARY**
22                                       |          **AND BENEFITS;**
                                         | **(11)   NEGLIGENCE;**
23                                       | **(12)   NEGLIGENCE;**
                                         | **(13)   NEGLIGENCE;**
24                                       | **(14)   INTENTIONAL**
                                         |          **MISREPRESENTATION;**
25                                       | **(15)   INTENTIONAL CONCEALMENT**
                                         |          **OF MATERIAL FACTS; AND**
26                                       | **(16)   NEGLIGENT**
                                         |          **MISREPRESENTATION.**
27                                       | [Amount demanded exceeds $25,000.00]
28                                       | **[DEMAND FOR JURY TRIAL]**

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

                    **COMPLAINT**

1  Comes now Plaintiffs LePort Educational Institute, Inc. and Carl Barney, in his capacity

2  as the trustee for The Carl Barney Living Trust, who complain and allege against Defendants

3  Higher Ground Education, Inc., Ramandeep Girn, Rebecca Girn, Guy Barnett, Matthew

4  Batemen, Jane Erickson, Lindsay Journo, Cornelia Lockitch and Does 1 through 50, inclusive, as

5  follows:

6  **PRELIMINARY STATEMENT**

7  This action is brought by an employer against its faithless former executives and other

8  employees, some of whom not only mismanaged the business, and as to one employee,

9  committed legal malpractice, but while still employed, all of whom conspired to establish a

10  competing business, solicited their employer's key executives in breach of their fiduciary and/or

11  common law duties and in violation of their employment agreements and misappropriated their

12  employer's trade secret, confidential and proprietary information.  Defendants' actions have and

13  continue to irreparably damage their former employer and the damages alleged herein

14  approximate or exceed $50 million and continue to accrue.  This action is also brought by an

15  investor and creditor who was fraudulently induced by one of the defendants named herein to

16  invest and loan in excess of $5 million.

17  **THE PARTIES**

18  1.  Plaintiff LEI LePort Educational Institute, Inc. ("LEI") is a corporation duly

19  organized and existing under and by virtue of the laws of the State of California.

20  2.  Plaintiff Carl Barney ("Barney") is the trustee of The Carl Barney Living Trust

21  (the "Trust") which is duly organized under the laws of the State of Nevada.

22  3.  Defendant Higher Ground Education, Inc. ("HGE") is a corporation organized

23  and existing under the laws of the State of Delaware.

24  4.  Defendant Ramandeep Girn a/k/a Ray Girn ("Ray Girn") is an individual who

25  resides in the County of Orange, State of California.  Ray Girn was the Chief Executive Officer

26  of LEI and a member of LEI's Board of Directors from July 2009 until February 2, 2016.

27  5.  Defendant Rebecca Girn ("Rebecca Girn") is an individual who resides in the

28  County of Orange, State of California.  Rebecca Girn is an attorney licensed to practice law in

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

1

**COMPLAINT**

the State of California.  Rebecca Girn was LEI's Vice President, Secretary and General Counsel from October 2010 until February 2016.

6.      Defendant Guy Barnett ("Barnett") is an individual who resides in the County of Orange, State of California.  Barnett was LEI's Chief Operating Officer from June 2014 until February 2016.

7.      Defendant Matthew Bateman ("Bateman") is an individual who resides in the County of Orange, State of California.  Bateman was LEI's curriculum director from June 2014 until February 2016.

8.      Defendant Jane Erickson ("Erickson") is an individual who resides in the County of Orange, State of California.  At all times relevant Erickson was LEI's Vice President of Academics.

9.      Defendant Lindsay Journo ("Journo") is an individual who resides in the County of Orange, State of California.  At all times relevant Journo was LEI's executive program developer and was a member of LEI's Board of Directors.

10.     Defendant Cornelia Lockitch ("Lockitch") is an individual who resides in the County of Orange, State of California.  At all times relevant Lockitch was LEI's Senior Montessori Coordinator.

11.     The true names and capacities, whether individual, corporate, associate or otherwise of Defendants named herein as Does 1 through 50, inclusive, are unknown to LEI, who therefore sues said Defendants by such fictitious names.  LEI is informed and believes and thereon alleges that each of the Defendants designated herein as a fictitiously named Defendant is in some manner responsible for the events and happenings herein referred to, either contractually or tortiously, and caused the damage to LEI as alleged herein.  When LEI ascertains the true names and capacities of Does 1 through 50, inclusive, it will amend this Complaint by setting forth the same.

12.     LEI is informed and believes and thereon alleges that Defendants, and each of them, conspired to and aided and abetted each other in committing the acts and omissions

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

2

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

1  hereinafter alleged.   Therefore, each Defendant, including the Doe Defendants, is jointly and

2  severally liable for LEI's damages hereinafter alleged.

3      13.    All references to "Defendants" in this Complaint include Doe Defendants 1

4  through 50.

5                                            **VENUE**

6      14.    Venue is proper in this Court pursuant to Code of Civil Procedure section 395

7  because some or all of the Defendants reside in the County of Orange, State of California.

8                                            **FACTS**

9  **Plaintiff LEI**

10     15.    LEI was founded by Peter LePort, M.D.   LEI owns and operates private

11 Montessori Schools in San Francisco, Los Angeles, Orange County, San Diego, Brooklyn New

12 York and Northern Virginia.   LEI was an extremely successful enterprise and its stock value was

13 $43.5 million as of December 2015.

14     16.    Critical to LEI's success was that it hired, trained and developed extraordinarily

15 talented key executives who were extremely loyal to LEI and its mission to provide quality

16 education to its students.   Without such key executives LEI's ability to function and its value

17 would be severely diminished.

18 **Defendants' Employment Contracts**

19     17.    Defendants Ray Girn, Rebecca Girn, Guy Barnett and Lindsey Journo were each

20 employed by LEI during 2015 and 2016 pursuant to a written "Executive Employment

21 Agreement."  Each of their contracts contained the following provisions:

22          **5.      Confidential Information.**

23

24          **(a)** The Executive agrees not to disclose, either while in the
            Company's employ or at any time thereafter, to any person not
25          employed by the Company, or not engaged to render services to
            the Company, any confidential information obtained while in the
26          employ of the Company, including, without limitation, any of the
            Company's inventions, processes, methods, curriculum, training
27          programs, student, family or customer lists, or trade secrets;
            provided, however, that the provisions of this Section shall not

28

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

3

**COMPLAINT**

preclude the Executive: (1) from disclosing such information to the Executive's professional tax advisor or legal counsel solely to the extent necessary to the rendering of their professional services to the Executive if such individuals agree to keep such information confidential; and (2) from use or disclosure of information known generally to the public or from disclosure required by law or court order.

### 6.    Intellectual Property.

**(a) Work for Hire.**  Executive understands and agrees that, to the extent permitted by law, all work, curriculum, textbooks, educational or pedagogical materials, manipulatives, written work product, handouts, assessments, lesson plans or notes, audio-visual materials, marketing materials or strategic documents, materials defining or relating to educational philosophy, documents of educational methods, papers, reports, documentation, drawings, images, product ideas, service ideas, photographs, negatives, tapes and masters therefor, computer programs including their source code and object code, prototypes and other materials (collectively, "Work Product"), including, without limitation, any and all such Work Product generated and maintained on any form of electronic media, that Executive generates, either alone or jointly with others, during employment with Company will be considered a "work made for hire," and ownership of any and all copyrights in any and all such Work Product will belong to Company.  In the event that any portion of the Work Product should be deemed not to be a "work made for hire" for any reason, Executive hereby assigns, conveys, transfers and grants, and agrees to assign, convey, transfer and grant to Company all of Executive's right, title, and interest in and to the Work Product and any copyright therein, and agrees to cooperate with Company in the execution of appropriate instruments assigning and evidencing such ownership rights. Executive hereby waive any claim or right under "droit moral" or moral rights to object to Company's copyright in or use of the Work Product.  Any Work Product not generally known to the public shall be deemed Confidential Information and shall be subject to the use and disclosure restrictions herein.

**(b) Inventions.**  Executive hereby assigns and agrees to assign to Company all of Executive's right, title, and interest in and to any discoveries, inventions and improvements (each, an "Invention," and collectively, "Inventions"), whether patentable or not, that Executive makes, conceives or suggests, either alone or jointly with others, in the course of the Executive's employment with the Company.  Any Invention that was made, conceived or suggested by Executive, either solely or jointly with others, within four (4) months following the Executive's Termination Date and that

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

4

**COMPLAINT**

pertains to any Confidential Information or business activity of Company will be irrebuttably presumed to have been made, conceived or suggested in the course of Executive's employment and with the use of the time, materials or facilities of Company. Any Invention not generally known to the public shall be deemed Confidential Information and shall be subject to the use and disclosure restrictions herein.

**12.    Non-Solicitation of Employees.**  During the term of the Executive's employment with the Company and for a period of 24 months following the Executive's Termination Date, the Executive shall not directly or indirectly solicit any other employee of the Company to terminate his or her employment with the Company.

18.    Defendants Batemen and Lockitch were employed by LEI during 2015 and 2016 pursuant to written offers of employment.

**Ray Girn's Attempt To Take Control Of LEI**

19.    On December 6, 2015 Ray Girn sent a letter to LEI's Board of Directors demanding that he assume total control of LEI.

20.    On December 18, 2015, while he was still Chief Executive Officer of LEI, Ray Girn proposed to reallocate the share of profits of LEI from its shareholders to himself by proposing that an entity owned and controlled by him would manage and control the schools owned by LEI, and that he be paid an exorbitant management fee for operating the schools.  Ray Girn also proposed to LEI's Board of Directors that LEI transfer all of LEI's intellectual property to this management company.  Ray Girn demanded that this proposal be presented to all of LEI's employees.  LEI's Board of Directors rejected this proposal.

**Ray Girn's Plan to Form a Competing Business and Solicitation of LEI's Employees**

21.    After LEI's Board of Directors rejected the above proposal Ray Girn expressly threatened that he would solicit key employees of LEI to join a new entity that he would form to compete with LEI, despite the express non-solicitation clause in his employment agreement.

22.    LEI is informed and believes and thereon alleges that before and after the termination of his employment with LEI (discussed *infra*) Ray Girn covertly and overtly solicited LEI's key executives and other employees to resign their employment with LEI and to join him in a new venture in direct competition with LEI.

SHULMAN HODGES & BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

5

**COMPLAINT**

23.     On or about January 23, 2016, while still employed as LEI's Chief Executive Officer, Ray Girn submitted to LEI a document wherein he proposed "settlement terms" for himself and the LEI employees that he had successfully recruited to form a competing business with LEI (the "Girn Group").  In this document Ray Girn proposed the following:

- To keep the contents of settlement discussions and settlement terms confidential;

- That the members of the Girn Group formally resign as directors of the company;

- That the Girn Group resign as officers and employees of the company with two weeks' notice for Ray Girn, Rebecca Girn and Barnett; and one month notice for Jane Erickson and Lindsey Journo; and two months' notice for Heike Larson;

- That LEI pay each member of the Girn Group four months' severance and/or LEI pay to the Girn Group one full month's severance for each full year or partial year that each has been employed;

- That until the Girn Group shares were repurchased, each member of the group would receive monthly their current salary after the base severance is complete;

- That children of the Girn Group and children of existing LEI staff who joined the Girn Group (or a business started by the Girn Group) (up to 15 students) would continue to receive tuition discounts through June 2017;

- That the Girn Group would be permitted to compete and to engage in any business opportunity including, without limitation, any projects for which LEI has not submitted an LOI, or which LEI has affirmatively declined to pursue, such as the prospective Arlington campus;

- That the Girn Group would not open a school campus within ten miles of an existing LEI school for one year; and within five miles of an existing LEI campus for two years;

- That the Girn Group for two years will not directly solicit existing enrolled families of LEI for enrollment;

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

6

**COMPLAINT**

- That the Girn Group would be permitted to solicit up to eight staff members of LEI, to be specified, to join them in such solicitation containing the following terms:

  a) Up to four of these employees may join the Girn Group with two weeks' notice;

  b) Up to two of them may join with one month's notice;

  c) Up to two of them may join with two months' notice; and

  d) Prior to solicitation of eight employees, the Girn Group would provide 48 hours prior notice to Dr. LePort;

- That until September 1, 2016, other than the eight employees referred to above, the Girn Group will not solicit any additional existing LEI corporate level staff;

- That the Girn Group will not solicit any campus-level staff (other than if such staff is included in the eight employees referred to above) until after July 1, 2017;

- That members of the Girn Group shall not constitute part of the eight employees above;

- That notwithstanding all of the foregoing, any general solicitation for hiring or the independent solicitation of a LEI employee of the Girn Group shall not be deemed to be a violation of such restriction;

- That the Girn Group would individually retain certain intellectual property of LEI;

- That the Girn Group would have access to all of the plans and work product related to the design, construction and approval of the Arlington campus;

- That LEI agree to a specific share buy-back of stock arrangement for Ray Girn's stock;

- That LEI agree to an arrangement that provides for an escalating value to the shares as time elapses;

- That the Girn Group have pre-emptive rights and the right of exercise of such shares in connection with a purchase of Girn Group Shares;

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

7

**COMPLAINT**

1        • That each party would be responsible for its/their own legal costs and fees; and

2        • That each party would have all rights to indemnification to the fullest extent of the

3        law.

4     24.    LEI's Board of Directors rejected these proposals.

5     25.    LEI is informed and believes and thereon alleges that at the instigation of Ray

6 Girn, during December 2015 and January 2016 the Girn Group had discussions with a number of

7 LEI's employees explaining Ray Girn's proposed new company and the opportunities that it

8 represented.  LEI is informed and believes and thereon alleges that after these discussions,

9 additional employees of LEI joined e-mail threads regarding the proposed new company,

10 including Cornelia Lockitch, Maris Mendes and Joel Mendes, all of whom ultimately resigned

11 their employment with LEI and accepted employment with HGE.

12 **LEI Terminates Ray Girn's and Barnett's Employment**

13     26.    At the February 2, 2016 meeting of LEI's Board of Directors, Ray Girn and

14 Barnett were terminated.

15     27.    LEI is informed and believes and thereon alleges that shortly after Ray Girn and

16 Barrett were terminated, they conducted weekly evening meetings with LEI's employees who

17 were considering joining their new venture.

18     28.    After February 2, 2017 several Girn Group members resigned, most only

19 providing LEI with two to four weeks' notice.  All had been offered employment at HGE.  These

20 employees constituted the majority of LEI's executive team upon whom LEI relied for its

21 success.

22     29.    LEI is informed and believes and thereon alleges that Ray Girn, Barnett and

23 Batemen encouraged these executives and other employees of LEI to only give short notice to

24 LEI in connection with their resignation.  As a result of these resignations on short notice, LEI

25 was unable to promptly replace the key employees resulting in LEI's operations being severely

26 hampered.

27

28

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

8

**COMPLAINT**

30.     LEI is informed and believes and thereon alleges that in February 2016 Rebecca Girn worked to set up payroll, health insurance and other aspects of the new venture to make it possible for people to transition their employment from LEI without a lapse in pay or benefits.

**Ray Girn and Barnett Continue to Solicit Key Executives of LEI to Resign From LET and to Accept Employment with HGE**

31.     In or about mid-February 2016 a member of LEI's Board of Directors, Pari Schacht, attempted to convince employees who had not yet resigned their employment with LEI to remain with LEI.  In response to Ms. Schacht's outreach, on February 22, 2016 Ray Girn sent an e-mail to the Girn Group disparaging LEI and arguing why people should not be swayed by Ms. Schacht's efforts.  Ray Girn proposed that employees resign their employment and even advised them against acting as consultants with LEI, but if they felt the need to assist LEI that they should contract their work for LEI as consultants rather than remain employed by LEI.

32.     On February 23, 2016 Bateman sent an e-mail to the Girn Group wherein he attempted to dissuade the Girn Group from even assisting LEI in the capacity of consultants.

33.     On February 22, 2016 LEI's employee, Hieke Larson, sent an e-mail to Ray Girn informing him that she would not be joining the new venture and instead would remain in LEI's employment for the foreseeable future.  Ray Girn responded to this e-mail wherein he attempted to convince Ms. Larson to resign from her employment with LEI and, if she so desired, work for LEI as a consultant rather than as a full-time employee.  Ray Girn encouraged Ms. Larson to make it clear that she "stood with the Girn Group" even if she was willing to continue working for LEI for several more months.

34.     On March 4, 2016 HGE was incorporated.

35.     As a direct result of Ray Girn's and Barnett's solicitations 10 LEI key executives resigned and accepted positions with HGE, including:

- Nicole St. Pierre resigned on February 3, 2016;

- Matt Bateman resigned on February 12, 2016;

- Jane Erickson resigned on February 19, 2016;

- Rebecca Girn resigned on February 24, 2016;

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

9

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

1       • Maris Mendes resigned on March 2, 2016;

2       • Lindsay Journo resigned on March 3, 2016;

3       • Elan Walshe resigned on March 4, 2015;

4       • Mitch Michulka resigned on March 28, 2016 ;

5       • Joel Mendes resigned on June 14, 2016; and

6       • Lindsay Sloan resigned on July 14, 2016.

7       36.    As a direct result of Ray Girn's and Barnett's solicitations five additional LEI

8   employees resigned and accepted positions with HGE, including:

9       • Cornelia Lockitch resigned on March 3, 2016;

10      • Libby Broom resigned on June 10, 2016;

11      • Kris Bineik resigned on June 10, 2016;

12      • Aaron Bailey resigned on June 16, 2016; and

13      • Jasmine Boller resigned in December 2016.

14      37.    The above resignations of LEI's key executives and other employees on short

15  notice were immensely detrimental to LEI, especially because many of them occurred during a

16  critical time of the year during the middle of re-enrollment and the hiring season, and because

17  LEI had to manage the acquisition of newly acquired schools in Northern Virginia.

18      38.    As a direct result of Defendants' wrongful solicitation of key executives and other

19  employees LEI's stock value dropped precipitously by more than $24 million.

20  **Illegal Hiring of Undocumented Workers**

21      39.    In her capacity as head of human resources of LEI, and with the knowledge and

22  approval Ray Girn, Rebecca Girn caused LEI to hire at least four employees whom she and

23  Ray Girn knew were not legally authorized to work in the United States, exposing LEI to

24  criminal penalties under 8 U.S.C. § 1324(a).  Rebecca Girn and Ray Girn attempted to conceal

25  this unlawful conduct by paying the undocumented employees in gift cards and cash in lieu of a

26  salary, paying the legal spouse of an undocumented employee instead of the employee himself,

27  and clandestinely paying at least one of the employees out of an ostensible bonus payment to

28  Barnett.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

10

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

40.     In the case of at least one of the employees, the unlawful compensation arrangement appears to have lasted a full year or more.  Due to this concealment, the other members of LEI's Board of Directors and senior management were unaware of this misconduct, which came to light as part of a due diligence process for a financing transaction with Leeds Equity Partners ("Leeds").

41.     Leeds now alleges that these immigration-related violations caused LEI to be in default under a certain August 19, 2015 Note Purchase Agreement between the parties ("NPA") and an event of default under the Convertible Senior Secured Note ("Note") issued thereunder, as well as several amendments to the NPA and the Note, in which Defendants caused LEI to breach a series of representations contained in the NPA and amendments.  As a result of Defendants' violations, LEI is incurring costs in connection with two lawsuits commenced by Leeds, and may be liable for default interest on the aggregate principal amount of the Note and amendments thereto at an annual rate of 20%, attorneys' fees, and transaction costs with Leeds. LEI also was forced to obtain a bridge loan due to delays in obtaining longer term financing caused by the discovery of Defendants' illegal and unauthorized actions, and to conduct an I-9 investigation.

42.     As a direct result of the hiring of undocumented employees LEI faces potential exposure of $10 million for illegal hiring practices, income tax violations, stock grants, tuition discounts and visa refunds.

**Defendants' Misappropriation of LEI's Trade Secret, Confidential and Proprietary Information While Still Employed by LEI**

43.     LEI has developed at great expense a substantial amount of trade secret and other confidential and proprietary information that affords LEI a competitive edge in its industry.  This information includes, but is not limited to curriculum, textbooks, educational or pedagogical materials, manipulatives, written work product, handouts, assessments, lesson plans or notes, audio-visual materials, marketing materials or strategic documents, materials defining or relating to educational philosophy, documents of educational methods, papers, reports, documentation, drawings, images, product ideas, service ideas, photographs, negatives, tapes and masters

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

11

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

therefor, computer programs including their source code and object code, prototypes and other materials.

44.     LEI is informed and believes and thereon alleges that Defendants conspired to and did intentionally misappropriate LEI's trade secret confidential and proprietary information. Specifically, on Thursday, January 21, 2016, at 11:49 a.m., while still the Chief Executive Officer of LEI, Ray Girn sent an e-mail from his personal e-mail account, raygirn@gmail.com, to the personal e-mail accounts of numerous employees of LEI, including Jane Erickson jane.erickson99@gmail.com, Lindsay Journo lindsayjourno@gmail.com, Heike Larson heikelarson@gmail.com, Nicole St. Pierre nnstpierre@gmail.com, Guy Barnett guyusj@hotmail.com and Rebecca Girn rebecca.girn@gmail.com, with instructions on how to export Google App data to an external hard drive wherein Ray Girn stated:  "Hi all, Here's a link on how you can easily archive all your google app data (email, drive, etc.) to an external hard drive:  https://support.google.com/accounts/answer/3024190.  Ray."

45.     On Thursday, January 21, 2016, at 12:04 p.m., while still employed by LEI, Bateman replied to all recipients of Ray Girn's January 21, 2016 e-mail wherein he stated:  "I've also ordered a huge external drive, arriving Friday, that will let me archive everything on Dropbox.  I might coordinate with some of you to get access to things that I might be missing."

46.     Since Thursday, January 21, 2016 was a work day at LEI, LEI is informed and believes and thereon alleges that Guy Girn and Batemen sent the above-referenced e-mails while at work at LEI, and did to using only private e-mail accounts in an effort to conceal their conspiracy to intentionally misappropriate LEI's trade secret, confidential and proprietary information.

47.     LEI is informed and believes and thereon alleges that pursuant to the above-described conspiracy Defendants downloaded LEI's trade secret, confidential and proprietary information and converted it to their own use and to HGE's use, and continue to do so in direct competition with LEI.

48.     LEI is informed and believes and thereon alleges that Defendants have breached the confidentiality and assignment provisions of their employment agreements by retaining and

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

12

**COMPLAINT**

1    misusing LEI's trade secret, confidential and proprietary information in connection with

2    establishing and operating HGE, their competing venture.    LEI is informed and believes and

3    thereon alleges that without LEI's authorization Defendants continue to use LEI's trade secret,

4    confidential and proprietary information.

5    **Rebecca Girn's Professional Negligence**

6         49.    As General Counsel for LEI Rebecca Girn was charged with the responsibility of

7    completing the task of converting LEI from a California corporation to a Delaware corporation.

8    During May 2014 Rebecca Girn filed a certificate of incorporation in Delaware for the new

9    Delaware corporation and filed a certificate of dissolution of LEI in California.    However,

10    Rebecca Girn knowingly made several false statements in the certificate, including, but not

11    limited to, the statement that the Board of Directors of LEI had authorized the dissolution.    As a

12    result of this misconduct, LEI's assets never properly transferred or vested in the Delaware

13    entity.    Rebecca Girn concealed this from LEI's Board of Directors and other members of senior

14    management.

15         50.    As a result, Leeds alleges that when LEI entered into the NPA in August 2015,

16    LEI's representations and warranties concerning its corporate existence and authorized capital

17    stock were incorrect.    As a consequence, LEI is incurring costs in connection with two lawsuits

18    commenced by Leeds wherein Leeds alleges that LEI is liable for default interest on the

19    aggregate principal amount of the Note and amendments thereto at an annual rate of 20%,

20    attorney's fees and transaction costs.

21         51.    Rebecca Girn managed LEI's human resources activities.    LEI is informed and

22    believes and thereon alleges that Rebecca Girn knowingly facilitated illegal activity in hiring and

23    improperly paying employees lacking the required immigration status, instead of informing

24    officers and directors of LEI who were not involved in the scheme.    Her actions exposed LEI to

25    criminal liability under federal law and caused Leeds to allege that LEI breached representations

26    made by it in the NPA, which representations Rebecca Girn had reviewed and approved in her

27    position as LEI's General Counsel.    LEI has incurred approximately $1.2 million in costs to date

28    in attempting to remedy the problem created by Rebecca Girn, and costs continue to accrue.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

13

**COMPLAINT**

1    52.    Rebecca Girn negotiated Ray Girn's and her own employment agreements with

2    LEI, in direct conflict with her duties to LEI as General Counsel.

3    53.    Rebecca Girn advised Peter LePort, M.D. on the transfer of LEI's shares owned

4    by Dr. LePort to Ray Girn, her husband, in direct conflict with her duties to LEI as its General

5    Counsel.

6    54.    Rebecca Girn negligently prepared inter-company agreements without the

7    requisite shareholder approvals.

8    55.    Rebecca Girn was responsible for the termination of Jason Monaghan's

9    employment with LEI resulting in a discrimination lawsuit against LEI.

10    56.    As a direct result of Rebecca Girn's professional negligence LEI has incurred

11    costs in excess of $2 million, excluding the amount for the illegal hiring set forth above.

12    **Lukas Pieter Option Agreement**

13    57.    In her capacity as Head of Human Resources for LEI, Rebecca Girn included an

14    option grant in LEI's employment offer to Lukas Pieter.  This option grant constituted a breach

15    of LEI's loan agreement with Leeds and triggered more than $400,000 in additional interest plus

16    fees and legal expense up to $1 million.

17    **Ray Girn's and Barnett's Gross Negligence and Mismanagement of Construction Projects**

18    58.    Part of Ray Girn's and Barnett's duties at LEI was management of construction

19    projects.

20    59.    LEI is informed and believes and thereon alleges that Ray Girn and Barnett

21    negligently mismanaged the construction of the Fifth Fell, Emeryville and Brooklyn projects.

22    The cost overruns exceed $10 million.

23    **Gross Mismanagement of LEI's Finances by Ray Girn**

24    60.    As Chief Executive Officer of LEI Ray Girn was responsible for overseeing all

25    expenditures by LEI.

26    61.    LEI is informed and believes and thereon alleges that Ray Girn negligently

27    mismanaged LEI's expenses by, *inter alia*, hiring and maintaining dozens of unneeded and

28    unqualified employees, hiring a software team at the cost of $1 million per year, grossly

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

14

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

1  overspending LEI's G&A budget and committing LEI to expenditures of $16 million without

2  LEI's ability to pay for these expenditures.  This uncontrollable spending by Ray Girn was in

3  gross dereliction of his duties as Chief Executive Officer of LEI.

4      62.    LEI is informed and believes and thereon alleges that Ray Girn negligently

5  mismanaged LEI's expenses by committing additional acts and omissions and will seek leave to

6  amend this Complaint when the same are ascertained.

7                          **FIRST CAUSE OF ACTION**

8              **(Breach of Contract by LEI Against Ray Girn, Rebecca Girn,**

9                   **Barnett, Journo and Does 1-50, inclusive)**

10     63.    LEI repeats and realleges all of the allegations contained in Paragraphs 1 through

11  62, inclusive, in this Complaint and by reference thereto incorporates them herein as though set

12  forth in full.

13     64.    As set forth in paragraph 17, above, Defendants, and each of them, entered into a

14  written employment agreements with LEI wherein they agreed that during and after their

15  employment with LEI they would not disclose LEI's Trade Secret, confidential and proprietary

16  information to persons not employed by or engaged by LEI, that all intellectual property that

17  they developed while employed by LEI was the property of LEI, that all inventions that they

18  developed were the property of LEI, and that they would not solicit employees of LEI for a

19  period of 2 years after the cessation of their employment with LEI.

20     65.    LEI has performed all of its obligations under these contracts except for those that

21  are excused because of Defendants' conduct.

22     66.    LEI is informed and believes and thereon alleges that Defendants, and each of

23  them, breached the provisions of their employment agreements with LEI, as set forth in

24  paragraph 17, above, by soliciting LEI's employees to terminate their employment with LEI on

25  short notice and to work for HGE in competition with LEI, and by surreptitiously downloading

26  and converting to their own use and HGE's use LEI's Trade Secret, confidential and proprietary

27  information.

28

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

15

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

67.     By inducing LEI's key executives and other employees to resign their employment with LEI, especially on short notice, Defendants irreparably damaged LEI.  As a direct, proximate and foreseeable consequence of Defendants' breach of the contract LEI has been damaged in an amount to be proven at trial, but in no event less than $50 million.

68.     Wherefore, LEI prays for judgment as stated hereinafter.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty by LEI Against

### Ray Girn, Rebecca Girn, Barnett, Erickson, Journo and Does 1-50)

69.     LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 68, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

70.     Corporate officers and directors owe the company fiduciary duties, including the duties of care and loyalty.   A company's General Counsel also owes fiduciary duties of care and loyalty to her employer.

71.     At all times relevant Ray Girn was LEI's Chief Executive Officer.

72.     At all times relevant Rebecca Girn was LEI's Vice President, Secretary and General Counsel.

73.     At all times relevant Barnett was LEI's Chief Financial Officer.

74.     At all times relevant Erickson was LEI's Vice President of Academics.

75.     At all times relevant Journo was a member of LEI's Board of Directors.

76.     During Defendants' tenures as officers of LEI and/or members of LEI's Board of Directors Defendants violated their fiduciary duty of loyalty to LEI by engaging in the acts and omissions alleged above, including, but not limited to conspiring to and soliciting LEI's key executives and other employees to resign their employment with LEI and work for HGE, and conspiring to and misappropriating LEI's Trade Secrets, confidential and proprietary information and converting the same to their own use and the use of HGE.

77.     Ray Girn and Rebecca Girn violated their fiduciary duty of care to LEI by and illegally hiring employees in violation of United States immigration laws, as alleged above.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

16

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

78.    Ray Girn and Barrett violated their fiduciary duty of care to LEI by mismanaging LEI's school construction projects, as alleged above.

79.    Ray Girn violated his fiduciary duty of care to LEI mismanaging LEI's finances, as alleged above.

80.    LEI is informed and believes and thereon alleges that Defendants, and each of them, committed additional acts and omissions in breach of the fiduciary duties of loyalty and care owed to LEI, and LEI will seek leave to amended this Complaint when the same are ascertained.

81.    As a direct and proximate result of Defendants' breaches of fiduciary duties LEI was harmed in an amount to be proven at trial but in no event in an amount less than $50 million.

82.    Defendants' conduct was a substantial factor in causing LEI's harm.

83.    The above-described conduct by Defendants was committed maliciously, fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of LEI within the meaning of California Civil Code section 3294.  Thus, LEI is entitled to recover punitive damages against Defendants, and each of them, in an amount sufficient to punish and make an example of Defendants.

84.    Wherefore, LEI prays for judgment as stated hereinafter.

### THIRD CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty

### by LEI Against Bateman, Lockitch and Does 1-50)

85.    LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 84, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

86.    Every employee owes a duty of loyalty to his or her employer.

87.    At all times relevant Defendants were employed by LEI.

88.    LEI is informed and believes and thereon alleges that Defendants were aware of the fiduciary positions held by Ray Girn, Rebecca Girn, Barnett, Erickson and Journo.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

17

**COMPLAINT**

89.     LEI is informed and believes and thereon alleges that Defendants intentionally aided and abetted Ray Girn, Rebecca Girn, Barnett, Erickson and Journo in breaching the fiduciary duties of loyalty and care that they owed to LEI engaging in the acts and omissions alleged above, including, but not limited to conspiring to and soliciting LEI's key executives and other employees to resign their employment with LEI and work for HGE, and conspiring to and misappropriating LEI's Trade Secrets, confidential and proprietary information and converting same to their own use and the use of HGE, as alleged above.

90.     LEI is informed and believes and thereon alleges that Defendants committed additional acts in furtherance of their aiding and abetting breaches of the fiduciary owed to LEI by Ray Girn, Rebecca Girn, Barnett, Erickson and Journo, and LEI will seek leave to amended this Complaint when the same are ascertained.

91.     As a direct and proximate result of Defendants' aiding and abetting breaches of fiduciary duty by Ray Girn, Rebecca Girn, Barnett, Erickson and Journo LEI was harmed in an amount to be proven at trial but in no event in an amount less than $50 million.

92.     Defendants' conduct was a substantial factor in causing LEI's harm.

93.     The above-described conduct by Defendants was committed maliciously, fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of LEI within the meaning of California Civil Code section 3294.  Thus, LEI is entitled to recover punitive damages against Defendants, and each of them, in an amount sufficient to punish and make an example of Defendants.

94.     Wherefore, LEI prays for judgment as stated hereinafter.

**FOURTH CAUSE OF ACTION**

**(Misappropriation of Trade Secrets by LEI Against All Defendants)**

95.     LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 94, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

96.     Through expenditure of funds and labor LEI developed and owns Trade Secrets, including, but not limited to those Trade Secrets set forth above.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

18

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

1    97.    The Trade Secrets are not known outside of LEI.

2    98.    The Trade Secrets are difficult for others to properly acquire or independently

3    duplicate.

4    99.    The Trade Secrets have actual independent economic value because they are not

5    generally known and they allow LEI to have a competitive advantage in its industry.

6    100.   LEI undertook reasonable efforts to keep the Trade Secrets secret, including, *inter*

7    *alia*, requiring all employees to sign an employment agreements that contain the provisions such

8    as those set forth in paragraph 17, above.

9    101.   The Trade Secrets were necessarily disclosed to Defendants in the course and

10   scope of their employment with LEI.

11   102.   Defendants, and each of them, have misappropriated LEI's Trade Secrets, as

12   alleged above, and are using the Trade Secrets in direct completion with LEI for their own

13   economic benefit and the economic benefit of HGE.

14   103.   LEI is informed and believes and thereon alleges that HGE acquired LEI's Trade

15   Secrets by improper and illegal means, as alleged above.  LEI is informed and believes and

16   thereon alleges that HGE is using LEI's Trade Secrets in violation of LEI's rights.

17   104.   As a direct and proximate result of Defendants' misappropriation of LEI's Trade

18   Secrets LEI was harmed in an amount to be proven at trial but in no event in an amount less than

19   $10 million.

20   105.   Defendants' conduct was a substantial factor in causing LEI's harm.

21   106.   LEI is entitled to an injunction pursuant to California Civil Code Section

22   3426.2(a) enjoining Defendants from further use of its Trade Secrets.

23   107.   LEI is informed and believes and thereon alleges that Defendants have been and

24   continue to be unjustly enriched as a result of using LEI's Trade Secrets, and therefore

25   Defendants, including HGE, should be required to disgorge all profits derived from said conduct

26   pursuant to California Civil Code Section 3426.3(a).

27   108.   Alternatively, LEI should be awarded royalty payments for Defendants' use of its

28   Trade Secrets pursuant to California Civil Code Section 3426.2(a).

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

19

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

109.    Defendants' misappropriation of LEI's Trade Secrets was willful and malicious within the meaning of California Civil Code Section 3426.3(c).  Therefore, LEI is entitled to recover punitive damages against Defendants, and each of them, in accordance with California Civil Code section 3426.3(c), in an amount sufficient to punish and make an example of Defendants.

110.    Wherefore, LEI prays for judgment as stated hereinafter.

**FIFTH CAUSE OF ACTION**

**(Conversion by LEI Against All Defendants)**

111.    LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 110, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

112.    California Labor Code Section 2860 provides:  "Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment."

113.    LEI holds exclusive title to Trade Secrets, confidential and proprietary information, as alleged above, and has an immediate right to exclusive possession of same.

114.    LEI is informed and believes and thereon alleges that secretly and without LEI's knowledge or consent Defendants, and each of them, conspired to and did intentionally and substantially interfere with LEI's property by downloading and copying from LEI's computer systems LEI's Trade Secrets, confidential and proprietary information, and converting the same to their own use and economic benefit in direct competition with LEI.

115.    LEI is informed and believes and thereon alleges that HGE acquired LEI's Trade Secrets, confidential and proprietary information through improper and illegal means in violation of LEI's rights and is using same in violation of LEI's exclusive rights.  LEI is informed and believes and thereon alleges that HGE has been and continues to be unjustly enriched as a result of using Trade Secrets, confidential and proprietary information, and therefore HGE should be required to disgorge all profits derived from said conduct.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

20

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

116.    LEI has demanded that Defendants cease and desist from continuing to use LEI's Trade Secrets, confidential and proprietary information, but Defendants refuse.

117.    As a direct and proximate result of conversion of LEI's Trade Secrets, confidential and proprietary information LEI has been harmed in an amount to be proven at trial but in no event in an amount less than $50 million.

118.    Defendants' conduct was a substantial factor in causing LEI's harm.

119.    The above-described conduct by Defendants was committed maliciously, fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of LEI within the meaning of California Civil Code section 3294.  Thus, LEI is entitled to recover punitive damages against Defendants, and each of them, in an amount sufficient to punish and make an example of Defendants.

120.    Wherefore, LEI prays for judgment as stated hereinafter.

### SIXTH CAUSE OF ACTION

**(Tortious Interference with Contractual Relations by LEI Against All Defendants)**

121.    LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 120, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

122.    In 2015 and 2016 written employment contracts existed between LEI and the persons identified in paragraphs 35 and 36, above.

123.    Defendants, and each of them, knew of the above referenced contracts.

124.    LEI is informed and believes and thereon alleges that by their conduct as alleged in paragraphs 21 – 38, above, Defendants intentionally and willfully interfered with the contractual relations between LEI and its aforementioned employees, thereby preventing performance of the contracts.

125.    Defendant's intended to disrupt the performance of the aforementioned contracts.

126.    LEI is informed and believes and thereon alleges that HGE has been and continues to be unjustly enriched as a result of Defendants' tortious interference with LEI's

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

21

**COMPLAINT**

1  contractual relations, and therefore HGE should be required to disgorge all profits derived from

2  said conduct.

3       127.  As a direct and proximate result of Defendants' tortious interference with LEI's

4  contractual relations LEI was harmed in an amount to be proven at trial but in no event in an

5  amount less than $50 million.

6       128.  Defendants' conduct was a substantial factor in causing LEI's harm.

7       129.  The above-described conduct by Defendants was committed maliciously,

8  fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of LEI within

9  the meaning of California Civil Code section 3294.  Thus, LEI is entitled to recover punitive

10  damages against Defendants, and each of them, in an amount sufficient to punish and make an

11  example of Defendants.

12       130.  Wherefore, LEI prays for judgment as stated hereinafter.

13  **SEVENTH CAUSE OF ACTION**

14  **(Intentional Interference with**

15  **Prospective Economic Advantage by LEI Against All Defendants)**

16       131.  LEI repeats and realleges all of the allegations contained in Paragraphs 1 through

17  130, inclusive, in this Complaint and by reference thereto incorporates them herein as though set

18  forth in full.

19       132.  LEI employees identified in paragraphs 35 and 36, above, were in an economic

20  relationship that would have resulted in a continuing economic benefit to LEI.

21       133.  Defendants, and each of them, knew of these economic relationships.

22       134.  LEI is informed and believes and thereon alleges that by their conduct as alleged

23  in paragraphs 21 thorough 38, above, Defendants intended to and did disrupt these economic

24  relationships.

25       135.  Defendants' conduct was independently wrongful because they committed the

26  acts in violation of their written agreements with LEI and in breach of their fiduciary and/or

27  common law duty of loyalty owed to LEI.

28

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

22

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

136.   LEI is informed and believes and thereon alleges that HGE has been and continues to be unjustly enriched as a result of Defendants' intentional interference with LEI's prospective economic advantage, and therefore HGE should be required to disgorge all profits derived from said conduct.

137.   As a direct and proximate result of Defendants' intentional interference with LEI's prospective economic advantage LEI was harmed in an amount to be proven at trial but in no event in an amount less than $50 million.

138.   Defendants' conduct was a substantial factor in causing LEI's harm.

139.   The above-described conduct by Defendants was committed maliciously, fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of LEI within the meaning of California Civil Code section 3294.  Thus, LEI is entitled to recover punitive damages against Defendants, and each of them, in an amount sufficient to punish and make an example of Defendants.

140.   Wherefore, LEI prays for judgment as stated hereinafter.

### EIGHTH CAUSE OF ACTION

### (Legal Malpractice by LEI Against Rebecca Girn)

141.   LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 140, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

142.   At all times relevant to this action Rebecca Girn was General Counsel to LEI.

143.   In acting as General Counsel for LEI Rebecca Girn owed a duty to use such skill, prudence, and diligence as other members of her profession commonly possess and exercise.

144.   Rebecca Girn breach her duty owed to LEI by negligently, carelessly and recklessly committing the acts and omissions alleged in paragraphs 44 – 56, above.

145.   LEI first discovered acts and omissions alleged in paragraphs 44 – 56, above, within one year of the filing of this Complaint.

146.   As a direct and proximate cause of Rebecca Girn's professional negligence, LEI was harmed in an amount to be proven at trial but in no event in an amount less than $10 million.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

23

**COMPLAINT**

147.    Wherefore, LEI prays for judgment as stated hereinafter.

**NINTH CAUSE OF ACTION**

**(Unfair Competition – Violation of Business & Professions Code**

**Section 17200 et seq. by LEI Against All Defendants)**

148.    LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 147, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

149.    California Business Code Section 17200 prohibits any unlawful, unfair or fraudulent business act or practice.

150.    The aforementioned conduct of Defendants, and each of them, constitutes acts of unfair competition, as defined by Business & Professions Code Section 17200 *et seq.* in at least the following respects:

       a.    Defendants solicited LEI's employees in breach of their written non-solicitation agreements;

       b.    Defendants solicited LEI's employees in breach of their fiduciary duty and/or common law of loyalty owed to LEI;  and

       c.    Defendants misappropriated LEI's Trade Secrets, confidential and proprietary information and are using same in the conduct of their business in direct competition with LEI.

151.    LEI is entitled to a temporary restraining order, preliminary injunction and permanent injunction enjoining Defendants from continuing to solicit LEI's employees and from using LEI's Trade Secrets and confidential and proprietary information.

152.    Wherefore, LEI prays for judgment as stated hereinafter.

**TENTH CAUSE OF ACTION**

**(Disgorgement of Salary and Benefits by LEI Against All Defendants Except HGE)**

153.    LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 152, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

24

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

154.    Under California law every employee owes a duty of loyalty to his or her employer.

155.    California Labor Code Section 2863 provides:  "An employee who has any business to transact on his own account, similar to that entrusted to him by his employer, shall always give the preference to the business of the employer."

156.    Any profit made in breach of the employee's duty of loyalty belongs to the employer.  *Rest.2d Agency* § 403, comment "a."   This includes disgorgement of salary and benefits paid to a faithless employee while secretly competing with his employer.  *Service Employees Int'l Union, Local 250 v. Colcord*, 160 Cal. App. 4th 362, 371 (2008).

157.    While still employed by LEI Defendants conspired to and did complete with LEI. Thus, LEI is entitled to an order requiring Defendants to disgorge all salary and benefits that they received from the time that they commenced competing with LEI, in an amount to be proven at trial.

158.    Wherefore, LEI prays for judgment as stated hereinafter.

## ELEVENTH CAUSE OF ACTION

### (Negligence by LEI Against Ray Girn and Barnett)

159.    LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 158, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

160.    Ray Girn and Barnett owed LEI a duty of care to competently manage LEI's construction projects.  This duty includes the duty to be adequately informed about and monitor the progress of the projects, and to reasonably control the cost of the projects.

161.    Ray Girn and Barnett carelessly and negligently failed to be adequately informed about and monitor the progress of the projects, and to reasonably control the cost of the projects.

162.    As a direct and proximate cause of Ray Girn's and Barnett's negligence, LEI has been damaged in an amount to be proven at trial, but in no event less than $10 million.

163.    Wherefore, LEI prays for judgment as stated hereinafter.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

25

**COMPLAINT**

**TWELFTH CAUSE OF ACTION**

**(Negligence by LEI Against Ray Girn)**

164. LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 163, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

165. As Chief Executive Officer of LEI Ray Girn owed LEI a duty of care to competently manage LEI's finances and expenditures.

166. Ray Girn carelessly and negligently failed to control LEI's finances and expenditures by hiring and maintaining dozens of unneeded and unqualified employees, hiring a software team at the cost of $1 million per year, grossly overspending LEI's G&A budget and committing LEI to expenditures of $16 million without LEI's ability to pay for these expenditures.

167. As a direct and proximate cause of Ray Girn's and Barnett's negligence, LEI has been damaged in an amount to be proven at trial, but in no event less than $16 million.

168. Wherefore, LEI prays for judgment as stated hereinafter.

**THIRTEENTH CAUSE OF ACTION**

**(Negligence by LEI Against Rebecca Girn)**

169. LEI repeats and realleges all of the allegations contained in Paragraphs 1 through 168, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

170. As Head of Human Resources of LEI Rebecca Girn owed LEI a duty of care to competently only employ persons in compliance with the law and to competently prepare employment agreements.

171. Rebecca Girn carelessly and negligently caused LEI to illegally hire persons in violation of the law and included an option grant in LEI's employment agreement with Lukas Pieter, as alleged in paragraphs 39-42 and 57, above.

172. As a direct and proximate cause of Rebecca Girn's negligence, LEI has been damaged in an amount to be proven at trial, but in no event less than $10 million.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

173.   Wherefore, LEI prays for judgment as stated hereinafter.

## FOURTEENTH CAUSE OF ACTION

### (Intentional Misrepresentation by Barney Against Ray Girn)

174.   Barney repeats and realleges all of the allegations contained in Paragraphs 1 through 173, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

175.   Before and during December 2012 Ray Girn solicited Barney to invest in LEI. Barney caused the Trust to invest $1 million in LEI in December 2012.

176.   Before and during June 2014 Ray Girn solicited Barney to invest in LEI.  Barney caused the Trust to invest $2.3 million in LEI in June 2014.

177.   Before and during December 2014 Ray Girn solicited Barney to provide a loan to LEI.  Barney caused the Trust to loan $2 million in LEI in December 2014.

178.   In connection with his solicitations of Barney Ray Girn continuously made the following representations to Barney:

- That LEI was flourishing and a profitable business;
- That LEI was well managed;
- That the stock price offered to Barney was a fair price.

179.   Ray Girn made the above representations to Barney with the intent to induce Barney to rely upon the above representations in deciding whether to cause the Trust to invest in LEI and loan funds to LEI.

180.   The above representations were material to Barney's decision to cause the Trust invest in and loan funds to LEI and Barney reasonably relied to his detriment upon the above representations in deciding to cause the Trust to invest in LEI and loan funds to LEI.

181.   The above representations induced Barney to cause the Trust to invest in LEI and loan funds to LEI.

182.   The above representations were false and/or the failure to disclose additional information made the above representations misleading.  The true facts were that:

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

27

**COMPLAINT**

- Ray Girn and Barnett were negligently mismanaging the construction of the Fifth Fell, Emeryville and Brooklyn projects. The cost overruns exceeded $10 million;

- Ray Girn had hired and maintained dozens of unneeded and unqualified employees;

- Ray Girn hired a software team at the excessive cost of $1 million per year; and

- Ray Girn was grossly overspending LEI's G&A budget and was committing LEI to expenditures without LEI's ability to pay for these expenditures.

183.  Barney did not know the true facts and did not discover the true facts until within three years of the filing of this Complaint.

184.  As a direct and proximate cause of Ray Girn's above misrepresentations Barney and the Trust have been damaged in an amount to be proven at trial.

185.  Ray Girn's misrepresentations were a substantial factor in causing harm to Barney and the Trust.

186.  The above-described conduct by Ray Girn was committed maliciously, fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of Barney and the Trust within the meaning of California Civil Code section 3294. Thus, Barney and the Trust are entitled to recover punitive damages against Ray Girn in an amount sufficient to punish and make an example of Ray Girn.

187.  Wherefore, Barney prays for judgment as stated hereinafter.

## FIFTEENTH CAUSE OF ACTION

### (Intentional Concealment of Material Facts by Barney Against Ray Girn)

188.  Barney repeats and realleges all of the allegations contained in Paragraphs 1 through 187, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

189.  In connection with his solicitations of Barney Ray Girn intentionally concealed the following material facts from Barney with the intention of inducing Barney to cause the Trust to invest in LEI:

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

28

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

- Ray Girn and Barnett were negligently mismanaging the construction of the Fifth Fell, Emeryville and Brooklyn projects.  The cost overruns exceeded $10 million;

- Ray Girn had hired and maintained dozens of unneeded and unqualified employees;

- Ray Girn hired a software team at the cost of $1 million per year; and

- Ray Girn was grossly overspending LEI's G&A budget and committing LEI to expenditures without LEI's ability to pay for these expenditures.

190.   Barney did not know the true facts and did not discover the true facts until within three years of the filing of this Complaint.

191.   The above facts were material to Barney's decision to cause the Trust to invest in and loan funds to LEI and Barney's lack of knowledge of the above facts induced Barney to cause the Trust to invest in and loan funds to LEI.  Had Barney known the above facts Barney would not have caused the Trust to invest in and loan funds to LEI.

192.   As a direct and proximate cause of Ray Girn's concealment of material facts Barney and the Trust have been damaged in an amount to be proven at trial.

193.   Ray Girn's concealment of material facts was a substantial factor in causing harm to Barney and the Trust.

194.   The above-described conduct by Ray Girn was committed maliciously, fraudulently and oppressively, in bad faith, and in conscious disregard of the rights of Barney and the Trust within the meaning of California Civil Code section 3294.  Thus, Barney and the Trust are entitled to recover punitive damages against Ray Girn in an amount sufficient to punish and make an example of Ray Girn.

195.   Wherefore, Barney prays for judgment as stated hereinafter.

## SIXTEENTH CAUSE OF ACTION

### (Negligent Misrepresentation by Barney Against Ray Girn)

196.   Barney repeats and realleges all of the allegations contained in Paragraphs 1 through 195, inclusive, in this Complaint and by reference thereto incorporates them herein as though set forth in full.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

29

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

197.   In connection with his solicitations of Barney Ray Girn continuously made the following representations as true to Barney:

- That LEI was flourishing and a profitable business;
- That LEI was well managed; and
- That the stock price offered to Barney was a fair price.

198.   Ray Girn made the above representations to Barney with the intent to induce Barney to rely upon the above representations in deciding whether to cause the Trust to invest in LEI and loan funds to LEI.

199.   The above representations were not true.  The true facts were:

- Ray Girn and Barnett were negligently mismanaging the construction of the Fifth Fell, Emeryville and Brooklyn projects.  The cost overruns exceeded $10 million;
- Ray Girn had hired and maintained dozens of unneeded and unqualified employees;
- Ray Girn hired a software team at the cost of $1 million per year; and
- Ray Girn was grossly overspending LEI's G&A budget and committing LEI to expenditures without LEI's ability to pay for these expenditures.

200.   Barney did not know the true facts and did not discover the true facts until within three years of the filing of this Complaint.

201.   Ray Girn had no reasonable basis to believe that the above representations were true when he made them.

202.   Ray Girn intended for Barney to rely upon the above misrepresentations.

203.   The above misrepresentations were material to Barney's decision to cause the Trust invest in and loan funds to LEI and Barney reasonably relied to his detriment upon the above misrepresentations in deciding to cause the Trust to invest in LEI and loan funds to LEI.

204.   The above misrepresentations induced Barney to cause the Trust to invest in LEI and loan funds to LEI.

205.   As a direct and proximate cause of Ray Girn's above misrepresentations Barney and the Trust have been damaged in an amount to be proven at trial.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

30

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

1   206.   Ray Girn's misrepresentations were a substantial factor in causing harm to Barney

2   and the Trust.

3   207.   Wherefore, Barney prays for judgment as stated hereinafter.

4   **PRAYER**

5   **WHEREFORE**, Plaintiffs pray for judgment as follows:

6   **ON THE FIRST CAUSE OF ACTION**

7   1.   For general, special and consequential damages according to proof, but in no

8   event less than $50 million.

9   **ON THE SECOND CAUSE OF ACTION**

10   1.   For general, special and consequential damages according to proof, but in no

11   event less than $50 million;

12   2.   For an order requiring Defendants to disgorge all salary and benefits during the

13   time that they competed with LEI while employed by LEI, according to proof;

14   and

15   3.   For punitive and exemplary damages in an amount sufficient to punish and make

16   an example of Defendants.

17   **ON THE THIRD CAUSE OF ACTION**

18   1.   For general, special and consequential damages according to proof, but in no

19   event less than $50 million;

20   2.   For an order requiring Defendants to disgorge all salary and benefits during the

21   time that they competed with LEI while employed by LEI, according to proof;

22   and

23   3.   For punitive and exemplary damages in an amount sufficient to punish and make

24   an example of Defendants.

25   **ON THE FOURTH CAUSE OF ACTION**

26   1.   For general, special and consequential damages according to proof, but in no

27   event less than $50 million;

28

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

31

**COMPLAINT**

2.   For an award in addition to LEI's actual damages disgorgement in the amount that Defendants have been unjustly enriched pursuant to California Civil Code Section 3426.3(a);

3.   For a temporary restraining order, preliminary injunction and permanent injunction enjoining Defendants from further use of LEI's Trade Secrets;

4.   Alternatively, for an order requiring Defendants to pay a royalty for their past and future use of LEI's Trade Secrets;

5.   For punitive and exemplary damages in an amount sufficient to punish and make an example of Defendants pursuant to California Civil Code Section 3426.3(c).

**ON THE FIFTH CAUSE OF ACTION**

1.   For general, special and consequential damages according to proof, but in no event less than $50 million;

2.   For an order requiring Defendants to disgorge all salary and benefits during the time that they competed with LEI while employed by LEI, according to proof;

3.   For a temporary restraining order, preliminary injunction and permanent injunction enjoining Defendants from further use of LEI's Trade Secrets; and

4.   For punitive and exemplary damages in an amount sufficient to punish and make an example of Defendants.

**ON THE SIXTH CAUSE OF ACTION**

1.   For general, special and consequential damages according to proof, but in no event less than $50 million;

2.   For an order requiring Defendants to disgorge all salary and benefits during the time that they competed with LEI while employed by LEI, according to proof; and

3.   For punitive and exemplary damages in an amount sufficient to punish and make an example of Defendants.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

32

**COMPLAINT**

1               **ON THE SEVENTH CAUSE OF ACTION**

2     1.     For general, special and consequential damages according to proof, but in no

3         event less than $50 million;

4     2.     For an order requiring Defendants to disgorge all salary and benefits during the

5         time that they competed with LEI while employed by LEI, according to proof;

6         and

7     3.     For punitive and exemplary damages in an amount sufficient to punish and make

8         an example of Defendants.

9               **ON THE EIGHTH CAUSE OF ACTION**

10     1.     For damages according to proof, but in no event less than $2 million.

11               **ON THE NINTH CAUSE OF ACTION**

12     1.     For a temporary restraining order, preliminary injunction and permanent

13         injunction enjoining Defendants from continuing to solicit LEI's employees for a

14         period of 24 months after the cessation of their employment with LEI and from

15         using LEI's Trade Secrets and confidential and proprietary information.

16               **ON THE TENTH CAUSE OF ACTION**

17     1.     For an order requiring Defendants to disgorge all salary and benefits during the

18         time that they competed with LEI while employed by LEI, according to proof.

19             **ON THE ELEVENTH CAUSE OF ACTION**

20     1.     For general, special and consequential damages according to proof, but in no

21         event less than $10 million.

22             **ON THE TWELFTH CAUSE OF ACTION**

23     1.     For general, special and consequential damages according to proof, but in no

24         event less than $16 million.

25            **ON THE THIRTEENTH CAUSE OF ACTION**

26     1.     For general, special and consequential damages according to proof, but in no

27         event less than $10 million.

28

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

33

**COMPLAINT**

**ON THE FOURTEENTH CAUSE OF ACTION**

1.  For general, special and consequential damages according to proof, but in no event less than $5.3 million; and

2.  For punitive and exemplary damages in an amount sufficient to punish and make an example of Ray Girn.

**ON THE FIFTEENTH CAUSE OF ACTION**

1.  For general, special and consequential damages according to proof, but in no event less than $5.3 million; and

2.  For punitive and exemplary damages in an amount sufficient to punish and make an example of Ray Girn.

**ON THE SIXTEENTH CAUSE OF ACTION**

1.  For general, special and consequential damages according to proof, but in no event less than $5.3 million; and

2.  For punitive and exemplary damages in an amount sufficient to punish and make an example of Ray Girn.

**ON ALL CAUSES OF ACTION**

1.  For prejudgment interest at the maximum legal rate;

2.  For costs of suit incurred herein, including attorney's fees as provided for by statute, case law and/or agreement of the parties; and

3.  For such other and further relief as this Court deems just and proper.

Respectfully submitted,

SHULMAN HODGES & BASTIAN LLP

Dated: March 6, 2017

By:    /s/ J. Ronald Ignatuk
J. Ronald Ignatuk
Attorneys for LePort Educational Institute, Inc.
and Carl Barney

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

**COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2     LEI and Barney hereby demand trial by jury.

3                                         SHULMAN HODGES & BASTIAN LLP

4

5     Dated: March 6, 2017              By:    /s/ J. Ronald Ignatuk

6                                         J. Ronald Ignatuk
                                          Attorneys for LePort Educational Institute, Inc.
7                                         and Carl Barney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\K-L\LePort Educational Institute\Pld\Complaint_Final.docx

35

**COMPLAINT**